

**IT IS ORDERED as set forth below:**

**Date: September 3, 2019**

_____

**Paul W. Bonapfel**
**U.S. Bankruptcy Court Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| JACK COOPER VENTURES, INC., *et al.*,[1] | ) | Case No. 19-62393 (PWB) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Jack Cooper Ventures, Inc. (0805); Jack Cooper Diversified, LLC (9414); Jack Cooper Enterprises, Inc. (3001); Jack Cooper Holdings Corp. (2446); Jack Cooper Transport Company, Inc. (3030); Auto Handling Corporation (4011); CTEMS, LLC (7725); Jack Cooper Logistics, LLC (3433); Auto & Boat Relocation Services, LLC (9095); Axis Logistic Services, Inc. (2904); Jack Cooper CT Services, Inc. (3523); Jack Cooper Rail and Shuttle, Inc. (7801); Jack Cooper Investments, Inc. (6894); North American Auto Transportation Corp. (8293); Jack Cooper Transport Canada Inc. (8666); Jack Cooper Canada GP 1 Inc. (7030); Jack Cooper Canada GP 2 Inc. (2373); Jack Cooper Canada 1 Limited Partnership (3439); and Jack Cooper Canada 2 Limited Partnership (7839). The location of the Debtors' corporate headquarters and service address is: 630 Kennesaw Due West Road NW, Kennesaw, Georgia 30152.

**ORDER (I) AUTHORIZING
THE DEBTORS TO ENTER INTO
AND PERFORM UNDER THE STALKING
HORSE ASSET PURCHASE AGREEMENT,
(II) APPROVING BIDDING PROCEDURES FOR THE
SALE OF THE DEBTORS' ASSETS, (III) APPROVING
THE EXPENSE REIMBURSEMENT, (IV) SCHEDULING HEARINGS AND
OBJECTION DEADLINES WITH RESPECT TO THE SALE, (V) SCHEDULING
BID DEADLINES AND AN AUCTION, (VI) APPROVING THE FORM AND MANNER
OF NOTICE THEREOF, (VII) APPROVING CONTRACT ASSUMPTION AND
ASSIGNMENT PROCEDURES, AND (VIII) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "Motion")[2] of the above captioned debtors and debtors in possession (the "Debtors") for the entry of an order (this "Order"): (a) authorizing the Debtors to enter into that certain asset purchase agreement attached hereto as **Exhibit 1** (the "Stalking Horse APA"); (b) approving the proposed bidding procedures attached as **Exhibit 2** to this Order (the "Bidding Procedures"); (c) approving the expense reimbursement contemplated under the Stalking Horse APA (the "Expense Reimbursement"); (d) scheduling an auction (the "Auction"); (e) approving the form and manner of notice thereof; (f) scheduling dates and deadlines in connection with the sale (the "Sale") of all or substantially all of the Debtors' assets (the "Assets"); (g) approving the form and manner of notice thereof; (h) approving procedures for assuming and assigning the Debtors' executory contracts and unexpired leases (the "Assumption and Assignment Procedures"); and (i) granting related relief; all as more fully set forth in the Motion; and upon the First Day Declaration and the Dunayer Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that it may enter

---

[2] Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Motion or the Bidding Procedures, as applicable.

a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing, if any, before this Court (the "Bidding Procedures Hearing"); and this court having determined that the legal and factual bases set forth in the Motion and at the Bidding Procedures Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this court; and after due deliberation and sufficient cause appearing therefor, THAT COURT FINDS THAT:

A.     The findings of fact and conclusions of law herein constitute the court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014.  To the extent any findings of facts are conclusions of law, they are adopted as such.  To the extent any conclusions of law are findings of fact, they are adopted as such.

B.     This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue in this court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     The statutory bases for the relief requested in the Motion are sections 105, 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006.

D.      Notice of the Motion, the Bidding Procedures Hearing, and the proposed entry of this Order was adequate and sufficient under the circumstances of these chapter 11 cases, and such notice complied with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, the Complex Case Procedures, and the Bankruptcy Local Rules for the Northern District of Georgia.  Notice of the Motion has been given to: (a) the Office of the United States Trustee for the Northern District of Georgia; (b) the Debtors' thirty (30) largest unsecured creditors; (c) counsel to the Prepetition Secured Parties; (d) counsel to the administrative agents for the Debtors' prepetition credit facilities; (e) counsel to the administrative agents for the Debtors' debtor-in-possession financing facilities; (g) all parties who have expressed a written interest in some or all of the Debtors' Assets; (h) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim or other interest in the Debtors' Assets; (i) the United States Securities and Exchange Commission; (j) the Internal Revenue Service; (k) the Georgia Department of Revenue; (l) the Attorney General for the State of Georgia; (m) the United States Attorney for the Northern District of Georgia; (n) the state attorneys general for states in which the Debtors conduct business; (o) the Pension Benefit Guaranty Corporation; and (p) any party that has requested notice pursuant to Bankruptcy Rule 2002.

E.      The Debtors have articulated good and sufficient reasons for this Court to: (a) authorize the Debtors to enter into the Stalking Horse APA; (b) approve the Bidding Procedures; (c) approve the Expense Reimbursement; (d) schedule the Bid Deadline, the Auction, the Sale Objection Deadline, and the Sale Hearing; (e) approve the form of the Sale Notice attached hereto as **Exhibit 3**; (f) approve the Assumption and Assignment Procedures and the form and manner of notice of the Cure Notice attached hereto as **Exhibit 4**; and (g) grant related relief.

F.       The Debtors have demonstrated and proven to the satisfaction of this Court that their entering into the Stalking Horse APA with the Stalking Horse Bidder and performance thereunder is in the best interests of the Debtors, their creditors, and their estates, and that performance under the Stalking Horse APA represents a prudent exercise of the Debtors' sound business judgment.    The Debtors have articulated good, sufficient, and sound business justifications and compelling circumstances for the entry into and performance under the Stalking Horse APA in that, among other things, the Stalking Horse Bid constitutes the highest or otherwise best restructuring proposal that the Debtors have received to date and the approval of the Stalking Horse APA is a necessary and constructive step toward the consummation of a sale of all or substantially all of the Debtors' Assets, and the Stalking Horse APA allows the Debtors to solicit the highest or otherwise best bid for their assets through the Bidding Procedures.

G.       The Stalking Horse APA was negotiated by the parties at arm's-length and in good faith by the Debtors and the Stalking Horse Bidder.  Furthermore, the Stalking Horse APA will serve as a minimum or floor bid on which the Debtors, their creditors, suppliers, vendors, and other bidders may rely.  The Stalking Horse Bidder is providing a material benefit to the Debtors and their creditors by increasing the likelihood that, given the circumstances, the best possible offer for the Debtors' assets will be received.  Accordingly, the Debtors' entry into the Stalking Horse APA is reasonable and appropriate, and represents the best method for maximizing value for the benefit of the Debtors' estates.

H.       The Bidding Procedures are reasonable and appropriate and represent the best available method for maximizing value for the benefit of the Debtors' estates. The Bidding Procedures were negotiated at arm's length, in good faith, and without collusion.  The Bidding

Procedures balance the Debtors' interests in emerging expeditiously from the chapter 11 cases while preserving the opportunity to attract value-maximizing proposals beneficial to the Debtors' estates, their creditors, and other parties in interest.

I.      The Expense Reimbursement, to the extent payable under the Stalking Horse APA, (i) shall be deemed an actual and necessary cost of preserving the Debtors' estates within the meaning of Bankruptcy Code section 503(b), (ii) is of substantial benefit to the Debtors' estates, (iii) is reasonable and appropriate, including in light of the size and nature of the transactions and the efforts that have been and will be expended by the Stalking Horse Bidder, (iv) has been negotiated by the parties and their respective advisors at arm's-length and in good faith and (v) is necessary to ensure that the Stalking Horse Bidder will continue to pursue the proposed Sale of the Assets. The Expense Reimbursement is a material inducement for, and a condition of, the Stalking Horse Bidder's entry into the Stalking Horse APA. The Stalking Horse Bidder is unwilling to commit to purchase the Assets under the terms of the Stalking Horse APA unless the Stalking Horse Bidder receives the Expense Reimbursement.

J.      The Sale Notice is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Auction.

K.      The Cure Notice is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Assumption and Assignment Procedures.

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted as provided herein.

2.      All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the court at the Bidding Procedures Hearing or by stipulation filed with the Court, are overruled.

3.      The Debtors' entry into and performance under the Stalking Horse APA is hereby approved, and the Stalking Horse APA is binding on the Debtors, including any chapter 7 or chapter 11 trustee or other fiduciary appointed for the Debtors' estates; *provided* that consummation of the Sale to the Stalking Horse Bidder or any other Successful Bidder shall remain subject to entry of a Court order approving the Sale to the Stalking Horse Bidder or any other Successful Bidder and, subject to the terms of the DIP Financing Orders, the Committee's rights to object to any provisions of the Stalking Horse APA (except for the Expense Reimbursement, which is approved herein), or any credit bid of the Stalking Horse Bidder are fully preserved

**I.      Important Dates and Deadlines.**

4.      The following dates and deadlines are hereby approved (and may be amended from time to time by the Debtors in consultation with the Consultation Parties[3] by filing an appropriate notice on the Court's docket and posting such notice on the Case Website).

5.      Unless extended by the Debtors, in consultation with the Consultation Parties, the deadline by which all bids for the Assets must be ***actually received*** by the parties specified in the Bidding Procedures is **October 1, 2019 at 5:00 p.m. (prevailing Eastern Time)**.

6.      The date and time of the Auction, if needed, is **October 4, 2019 at 10:00 a.m. (prevailing Eastern Time)**, which time may be extended by the Debtors, in consultation with the other Consultation Parties, upon written notice filed with the Court, to be held at the offices of

---

[3]    "Consultation Parties" means the Prepetition Secured Parties and the Committee (defined below).

Paul, Weiss, Rifkind, Wharton & Garrison LLP, located at 1285 Avenue of the Americas, New York, New York 10019. The Debtors shall send written notice of the date, time, and place of the Auction to Qualified Bidders no later than two (2) business days before such Auction, and shall post notice of the same no later than two (2) business days before such Auction on the Case Website.

7.      The deadline to object to approval of the Sale (the "Sale Objection Deadline") is set for **October 2, 2019 at 5:00 p.m. (prevailing Eastern Time);** *provided, however***,** to the extent an Auction is necessary the Sale Objection Deadline shall be **October 5, 2019 at 5:00 p.m. (prevailing Eastern Time)**. The deadline by which responses to any objections to approval of the Sale must be filed is **October 8, 2019 at 5:00 p.m. (prevailing Eastern Time)**.

8.      The hearing to consider approval of the Sale (the "Sale Hearing") will take place on **October 10, 2019 at 2:30 p.m. (prevailing Eastern Time)**.

9.      Notwithstanding the foregoing, the Court's approval of the foregoing schedule is without prejudice to all parties' rights to object to the approval of any sale, including to the Stalking Horse Bidder pursuant to the Stalking Horse APA, contemplated under this Order at the Sale Hearing on any grounds.

**II.      The Stalking Horse APA and Expense Reimbursement.**

10.      The Stalking Horse Bidder shall be deemed a Qualified Bidder, and the bid of the Stalking Horse Bidder contemplated by the Stalking Horse APA (the "Stalking Horse Bid") shall be deemed a Qualified Bid.

11.     Any obligations of the Debtors set forth in the Stalking Horse APA that are intended to be performed prior to the Sale Hearing and/or entry of the Sale Order are authorized as set forth herein.

12.     The Expense Reimbursement, to the extent payable under the Stalking Horse APA, is granted.  Upon entry of this Order, the Expense Reimbursement shall constitute an allowed superpriority administrative expense claim against each of the Debtors under sections 503 and 507(b)(2) of the Bankruptcy Code, senior in respect of lien priority and right to payment to all other administrative expense claims of the Debtors, but subject to the Carve-Out and the CCAA Priority Charges (each as defined in the DIP Financing Orders (as defined in the Stalking Horse APA)) and prior payment in full of the First Lien Term Loan Facility (as defined in the Stalking Horse APA).

13.     The Debtors are hereby authorized and directed to pay the Expense Reimbursement in accordance with the terms of the Stalking Horse APA without further order of this Court; *provided*, that the Stalking Horse Bidder shall deliver an invoice supporting the Expense Reimbursement to the Debtors and the Consultation Parties, and the Debtors and the Committee shall have two (2) business days following receipt of documentation supporting the Expense Reimbursement to object to the reasonableness of such supporting documentation; *provided further*, that to the extent the Debtors and/or the Committee, as applicable, and the Stalking Horse Bidder are unable to consensually resolve any such objection(s), such objection(s) shall be resolved by this Court.

14.     Except in the case of Fraud (as defined in the Stalking Horse APA), the Expense Reimbursement shall be the sole remedy of the Stalking Horse Bidder under the Stalking Horse

APA if the Stalking Horse APA is terminated under circumstances where the Expense Reimbursement is payable.

**III.     The Bidding Procedures.**

15.     The Bidding Procedures are hereby approved in their entirety, and the Bidding Procedures shall govern the submission, receipt, and analysis of all bids relating to the proposed sale of the Assets.  Any party desiring to bid for all or substantially all of the Assets shall comply with the Bidding Procedures and this Order.  The Debtors are authorized to take any and all actions necessary to implement the Bidding Procedures.

16.     Each bidder participating at the Auction shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale, as set forth in the Bidding Procedures.

17.     Any Qualified Bidder who has a valid and perfected lien on any Assets of the Debtors' estates (a "Secured Creditor") and the right and power to credit bid claims secured by such liens, shall have the right to credit bid all or a portion of such Secured Creditor's secured claims within the meaning of section 363(k) of the Bankruptcy Code; *provided* that a Secured Creditor shall have the right to credit bid its secured claim only with respect to the collateral by which such Secured Creditor is secured; *provided, further*, that the Stalking Horse Bidder shall have the right (including as part of any applicable Overbid) to credit bid all or a portion of its secured claims within the meaning of section 363(k) of the Bankruptcy Code, which amount shall be capped at $321,928,903, reflecting a reduction from the aggregate principal amount of $351,928,903 outstanding under the Junior Credit Agreements and DIP Credit Agreement (as defined in the Stalking Horse APA).  Notwithstanding the foregoing and except as otherwise set

forth in the RSA and the DIP Financing Orders, nothing shall affect any rights of parties in interest, if any, with respect to challenging whether any Qualified Bidder has a valid secured claim, the amount of any such secured claim, and such bidder's right to credit bid on any particular Asset(s). For the avoidance of doubt, the Stalking Horse Bidder shall be considered a Qualified Bidder with respect to its right to acquire all or any of the Assets by credit bid, and, subject to the DIP Financing Orders, the rights of the parties in interest, including the Committee, to challenge (in whole or in part) such right of the Stalking Horse Bidder are fully preserved.

18.     The Debtors may, in consultation with the Consultation Parties: (a) determine which Qualified Bid, other than the Stalking Horse Bid, is the highest or otherwise best offer for each Asset or Assets; (b) reject at any time before entry of an Order of the Court approving the Successful Bid, any bid other than the Stalking Horse Bid that, in the discretion of the Debtors, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Bidding Procedures, or (iii) contrary to the best interests of the Debtors' estates and their creditors; and (c) at or before the conclusion of the Auction, may impose such other terms and conditions upon Qualified Bidders as the Debtors determine, in consultation with the Consultation Parties, to be in the best interests of the Debtors' estates in these cases.

19.     The Debtors are deemed to have complied with all contractual rights of first refusals, or similar contractual purchasing rights, regarding the Assets.  The Bidding Procedures and the notice thereof provide all parties in interest with notice of, and the opportunity to participate in, any potential Sale and/or Auction.

20.     For the avoidance of doubt, notwithstanding ratification of any proposed modifications to any of the Debtors' current collective bargaining agreements prior to the Bid

Deadline, Potential Bidders may continue to submit, and the Debtors, together with the Consultation Parties, shall consider, Bids that provide for the assumption of, or such other proposed treatment that may be agreeable among the parties with respect to, any or all of the Employee Obligations.

**IV.    Notice Procedures.**

21.    The form of Sale Notice is approved.

22.    No later than three (3) business days after entry of the Bidding Procedures Order (the "Mailing Date"), the Debtors shall serve the Bidding Procedures Order and Bidding Procedures by first-class mail or courier service upon: (a) the Office of the United States Trustee for the Northern District of Georgia; (b) the counsel to the Official Committee of Unsecured Creditors appointed in these chapter 11 cases (the "Committee"); (c) counsel to the Prepetition Secured Parties; (d) counsel to the administrative agents for the Debtors' prepetition credit facilities; (e) counsel to the administrative agents for the Debtors' debtor-in-possession financing facilities; (f) all parties who have expressed a written interest in some or all of the Debtors' Assets; (g) counsel to the Teamsters National Auto Transports Industry Negotiating Committee; (h) counsel to the Central States, Southeast and Southwest Areas Pension Fund; (i) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim or other interest in the Debtors' assets; (j) the United States Securities and Exchange Commission; (k) the Internal Revenue Service; (l) the Georgia Department of Revenue; (m) the Attorney General for the State of Georgia; (n) the United States Attorney for the Northern District of Georgia; (o) the state attorneys general for states in which the Debtors conduct business;

12

(p) the Pension Benefit Guaranty Corporation; and (q) any party that has requested notice pursuant to Bankruptcy Rule 2002.

23. Within seven (7) business days of the Mailing Date, the Debtors will publish the Sale Notice, with any modifications necessary for ease of publication, once in the *USA Today (National Edition)* to provide notice to any other potential interested parties.

## V.    The Assumption and Assignment Procedures.

24. The Assumption and Assignment Procedures set forth herein regarding the assumption and assignment of the Assigned Contracts proposed to be assumed by the Debtors and assigned to the Successful Bidder are approved.

    (a)    **Cure Notice**. On the date that is twenty-one (21) days prior to the Sale Hearing, the Debtors shall file with the Court and serve via first class mail, electronic mail, or overnight delivery, the Cure Notice on all Contract Counterparties, and post the Cure Notice to the Case Website.

    (b)    **Content of Cure Notice**. The Cure Notice shall notify the applicable Contract Counterparties that the Assigned Contracts may be subject to assumption and assignment in connection with a proposed sale transaction, and contain the following information: (i) a list of the Assigned Contracts; (ii) the applicable Contract Counterparties; (iii) the Debtors' good faith estimates of the Cure Costs; and (iv) the deadline by which any Contract Counterparty to an Assigned Contract may file an objection to the proposed assumption, assignment, cure, and/or adequate assurance and the procedures relating thereto; *provided* that service of a Cure Notice does not constitute an admission that such Assigned Contract is an executory contract or unexpired lease or that such Assigned Contract will be assumed at any point by the Debtors or assumed and assigned pursuant to any Successful Bid.

    (c)    **Customized Cure Notice**. The Debtors shall serve on all Contract Counterparties, via first class mail or electronic mail, a customized version of the Cure Notice, without the Assigned Contracts Schedule, which will include: (a) the Prime Clerk Instructions; (b) information necessary and appropriate to provide notice of the relevant proposed assumption and assignment of Assigned Contracts and rights thereunder; (c) Cure Costs, if any; and (d) the Necessary Notice Information. The Debtors shall serve on

the Rule 2002 Notice List, via first class mail or electronic mail, a modified version of the Cure Notice that contains the Prime Clerk Instructions and Necessary Notice Information.  Service as set forth herein shall be deemed proper, due, timely, good, and sufficient notice and no other or further notice is necessary.

(d)     **Objections**.  Objections, if any, to a Cure Notice must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, the Complex Case Procedures, the Bankruptcy Local Rules for the Northern District of Georgia, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Costs, state the cure amount alleged to be owed to the objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with the Court prior to **October 2, 2019 at 5:00 p.m. (prevailing Eastern Time)**; *provided*, that to the extent there is an Auction, such objection may be filed as set forth above no later than **October 5, 2019 at 5:00 p.m. (prevailing Eastern Time)**; *provided, further,* that the Debtors, subject to consultation with the Consultation Parties, may modify the Cure Objection Deadline by filing a notice of such modification on the Court's docket.

(e)     **Dispute Resolution**.  Any objection to the proposed assumption and assignment of an Assigned Contract, or Cure Costs, that remain unresolved as of the Sale Hearing, shall be heard at the Sale Hearing (or at such later date as may be fixed by the Court).  Upon entry of an order by the Court resolving such Assigned Contract Objection, the assignment, if approved by the Court, shall be deemed effective as of the closing date of the sale transaction.  To the extent that any Assigned Contract Objection cannot be resolved by the parties, such Assigned Contract shall be assumed and assigned only upon satisfactory resolution of the Assigned Contract Objection, to be determined in the Stalking Horse Bidder's or other Successful Bidder's reasonable discretion.  To the extent an Assigned Contract Objection remains unresolved, the Assigned Contract may be conditionally assumed and assigned, subject to the consent of the Stalking Horse Bidder or other Successful Bidder, pending a resolution of the Assigned Contract Objection after notice and a hearing.  If an Assigned Contract Objection is not satisfactorily resolved, the Stalking Horse Bidder or other Successful Bidder may determine that such Assigned Contract should be rejected and not assigned, in which case the Stalking Horse Bidder or other Successful Bidder will not be responsible for any Cure Costs in respect of such contract.

(f)     **Supplemental Cure Notice**.  The Debtors reserve the right, with the consent of the Successful Bidder and subject to consultation with the Consultation Parties, at any time after the Assumption and Assignment Service Date, to: (i) supplement the Assigned Contract Schedule attached to the Cure Notice with previously omitted Assigned Contracts in accordance with the definitive agreement for a Sale; (ii) remove any Assigned Contracts from the list of executory contracts and unexpired leases ultimately selected as Assigned Contracts that the Successful Bidder proposes be assumed and assigned to it in connection with a Sale or add to such list; and/or (iii) modify the previously stated Cure Cost associated with any Assigned Contracts (a "Supplemental Assigned Contracts Schedule").  In the event that the Debtors exercise any of the rights reserved above, the Debtors will promptly provide the Consultation Parties with notice and an opportunity to object to any such actions, and thereafter will serve a Supplemental Cure Notice by electronic transmission, hand delivery, or overnight mail on the applicable Contract Counterparty, and its counsel, if known, to each impacted Assigned Contract at the last known address available to the Debtors.  Each Supplemental Cure Notice will include the same information with respect to listed Assigned Contracts as was included in the Cure Notice.  Any Assigned Contract Counterparty listed on a Supplemental Cure Notice may file a Supplemental Assigned Contract Objection only if such objection is to the proposed assumption and assignment of the applicable Assigned Contract or the proposed Cure Costs, if any.  All Supplemental Assigned Contract Objections must: (x) state with specificity the legal and factual basis thereof as well as what Cure Costs the objecting party believes are required, if any; (y) include appropriate documentation in support of the objection; and (z) be filed and served on the Objection Recipients no later than 5:00 p.m. (prevailing Eastern Time) on the date that is the later of (i) the Sale Objection Deadline and (ii) fourteen days from the date of service of such Supplemental Cure Notice, which date will be set forth in the Supplemental Cure Notice (the "Supplemental Assigned Contract Objection Deadline").

(g)     **Supplemental Hearing**.  If a Contract Counterparty files a Supplemental Assigned Contract Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute, the Debtors will seek a Supplemental Assigned Contract Hearing to determine the Cure Costs, if any, and approve the assumption of the relevant Assigned Contracts.  If there is no such objection, then the Debtors will obtain entry of an order, including by filing a certification of no objection, fixing the Cure Costs and approving the assumption of any Assigned Contract listed on a Supplemental Cure Notice.

25.     If a Contract Counterparty does not file and serve an Assigned Contract Objection or Supplemental Assigned Contract Objection in a manner that is consistent with the requirements set forth above, and absent a subsequent order of the Court establishing an alternative Cure Cost, (a) the Cure Costs, if any, set forth in the Cure Notice (or Supplemental Cure Notice) shall be controlling, notwithstanding anything to the contrary in any Assigned Contract or any other document, and (b) the Contract Counterparty will be deemed to have consented to the assumption and assignment of the Assigned Contract and the Cure Costs, if any, and will be forever barred from objecting to the assumption and assignment of such Assigned Contract and rights thereunder, including the Cure Costs, if any, and from asserting any other claims related to such Assigned Contract against the Debtors or the Successful Bidder, or the property of any of them.

26.     Any objections to the Successful Bidder's proposed form of adequate assurance of future performance must be filed no later than the later of the Sale Objection Deadline or Supplemental Assigned Contract Objection Deadline, as applicable, and such objections will be resolved at the Sale Hearing or Supplemental Assigned Contract Hearing, as applicable.  The Debtors may adjourn the resolution of any such objection to a later hearing.

27.     The inclusion of an Assigned Contract on the Assigned Contract Schedule, Supplemental Assigned Contract Schedule, and/or in a Supplemental Cure Notice will not: (a) obligate the Debtors to assume any Assigned Contract listed thereon or obligate the Successful Bidder to take assignment of such Assigned Contract; or (b) constitute any admission or agreement of the Debtors that such Assigned Contract is an executory contract or unexpired lease.  Only those Assigned Contracts that are included on a schedule of assumed and assigned contracts attached to the definitive sale agreement with the Successful Bidder (including amendments or modifications

to such schedules in accordance with such agreement) will be assumed and assigned to the Successful Bidder.

28.    Notwithstanding anything in this Order to the contrary, unless Cigna Health and Life Insurance Company ("Cigna") and the Debtors agree otherwise, assumption and assignment of the Cigna Employee Benefits Agreements (as identified in Cigna's Objection [Docket No. 156] to the Motion) shall not be considered or approved at any hearing unless, at least five (5) business days prior to such hearing, Cigna, through its counsel of record, is provided with (i) written notice of Debtors' irrevocable decision as to whether or not it proposes to assume and assign the Employee Benefits Agreements as part of the Sale; (ii) the identity of the proposed assignee; and (iii) adequate assurance information for the proposed assignee, including a good faith estimate as to the number of employees of the Debtors who will become employees of the assignee.

## VI.    Miscellaneous.

29.    The failure to include or reference a particular provision of the Bidding Procedures specifically in this Order shall not diminish or impair the effectiveness or enforceability of such provision.

30.    In the event of any inconsistency between this Order and the Motion and/or the Bidding Procedures, this Order shall govern in all respects.

31.    The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

32.    Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a), the Bankruptcy Local Rules for the Northern District of Georgia and the Complex Case Procedures are satisfied by such notice.

33.    The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

34.    This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

END OF ORDER

Prepared and presented by:

*/s/* Sarah R. Borders                        
Sarah R. Borders
Georgia Bar No. 610649
Leia Clement Shermohammed
Georgia Bar No. 972711
Britney Baker
Georgia Bar No. 625752
**KING & SPALDING LLP**
1180 Peachtree Street NE
Atlanta, Georgia 30309
Telephone: (404) 572-4600
Email: sborders@kslaw.com
Email: lshermohammed@kslaw.com
Email: bbaker@kslaw.com

-and-

Kelley A. Cornish (admitted *pro hac vice*)
New York Bar No. 1930767
Brian S. Hermann (admitted *pro hac vice*)
New York Bar No. 2810232
**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Email: kcornish@paulweiss.com
Email: bhermann@paulweiss.com


*Counsel for the Debtors in Possession*

## **Exhibit 1**

**Stalking Horse APA**

STRICTLY CONFIDENTIAL                                    EXECUTION VERSION

ASSET PURCHASE AGREEMENT

DATED AS OF AUGUST 22, 2019

BY AND AMONG

JC BUYER COMPANY, INC.,

AS BUYER

AND

JACK COOPER INVESTMENTS, INC.

AND

CERTAIN SUBSIDIARIES OF JACK COOPER INVESTMENTS, INC.,

AS SELLERS

TABLE OF CONTENTS

ARTICLE 1 DEFINITIONS ................................................................................................ 2

    1.1    DEFINITIONS ................................................................................ 2
    1.2    OTHER DEFINITIONS AND INTERPRETIVE MATTERS. ............................. 24

ARTICLE 2 PURCHASE AND SALE ................................................................................. 25

    2.1    PURCHASE AND SALE ................................................................... 25
    2.2    EXCLUDED ASSETS ...................................................................... 28
    2.3    ASSUMED LIABILITIES .................................................................. 30
    2.4    EXCLUDED LIABILITIES ................................................................ 31
    2.5    ASSIGNMENT AND ASSUMPTION OF CONTRACTS ............................. 33
    2.6    FURTHER ASSURANCES ................................................................ 36
    2.7    IDENTIFICATION OF EXCLUDED ASSETS ......................................... 37

ARTICLE 3 PURCHASE PRICE ....................................................................................... 38

    3.1    CONSIDERATION ......................................................................... 38
    3.2    ALLOCATION OF PURCHASE PRICE ................................................ 38
    3.3    CLOSING DATE STATEMENT .......................................................... 40
    3.4    LIMITATIONS ON BUYER LIABILITY ............................................... 40
    3.5    WITHHOLDING ........................................................................... 40

ARTICLE 4 CLOSING AND DELIVERIES ....................................................................... 40

    4.1    CLOSING DATE ........................................................................... 40
    4.2    BUYER'S DELIVERIES .................................................................. 41
    4.3    SELLERS' DELIVERIES ................................................................. 41
    4.4    BUYER DESIGNEES ...................................................................... 42

ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF SELLERS ............................ 43

    5.1    ORGANIZATION AND GOOD STANDING .......................................... 43
    5.2    COMPETITION ACT ..................................................................... 43
    5.3    AUTHORITY; VALIDITY; CONSENTS ............................................. 43
    5.4    NO CONFLICT ............................................................................ 44
    5.5    REAL PROPERTY ........................................................................ 44
    5.6    ENVIRONMENTAL MATTERS ......................................................... 47
    5.7    TITLE TO ACQUIRED ASSETS; SUFFICIENCY OF ACQUIRED ASSETS. ...... 48
    5.8    TAXES ....................................................................................... 48
    5.9    LEGAL PROCEEDINGS .................................................................. 50
    5.10    COMPLIANCE WITH LEGAL REQUIREMENTS; PERMITS .................... 51
    5.11    LABOR MATTERS ....................................................................... 52
    5.12    EMPLOYEE BENEFITS .................................................................. 53
    5.13    SELLERS' INTELLECTUAL PROPERTY ............................................ 56
    5.14    CONTRACTS ............................................................................... 57

5.15    INSURANCE ................................................................................ 58
5.16    BROKERS OR FINDERS ............................................................... 58
5.17    AFFILIATE INTERESTS ............................................................... 58
5.18    BANK ACCOUNTS ...................................................................... 59
5.19    UNDUE INFLUENCE .................................................................. 59
5.20    FINANCIAL STATEMENTS .......................................................... 59
5.21    INVENTORY .............................................................................. 60
5.22    ABSENCE OF CERTAIN CHANGES ............................................ 60
5.23    WARRANTIES EXCLUSIVE ......................................................... 61

**ARTICLE 6 REPRESENTATIONS AND WARRANTIES OF BUYER** ................................. **62**

6.1    ORGANIZATION AND GOOD STANDING ..................................... 62
6.2    AUTHORITY; VALIDITY; CONSENTS .......................................... 62
6.3    NO CONFLICT ........................................................................... 63
6.4    BROKERS OR FINDERS ............................................................... 63
6.5    LEGAL PROCEEDINGS ................................................................ 63
6.6    FINANCING ............................................................................... 63
6.7    QUALIFICATION ....................................................................... 64
6.8    NO OTHER REPRESENTATIONS OR WARRANTIES; CONDITION OF THE BUSINESS;
         BUYER'S RELIANCE. .................................................................. 64
6.9    INFORMATION .......................................................................... 64

**ARTICLE 7 ACTIONS PRIOR TO THE CLOSING DATE** ............................................. **65**

7.1    ACCESS AND REPORTS; CONFIDENTIALITY ............................... 65
7.2    OPERATIONS PRIOR TO THE CLOSING DATE .............................. 66
7.3    REGULATORY MATTERS; COOPERATION .................................... 68
7.4    TAX COOPERATION .................................................................. 70
7.5    BANKRUPTCY COURT MATTERS; MILESTONES ........................... 70
7.6    NOTICE OF DEVELOPMENTS ...................................................... 72
7.7    TRANSITION OF BUSINESS. ......................................................... 72
7.8    SALE FREE AND CLEAR ............................................................. 72

**ARTICLE 8 ADDITIONAL AGREEMENTS** .............................................................. **72**

8.1    TAXES ...................................................................................... 72
8.2    BULK SALES .............................................................................. 74
8.3    PAYMENTS RECEIVED ............................................................... 75
8.4    ASSUMED CONTRACTS: ADEQUATE ASSURANCE AND PERFORMANCE ................. 75
8.5    EMPLOYEE MATTERS ................................................................. 75
8.6    POST-CLOSING BOOKS AND RECORDS; PROPERTIES; AND PERSONNEL ............. 79
8.7    CASUALTY LOSS ....................................................................... 79
8.8    CHANGE OF NAME .................................................................... 79
8.9    NO SUCCESSOR LIABILITY ......................................................... 80
8.10   LIENS ....................................................................................... 80
8.11   ASSUMED WORKERS' COMPENSATION PROGRAMS ...................... 80

8.12    ADJUSTMENTS TO WIND-DOWN AMOUNT ............................................. 81
8.13    REGISTRATIONS, OPERATING AUTHORITIES AND VEHICLE RE-IDENTIFICATION.... 81

**ARTICLE 9 CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE ...................... 81**

9.1    ACCURACY OF REPRESENTATIONS ...................................................... 81
9.2    SELLERS' PERFORMANCE ................................................................... 82
9.3    NO ORDER ...................................................................................... 82
9.4    GOVERNMENTAL AUTHORIZATIONS .................................................. 82
9.5    SELLERS' DELIVERIES ...................................................................... 82
9.6    SALE ORDER ................................................................................... 82
9.7    ASSUMED CONTRACTS ..................................................................... 82
9.8    MATERIAL ADVERSE EFFECT ............................................................ 83
9.9    COLLECTIVE BARGAINING AGREEMENTS ........................................... 83
9.10   EXIT FACILITIES .............................................................................. 83
9.11   WITHDRAWAL FROM MULTIEMPLOYER PENSION PLANS ...................... 83
9.12   DIP FINANCING ORDERS; DIP TERM LOAN CREDIT AGREEMENT; RESTRUCTURING
       SUPPORT AGREEMENT ...................................................................... 84

**ARTICLE 10 CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLERS TO CLOSE ........... 84**

10.1   ACCURACY OF REPRESENTATIONS ...................................................... 84
10.2   BUYER'S PERFORMANCE ................................................................... 84
10.3   NO ORDER ...................................................................................... 84
10.4   GOVERNMENTAL AUTHORIZATIONS .................................................. 84
10.5   BUYER'S DELIVERIES ....................................................................... 85
10.6   SALE ORDER ................................................................................... 85
10.7   EXIT FACILITIES .............................................................................. 85
10.8   BUYER LIQUIDITY ........................................................................... 85
10.9   RESTRUCTURING SUPPORT AGREEMENT ............................................. 85

**ARTICLE 11 TERMINATION ......................................................................................... 85**

11.1   TERMINATION EVENTS ..................................................................... 85
11.2   EFFECT OF TERMINATION ................................................................. 88
11.3   EXPENSE REIMBURSEMENT ............................................................... 88

**ARTICLE 12 GENERAL PROVISIONS ............................................................................ 89**

12.1   SURVIVAL ...................................................................................... 89
12.2   CONFIDENTIALITY ........................................................................... 89
12.3   PUBLIC ANNOUNCEMENTS ............................................................... 90
12.4   NOTICES ......................................................................................... 91
12.5   WAIVER ......................................................................................... 92
12.6   ENTIRE AGREEMENT; AMENDMENT ................................................... 92
12.7   ASSIGNMENT .................................................................................. 93
12.8   SEVERABILITY ................................................................................ 93
12.9   EXPENSES ....................................................................................... 93

12.10   Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver 93
12.11   Counterparts ........................................................................................... 94
12.12   Parties in Interest; Third Party Beneficiaries; No Amendment............... 94
12.13   Remedies ................................................................................................. 94
12.14   Specific Performance .............................................................................. 95
12.15   Sellers' Representative; Reliance............................................................. 95
12.16   No Liability; Releases ............................................................................. 96

**EXHIBITS**

Exhibit A          Bidding Procedures Order
Exhibit B          CBA Term Sheet
Exhibit C          CSPF Term Sheet
Exhibit D          Restructuring Support Agreement
Exhibit E          Form of Waiver
Exhibit F          HST Undertaking

### ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of August 22, 2019 (the "Execution Date"), is made and entered into by and among JC Buyer Company, Inc., a Delaware corporation ("Buyer"), Jack Cooper Investments, Inc., a Delaware corporation (the "Company"), and the Additional Sellers (together with the Company, "Sellers" and each entity individually a "Seller").  Capitalized terms used herein and not otherwise defined herein have the meanings set forth in Article 1.

### RECITALS

WHEREAS, Sellers are engaged in the Business;

WHEREAS, each Seller (i) filed voluntary petitions on August 6, 2019 (the "Chapter 11 Case") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Georgia (the "U.S. Bankruptcy Court") and/or (ii) initiated recognition proceedings on August 9, 2019 (the "CCAA Proceedings" and, together with the Chapter 11 Case, the "Bankruptcy Cases") pursuant to Part IV of the Companies' Creditors Arrangement Act (the "CCAA") before the Ontario Superior Court of Justice (Commercial List) (the "CCAA Court", and, together with the U.S. Bankruptcy Court, the "Bankruptcy Courts");

WHEREAS, subject to the terms and conditions set forth in this Agreement and the entry of the Sale Order, (i) Sellers desire to sell to Buyer all of the Acquired Assets and to assign to Buyer all of the Assumed Liabilities, Buyer desires to purchase from Sellers all of the Acquired Assets and assume all of the Assumed Liabilities, (ii) Buyer is Agent or has been designated as Sub-Agent (as defined in the Restructuring Term Sheet) with authority to credit bid up to the full amount of the outstanding obligations pursuant to the 1.5 Lien Credit Agreement, the Second Lien Term Loan Credit Agreement and the DIP Term Loan Credit Agreement, (iii) Buyer desires to credit bid for the Acquired Assets, and (iv) the Parties intend to effectuate the transactions contemplated by this Agreement, upon the terms and conditions hereinafter set forth;

WHEREAS, the Acquired Assets and Assumed Liabilities shall be purchased and assumed by Buyer pursuant to the Sale Order, free and clear of all Encumbrances (other than Permitted Encumbrances), pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure and Part IV of the CCAA;

WHEREAS, Sellers' ability to consummate the transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Courts; and

WHEREAS, the board of directors (or similar governing body) of each Seller has determined that it is advisable and in the best interests of such Seller and its constituencies to enter into this Agreement and to consummate the transactions provided for herein, subject to entry of the Sale Order, and each has approved the same.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the foregoing and of the representations, warranties,

covenants, agreements and conditions herein contained, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

## ARTICLE 1

### DEFINITIONS

1.1     Definitions.

For purposes of this Agreement, the following terms have the meanings specified or referenced below.

"1.5 Lien Credit Agreement" means that certain Credit Agreement, dated as of June 28, 2018, by and between Jack Cooper Ventures, Inc., as borrower, Wilmington Trust, National Association, as administrative and collateral agent, in the original principal amount of $41,000,000, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

"Accounting Referee" has the meaning set forth in Section 3.2(d).

"Accounts Receivable" means, with respect to each Seller, all accounts receivable, notes receivable, purchase orders, negotiable instruments, completed work or services that has not been billed, chattel paper, notes and other rights to payment, including those consisting of all accounts receivable in respect of services rendered or products sold to customers by such Seller, any other miscellaneous accounts receivable of such Seller, and any claim, remedy or other right of such Seller related to any of the foregoing, together with all unpaid financing charges accrued thereon and any payments with respect thereto.

"Accrued Payroll" means all wages that have accrued in accordance with the DIP Budget and are unpaid since the end of the last payroll period immediately prior to the Closing Date.

"Acquired Actions" has the meaning set forth in Section 2.1(m).

"Acquired Assets" has the meaning set forth in Section 2.1.

"Action" means any action, suit, petition, plea, charge, claim, demand, hearing, inquiry, arbitration, complaint, grievance, summons, litigation, mediation, proceeding (including any civil, criminal, regulatory, administrative, investigative or appellate proceeding), prosecution, contest, inquest, audit, examination, investigation or similar matter by or before (or that could come before) any Governmental Authority.

"Additional Sellers" means each of Auto & Boat Relocation Services LLC; Auto Handling Corporation; Axis Logistic Services, Inc.; CTEMS, LLC; Jack Cooper Canada 1 Limited Partnership; Jack Cooper Canada 2 Limited Partnership; Jack Cooper Canada GP 1 Inc.; Jack Cooper Canada GP 2 Inc.; Jack Cooper CT Services, Inc.; Jack Cooper Diversified, LLC; Jack Cooper Enterprises, Inc.; Jack Cooper Holdings Corp.; Jack Cooper Logistics, LLC; Jack

2

Cooper Rail and Shuttle, Inc.; Jack Cooper Transport Canada Inc.; Jack Cooper Transport Company, Inc.; Jack Cooper Ventures, Inc.; and North American Auto Transportation Corp.

"<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, any Contract or otherwise.

"<u>Affiliated Group</u>" means a group of Persons that elects, is required to, or otherwise files a Tax Return or pays a Tax as an affiliated group, consolidated group, combined group, unitary group, or other group recognized by applicable Laws relating to Taxes.

"<u>Agreement</u>" has the meaning set forth in the introductory paragraph.

"<u>Allocation Statement</u>" has the meaning set forth in <u>Section 3.2(b)</u>.

"<u>Alternative Transaction</u>" means the sale, transfer or other disposition, directly or indirectly, including through an asset sale, equity sale, merger, amalgamation or other similar transaction, including a plan of reorganization approved by the U.S. Bankruptcy Court, or resulting from the Auction, or otherwise in connection with the liquidation or winding up of any of Sellers, of not less than a majority of Sellers' assets or equity, in a transaction or series of transactions with one or more Person, other than Buyer.

"<u>Anti-Corruption Laws</u>" shall mean applicable laws enacted to prohibit bribery and corruption, including the U.S. Foreign Corrupt Practices Act of 1977 (as amended), the UK Bribery Act 2010, the Corruption of Foreign Public Officials Act (Canada) and applicable laws enacted to implement the OECD Convention on Combating Bribery of Foreign Officials in International Business Transactions.

"<u>Anti-Corruption Prohibited Activity</u>" shall mean (a) using funds in violation of Anti-Corruption Laws for unlawful contributions, gifts, or entertainment, or other unlawful expenses relating to political activity, or (b) making or taking an act in furtherance of an offer, promise, or authorization of any bribe, rebate, payoff, influence payment, kickback or other similar payment, whether directly or indirectly to any Governmental Authority or to any private commercial entity for the purpose of either gaining an improper business advantage or encouraging the recipient to violate the policies of his or her employer or to breach an obligation of good faith or loyalty in violation of Anti-Corruption Laws.

"<u>Anti-Money Laundering Laws</u>" shall mean applicable laws relating to money laundering and terrorism financing, including the USA PATRIOT Act of 2001, the U.S. Money Laundering Control Act of 1986, as amended; the applicable financial recordkeeping and reporting requirements of the U.S. Currency and Foreign Transaction Reporting Act of 1970, as amended; the EU Anti-Money Laundering Directives and any laws, decrees, administrative orders, circulars, or instructions implementing or interpreting the same; and other similar applicable laws and regulations.

"Antitrust Law" means, collectively, the HSR Act, Title 15 of the United States Code §§ 1-7 (the Sherman Act), Title 15 of the United States Code §§ 12-27 and Title 29 of the United States Code §§ 52-53 (the Clayton Act), the Federal Trade Commission Act (15 U.S.C.§ 41 et seq.), and the rules and regulations promulgated thereunder, and any other Legal Requirements that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition.

"Assumed Contracts" has the meaning set forth in Section 2.5(a)(i).

"Assumed Employee Liabilities" has the meaning set forth in Section 2.3(d).

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Assumed Workers' Compensation Program" means any workers' compensation program or insurance set forth on Schedule 1.1(a) to the extent transferable under applicable law.

"Auction" has the meaning set forth in the Bidding Procedures Order.

"Audited Financial Statements" has the meaning set forth in Section 5.20.

"Available Contracts" has the meaning set forth in Section 2.5(a)(i).

"Avoidance Action" means any claim, right or cause of action of any Seller arising under chapter 5 of the Bankruptcy Code and any analogous state or federal statutes and common law.

"Bankruptcy Cases" has the meaning set forth in the recitals.

"Bankruptcy Code" means Title 11 of the United States Code, Sections 101 *et seq.*

"Bankruptcy Courts" has the meaning set forth in the recitals.

"Benefit Plan" means any (i) "employee benefit plan" within the meaning of Section 3(3) of ERISA or (ii) other employee benefit plans, agreements, programs, policies, or arrangements, whether or not subject to ERISA (including any funding mechanism therefor now in effect or required in the future as a result of the transactions contemplated by this Agreement or otherwise), including any plan, program, arrangement or agreement that is a pension, profit-sharing, savings, retirement, employment, consulting, severance pay, termination, executive compensation, incentive compensation, deferred compensation, bonus, stock purchase, stock option, phantom stock or other equity-based compensation, change of control, retention, salary continuation, vacation, sick leave, disability, death benefit, group insurance, hospitalization, medical, dental, life (including all individual life insurance policies as to which any Seller(s) is the owner, the beneficiary, or both), Code Section 125 "cafeteria" or "flexible" benefit, employee loan, educational assistance or fringe benefit plan, program, arrangement or agreement, whether written or oral, in each case, that (x) is sponsored, maintained or contributed to by any of Sellers, or for which any of Sellers has any obligation to sponsor, maintain or

contribute to, or for which any of Sellers has any direct or indirect liability, whether contingent or otherwise and under which any current or former officer, director, employee, consultant (or their respective beneficiaries) of any of Sellers has any present or future right to benefits or (y) otherwise with respect to which any of the Sellers has or could reasonably expect to have any liability or obligation, including on account of being deemed to be an ERISA Affiliate; provided that the term "Benefit Plan" shall not include any (A) statutory benefit plan to which any of the Sellers is required to participate in or comply with that is sponsored and administered by a Governmental Authority (such as Social Security); (B) Multiemployer Plan; or (C) Canadian Multi-Employer Plan.

"Bid Deadline" has the meaning set forth in Section 7.5(f).

"Bidding Procedures" means bid procedures in substantially the form attached as Exhibit 2 to the Bidding Procedures Order, with such amendments, modifications or supplements as approved by Buyer and Sellers. The Bidding Procedures will comport with the terms set forth in the Restructuring Support Agreement and Restructuring Term Sheet.

"Bidding Procedures Order" means the form of bidding procedures order attached hereto as **Exhibit A**, with such amendments, modifications or supplements as approved by Buyer and Sellers and entered by the Bankruptcy Court. The Bidding Procedures Order will comport with the terms set forth in the Restructuring Support Agreement and Restructuring Term Sheet.

"Bidding Procedures Recognition Order" means an order in form and substance reasonably satisfactory to Solus to be entered by the CCAA Court recognizing and giving effect to the Bidding Procedures Order.

"Bill of Sale" means a bill of sale in customary form reasonably acceptable to the Parties.

"Business" means the business and operations of Sellers (wherever such business and operations are situated or conducted) as currently conducted or currently proposed to be conducted.

"Business Day" means any day of the year on which national banking institutions in New York are open to the public for conducting business and are not required or authorized to close.

"Buyer" has the meaning set forth in the introductory paragraph and shall also include any Buyer Designee.

"Buyer Benefit Plans" has the meaning set forth in Section 8.5(b).

"Buyer Confidential Information" has the meaning set forth in Section 7.1(c).

"Buyer Designee" has the meaning set forth in Section 4.4.

"Buyer Employees" has the meaning set forth in Section 8.5(a).

"Buyer Group" means (1) any of Buyer and its directors, officers, control persons (as defined in Section 15 of the Securities Act or Section 20 of the Exchange Act), members, employees, agents, attorneys, financial advisors, consultants, legal representatives, shareholders, partners, estates, successors and assigns, (2) the lenders and agents under each of the First Lien Term Loan Facility, the Prepetition ABL Credit Agreement, the Junior Credit Agreements, the DIP Facilities and the Exit Facilities, and (3) any of the respective agents, attorneys, financial advisors, legal advisors, affiliates, directors, managers, officers, control persons, shareholders, members or employees of the foregoing (1) through (2), in each case, in such capacity.

"Buyer Released Claims" has the meaning set forth in Section 12.16(c).

"Canadian Borrowers" means, collectively, Jack Cooper Canada 1 Limited Partnership, Jack Cooper Canada 2 Limited Partnership, Jack Cooper Canada GP 1 Inc., Jack Cooper Canada GP 2 Inc. and Jack Cooper Transport Canada, Inc.

"Canadian CBAs" means all Collective Bargaining Agreements in respect of Employees and Owner Operators working in Canada.

"Canadian Multi-Employer Plan" means each benefit plan that any of the Sellers is required to contribute to or participate in pursuant to a Canadian CBA and is not maintained or administered by any of Sellers or their Affiliates.

"Canadian Sale Order" has the meaning set forth in the definition of "Sale Order" in this Section 1.1.

"Canadian Sub-Facility" means the first priority senior secured debtor-in-possession credit facility that is a sub-facility of the U.S. Revolver Facility, providing for, among other things, commitments available for borrowing by the Canadian Borrowers of up to $5,000,000 (of which up to $500,000 shall be available for the issuance of letters of credit).

"Canadian Tax Act" means the *Income Tax Act* (Canada).

"Cash Consideration" has the meaning set forth in Section 3.1(a).

"CBA Term Sheet" means the CBA Term Sheet attached hereto as **Exhibit B**.

"CCAA" has the meaning set forth in the recitals.

"CCAA Court" has the meaning set forth in the recitals.

"CCAA Proceedings" has the meaning set forth in the recitals.

"Central States Plan" has the meaning set forth in Section 9.11.

"Cerberus" means Cerberus Business Finance Agency, LLC.

"Chapter 11 Case" has the meaning set forth in the recitals.

"Claim" means a "claim" as defined in Section 101(5) of the Bankruptcy Code or Section 2(1) of the CCAA.

"Closing" has the meaning set forth in Section 4.1.

"Closing Date" means the date and time as of which the Closing occurs as set forth in Section 4.1.

"Closing Date Statement" has the meaning set forth in Section 3.3.

"Closing Required Permits" means all Governmental Authorizations (including Permits) set forth on Schedule 1.1(b).

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985.

"Code" means the Internal Revenue Code of 1986.

"Collective Bargaining Agreement" has the meaning set forth in Section 5.11(a).

"Company" has the meaning set forth in the introductory paragraph.

"Competition Act" means the *Competition Act* R.S.C. 1895 C. C.34 (Canada), as amended, and the regulations thereunder.

"Computer Systems" means software, computer firmware, computer hardware, electronic data processing, telecommunications networks, network equipment, interfaces, platforms, peripherals, computer systems, and information contained therein or transmitted thereby, in each case, owned, licensed, or used by any Seller.

"Confidential Information" has the meaning set forth in Section 12.2.

"Contract" means any legally binding agreement, contract, obligation, indenture, note, bond, loan, instrument, promise, undertaking, sublicense, lease (including Leases and Lessor Leases), sublease, purchase order, arrangement, license, commitment, or other binding arrangement or understanding (in each case whether written or oral), and any amendments, modifications or supplements thereto.

"Copyrights" means all United States and foreign copyright rights in any original works of authorship, whether registered or unregistered, including all copyright registrations and applications.

"Credit Bid and Release" has the meaning set forth in Section 3.1(c).

"CSPF Term Sheet" means the Non-Binding Term Sheet Relating to the Treatment of the Central States, Southeast and Southwest Areas Pension Plan attached hereto as **Exhibit C**.

"CTA" means the Canada Transportation Act, R.S.C. 1996, C. 10, as amended.

7

"Cure Costs" means all monetary liabilities, including pre-petition monetary liabilities, of Sellers that must be paid or otherwise satisfied to cure all of Sellers' monetary defaults under the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code or Section 11.3 of the CCAA at the time of the assumption thereof and assignment to Buyer as provided hereunder.

"Cure Notice" means, with respect to each Available Contract, the notice submitted by Sellers to the counterparty or counterparties thereto setting forth, among other things, the Cure Cost amount with respect thereto as calculated by Sellers.

"Cure Notice Date" has the meaning set forth in Section 7.5(i).

"Dataroom" or "Data Room" means that certain "Project Phoenix" Data Room of the Company.

"Data Security Requirements" means, collectively, all of the following to the extent relating to confidential or sensitive information, payment card data, personally identifiable information, or other protected information relating to individuals or otherwise relating to privacy, security, or security breach notification requirements and applicable to any Seller: (i) each Seller's own rules, policies, and procedures (whether physical or technical in nature, or otherwise), (ii) all applicable laws and all industry standards applicable to the Business (including the Payment Card Industry Data Security Standard (PCI DSS)), and (iii) agreements any Seller has entered into or by which it is bound.

"Deeds" means special (or limited) warranty deeds, or jurisdictional equivalents, as the case may be, in recordable form for the appropriate jurisdiction, reasonably acceptable to Buyer, transferring title to the Real Property other than Leased Real Property and Improvements thereon (subject only to Permitted Encumbrances).

"Determination Date" has the meaning set forth in Section 2.5(a)(i).

"DIP Budget" shall have the meaning ascribed to the term "Approved Budget" in the DIP Financing Orders.

"DIP Facilities" means, collectively, the U.S. Revolver Facility, the Canadian Sub-Facility and the DIP Term Loan Facility.

"DIP Financing Orders" means, collectively, (i) the Interim Order of the U.S. Bankruptcy Court, in form and substance reasonably satisfactory to Wells Fargo Capital Finance, LLC and Solus, authorizing and approving the DIP Facilities (the "Interim DIP Order"), (ii) the order of the CCAA Court recognizing and giving effect to the Interim DIP Order, as applicable, in form and substance reasonably satisfactory to Wells Fargo Capital Finance, LLC and Solus, authorizing and approving the Canadian Sub-Facility (the "Interim Recognition Order"), (iii) the Final Order of the U.S. Bankruptcy Court, in form and substance reasonably satisfactory to Wells Fargo Capital Finance, LLC and Solus, authorizing and approving the DIP Facilities (the "Final DIP Order"); and (iv) the order of the CCAA Court recognizing and giving effect to the Final DIP Order, as applicable, in form and substance reasonably satisfactory to Wells Fargo

8

Capital Finance, LLC and Solus, authorizing and approving the Canadian Sub-Facility (the "Final Recognition Order").

"DIP Motion" means a motion filed by Sellers with the Bankruptcy Courts to approve the DIP Facilities.

"DIP Term Loan Credit Agreement" means that certain Debtor-In-Possession Credit Agreement dated August 9, 2019, by and among Jack Cooper Ventures, Inc., as borrower, the lenders thereto, and Wilmington Trust, National Association, as agent, as restated, amended and restated, supplemented, waived and/or otherwise modified prior to the date hereof.

"DIP Term Loan Facility" means the junior priority secured debtor-in-possession credit facility to be entered into among Jack Cooper Ventures, Inc., as borrower, Solus and the other lenders thereto, as lenders, and Solus, as administrative agent, consisting of, among other things, up to $15,000,000 of term loans made to Jack Cooper Ventures, Inc.

"Disclosure Schedules" means the disclosure schedules attached hereto, dated as of the date hereof, delivered or made available by Sellers to Buyer in connection with the execution of this Agreement, as the same may be supplemented and amended pursuant to Sections 7.6 and 12.6.

"Documents" means all of the documents that are used or useful in, or held for use in, the Business.

"DOL" has the meaning set forth in Section 5.12(b).

"Employees" means all of the employees of Sellers on the Execution Date, as well as any additional persons who become employees of Sellers in the Ordinary Course of Business during the period from the Execution Date through and including the Closing Date.

"Encumbrance" means any "interest" as that term is used in Section 363(f) of the Bankruptcy Code, mortgage, hypothec, deed of trust, pledge, security interest, encumbrance, easement, condition, reservation, lien (statutory or otherwise), mechanics lien, Claim, covenant, encroachment, lease, right of use or possession, or other similar third party interest, or other survey defect, option, debenture, defect of title, restriction on transfer or use, charge, hypothecation, deemed trust, action, easement, right-of-way or covenant on real property, or license (other than any non-exclusive licenses of Intellectual Property granted in the Ordinary Course of Business), whether imposed by Contract, Legal Requirement, equity or otherwise.

"Environment" means the environment or natural environment, including air, water, surface water, groundwater, soil, surface and subsurface strata or other environmental, media, natural resources, flora, fauna, wetlands and as additionally defined in any Environmental Law.

"Environmental Laws" means any and all Legal Requirements concerning or relating to the protection of (a) public health or safety, including as may be affected by the Release of, or exposure to, Hazardous Substances, and OSHA or (b) pollution or protection of the Environment, including those relating to the presence, use, manufacturing, refining,

9

production, generation, handling, transportation, treatment, recycling, storage, disposal, distribution, importing, labeling, testing, processing, discharge, Release, control, cleanup, or other action or failure to act involving, or exposure of any Person to, pollutants, contaminants, Hazardous Substances or other material regulated by Environmental Laws.

"Environmental Permit" means any and all Permits, Governmental Authorizations, licenses, approvals, consents, waivers, franchises, filings, accreditations, registrations, certifications, notifications, exemptions, clearances and any other authorization required by or issued under any Environmental Law.

"Equipment" means all personal property, furniture, fixtures, equipment, computers, machinery, vehicles, apparatus, appliances, implements, telephone systems, signage, supplies and all other tangible personal property of every kind and description, and Improvements and tooling used, or held for use, in connection with the operation of the Business, wherever located, including communications equipment, information technology assets, and any attached and associated hardware, routers, devices, panels, cables, manuals, cords, connectors, cards, and vendor documents, and including all warranties of the vendor applicable thereto. "Equipment" shall include all rights under any leases relating to such Equipment, to the extent such leases constitute Assumed Contracts.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any Person that would, at any relevant time, be considered a single employer with any of Sellers under Section 4001(b) of ERISA or Sections 414(b), (c), (m) or (o) of the Code.

"Escrow Agent" means an escrow agent to be mutually agreed by Buyer and Sellers' Representative.

"Escrow Agreement" means an Escrow Agreement, to be entered into as of the Closing Date by and among the Company, Buyer and the Escrow Agent, in a form to be mutually agreed among Buyer and Sellers' Representative.

"Exchange Act" means the Securities Exchange Act of 1934.

"Excise Taxes" means any federal levy Taxes imposed on any Seller's purchases or sales of specific goods or services, such as fuel or other similar products, and the operation of such Seller's fleet of trucks and trailers.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Benefit Plans" means all Benefit Plans other than the Buyer Benefit Plans set forth on Schedule 8.5(c).

"Excluded Contracts" has the meaning set forth in Section 2.5(a)(i).

"Excluded Liabilities" has the meaning set forth in Section 2.4.

10

"<u>Execution Date</u>" has the meaning set forth in the introductory paragraph.

"<u>Executive Committee Members</u>" means T. Michael Riggs (CEO), Sarah Amico (Executive Chairperson), Theo Ciupitu (EVP, General Counsel, and Chief Risk Officer), Greg May (CFO), Katie Helton (EVP, Associate General Counsel, and Chief Human Resources Officer), Jeff Herr (President of Logistics), Kirk Hay (CIO) and Alejandro Meza (President of Transport).

"<u>Existing CBAs</u>" means the Collective Bargaining Agreements in effect (whether or not expired) as of the date hereof between the Company and any Union, other than the Canadian CBAs.

"<u>Exit Facilities</u>" means, collectively, the Exit Revolving Facility and the Exit First Lien Term Loan Facility.

"<u>Exit First Lien Term Loan Facility</u>" means the replacement debt facility to be entered into on the Closing Date by the Buyer, Cerberus, as agent, and the lenders party thereto, in full and final satisfaction, compromise, settlement, release, discharge and exchange for all obligations outstanding under the First Lien Term Loan Facility, on terms acceptable to Sellers, Buyer and Cerberus.

"<u>Exit Revolving Facility</u>" means the replacement debt facility to be entered into on the Closing Date by the Buyer, as borrower, Wells Fargo Capital Finance, LLC and the other lenders thereto, as lenders, and Wells Fargo Capital Finance, LLC, as administrative agent.

"<u>Expense Reimbursement</u>" has the meaning set forth in <u>Section 11.3</u>.

"<u>Export Control and Customs Laws</u>" shall mean applicable export control laws and regulations, including the EC Regulation 428/2009 and the implementing laws and regulations of the EU member states; the U.S. Export Administration Act, U.S. Export Administration Regulations, U.S. Arms Export Control Act, U.S. International Traffic in Arms Regulations, and their respective implementing rules and regulations; the U.K. Export Control Act 2002 (as amended and extended by the Export Control Order 2008); and all import laws administered by all applicable Government Authority, including the Tariff Act of 1930, as amended, the Trade Act of 1974, the Trade Expansion Act of 1962, and other Laws and programs administered or enforced by the U.S. Department of Commerce, U.S. International Trade Commission, U.S. Customs and Border Protection, and U.S. Immigration and Customs Enforcement and their predecessor agencies.

"<u>Extended Contract Period</u>" has the meaning set forth in <u>Section 2.5(a)(i)</u>.

"<u>Final DIP Order</u>" has the meaning set forth in the definition of "DIP Financing Orders" in this <u>Section 1.1</u>.

"<u>Final Order</u>" means a judgment or Order of the Bankruptcy Courts (or any other court of competent jurisdiction) which has not been modified, amended, reversed, vacated or stayed (other than such modifications or amendments that are consented to by Buyer) and as to which (A) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or

rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (B) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such Order or judgment of the Bankruptcy Courts (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have expired, as a result of which such judgement or Order shall have become final in accordance with Bankruptcy Rule 8002 or any applicable Canadian Legal Requirement; <u>provided</u> that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedures, or any analogous rule under the Bankruptcy Rules, may be filed relating to such Order, shall not cause an Order not to be a Final Order.

"<u>Final Recognition Order</u>" has the meaning set forth in the definition of "DIP Financing Orders" in this <u>Section 1.1</u>.

"<u>Financial Statements</u>" has the meaning set forth in <u>Section 5.20</u>.

"<u>First Lien Term Loan Facility</u>" means that certain Credit Agreement, dated as of June 28, 2018, by and among certain of Sellers, Cerberus, as agent, and the banks, financial institutions, and other lenders party thereto, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

"<u>FLSA</u>" means the federal Fair Labor Standards Act and any state or local laws governing wages, hours, and/or overtime pay.

"<u>Fraud</u>" means, with respect to any Person, a claim for Delaware common law fraud with a specific intent to deceive based on a representation or warranty of a Party set forth in <u>Article 5</u> or <u>Article 6</u>, as applicable, or in any certificate delivered pursuant hereto.  For the avoidance of doubt, "<u>Fraud</u>" does not include any claim for equitable fraud, promissory fraud, unfair dealings fraud, or any torts based on negligence or recklessness.

"<u>GAAP</u>" has the meaning set forth in <u>Section 5.20</u>.

"<u>Governmental Authority</u>" means any United States or Canadian federal, state, provincial, local or municipal or any foreign government, multi-national organization, quasi-governmental authority, or other similar recognized governmental authority or regulatory or administrative authority, agency or commission or any court, arbitrator or arbitral panel (public or private), tribunal, board, bureau, ministry or judicial body having jurisdiction.

"<u>Governmental Authorization</u>" means any approval, consent, license, Permit, waiver or other authorization issued, granted or otherwise made available by or under the authority of any Governmental Authority.

"<u>GST/HST</u>" means the goods and services tax and harmonized sales tax imposed under Part IX of the GST Act.

"<u>GST Act</u>" means the *Excise Tax Act* (Canada).

12

"Hazardous Substance" means any "pollutant," "contaminant," "hazardous waste," "industrial waste," "hazardous material," "hazardous substance" or "regulated substance" under any Environmental Law, or any other substance, chemical, material, element, vibration, sound, noise, odor, pollutant, contaminant, chemical, waste or material, or combination thereof, whether solid, liquid, or gaseous in nature, subject to regulation, investigation, remediation, limitation, prohibition, control or corrective action, or for which liability may be imposed, under any Environmental Laws.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, and the rules and regulations promulgated thereunder.

"HST Undertaking" has the meaning set forth in Section 8.1(d).

"Hybrid Plan Participation Agreement" means the Hybrid Plan Participation and Release Agreement by and among the Central States Plan, Buyer, and certain of the Sellers that shall be consistent in all respects with the CSPF Term Sheet and become effective on the Closing Date

"IAM" means the International Association of Machinists.

"IBT" means the International Brotherhood of Teamsters.

"Improvements" means the buildings, plants, structures, fixtures, systems, equipment, facilities, infrastructure and other improvements affixed or appurtenant to the Owned Real Property or Leased Real Property.

"Incorporated Information" means information expressly set forth in the Company's annual reports on Form 10-K and quarterly reports on Form 10-Q, in each case during the three (3) years prior to the date hereof as posted to the Company's investor website; provided that "Incorporated Information" shall not include items which are cross-referenced, footnoted or only referred to in such documents except to the extent such cross-referenced or footnoted items are otherwise included as Incorporated Information.

"Indebtedness" means, at any time and with respect to any Person: (a) all indebtedness of such Person for borrowed money; (b) all indebtedness of such Person for the deferred purchase price of property or services (other than Trade Payables, other expense accruals and deferred compensation items arising in the Ordinary Course of Business); (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments (other than performance, surety and appeal bonds arising in the Ordinary Course of Business in respect of which such Person's liability remains contingent); (d) all indebtedness of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), other than inventory or other property purchased by such Person in the Ordinary Course of Business; (e) all obligations of such Person under leases which have been or should be, in accordance with GAAP, recorded as capital leases, to the extent required to be so recorded; (f) all reimbursement, payment or similar obligations of such Person, contingent or otherwise, under acceptance, letter of credit or similar facilities, in each case only to the extent drawn;

(g) all Indebtedness of others referred to in clauses (a) through (f) above guaranteed directly or indirectly by such Person, or in effect guaranteed directly or indirectly by such Person through an agreement (i) to pay or purchase such Indebtedness or to advance or supply funds for the payment or purchase of such Indebtedness; (ii) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Indebtedness; (iii) to supply funds to or in any other manner invest in the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are rendered); or (iv) otherwise to assure a creditor against loss in respect of such Indebtedness; (h) in the event Buyer elects pursuant to Section 2.2(d) to acquire the equity interests of any Specified Foreign Subsidiary, all liabilities relating to unpaid Taxes (whether or not such Taxes are due and payable as of the Closing Date) or of otherwise imposed on the Specified Foreign Subsidiaries with respect to a taxable period or portion thereof ending on or before the Closing Date (which amount shall not be less than zero and shall be determined without regard to any Tax refunds, credits or overpayments of Tax); and (i) all Indebtedness referred to in clauses (a) through (h) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any lien upon or in property owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness.

"Information Officer" means the Person appointed by the CCAA Court to act as information officer in the CCAA Proceedings.

"Intellectual Property" means all intellectual property rights of any type in any jurisdiction, including all (i) Copyrights, (ii) Patents, (iii) Trademarks, (iv) Trade Secrets, (v) rights in software, technology, and inventions (whether patentable or not), (vi) rights of publicity, including rights to use of the names, likenesses, voices, signatures, and biographical information of real persons, and (vii) other proprietary intellectual property rights recognized under applicable law and all rights to sue and recover monetary damages for any past, present, or future infringements, misappropriations, or other violations of any of the foregoing.

"Interim DIP Order" has the meaning set forth in the definition of "DIP Financing Orders" in this Section 1.1.

"Interim Recognition Order" has the meaning set forth in the definition of "DIP Financing Orders" in this Section 1.1.

"Inventory" has the meaning set forth in Section 2.1(a).

"IRS" has the meaning set forth in Section 5.12(d).

"Junior Credit Agreements" means, collectively, the Second Lien Term Loan Agreement and the 1.5 Lien Credit Agreement.

"Key Employment Agreements" has the meaning set forth in Section 2.5(a)(i).

"Knowledge" means, with respect to any matter in question, in the case of Sellers, the actual knowledge after due inquiry of any of the individuals listed on Schedule 1.1(c).

"Lease" has the meaning set forth in the definition of "Leased Real Property" in this Section 1.1

"Leased Real Property" means, specifically excluding any Excluded Asset, the interests in real property let, leased or subleased by Sellers, as tenant, subtenant, lessee or sublessee, or in which a Seller has been granted a possessory interest or right to use or occupy all or any portion of the same including as the same are evidenced by any and all lease agreements and all short form leases, memoranda, offers to lease, occupancy agreements and amendments relating to the foregoing, together with, to the extent let, leased, used or occupied by Sellers in connection with the Business or the Acquired Assets, and all buildings and other structures, facilities or Improvements located thereon (and any present or future rights, title and interests arising from or related to the foregoing) (each such lease, a "Lease," and collectively, the "Leases").

"Leasehold Improvements" has the meaning set forth in Section 5.5(c).

"Legal Requirement" means any federal, state, provincial, territorial, local, municipal, domestic, foreign, international, or multinational law (statutory, common or otherwise), constitution, treaty, convention, ordinance, equitable principle, code, rule, by-law, regulation, code, principle of common law, decree or Order enacted, adopted, promulgated, issued or applied by any Governmental Authority or other similar authority.

"Lessor Leases" has the meaning set forth in Section 5.5(b).

"Liability" means a Claim or Encumbrance of any kind or nature whatsoever (whether direct or indirect, known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, vested or otherwise, liquidated or unliquidated, or due or to become due, and whether or not actually reflected or required to be reflected in a balance sheet or other books and records).

"Liquidity" means, as of any time (i) cash and cash equivalents plus (ii) as of such time, the principal amount of loans available for borrowing under the Exit Facilities after giving effect to the borrowing base formula and all applicable reserves, holdbacks and minimum availability tests.

"Material Adverse Effect" means any change, effect, event, circumstance, state of facts, development, condition, matter or occurrence that individually or in the aggregate (taking into account all other such changes, effects, events, circumstances, states of fact, developments, conditions, matters or occurrences) has had, or would be reasonably expected to have, a material adverse change in or material adverse effect on (1) the Acquired Assets, the Assumed Liabilities or the assets, properties, prospects, condition (financial or otherwise) or results of operations of the Business (excluding the Excluded Assets and the Excluded Liabilities), in each case taken as a whole or (2) the ability of Sellers to consummate the transactions contemplated by this Agreement or to perform any of their obligations under this Agreement, but excluding, in the case of (1) only, any change or effect to the extent that it results from or arises out of (i) any reasonably anticipated effects of the commencement or prosecution of the Bankruptcy Cases; (ii) the announcement of the execution and delivery of this Agreement, including the effects of

15

thereof on business relationships with suppliers and customers; (iii) changes in Legal Requirements or accounting regulations (including GAAP); (iv) any specific action expressly required to be taken (or omitted) by this Agreement or taken (or omitted) at the written request of Buyer; (v) general industry changes in the industries in which Sellers compete; (vi) acts of God (including earthquakes, storms, severe weather, fires, floods and natural catastrophes); (vii) any failure of the Business to achieve external or internal forecasts or financial projections (provided that the underlying cause of such failure (subject to the other provisions of this definition) shall not be excluded); (viii) any breach of this Agreement by Buyer; or (ix) any change or effect of economic or political conditions (including acts of terrorism, hostilities, sabotage, military actions or war, or any material worsening of such acts of terrorism, hostilities, sabotage, military actions or war), in each case of clauses (iii), (v), (vi) and (ix) to the extent that such conditions do not disproportionately affect Sellers, taken as a whole, as compared to other companies that are principally engaged in the same Business as Sellers.

"Material Contract" means: (i) any Contract in which any Seller is reasonably expected to incur potential aggregate Liabilities in an amount greater than or equal to $10,000,000 per annum; (ii) any Contract for Indebtedness; (iii) employment or engagement Contract of any person on a full-time, part-time, consulting or similar basis and providing for annual compensation in excess of $100,000, other than agreements with vehicle operators and employment agreements for "at will" employment; (iv) CBAs or other Contract with any labor organization, works council, or similar employee-representative body; (v) leases or agreements under which it is lessee of, or holds or operates any personal property owned by any other party, for which the annual rental exceeds $500,000; (vi) leases or agreements under which it is lessor of, or permits any third party to hold or operate any personal property, for which the annual rental exceeds $500,000; (vii) material licenses or royalty agreements relating to the use of any third party Intellectual Property (other than commercially available software or agreements involving annual payments that do not exceed $500,000); (viii) Contracts with the top five (5) customers of the Business; (ix) Contacts with suppliers for which annual expenditures exceed $2,000,000; and (x) Contracts which restrict the activities of any Seller in any geographical area or which contain a "most-favored nation" clause.

"Modified CBA" has the meaning set forth in Section 2.1(v).

"Motor Vehicle Laws" means, collectively, all Legal Requirements governing the operation of commercial motor vehicles or freight brokers, including the CTA and title 49 of the United States Code and all rules and regulations of the Federal Motor Carrier Safety Administration, U.S. Department of Transportation and any equivalent state, local, provincial or foreign Governmental Authority.

"Multiemployer Plan" means a "multiemployer plan" as defined in Sections 3(37) and 4001(a)(3) of ERISA but excluding any Canadian Multi-Employer Plan.

"No Action Letter" has the meaning set forth in this Section 1.1.

"Objections Notice" has the meaning set forth in Section 3.2(c).

16

"Order" means any award, writ, injunction, judgment, order, ruling, decision, verdict, subpoena, precept, directive, consent, approval, award, decree, stipulation or similar determination or finding entered, issued, made or rendered by any Governmental Authority or an arbitrator, mediator or other judicially sanctioned Person or body.

"Ordinary Course of Business" means, with respect to any Person, the ordinary and usual course of normal day-to-day operations of such Person and its business, consistent with its past practice; provided that in the case of Sellers, "Ordinary Course of Business" shall take into account the business and operating practices that have been utilized by Sellers since the commencement of the Bankruptcy Cases.

"OSHA" means the Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651 et. seq.

"Outside Date" has the meaning set forth in Section 11.1(c)(ii).

"Owned Real Property" means, specifically excluding any Excluded Asset, all real property owned by any Seller, and all right, title and interest of such Seller therein, together with all of such Seller's right, title and freehold or fee simple and interest in and to the following: (i) all buildings, structures, systems, hereditaments and Improvements located on such real property owned by such Seller; (ii) all Improvements owned by such Seller; and (iii) all easements, if any, in or upon such real property owned by such Seller, licenses and all rights-of-way, beneficial easements, licenses, and other rights, privileges and appurtenances belonging or in any way pertaining to such real property owned by such Seller.

"Party" or "Parties" means, individually or collectively, as applicable, Buyer and Sellers.

"Patents" means United States and foreign patents and patent applications, as well as any continuations, continuations-in-part, divisions, extensions, reexaminations, reissues, renewals and patent disclosures related thereto.

"PBGC" has the meaning set forth in Section 5.12(e).

"Permits" means any and all permits, licenses, approvals, consents, waivers, franchises, filings, accreditations, registrations, certifications, certificates of occupancy, easements, rights of way, notifications, exemptions, clearances, and authorizations, together with all modifications, renewals, amendments, supplements and extensions thereof and applications therefor, of or from any Governmental Authority.

"Permitted Encumbrances" means (a) Encumbrances specifically permitted by the Sale Order and (b) with respect to each Owned Real Property and Leasehold Improvement (as the case may be): (i) real estate taxes, assessments and other governmental levies, fees or charges imposed with respect to Real Property which are not due and payable as of the Closing Date; (ii) mechanics liens and similar liens for labor, materials or supplies provided with respect to Real Property incurred in the ordinary course of business for amounts which are not due and payable; (iii) zoning, building codes and other land use Legal Requirements regulating the use or occupancy of Real Property or the activities conducted thereon which are imposed by any

17

Governmental Authority having jurisdiction over such Real Property which are not violated by the current use or occupancy of such Real Property or the operation of the Business thereon; and (iv) easements, covenants, conditions, restrictions and other similar matters of record affecting title to Real Property which do not or would not materially impair the use or occupancy of such Real Property in the Property in the operation of the Business conducted thereon in the manner that it is currently conducted.

"Person" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, unincorporated organization, estate, trust, association, organization or other legal entity or group (as defined in Section 13(d)(3) of the Exchange Act) or Governmental Authority.

"Personal Information" means information about an identifiable individual (other than any information that is used for the purpose of communicating or facilitating communication with an individual in relation to their employment, business or profession such as the individual's name, position name or title, work address, work telephone number, work fax number or work electronic address) disclosed or conveyed to one Party or any of its representatives or agents by or on behalf of another party in anticipation of, as a result of, or in conjunction with the transactions contemplated by this Agreement.

"Petition Date" means August 6, 2019.

"Pre-Paid Expenses" means all deposits (including customer deposits and security deposits (whether maintained in escrow or otherwise) with third party suppliers, vendors, service providers or landlords for rent, electricity, telephone or otherwise), advances, pre-paid expenses, prepayments, rights under warranties or guarantees, vendor rebates, credits and other refunds of every kind and nature (whether or not known or unknown or contingent or non-contingent), except that professional fee retainers and pre-paid deposits related thereto shall not be included in the definition of "Pre-Paid Expenses."

"Prepetition ABL Credit Agreement" means that certain Second Amended and Restated Credit Agreement, amended and restated as of February 15, 2018, by and among Jack Cooper Holdings Corp., the Canadian Borrowers, the other borrowers party thereto, the guarantors party thereto, Wells Fargo Capital Finance, LLC, as administrative agent, and each lender from time to time party thereto (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof).

"Previously Omitted Contract" has the meaning set forth in Section 2.5(b)(i).

"Previously Omitted Contract Designation" has the meaning set forth in Section 2.5(b)(i).

"Previously Omitted Contract Notice" has the meaning set forth in Section 2.5(b)(ii).

"Prior Event" means any transaction, event, circumstances, action, failure to act or occurrence of any sort or type, including any approval or acceptance given or denied, whether

18

known or unknown, in each case, which occurred, existed, was taken prior to the consummation of the transactions contemplated hereunder.

"Proceeding" means any Action commenced, brought, conducted, or heard by or before any Governmental Authority.

"Professional" means any Person retained by Sellers, including any ordinary course professionals, in any of the Bankruptcy Cases (including, in the case of the CCAA Proceedings, the Information Officer and its counsel).

"Professional Fees Amount" means an amount equal to all fees and expenses incurred on or prior to the Closing Date (regardless of whether such fees and expenses have been approved by the Bankruptcy Court as of the Closing Date) by any professional retained by the Sellers, the Official Committee of Unsecured Creditors appointed in the Bankruptcy Cases, or any other official committee appointed in the Bankruptcy Cases; provided, however, that with respect to any "success fees" or other fees that are payable based solely upon the consummation of the transactions provided for herein, such fees shall be included in the Professional Fees Amount only if they have been approved by the Bankruptcy Court prior to, and earned as of, the Closing Date.

"Professional Fees Escrow Account" means the account established pursuant to the Escrow Agreement into which the Professional Fees Amount will be deposited at the Closing in accordance with Section 4.2(b).

"PST Acts" means the *Provincial Sales Tax Act* (British Columbia), the *Provincial Sales Tax Act* (Saskatchewan) and the *Retail Sales Tax Act* (Manitoba).

"Purchase Price" has the meaning set forth in Section 3.1.

"QST" means the Quebec sales tax payable under the QST Legislation.

"QST Legislation" means An Act Respecting the Quebec Sales Tax (Quebec).

"Real Property" and "Real Properties" means (i) the Owned Real Property; (ii) the Leased Real Property; (iii) all Improvements; and (iv) all easements, licenses, rights and appurtenances relating to the foregoing to the extent that any Seller has a legally recognized interest therein.

"Real Property Taxes" mean any real property Taxes.

"Release" means, except as authorized by a valid Environmental Permit, (a) any releasing, spilling, discharging, disposing, leaking, pumping, injecting, pouring, depositing, placing, dispersing, spraying, abandoning, throwing, emitting, emptying, escaping, dumping, or leaching of any Hazardous Substance into the Environment, and (b) migration of Hazardous Substances into, on, in, under, through or out of any of the Real Property through soil, surface water, or groundwater.

"Representative" means, with respect to a particular Person, any director, officer, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

"Response Period" has the meaning set forth in Section 3.2(c).

"Restricted Party" shall mean (a) any Person or government that is the subject of Sanctions, (b) any Person resident in or organized under the laws of any country or territory that is the subject of country- or territory-wide Sanctions (including Cuba, Iran, North Korea, Syria, or the Crimea region) or (c) owned or controlled by a Person or Persons described in clause (a) or (b).

"Restructuring Support Agreement" means the Restructuring Support Agreement, dated August 6, 2019, attached hereto as **Exhibit D**.

"Restructuring Term Sheet" means the Summary of Principal Terms of Restructuring attached as Exhibit A to the Restructuring Support Agreement.

"Sale and Bidding Procedures Motion" means the motion filed by Sellers pursuant to, *inter alia*, Sections 363 and 365 of the Bankruptcy Code to approve the transactions contemplated by this Agreement and the Bidding Procedures.

"Sale Order" means, collectively, (a) the order of the U.S. Bankruptcy Court (the "U.S. Sale Order") authorizing and approving, *inter alia*, the sale of the Acquired Assets to Buyer on the terms and conditions set forth herein, free and clear of all Encumbrances (other than Permitted Encumbrances) and Excluded Liabilities, including, for the avoidance of doubt, successor liability, and the assumption and assignment of the Assumed Contracts and the Assumed Liabilities by and to Buyer, and (b) the order of the CCAA Court (the "Canadian Sale Order"), inter alia, recognizing and giving effect to the U.S. Sale Order, in each case in form and substance reasonably satisfactory to Buyer and Sellers.

"Sanctions" shall mean economic or financial sanctions or trade embargoes imposed, administered, or enforced from time to time by (a) the U.S. government (including the U.S. Department of State and the Office of Foreign Assets Control of the U.S. Department of the Treasury), (b) the United Nations Security Council, (c) the European Union, (d) Her Majesty's Treasury of the United Kingdom, or (e) other relevant sanctions authority with jurisdiction over any Party.

"Second Lien Term Loan Credit Agreement" means that certain Credit Agreement, dated as of June 28, 2018, by and among certain of the Sellers, Wilmington Trust, National Association, as administrative and collateral agent, and the banks, financial institutions, and other lenders party thereto, in the original principal amount of $261,625,000, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

"Secured Taxes" means (i) unpaid Real Property Taxes as of the Closing Date (if any) to the extent such unpaid Real Property Taxes give rise to a statutory lien on the corresponding Real Property to which such unpaid Real Property Taxes relate, (ii) unpaid Excise Taxes as of the Closing Date (if any) to the extent such unpaid Excise Taxes give rise to a

statutory lien on the corresponding Acquired Asset to which such unpaid Excise Taxes relate, and (iii) Trust Fund Taxes, in each case only to the extent set forth on Schedule 1.1(d).

"Seller Released Claims" has the meaning set forth in Section 12.16(b).

"Sellers" and "Seller" have the meaning set forth in the introductory paragraph.

"Sellers Group" means (1) each of the Sellers and their respective directors, officers, control persons (as defined in Section 15 of the Securities Act or Section 20 of the Exchange Act), members, employees, agents, attorneys, financial advisors, consultants, legal representatives, shareholders, partners, estates, successors and assigns solely in their capacity as such, and (2) any of their respective agents, attorneys, financial advisors, legal advisors, affiliates, directors, managers, officers, control persons, shareholders, members or employees.

"Solus" means Solus Alternative Asset Management LP.

"Specified Foreign Subsidiaries" has the meaning set forth in Section 2.2(d).

"Subsidiary" means any legal entity with respect to which a specified Person (or a subsidiary thereof) owns, directly or indirectly, more than 50% of the voting stock or other equity or partnership interests, the holders of which are generally entitled to vote for the election of the board of directors or other governing body of such legal entity, or of which the specified Person controls the management.

"Surveys" means a survey for each Owned Real Property and material Leased Real Property, dated no earlier than the date of this Agreement, prepared by a licensed surveyor satisfactory to Buyer, and conforming to 1999 ALTA/ACSM Minimum Detail Requirements for Urban Land Title Surveys, including Table A Items Nos. 1, 2, 3, 4, 6, 7(a), 7(b)(1), 7(c), 8, 9, 10, 11(b), 13, 14 15 and 16, (or the comparable customary standards for surveys in Canada) and such other standards as the Title Company and Buyer require as a condition to the removal of any survey exceptions from the Title Policies, and certified to Buyer, Buyer's lender and the Title Company, in a form satisfactory to each of such parties.

"Tax" or "Taxes" (and with correlative meaning, "Taxable" and "Taxing") means (i) any federal, state, provincial, local, foreign or other income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, gross receipts, value added, sales, use, goods and services, harmonized sales, excise, customs duties, transfer, real property transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, escheat, unclaimed or abandoned property. environmental, natural resources, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other tax, duty, levy or other governmental charge or assessment of any kind whatsoever, however denominated, or deficiency thereof (including all interest and penalties thereon and additions thereto whether disputed or not) and (ii) any liability for any items described in clause (i) payable by reason of contract, transferee liability or operation of law (including Treasury Regulation Section 1.1502-6) or otherwise.

21

"Tax Return" means any return, declaration, report, election, claim for refund, information return or other document (including any related or supporting estimates, elections, schedules, statements, or information) filed or required to be filed in connection with the determination, assessment or collection of any Tax or the administration of any laws, regulations or administrative requirements relating to any Tax.

"Title Commitments" means a commitment for an ALTA Owner's Title Insurance Policy (1970 Form B, 1992 Form, or other form of policy acceptable to Buyer) for each Owned Real Property (other than Owned Real Property located outside the United States), issued by a title insurance company satisfactory to Buyer (the "Title Company"), together with a copy of all documents referenced therein.

"Title Company" has the meaning set forth in the definition of "Title Commitments" in Section 1.1.

"Title IV Plan" means any Benefit Plan subject to Title IV of ERISA (which, for the avoidance of doubt, excludes any Multiemployer Plan).

"Title Policies" means title insurance policies from the Title Company (which may be in the form of a mark-up of a pro forma of the Title Commitments) in accordance with the Title Commitments, insuring Buyer's fee simple title to each Owned Real Property or Buyer's legal, valid, binding and enforceable leasehold interest in each material Leased Real Property (as the case may be) as of the Closing Date (including all recorded appurtenant easements insured as separate legal parcels) with gap coverage from Sellers through the date of recording, subject only to Permitted Encumbrances, in such amount as Buyer reasonably determines to be the value of the Real Property insured thereunder.

"Trade Payables" means trade obligations and accrued operating expenses of the Sellers as of the Closing Date incurred in the Ordinary Course of Business and in accordance with the DIP Budget on or after the Petition Date, to the extent such obligations relate to the Acquired Assets.

"Trade Secrets" means trade secrets and other confidential and proprietary information and know-how.

"Trademarks" means United States, state and foreign trademarks, service marks, logos, slogans, trade dress and trade names, corporate names, "d/b/a" names, Internet domain names, social media accounts, and any other similar designations of source of goods or services, whether registered or unregistered, and registrations and pending applications to register the foregoing, and all goodwill related to or symbolized by the foregoing.

"Transaction Documents" means this Agreement, the Bill of Sale, the Restructuring Support Agreement, and any other agreements, instruments or documents entered into at the Closing pursuant to this Agreement.

"Transfer Taxes" means any real property transfer Tax, sales Tax, goods and services Tax, harmonized sales Tax, use Tax, real property recording Tax or fee, intangible Tax, documentary stamp Tax or similar Tax attributable to the sale or transfer of the Acquired Assets

(and the perfecting or recording of evidence thereof) and not exempted under the Sale Order, by Section 1146(c) of the Bankruptcy Code or applicable state, provincial, municipal or foreign law.

"Transferred Permits" has the meaning set forth in Section 2.1(f).

"Treasury Regulations" means the Treasury regulations promulgated under the Code.

"Trust Fund Taxes" means any accrued but unpaid payroll, withholding, and sales and use taxes to the extent that (a) the Sellers have actually (i) withheld or collected and (ii) set aside such amounts in trust to satisfy such taxes and (b) all such amounts constitute Acquired Assets.

"U.S. Bankruptcy Court" has the meaning set forth in the recitals.

"U.S. Borrowers" means each of the Additional Sellers other than the Canadian Borrowers.

"U.S. Revolver Facility" means the first priority senior secured debtor-in-possession credit facility entered into on the Petition Date among the U.S. Borrowers, as borrowers, Wells Fargo Capital Finance, LLC and the other lenders thereto, as lenders, and Wells Fargo Capital Finance, LLC, as administrative agent, providing for, among other things, commitments available for borrowing by the U.S. Borrowers of up to $85,000,000.

"U.S. Sale Order" has the meaning set forth in the definition of "Sale Order" in this Section 1.1.

"Unaudited Financial Statements" has the meaning set forth in Section 5.20.

"Union" and "Unions" have the meanings set forth in Section 5.11(a).

"Waiver" means a written waiver and release in form attached hereto as **Exhibit E** signed by Buyer at the Closing waiving all potential and existing Avoidance Actions and any other causes of action available to Sellers or their estates against the directors, officers, employees, shareholders, attorneys and advisors of Sellers and other Persons as set forth therein and fully and finally releasing each of the foregoing Persons from any and all liability in connection therewith.

"WARN Act" has the meaning set forth in Section 5.11(c).

"Wind-Down Amount" means an amount as determined in accordance with Section8.12.

"Wind-Down Escrow Account" means the account established pursuant to the Escrow Agreement into which the Wind-Down Amount will be deposited at the Closing in accordance with Section 4.2(c).

1.2     Other Definitions and Interpretive Matters.

(a)     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

Calculation of Time Period.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day.

Contracts, Agreements and Orders.  Any reference in this Agreement to any contract, license, agreement or order means such contract, license, agreement or order as amended, supplemented or modified from time to time in accordance with the terms thereof.

Day.  Any reference in this Agreement to "days" (but not Business Days) means to calendar days.

Dollars.  Any reference in this Agreement to "$" means United States dollars.

Exhibits/Schedules.  All Exhibits and Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

Gender and Number.  Any reference in this Agreement to gender includes all genders, and words imparting the singular number include the plural and vice versa.

Headings.  The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement.  All references in this Agreement to any "Section," "Article" or "Schedule" are to the corresponding Section, Article or Schedule of this Agreement unless otherwise specified.

Herein.  Words such as "herein," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear.

Including.  The word "including" or any variation thereof means "including, without limitation," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

Law.  Any reference to any law in this Agreement means such law as amended, modified, codified, reenacted, supplemented or superseded in whole or in part, and in effect from time to time.

Other.  The words "to the extent" shall be interpreted to mean "to the extent (but only to the extent)".

24

Person. Any reference to a Person shall include such Person's successors and permitted assigns.

Made Available. Any reference in this Agreement to "made available" shall mean (i) the Incorporated Information and (ii) such other documents or information that have been provided in the Dataroom for Buyer and its Representatives or shall have been provided directly to Buyer no later than one (1) Business Day prior to the Execution Date.

(b)     No Strict Construction.  Buyer, on the one hand, and Sellers, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and Sellers, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.  Without limiting the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

## ARTICLE 2

### PURCHASE AND SALE

2.1     Purchase and Sale.

Subject to the entry of the Sale Order and upon the terms and subject to the conditions of this Agreement, on the Closing Date, Sellers shall unconditionally sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer and/or to one or more Buyer Designees, and Buyer and/or such Buyer Designees shall purchase, acquire and accept from Sellers, free and clear of all Encumbrances (other than Permitted Encumbrances), all of each Seller's right, title and interest in, to or under the Business and all of each Seller's properties, rights, claims and assets (in each case, other than the Excluded Assets), wherever situated or located, whether real, personal or mixed, whether tangible or intangible, whether identifiable or contingent, whether owned, leased, licensed, used or held for use in or relating to the Business, and whether or not reflected on the books and records of each Seller, as the same shall exist on the Closing Date, including the following (collectively, the "Acquired Assets"):

(a)     all inventory of any kind or nature, merchandise and goods, related to the Business or the Acquired Assets and located upon or within Sellers' Real Property or belonging to any Seller on the Closing Date, whether or not prepaid, and wherever located, held or owned, and any prepaid deposits for any of the same, including any goods in transit, other than any such items to the extent related to the Excluded Assets ("Inventory");

(b)     all Equipment,  except to the extent primarily used in connection with the Excluded Assets;

(c)     subject to Section 2.5, all Assumed Contracts;

(d)     all (i) Real Property (other than the Leased Real Property to the extent the Leases related thereto are not Assumed Contracts) and (ii) the Lessor Leases (to the extent that a Lessor Lease is an Assumed Contract);

(e)     any rights of Sellers to the warranties, express or implied, and licenses received from manufacturers and Sellers of the Equipment, Improvements or any component thereof;

(f)     subject to Section 2.5(c) and obtaining the consents set forth on Schedule 5.3, all Permits, Environmental Permits and licenses held by Sellers, including those identified on Schedule 2.1(f) (the "Transferred Permits");

(g)     all Intellectual Property owned or purported to be owned by any Seller;

(h)     all Personal Information that is collected, stored or used by any Seller;

(i)     all Accounts Receivable;

(j)     all Pre-Paid Expenses;

(k)     to the extent not prohibited by Legal Requirements, but specifically excluding any of the following materials to the extent prepared in anticipation of or in connection with or otherwise related to the negotiation, execution or performance by Sellers under this Agreement or any other Transaction Agreement, all Documents and other books and records (financial, accounting, personnel files of Buyer Employees, and correspondence), and all customer sales, marketing, advertising, packaging and promotional materials, files, data, software (whether written, recorded or stored on disk, film, tape or other media, and including all computerized data), ledgers, instruments, research, drawings, engineering and manufacturing data and other technical information and data, and all other business and other records, in each case, that are used or useful in, held for use in, or that arise in any way out of or are related to, the Acquired Assets, the Assumed Liabilities or the Business; provided, that Sellers shall be permitted to keep copies of all of the foregoing to the extent necessary or required by the Bankruptcy Courts or in connection with the Bankruptcy Cases or in any subsequent wind-down proceedings of Sellers related to the Excluded Assets or the Excluded Liabilities, subject to Section 12.2;

(l)     except as set forth on Schedule 2.1(l), all claims (other than Avoidance Actions which shall be addressed solely by Section 2.1(m)), interests, rights, rebates, refunds, abatements, remedies, recoveries, goodwill, customer and referral relationships, other intangible property and all privileges, set-offs and benefits of Sellers, and all claims, demands, indemnification rights, causes of action, arising under or relating to any of the Acquired Assets (including Intellectual Property), the Assumed Liabilities or the Business, including those arising out of Assumed Contracts, express or implied warranties, representations and guarantees from suppliers, manufacturers, contractors or others to the extent relating to the operation of the Business or affecting the Equipment, Inventory or other tangible Acquired Assets;

(m)      all Avoidance Actions and any other causes of action available to Sellers or their estates to the extent that such other causes of action either (1) relate to the Acquired Assets, Assumed Contracts or Assumed Liabilities or (2) are against any of Sellers, Buyer, any of the directors, officers, managers, employees, shareholders, members and advisors of Sellers or Buyer, any lenders or agents under the First Lien Term Loan Facility, the Prepetition ABL Credit Agreement, the Junior Credit Agreements, the DIP Facilities or the Exit Facilities or any other Persons (including the Actions set forth on Schedule 2.1(m)) (collectively, the "Acquired Actions") provided, that the Acquired Actions against Sellers, any lenders and agents under the Junior Credit Agreements and the Exit Facilities, and their respective directors, officers, managers, employees, shareholders, members and advisors shall be waived and released effective as of the Closing Date as set forth in the Waiver;

(n)      all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit, bank accounts (to the extent transferrable) and other bank deposits, instruments, utility and other deposits, and investments of Sellers; provided, however, that prepaid deposits related to professional fee retainers and other cash collateral securing obligations permitted pursuant to the DIP Financing Orders, as well as the Professional Fees Escrow Amount and the Wind-Down Escrow Amount (which are included in Cash Consideration and are an Excluded Asset), shall not be included; provided, further, that cash in an amount necessary and sufficient to cover checks in transit relating to items that were permitted to be paid, but have not been paid, pursuant to the DIP Financing Orders or the DIP Facilities as of the Closing Date shall not be included;

(o)      all third party business interruption, property or casualty insurance proceeds, to the extent receivable by Sellers in respect of the Business or the Acquired Assets or the Assumed Liabilities after the Closing Date;

(p)      all rights under non-disclosure or confidentiality, non-compete, or non-solicitation agreements (in each case, to the extent transferable) or key employee retention plans or similar arrangements with (or for the benefit of) Employees and agents of Sellers or with third parties (including any non-disclosure or confidentiality, non-compete, or non-solicitation agreements (in each case, to the extent transferrable)), to the extent included as an Assumed Contract;

(q)      all telephone, telex and telephone facsimile numbers and other directory listings;

(r)      all assets, if any, listed on Schedule 2.1(r) (regardless of whether such assets are covered by any of the foregoing);

(s)      all assets, rights, titles and interest in any Buyer Benefit Plan, including (i) with respect to any Buyer Benefit Plan that is funded by a trust (other than a so-called "rabbi trust"), the assets of such related trust; (ii) with respect to any Buyer Benefit Plan that is funded by an insurance policy, the related insurance policy (to the extent transferrable); and (iii) with respect to any Buyer Benefit Plan, to the extent applicable and subject to conformity with Legal Requirements, the administrative service agreements and other contracts, files and records in respect thereof (to the extent transferrable);

(t)       all proceeds and products of any and all of the foregoing Acquired Assets;

(u)       to the extent not prohibited by Legal Requirements, the Tax records and work papers of Sellers other than those that solely relate to the Excluded Assets; provided, however, that Sellers can retain copies of the foregoing items with the prior written consent of Buyer (not to be unreasonably withheld, conditioned or delayed);

(v)       the Canadian CBAs and, solely to the extent any Existing CBA is acceptable to Buyer or is amended in a manner acceptable to Buyer and ratified prior to the Closing and to the extent any non-consensual modification requires Bankruptcy Court approval under section 1113 of the Bankruptcy Code, to the extent such approval shall have been granted by the Bankruptcy Courts prior to the Closing (such Existing CBA as so amended, a "Modified CBA"), each applicable Modified CBA;

(w)       all Tax refunds, rebates, credits and similar items relating to any period, or portion of any period, on or prior to the Closing Date;

(x)       any assets designated an Acquired Asset pursuant to Section 2.2(d);

(y)       any insurance policies of Sellers (to the extent transferrable under applicable Law) relating to the Acquired Assets or the Assumed Liabilities solely to the extent Buyer has provided written notice to Sellers prior to the date that is three (3) Business Days prior to the date scheduled for the Auction in the Bidding Procedures Order entered by Bankruptcy Court  of its intention to acquire such insurance policies; and

(z)       subject to Section 8.11, all assets of the Assumed Workers' Compensation Programs, including any collateral (to the extent related thereto), prepaid expenses or deposits related thereto.

2.2    Excluded Assets.

Notwithstanding anything to the contrary in this Agreement, nothing herein shall be deemed to sell, transfer, assign, convey or deliver any of the Excluded Assets to Buyer, and Sellers shall retain all right, title and interest to, in and under, and all Liabilities with respect to, the Excluded Assets.  For all purposes of and under this Agreement, the term "Excluded Assets" shall consist of only the following items, assets and properties (whether or not such assets are otherwise described in Section 2.1):

(a)       the assets, if any, listed on Schedule 2.2(a);

(b)       to the extent any Existing CBA is not acceptable to Buyer, and is not amended in a manner acceptable to Buyer prior to the Closing, all such Existing CBAs (any CBA not assumed shall have been rejected by any applicable Seller pursuant to the authorization of such rejection by the U.S. Bankruptcy Court prior to the Closing);

(c)      any Excluded Benefit Plan and any assets, trust agreements, insurance policies, administrative service agreements and other contracts, files and records in respect thereof;

(d)      any shares of capital stock or other equity interest in or issued by any Seller or ERISA Affiliate or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest in or issued by any Seller or ERISA Affiliate, and any shares of capital stock or other equity interest in or issued by any Subsidiary of any Seller or ERISA Affiliate (including, for the avoidance of doubt, any foreign Subsidiary) or other entity in which any Seller or ERISA Affiliate holds an equity interest, or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest in or issued by any Subsidiary of any Seller or ERISA Affiliate or other entity in which any Seller or ERISA Affiliate holds an equity interest, including the capital stock or equity interest set forth on Schedule 2.2(d); provided, that Buyer may, in its sole discretion, elect in writing by notice to Sellers in accordance with this Agreement at any time prior to the Closing to acquire the equity interests of, or all of the assets held by, the entities identified with an asterisk on Schedule 2.2(d) (collectively, the "Specified Foreign Subsidiaries") on terms agreed between Buyer and Sellers in good faith, in which event such equity interests or assets, as the case may be, shall be considered "Acquired Assets" for all purposes of this Agreement;

(e)      the limited liability company, partnership and corporate books and records of internal limited liability company, partnership and corporate proceedings, minute books, organizational or governing documents and stock ledgers of Sellers; provided, however, that copies of the foregoing items have been made available by Sellers to Buyer;

(f)      documents that Sellers are required by Legal Requirements to retain as described in Section 2.1(k); provided, that such documents shall remain subject to Section 12.2, if applicable;

(g)      insurance policies and all rights under or arising out of insurance policies to the extent not set forth in Section 2.1(o);

(h)      any prepaid deposits related to professional fee retainers ;

(i)      the Cash Consideration; provided that any unused portion of the Professional Fees Amount and the Wind-Down Amount which is not utilized by Sellers to pay professional fees and wind-down expenses in accordance with the Escrow Agreement shall be returned to Buyer in accordance with the Escrow Agreement;

(j)      all current and prior director and officer insurance policies of Sellers and all rights of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(k)      any rights, claims or causes of action of Sellers under this Agreement or any other Transaction Document;

(l)      subject to Section 2.5(c), any Permits and licenses held by Sellers that are not included in Section 2.1(f);

(m)   cash in an amount necessary and sufficient to cover checks in transit relating to items that were permitted to be paid, but have not been paid, pursuant to the DIP Financing Orders or the DIP Facilities as of the Closing Date; and

(n)   subject to <u>Section 8.11</u>, all assets associated with any workers' compensation policy or program, including any collateral, prepaid expenses or deposits to the extent related thereto, other than the Assumed Workers Compensation Programs.

2.3   <u>Assumed Liabilities</u>.

Subject to entry of the Sale Order, upon the terms and subject to the conditions of this Agreement, on the Closing Date, Buyer and/or each relevant Buyer Designee, shall, effective at the time of the Closing, assume and agree to discharge and perform when due, only the Liabilities of Sellers which are enumerated in this <u>Section 2.3</u> (the "<u>Assumed Liabilities</u>").  The following Liabilities of Sellers shall constitute, without duplication, the Assumed Liabilities:

(a)   all Liabilities under the Assumed Contracts that first become due from and after the Closing Date;

(b)   all Cure Costs;

(c)   (i) outstanding Trade Payables, (ii) all administrative and priority claims in the Bankruptcy Cases that are reflected in the DIP Budget and all claims secured by the CCAA Priority Charges in the CCAA Proceedings and all priority claims contemplated under Section 36 of the CCAA, in each case to the extent unpaid as of the Closing Date (except to the extent included in the Professional Fees Amount or the Wind-Down Amount), and (iii) Accrued Payroll;

(d)   Liabilities to the extent arising out of the ownership, operation, management or control of the Acquired Assets for periods following the Closing Date, including with respect to workers' compensation (relating to any Buyer Employee) and Environmental Laws, in each case to the extent arising out of an event, fact, act, omission or condition to the extent occurring on or after the Closing Date;

(e)   (i) those specific Liabilities of Sellers (if any) related to Employees as such Liabilities are identified on <u>Schedule 2.3(e)(i)</u>; (ii) any Existing CBAs acceptable to Buyer; (iii) to the extent amended in a manner acceptable to Buyer in its sole discretion prior to the Closing Date, all Modified CBAs; (iv) all Liabilities in respect of the Canadian CBAs to the extent required by applicable Legal Requirement; (v) all Liabilities of Sellers to provide COBRA health continuation coverage to Employees at the time and only to the extent required to be assumed by Buyer pursuant to 26 C.F.R. 54.4980B-9, A-8(c); and (vi) the sponsorship of, and Liabilities under, each Buyer Benefit Plan (collectively, the "<u>Assumed Employee Liabilities</u>");

(f)   all Liabilities and obligations of Sellers to be performed under (i) the Transferred Permits, including compliance with performance obligations or standards under the Transferred Permits; and (ii) applicable Legal Requirements (including Environmental Laws), in each case, to the extent arising after the Closing Date;

30

(g)     all obligations under the Exit Facilities;

(h)     the Secured Taxes; and

(i)     subject to <u>Section 8.11</u>, all Liabilities under the Assumed Workers' Compensation Programs, if any.

       2.4     <u>Excluded Liabilities</u>.

Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume and shall not be obligated to assume or be obliged to pay, perform or otherwise discharge any Liability of, or Liability against, Sellers, Sellers' Subsidiaries, any ERISA Affiliate, the Business or the Acquired Assets, of any kind or nature, whether or not direct or indirect, and Sellers shall be solely and exclusively liable with respect to all Liabilities of Sellers, Sellers' Subsidiaries, the Business or the Acquired Assets, other than the Assumed Liabilities (such Liabilities other than Assumed Liabilities, collectively, the "<u>Excluded Liabilities</u>").  Without limiting the generality of the foregoing, the Excluded Liabilities shall include each of the following Liabilities of Sellers and Sellers' Subsidiaries, except to the extent they are set forth in <u>Section 2.3</u>:

(a)     any and all (i) obligations, Claims, or Liabilities of Sellers or any predecessor, successor or Affiliate of any Seller, or for which Sellers or any predecessor, successor or Affiliate of any Seller could be liable, relating to Taxes, including (i) Taxes with respect to the Acquired Assets or the Business for any Taxable period (or portion thereof) ending on or before the Closing, (ii) Taxes (other than Transfer Taxes) arising in connection with the transactions contemplated under this agreement (including as a result of the sale of the Acquired Assets or the assumption of the Assumed Liabilities), (iii) deferred Taxes of any nature, (iv) Liabilities for unpaid Taxes of another Person as a transferee, or successor, by contract or otherwise, (v) Taxes attributable to any violation of or liability under any applicable bulk sales law in connection with the transfer of the Acquired Assets, but excluding any Taxes that are Assumed Liabilities under <u>Section 2.3</u>; and (vi) Transfer Taxes (other than Transfer Taxes for which Buyer is liable under applicable state or local Transfer Tax Law).

(b)     all Liabilities with respect to Actions and Proceedings pending on or before the Closing Date or to the extent against or giving rise to Liability against the Business or the Acquired Assets prior to the Closing Date, even if instituted after the Closing Date;

(c)     all Liabilities to any owner or former owner of capital stock or other equity interest in or issued by, or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest in or issued by, holder of Indebtedness for borrowed money of, or current or former officer or director of, in each case, any Seller or Subsidiary of any Seller in such capacities;

(d)     all Liabilities with respect to any Excluded Asset, including the Existing CBAs if not amended in a manner acceptable to Buyer prior to the Closing Date, any Excluded Benefit Plans, and Liabilities in respect of any other benefit plans, programs and arrangements of any ERISA Affiliate that is not specifically included in the Assumed Employee Liabilities;

31

(e)      other than Trade Payables, all Liabilities for: (i) costs and expenses incurred or owed in connection with the administration of the Bankruptcy Cases; and (ii) all costs and expenses incurred by Sellers in connection with the negotiation, execution and consummation of the transactions contemplated under this Agreement;

(f)      all Liabilities with respect to Claims by unsecured creditors except as set forth herein;

(g)      any Liability or other obligations of any of Sellers or any ERISA Affiliate arising under, relating to or with respect to any single employer defined benefit pension plan or any Multiemployer Plan, except as otherwise provided in the Hybrid Plan Participation Agreement;

(h)      except for the Assumed Employee Liabilities, all Liabilities with respect to Employees, or former Employees, or both (or their representatives or beneficiaries) or employees of any ERISA Affiliate related to any occurrence, action or inaction occurring, prior to or on the Closing Date (regardless of when reported, asserted, filed or claimed), including with respect to vacation, payroll, sick leave, unemployment benefits, retirement benefits, pension benefits, employee stock option, equity compensation, employee stock purchase, or profit sharing plans, health care and other welfare plans or benefits, or any other employee plans or arrangements or benefits or other compensation of any kind, including under any Excluded Benefit Plan or benefit plans, programs and arrangements of an ERISA Affiliate, and Liabilities of Sellers and their predecessors pursuant to the WARN Act;

(i)      except for the Assumed Employee Liabilities and Assumed Contracts or as required by applicable Canadian Legal Requirement, any Liability arising under or related to any employment agreement, Collective Bargaining Agreement or arrangement, severance, retention or termination agreement or other similar arrangement with any current or former employee, consultant or contractor (or its representatives), or any dependent or beneficiary of any of them, of any Seller;

(j)      all Liabilities accruing, arising out of, or relating to any federal, state, provincial or local investigations of any Seller or any Employee, agents, vendors or representatives of any Seller arising out of actions prior to the Closing (other than rights of setoff and recoupment claims);

(k)      all Liabilities and obligations for payment of the Professional Fees Amount to the applicable Professionals; provided, however, that such Liabilities can be satisfied from the Professional Fees Escrow Account;

(l)      all Liabilities and obligations for payment of the Wind-Down Amount to the applicable payees; provided, however, that such Liabilities can be satisfied from the Wind-Down Escrow Account;

(m)      all Liabilities arising out of, under or relating to Environmental Laws or Hazardous Substances; and

(n)      all Liabilities regarding any workers' compensation claims or

32

Actions (except to the extent such claims or Actions are Assumed Workers' Compensation Programs).

2.5    Assignment and Assumption of Contracts.

(a)

(i)    Schedule 2.5(a), as and when included in the Disclosure Schedules, will set forth a list of all executory Contracts, including all customer agreements, supply agreements, joint venture agreements, employment agreements of the Executive Committee Members (such employment agreements, collectively, the "Key Employment Agreements"), other employment-related agreements, insurance policies funding or related to, and administrative services agreements or similar contracts related to, Buyer Benefit Plans, all Existing CBAs, Modified CBAs and Canadian CBAs, Leases, and Lessor Leases relating to the Business or the Acquired Assets to which one or more of Sellers are party (the "Available Contracts") which Schedule 2.5(a) may be updated from time to time to add or remove any Contracts inadvertently included or excluded from such schedule.  On or before the earlier of (x) the date that is the Closing Date and (y) the date on which the Bankruptcy Code or Bankruptcy Courts otherwise would require a determination to assume or reject such Available Contracts (such date, the "Determination Date"), Buyer shall designate in writing which Available Contracts from Schedule 2.5(a) relating to the Business or the Acquired Assets that Buyer wishes to "Assume", which shall include the Canadian CBAs (collectively, the "Assumed Contracts"). All Contracts of Sellers that are listed on Schedule 2.5(a) and which Buyer does not designate in writing for assumption shall not be considered Assumed Contracts or Acquired Assets and shall automatically be deemed "Excluded Contracts" (and for the avoidance of doubt, Buyer shall not be responsible for any related Cure Costs); provided, however, that if an Available Contract is subject to a cure dispute or other dispute as to the assumption or assignment of such Available Contract that has not been resolved to the mutual satisfaction of Buyer and Sellers prior to the Determination Date, then the Determination Date shall be extended (but only with respect to such Available Contract) to no later than the earlier of (A) the date on which such dispute has been resolved to the mutual satisfaction of Buyer and Sellers, (B) the date on which such Available Contract is deemed rejected by operation of 11 U.S.C. § 365(d)(4) and (C) the date required by the Bankruptcy Courts and set forth in the Sale Order (the "Extended Contract Period"); provided, further, that Buyer must assume, and may not reject, the Key Employment Agreements, each of which shall be an Assumed Contract for all purposes hereof (provided, that, notwithstanding anything to the contrary in the foregoing, each individual party to a Key Employment Agreement will, at or prior to the Closing, execute a written acknowledgement confirming that (1) the transactions contemplated by this Agreement do not constitute a "change of control" (or similar transaction) under, and for purposes of, such individual's Key Employment Agreement, but not waiving any rights with respect to any transaction following the Closing that may constitute a "change of control" (or similar transaction) thereunder and (2) such Key Employment Agreement is amended and restated to exclude all indemnification provision thereunder, and Buyer shall be required to assume each Key Employment Agreement (as so modified) with an individual who executes and delivers such a written acknowledgement to Buyer at or prior to the Closing; provided, however, that, at Closing, Buyer shall enter into an indemnification agreement with each such individual who so waives the right to indemnification under his or her Key Employment Agreement which provides for customary indemnification

33

rights for directors, officers and employees of Buyer and its Affiliates on a go forward basis, including as to claims against such individual for costs of defense (but not for refunding of payments) regarding Sellers' key employee retention plan, and shall procure customary director and officer insurance coverage for the post-Closing directors and officers, including a customary "tail" policy or comparable director and officer insurance coverage reasonably acceptable to Buyer and Sellers (which, for the avoidance of doubt, will cover pre-Closing directors, officers and any other individuals who are party to the Key Employment Agreements for the applicable statute of limitations). Such insurance coverage will be procured by Buyer's brokers in consultation with Sellers.  If such Available Contract is not expressly assumed by Buyer in writing by the end of such Extended Contract Period, such Available Contract shall be automatically deemed an Excluded Contract. Buyer shall be responsible for any obligations or Liabilities arising following the Closing during any Extended Contract Period relating to any Available Contract that has not been assumed or rejected as of the Determination Date as provided in this Section 2.5(a). For the avoidance of doubt, except as set forth in Section 2.3 and other than as provided in the preceding sentence, Buyer shall not assume or otherwise have any Liability with respect to any Excluded Contract.

(ii)    Each of Sellers and Buyer, as applicable, shall use commercially reasonable efforts to assign, or cause to be assigned, the Assumed Contracts to Buyer or to the applicable Buyer Designee, including taking all actions required by the Bankruptcy Courts to obtain an Order containing a finding that the proposed assumption and assignment of the Assumed Contracts to Buyer satisfies all applicable requirements of Section 365 of the Bankruptcy Code or the CCAA.

(iii)    If, prior to the Closing Date, there are Available Contracts that have not been designated as an Assumed Contract or an Excluded Contract, Sellers shall reject such Available Contract pursuant to Section 365 of the Bankruptcy Code and any applicable provisions of the CCAA, upon the earlier of (x) the date Buyer so directs Sellers and (y) the end of the Extended Contract Period, if applicable (which assumption shall be at Buyer's sole cost and expense); provided, that Buyer shall be responsible for any obligations or Liabilities arising following the Closing during any Extended Contract Period.

(iv)    At Closing, but subject to Sections 2.5(a)(i) and 2.5(a)(iii), (x) Sellers shall, pursuant to the Sale Order, assume and assign, or cause to be assigned, to Buyer or to the applicable Buyer Designee (the consideration for which is included in the Purchase Price) each of the Assumed Contracts that is capable of being assumed and assigned and (y) Buyer shall pay promptly all Cure Costs (if any) in connection with such assumption and assignment (as agreed to among Buyer and Sellers or as determined by the Bankruptcy Courts) and assume and perform and discharge the Assumed Liabilities (if any) under the Assumed Contracts, pursuant to the Sale Order.

(v)    An initial estimate of Cure Costs is set forth on Schedule 2.5(a)(v), which shall be included in the Disclosure Schedules.  Not less than five (5) Business Days prior to the Cure Notice Date, Sellers will provide to Buyer the full version of Schedule 2.5(a)(v) that will be used to generate the Cure Notices on the Cure Notice Date, subject to Buyer's input on which Available Contracts should be Assumed Contracts for the Cure Notices.

34

(b)    <u>Previously Omitted Contracts</u>.

(i)    If prior to or following Closing, it is discovered that a Contract should have been listed on <u>Schedule 2.5(a)</u> but was not listed on <u>Schedule 2.5(a)</u> and has not been rejected by Sellers pursuant to <u>Section 2.5(a)</u> (any such Contract, a "<u>Previously Omitted Contract</u>"), Sellers shall, promptly following the discovery thereof (but in no event later than five (5) Business Days following the discovery thereof), notify Buyer in writing of such Previously Omitted Contract and all Cure Costs (if any) for such Previously Omitted Contract, and provide Buyer a copy of such Previously Omitted Contract.  Buyer shall thereafter deliver written notice to Sellers, no later than five (5) Business Days following notification of such Previously Omitted Contract from Sellers, designating such Previously Omitted Contract as "Assumed" or "Rejected" (a "<u>Previously Omitted Contract Designation</u>").  A Previously Omitted Contract designated in accordance with this <u>Section 2.5(b)(i)</u> as "Rejected," or with respect to which Buyer fails to timely deliver a Previously Omitted Contract Designation, shall be an Excluded Contract.

(ii)    If Buyer designates a Previously Omitted Contract as "Assumed" in accordance with <u>Section 2.5(b)(i)</u>, Sellers shall serve a notice (the "<u>Previously Omitted Contract Notice</u>") on the counterparties to such Previously Omitted Contract notifying such counterparties of the Cure Costs with respect to such Previously Omitted Contract and Sellers' intention to assume and assign such Previously Omitted Contract in accordance with this <u>Section 2.5</u>.  The Previously Omitted Contract Notice shall provide the counterparties to such Previously Omitted Contract with ten (10) Business Days to object, in writing to Sellers and Buyer, to the Cure Costs or the assumption of its Contract.  If the counterparty to an assumed Previously Omitted Contract files an objection to the Cure Costs in a manner that is consistent with the Bidding Procedures, and Sellers, Buyer, and counterparty are unable to reach a consensual resolution with respect to the objection, Sellers shall seek an expedited hearing before the applicable Bankruptcy Court to determine the Cure Costs, if any, and approve the assumption of the relevant Previously Omitted Contract.  If no objection to the Cure Costs is served on Sellers and Buyer, Sellers shall seek an order of the applicable Bankruptcy Court, including by filing a certification of no objection, fixing the Cure Costs and approving the assumption of the Previously Omitted Contract. In the event the Court determines the Cure Costs in a manner not acceptable to the Buyer, the Buyer reserves the right to seek to reject the Previously Omitted Contract.  Buyer shall be responsible for all Cure Costs relating to such "Assumed" Previously Omitted Contracts and for any obligations or Liabilities relating to such "Assumed" Previously Omitted Contracts arising during the Extended Contract Period.

(c)    <u>Non-Assignment of Contracts</u>.  Notwithstanding anything contained in this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer any Contract if, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code and the corresponding provisions of the CCAA, an attempt at assignment or transfer thereof, without the consent or approval required or necessary for such assignment or transfer, would constitute a violation of a Legal Requirement or a breach of such Contract.  If, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code and the corresponding provisions of the CCAA and the commercially reasonable efforts of Sellers, such consent or approval is required but not obtained with respect to an Assumed Contract, neither Sellers nor Buyer shall be in breach of this Agreement nor shall the Purchase Price be adjusted

nor (but subject to Buyer's termination right set forth in <u>Section 11.1</u>) shall the Closing be delayed in respect of the Assumed Contracts; <u>provided</u>, <u>however</u>, if the Closing occurs, then, with respect to any Assumed Contract for which consent or approval is required but not obtained, from and after the Closing for a period of no more than six (6) months, Sellers shall reasonably and timely cooperate, at Buyer's sole cost and expense, with Buyer in any reasonable arrangement that Buyer may request to provide Buyer with all of the benefits of, or under, the applicable Assumed Contract, including enforcement for the benefit of Buyer of any and all rights of Sellers against any party to the applicable Assumed Contract arising out of the breach or cancellation thereof by such party; <u>provided</u>, <u>however</u>, to the extent that any such arrangement has been made to provide Buyer with the benefits of, or under, the applicable Assumed Contract, from and after the Closing, Buyer shall be responsible for, and shall promptly pay and perform all payment and other obligations under such Assumed Contract (all of which shall constitute, and shall be deemed to be, Assumed Liabilities hereunder) to the same extent as if such Assumed Contract had been assigned or transferred at Closing with respect to Assumed Contracts, and at such applicable later date specified in this <u>Section 2.5(c)</u> with respect to any additional Assumed Contracts. Any assignment to Buyer of any Assumed Contract that shall, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code and the corresponding provisions of the CCAA, require the consent or approval of any Person for such assignment as aforesaid shall be made subject to such consent or approval being obtained. Notwithstanding anything to the contrary contained herein, Buyer shall reimburse, indemnify and hold harmless Sellers and/or their Affiliates from any and all reasonable out-of-pocket costs incurred by Sellers and/or their Affiliates in connection with any action taken by Sellers at Buyer's or its Affiliates' request pursuant to this <u>Section 2.5(c)</u>; <u>provided</u> that Sellers shall provide Buyer reasonable advance written notice before incurring any reimbursable costs in connection with complying with this <u>Section 2.5(c)</u> and no amounts shall be reimbursed to the extent such amounts are otherwise satisfied from the DIP Budget, the Professional Fees Escrow Account or the Wind-Down Escrow Account.

    2.6  <u>Further Assurances</u>.

    (a)  Except as otherwise provided herein (including <u>Section 7.3</u>) and subject to the terms and conditions of this Agreement, the Bankruptcy Code, the CCAA and any orders of the Bankruptcy Courts, from and after the Execution Date, Sellers and Buyer shall use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under applicable Legal Requirements to consummate the transactions contemplated by this Agreement, including (i) preparing and filing as promptly as practicable with any Governmental Authority or other third party all documentation to effect all necessary filings, notices, petitions, statements, registrations, submissions of information, applications and other documents and (ii) obtaining and maintaining all approvals, consents, registrations, permits, authorizations and other confirmations required to be obtained from any Governmental Authority or other third party that are necessary, proper or advisable to consummate the transactions contemplated by this Agreement, in each case, after giving effect to the Sale Order.

    (b)  At and after the Closing, Sellers shall execute and deliver to Buyer such further instruments and certificates as reasonably requested by Buyer and Buyer will reimburse Sellers for any out of pocket expenses incurred by Sellers in connection with actions

36

taken by Sellers (i) to vest, perfect or confirm ownership (of record or otherwise) in Buyer and/or one or more Buyer Designees, Sellers' right, title or interest in, to or under any or all of the Acquired Assets and Business, including the Real Property, free and clear of all Encumbrances (other than Permitted Encumbrances and Assumed Liabilities) or (ii) to otherwise effectuate the purposes and intent of this Agreement and the other Transaction Documents.  In furtherance of the foregoing, Sellers hereby grant to Buyer an irrevocable proxy and power of attorney coupled with an interest to execute the foregoing instruments and certificates.  From and after the Closing Date, Buyer will reimburse Sellers for any out-of-pocket expenses incurred by Sellers in connection with actions taken by Sellers under this <u>Section 2.6(b)</u>, <u>provided</u> that Sellers shall provide Buyer reasonable advance written notice before incurring any reimbursable costs in connection with complying with this <u>Section 2.6(b)</u> and no amounts shall be reimbursed to the extent such amounts are otherwise satisfied from the DIP Budget, the Professional Fees Escrow Account or the Wind-Down Escrow Account, and each of the Parties shall take, or cause to be taken, and cooperate with the other Parties to take, or cause to be taken, all actions, do or cause to be done all things as may be reasonably requested by the other Parties in order to vest, perfect or confirm any and all right, title and interest in, to and under such rights, properties or assets in Buyer or one of more Buyer Designees or otherwise to carry out this Agreement, and shall execute and deliver all deeds, bills of sale, instruments of conveyance, powers of attorney, assignments, assumptions and assurances, and as may be required to consummate the transactions contemplated by this Agreement, it being specifically understood that, notwithstanding anything to the contrary herein, no Seller shall have any obligation to pay any title insurance fee or premium in connection with any title insurance commitment or policy Buyer may obtain, in each case, included any related costs and expenses (except to the extent Buyer agrees to reimburse Sellers for any out-of-pocket expenses incurred by Sellers in connection with such commitment or policy).

(c)      Each Seller shall use its respective reasonable best efforts to assist Buyer in obtaining Title Commitments, Title Policies and Surveys, including using its reasonable best efforts to remove from title any liens or encumbrances which are not Permitted Encumbrances.  Each Seller shall provide the Title Company with any customary affidavit, indemnity or other assurances reasonably requested by the Title Company to issue the Title Policies; <u>provided</u>, that in no event will any individual executing any such document on behalf of a Seller be required to execute any document imposing (or purporting to impose) personal liability.

(d)      The Parties acknowledge it will not be commercially feasible for Buyer and Buyer Designees to physically obtain new vehicle registrations and placards for each item of Equipment comprising Acquired Assets immediately following the Closing. Accordingly, Sellers consent and agree that all such equipment may continue to be operated following the Closing (a) using Sellers' existing registrations until the expiration of such registrations, and (b) using Sellers' existing placard for a period of no longer than ninety (90) days in order to efficiently transfer and continue the Business.

2.7      <u>Identification of Excluded Assets</u>.

At any time prior to the Auction, Buyer will be entitled, in its sole discretion, to remove any property, asset or right or category or group of properties, assets or rights of Sellers from the

Acquired Assets and designate such right, property or asset or category or group of properties, assets or rights as an Excluded Asset by providing written notice thereof to Sellers, which notice shall specifically identify each right, property and/or asset or category or group of properties, assets and/or rights that is being designated by Buyer as an Excluded Asset and (a) any such property, asset or right or category or group of properties, assets or rights so designated will be deemed to be an "Excluded Asset" (and not an "Acquired Asset") for all purposes hereunder and (b) all corollary terms in this Agreement in respect of the terms "Acquired Asset" and "Excluded Asset", including the term "Business", shall be deemed to be modified to reflect such removal and designation, *mutatis mutandis*; provided that, for the avoidance of doubt, any such removal and designation by Buyer in accordance with this Section 2.7 shall not reduce or otherwise modify or affect the Purchase Price.

## ARTICLE 3

### PURCHASE PRICE

3.1     Consideration.

The aggregate consideration (the "Purchase Price") for the purchase, sale, assignment and conveyance of the Acquired Assets shall consist of:

(a)     cash (the "Cash Consideration") in an aggregate amount equal to (i) the Professional Fees Amount, plus (ii) the Wind Down Amount, plus (iii) to the extent not covered by the foregoing, an additional amount that shall be sufficient to pay for any assets that cannot be acquired through a credit bid (if any), provided that such additional cash shall not exceed $1,000,000;

(b)     the assumption by Buyer or a Buyer Designee, as applicable, of the Assumed Liabilities from Sellers, including the assumption of (i) all obligations under the Exit Facilities and (ii) the obligation to pay to the applicable counterparties of the applicable Assumed Contracts the Cure Costs payable by Buyer under Section 2.5; and

(c)     the release of Sellers that are borrowers or guarantors under the Junior Credit Agreements and/or the DIP Term Loan Facility of the obligations arising thereunder or otherwise relating thereto, in an aggregate amount not less than (i) $425,000,000, minus (ii) the Cash Consideration, minus (iii) the aggregate outstanding principal amount under the (x) U.S. Revolver Facility, (y) Canadian Sub-Facility and (z) First Lien Term Loan Facility (the "Credit Bid and Release") pursuant to Section 363(k) of the Bankruptcy Code.

At the option of Buyer, Sellers shall retain a designated amount of unrestricted cash that would otherwise be included in the Acquired Assets, and such unrestricted cash so retained shall reduce, on a dollar for dollar basis, the cash amount that would otherwise be required to be included in the Purchase Price pursuant to this Section 3.1.

3.2     Allocation of Purchase Price.

(a)     Buyer and Sellers agree that, for Buyer's and Sellers' respective federal, state, provincial and local income tax purposes, the Purchase Price, the Assumed

Liabilities and other relevant items shall be allocated among the Acquired Assets as mutually agreed by Buyer and Sellers in a manner consistent with Section 1060 of the Code and the Treasury Regulations promulgated thereunder.

(b)      Within sixty (60) days of the Closing Date, Buyer shall prepare and deliver to Sellers a statement allocating the sum of the Purchase Price, the Assumed Liabilities and other relevant items among the Acquired Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (such statement, the "Allocation Statement").

(c)      Sellers shall have a period of thirty (30) days after the delivery of the Allocation Statement (the "Response Period") to present in writing to Buyer notice of any objections that Sellers may have to the allocations set forth therein (an "Objections Notice"). Unless Sellers timely object, such Allocation Statement shall be binding on the Parties without further adjustment.

(d)      If Sellers shall raise any objections within the Response Period, Buyer and Sellers shall negotiate in good faith and use their commercially reasonable efforts to resolve such dispute.  If the Parties fail to agree within fifteen (15) days after the delivery of the Objections Notice, then the disputed items shall be resolved by a firm of independent nationally recognized accountants reasonably chosen and mutually accepted by both Parties (the "Accounting Referee"), whose determination shall be final and binding on the Parties.  The Accounting Referee shall resolve the dispute within thirty (30) days after the item has been referred to it.  The costs, fees and expenses of the Accounting Referee allocated to Buyer, on the one hand, and Sellers on the other hand, shall be based on the inverse of the percentage that the Accounting Referee determination (before such allocation) bears to the total amount of the total items in dispute as originally submitted to the Accounting Referee.  For example, should the items in dispute total in amount to $1,000 and the Accounting Referee awards $600 in favor of Sellers' position, 60% of the costs of its review would be borne by Buyer and 40% of the costs would be borne by Sellers.

(e)      The allocation of the Purchase Price pursuant to the Allocation Statement (if applicable, as modified by Section 3.2(d) hereof) shall be final and binding on the Parties, and the Parties agree that the values allocated to the Acquired Assets represent the respective fair market values thereof, and the Parties shall follow the Allocation Statement for purposes of filing IRS Form 8594 (and any supplements to such form) and all other Tax Returns, and shall not take any position inconsistent therewith.  If the IRS or any other taxation authority proposes a different allocation, Sellers or Buyer, as the case may be, shall promptly notify the other party of such proposed allocation.  Sellers or Buyer, as the case may be, shall provide the other party with such information and shall take such actions (including executing documents and powers of attorney in connection with such proceedings) as may be reasonably requested by such other party to carry out the purposes of this Section 3.2.  Except as otherwise required pursuant to a "determination" under Section 1313(a) of the Code (or any comparable provision of United States state, local, or non-United States law), (i) the transactions contemplated by Article 2 of this Agreement shall be reported for all Tax purposes in a manner consistent with the terms of this Section 3.2, and (ii) neither Party (nor any of their Affiliates) will take any position

inconsistent with this Section 3.2 in any Tax Return, in any refund claim, in any litigation or otherwise.

      3.3     Closing Date Statement.

Not less than two (2) Business Days prior to the Closing Date, the Company will execute and deliver to Buyer a statement (the "Closing Date Statement") which sets forth the Company's good faith estimate as of the Closing Date of the Professional Fees Amount, together with invoices from each payee of any portion thereof.

      3.4     Limitations on Buyer Liability.

For the avoidance of doubt, except for amounts deposited at Closing pursuant to Section 4.2 (to the extent such amounts are required to be deposited pursuant to this Agreement) or as otherwise expressly provided in this Agreement, Buyer shall have no liability with respect to the Professional Fees Amount or the Wind-Down Amount.

      3.5     Withholding.

Buyer (or any Affiliate thereof) shall be entitled to deduct and withhold from any amounts payable pursuant to this Agreement to Sellers such amounts as Buyer (or any Affiliate thereof) is required to deduct and withhold under applicable Legal Requirements.  To the extent that amounts are so deducted and withheld and remitted to the appropriate Governmental Authority, such amounts shall be treated for all purposes of this Agreement as having been paid to Sellers.

## ARTICLE 4

### CLOSING AND DELIVERIES

      4.1     Closing Date.

Upon the terms and subject to the conditions hereof, the closing of the sale of the Acquired Assets and the assumption of the Assumed Liabilities (other than those pertaining to Previously Omitted Contracts pursuant to Section 2.5(b) and Assumed Contracts subject to a cure dispute pursuant to Section 2.5(a)(i) contemplated hereby) (the "Closing") shall take place at the offices of King & Spalding LLP, 1180 Peachtree Street, Atlanta, GA 30309, as soon as practicable after the Sale Order becomes a Final Order, but in any event no later than three (3) Business Days following the date on which all the conditions set forth in Article 9 and Article 10 have been satisfied or (if permissible) waived by the Party entitled to waive such condition (other than the conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or (if permissible) waiver of such conditions), or on such other date and time as Sellers and Buyer may mutually agree in writing.  The date and time at which the Closing actually occurs is hereinafter referred to as the "Closing Date."  Upon consummation of the Closing, the purchase and sale of the Acquired Assets and the assumption of the Assumed Liabilities hereunder, and the Closing, shall be deemed to have occurred as of 12:01 a.m. (prevailing Eastern Time) on the Closing Date.

4.2 <u>Buyer's Deliveries</u>.

Subject to satisfaction or (if permissible) waiver of the other conditions set forth in <u>Article 9</u> and <u>Article 10</u>, at the Closing, Buyer shall deliver (and/or cause one or more of its Affiliates or Buyer Designees to deliver):

(a)      to Sellers, cash required by <u>Section 3.1(a)</u> (as may be adjusted pursuant to <u>Section 3.1</u>), if any, other than the Professional Fees Amount and the Wind-Down Amount;

(b)      to the Escrow Agent, the Professional Fees Amount, to be deposited and held in the Professional Fees Escrow Account by the Escrow Agent in accordance with the Escrow Agreement; <u>provided</u> that any unused portion of the Professional Fees Amount which is not utilized by Sellers to pay professional fees in accordance with the Escrow Agreement shall be returned to Buyer in accordance with the Escrow Agreement;

(c)      to the Escrow Agent, the Wind-Down Amount, to be deposited and held in the Wind-Down Escrow Account by the Escrow Agent in accordance with the Escrow Agreement; <u>provided</u> that any unused portion of the Wind-Down Amount which is not utilized by Sellers to pay wind-down expenses in accordance with the Escrow Agreement shall be returned to Buyer in accordance with the Escrow Agreement;

(d)      to Sellers, each other Transaction Document to which Buyer or a Buyer Designee is a party, duly executed by Buyer or such Buyer Designee, as applicable;

(e)      to Sellers, the certificates of Buyer to be received by Sellers pursuant to <u>Sections 10.1</u> and <u>10.2</u>;

(f)      to Sellers, a Waiver, duly executed by Buyer or any Buyer Designee, as applicable;

(g)      to Sellers, a payoff letter, release letter or other similar document, duly executed by Buyer and the other applicable parties, regarding the Credit Bid and Release; and

(h)      to Sellers, evidence, in form and substance reasonably acceptable to Sellers, that one or more credit bids of obligations under the Junior Credit Agreements and the DIP Term Loan Facility and on behalf of Buyer in payment of, in the aggregate, all of the Purchase Price as set forth in <u>Section 3.1</u> (other than the Assumed Liabilities and the cash portion of the Purchase Price) has been properly authorized.

4.3 <u>Sellers' Deliveries</u>.

At the Closing, Sellers shall deliver to Buyer:

(a)      the Bills of Sale and Deeds (in each case, relating to the Acquired Assets), and each other Transaction Document to which any Seller is a party, duly executed by the applicable Sellers;

(b)    (i) short form instruments of assignment of the Copyrights, Patents and Trademarks and other Intellectual Property that are owned by any of the Sellers, either alone or jointly, and included in the Acquired Assets, if any, duly executed by the applicable Sellers, in form for recordation with the appropriate Governmental Authorities, and in customary form reasonably acceptable to Buyer and (ii) in the case of Internet domain names, cooperation in updating the applicable registrars;

(c)    with respect to the Real Property included in the Acquired Assets, possession of such Real Property, together with copies (and originals in Sellers' possession) of all instruments, Leases and agreements evidencing Sellers' interest in the same, and any existing ALTA surveys, appraisals, property condition reports, owned legal descriptions and title policies concerning such Real Property, to the extent that they are in the possession of Sellers, and which shall be deemed to be delivered to the extent located at any of the Real Property;

(d)    certified copies of the Sale Order;

(e)    the certificates of Sellers to be received by Buyer pursuant to Sections 9.1 and 9.2;

(f)    certificates executed by each Seller, in the form prescribed under Treasury Regulation Section 1.1445-2(b) and reasonably acceptable to Buyer, that such Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Code; and

(g)    such other bills of sale, Deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Buyer, as Buyer may reasonably request to vest in Buyer all of the right, title and interest of Sellers in, to or under any or all of the Acquired Assets, including all Real Property, subject only to Permitted Encumbrances and Assumed Liabilities.

4.4    Buyer Designees.

At least three (3) Business Days prior to the Closing, Buyer shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this Section 4.4, one or more Affiliates of Buyer to (i) purchase specified Acquired Assets; (ii) assume specified Assumed Liabilities; and/or (iii) employ Buyer Employees, in each case, as of the Closing Date (any Person that shall be properly designated by Buyer in accordance with this clause, a "Buyer Designee"); it being understood and agreed, however, that any such right of Buyer to designate a Buyer Designee is conditioned upon (x) such Buyer Designee being able to perform the applicable covenants under this Agreement and, as applicable, any other transaction agreement to which Buyer is party and demonstrate satisfaction of the requirements of Section 365 of the Bankruptcy Code (to the extent applicable), including the provision of adequate assurance for future performance with respect to the Acquired Assets and Assumed Liabilities, (y) any such designation not creating any Liability for Sellers or their Affiliates that would not have existed had Buyer purchased the Acquired Assets, assumed the Assumed Liabilities and/or employed the Buyer Employees, and which Liability is not fully reimbursed by or on behalf of Buyer and (z) such designation not being reasonably expected to cause a delay, or prevent or hinder the consummation of the transactions contemplated by this Agreement.  As soon as reasonably

42

practicable and in no event later than three (3) Business Days prior to the Closing, Buyer shall make any such designations of Buyer Designees by way of a written notice to be delivered to Sellers, and Buyer Designees shall deliver a signed counterpart to this Agreement or joinder agreement to this Agreement and each other Transaction Document to which Buyer is party.  No such designation shall relieve Buyer of any of its obligations hereunder and any breach hereof by a Buyer Designee shall be deemed a breach by Buyer.  Buyer and Buyer Designees shall be jointly and severally liable for any obligations of Buyer and such Buyer Designees hereunder.  For the avoidance of doubt, and notwithstanding anything to the contrary herein, all Buyer Designees appointed in accordance with this Section 4.4 shall be included in the definition of "Buyer" for all purposes under this Agreement and all such Buyer Designees shall be deemed to have made all of the representations and warranties of Buyer set forth in this Agreement.

## ARTICLE 5

### REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers hereby jointly and severally represent and warrant to Buyer as of the date hereof and the Closing Date as follows, except as set forth in the Incorporated Information (so long as the applicability of the type of information contained the Incorporated Information to such representation and warranty is reasonably apparent on the face of such information to a Person familiar with the types of reports included in the Incorporated Information):

5.1     Organization and Good Standing.

Each Seller is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization.  Subject to the applicable provisions of the Bankruptcy Code and the CCAA, each Seller has all requisite corporate, limited liability company or similar power and authority, as applicable, to own, lease, develop, operate and use its properties, including the Acquired Assets, and to carry on its business as now conducted.  Each Seller is duly qualified or licensed to do business and is in good standing in each jurisdiction where the character of its Business or the nature of its properties, including the Acquired Assets, makes such qualification or licensing necessary, except for such failures to be so qualified or licensed or in good standing as would not, individually or in the aggregate, have a Material Adverse Effect.

5.2     Competition Act.  Neither the aggregate value of the assets in Canada of the Business, nor the gross revenues from sales in or from Canada generated from those assets, exceeds $96 million Canadian Dollars, all as determined in accordance with Part IX of the Competition Act.

5.3     Authority; Validity; Consents.

Each Seller has, subject to entry of the Sale Order, the requisite corporate, limited liability company or similar power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which such Seller is a party and to consummate the transactions contemplated hereby and thereby, and, subject to entry of the Sale Order, the execution, delivery and performance of this Agreement and such other

Transaction Documents by such Seller and the consummation by such Seller of the transactions contemplated herein and therein have been duly and validly authorized by all requisite corporate, limited liability company or similar action on the part of Sellers.  Subject to entry of the Sale Order, this Agreement has been duly and validly executed and delivered by each Seller and each other Transaction Document required to be executed and delivered by a Seller at the Closing will be duly and validly executed and delivered by such Seller at the Closing.  Subject to entry of the Sale Order, this Agreement and the other Transaction Documents constitute, with respect to each Seller that is party thereto, the legal, valid and binding obligations of such Seller (assuming the due authorization, execution and delivery by all other parties hereto and thereto), except in each case as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity.  Subject to entry of the Sale Order, except (a) as required to comply with, the HSR Act and the antitrust legislation of any other relevant jurisdiction applicable to the purchase of the Acquired Assets or the Business, (b) for entry of the Sale Order, (c) for notices, filings and consents required in connection with the Bankruptcy Cases, and (d) for the notices, filings and consents set forth on Schedule 5.3, Sellers are not required to give any notice to, make any registration, declaration or filing with or obtain any consent, waiver or approval from, any Governmental Authority in connection with the execution and delivery of this Agreement and the other Transaction Documents to which a Seller is a Party or the consummation and performance of any of the transactions contemplated hereby and thereby, except for such notices, registrations, declarations or filings, the failure of which to make or obtain would not, individually or in the aggregate, be material to the Business or the Acquired Assets.

5.4   No Conflict.

Except as a result of the Bankruptcy Cases or as set forth in Schedule 5.4, neither the execution and delivery by any Seller of this Agreement or any other Transaction Document to which it is (or will be) a party nor after giving effect to the Sale Order, the consummation of the transactions contemplated hereby or thereby nor, after giving effect to the Sale Order, compliance by it with any of the provisions hereof or thereof will, (a) conflict with or result in a violation of (i) any provision of the certificate of incorporation or bylaws (or other organizational or governing documents) of such Seller or (ii) any Order binding upon such Seller or by which the Business or any Acquired Assets are subject or bound, (b) other than as would not be material to the Business or the Acquired Assets (i) violate, conflict with, or result in a breach of any of the terms of, or constitute a default under, or give rise to any right of termination, modification, cancellation or acceleration under any license, insurance policy or Permit held by Sellers, authorization, consent, order or approval of, or registration, declaration or filings with, any Governmental Authority or (ii) result in a breach of or constitute a default under or give rise to any right of termination, modification, cancellation or acceleration under any Material Contract which is an Available Contract, or (c) result in the creation of any Encumbrance (other than a Permitted Encumbrance or Assumed Liability) upon the properties or assets of such Seller being sold or transferred hereunder.

5.5   Real Property.

(a)   Owned Real Property.  Schedule 5.5(a)(i) sets forth an accurate and complete list of the Owned Real Property.  Except for Permitted Encumbrances, Sellers have

good and marketable title in the Owned Real Property set forth on Schedule 5.5(a)(i). Except for the Lessor Leases, none of the Owned Real Property is subject to any lease, offers to lease or grant to any third-party of any right to the use, purchase, occupancy or enjoyment of such Owned Real Property or any material portion thereof required to conduct the Business. Except for Permitted Encumbrances and the applicable terms of Permits held by Sellers and their Affiliates, the Owned Real Property is not subject to any Encumbrances (other than liens that will be removed pursuant to the Sale Order), which in any material respect interfere with or impair the present and continued use thereof in the Ordinary Course of Business. There are no pending or, to Sellers' Knowledge, threatened condemnation or expropriation proceedings relating to any of the Owned Real Property except those which do not materially impair or restrict the current use of the Owned Real Property subject thereto. Other than as set forth on Schedule 5.5(a)(ii) hereto, there are no outstanding options or rights of first refusal to purchase any of the Owned Real Property or any interest therein.

(b)    Lessor Leases. Schedule 5.5(b) lists all material unexpired leases, offers to lease, subleases, licenses, sublicenses, occupancy or other agreements whereby any Seller leases, subleases, licenses or grants an interest in any Owned Real Property or Leased Real Property to a third party (the "Lessor Leases") including the date and name of the parties to such Lessor Lease document. Sellers have made available, to the extent that they are in Sellers' possession or under their reasonable control, true, complete and correct copies of the Lessor Leases to Buyer, including any amendments thereto. Other than as set forth on Schedule 5.5(b)(i)or as a result of the Bankruptcy Cases, Sellers are not in material breach of or in default under the Lessor Leases and, to Sellers' Knowledge, no party to any Lessor Lease has given Sellers written notice of or, to Sellers' Knowledge, made a claim with respect to any material breach or material default by Sellers thereunder (other than as a result of the Bankruptcy Cases). Except as set forth in Schedule 5.5(b), with respect to each of the Lessor Leases: (i) such Lessor Lease is legal, valid, binding, enforceable and in full force and effect; (ii) neither any Seller who is party to such Lessor Lease nor, to Sellers' Knowledge, any other party to such Lessor Lease is in breach or default thereunder, and no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a breach or default thereunder; (iii) no security deposit or portion thereof deposited with respect such Lessor Lease has been applied in respect of a breach or default under such Lessor Lease which has not been redeposited in full; (iv) such Seller does not owe any brokerage commissions or finder's fees with respect to such Lessor Lease; (v) the other party to such Lessor Lease is not an Affiliate of such Seller; (vi) to Sellers' Knowledge, the other party to such Lessor Lease has not subleased, licensed or otherwise granted any Person the right to use or occupy, the premises demised thereunder or any portion thereof; (vii) to Sellers' Knowledge, the other party to such Lessor Lease has not collaterally assigned or granted any other security interest in such Lessor Lease; and (viii) there are no liens or encumbrances on the estate or interest created by such Lessor Lease.

(c)    Leased Real Property. Schedule 5.5(c) contains a true and complete list of the address of each Leased Real Property, and a true and complete list of all Leases (including all amendments, extensions, renewals, guaranties and other agreements with respect thereto) for each such Leased Real Property (including the date and name of the parties to such Lease document). Seller has delivered to Buyer a true and complete copy of each such Lease document, and in the case of any oral Lease, a written summary of the material terms of

45

such Lease. Except as set forth in Schedule 5.5(c)(i), with respect to each of the Leases: (i) such Lease is legal, valid, binding, enforceable and in full force and effect; (ii) the assignment of such Lease to Buyer pursuant to this Agreement does not require the consent of any other party to such Lease, and will not result in a material breach of or material default under such Lease, or give rise to a termination right under such Lease; (iii) the applicable Seller's possession and quiet enjoyment of the Leased Real Property under such Lease has not been materially disturbed; (iv) to Sellers' Knowledge, there are no disputes with respect to such Lease; (v) neither such Seller nor, to Sellers' Knowledge, any other party to the Lease is in material breach or material default under such Lease, and no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a material breach or material default, or permit the termination, modification or acceleration of rent under such Lease; (vi) no security deposit or portion thereof deposited with respect such Lease has been applied in respect of a breach or default under such Lease which has not been redeposited in full; (vii) such Seller does not owe any brokerage commissions or finder's fees with respect to such Lease; (viii) the other party to such Lease is not an Affiliate of such Seller; and (ix) such Seller has not subleased, licensed or otherwise granted any Person the right to use or occupy such Leased Real Property or any material portion thereof.

(d)     Leasehold Improvements.  Schedule 5.5(d) set forth a description of all material buildings, structures, improvements and fixtures located on any Leased Real Property which are owned by Sellers ("Leasehold Improvements").  The applicable Seller has good and marketable title to the Leasehold Improvements, free and clear of all liens and encumbrances, except Permitted Encumbrances, and other than the right of Buyer pursuant to this Agreement, there are no outstanding options, rights of first offer or rights of first refusal to purchase any such Leasehold Improvements.

(e)     Real Property Used in the Business.  The Owned Real Property identified in Schedule 5.5(a), the Leased Real Property identified in Schedule 5.5(c) and the Leasehold Improvements (collectively, the "Real Property") comprise all of the real property used in the Business.

(f)     Improvements.  All material Improvements are in good condition and repair and sufficient for the operation of the Business.  There are no material structural deficiencies affecting any of the Improvements and, to Sellers' Knowledge, there are no facts or conditions affecting any of the Improvements which would interfere in any material respect with the use or occupancy of the Improvements in the operation of the Business as currently conducted. The operation and use of the buildings and other improvements constituting the Owned Real Property or the Leased Real Property do not violate, in any material respect, any zoning, subdivision, building or similar law, ordinance, order, regulation or recorded plat or any certificate of occupancy issued with respect to the Owned Real Property or the Leased Real Property.

(g)     Access.  Each parcel of Owned Real Property has direct access to a public street adjoining the Owned Real Property, and such access is not dependent on any land or other real property interest which is not included in the Owned Real Property.

46

5.6    Environmental Matters.

Except as set forth on Schedule 5.6 and except as would not be material to the Business or the Acquired Assets:

(a)    Sellers' operation of the Business, and Real Properties related thereto, have complied during the previous three (3) years and are in compliance with all Environmental Laws;

(b)    Sellers have not received any written notice, written report or other written information from any Person alleging any pending or, to Sellers' Knowledge, threatened violation, non-compliance, liability or potential liability regarding Environmental Laws, including with regard to any of the Real Properties or the Business, or any prior business for which Sellers have retained, assumed or otherwise become subject to liability, including under any Contract or Environmental Law, nor have Sellers received written notice of, nor do the Sellers have, any pending or, to Sellers' Knowledge, threatened claims alleging any violations of Environmental Law;

(c)    the Real Properties do not contain any Hazardous Substances in amounts or concentrations which (i) constitute a violation of, or (ii) would give rise to material liability, including liability for response costs, corrective action costs, personal injury, property damage or natural resources damage, under, any Environmental Law;

(d)    no Seller or, to the Sellers' Knowledge. other Person, has treated, recycled, stored, disposed of, arranged for or permitted the disposal of, transported, handled, exposed any Person to, or Released any Hazardous Substances except as authorized by Environmental Permits, or owned or operated any property or facility contaminated by any Hazardous Substances, in each case as has given or could give rise to material liability, including liability for response costs, corrective action costs, personal injury, property damage or natural resources damage, of any Seller, or with respect to the Acquired Assets or the Business, under any Environmental Law;

(e)    no Action is pending or, to Sellers' Knowledge, threatened under any Environmental Law against Sellers or with respect to the Acquired Assets, including the Real Properties, or the Business, nor are there any Orders outstanding under any Environmental Law with respect to the Acquired Assets, including the Real Properties or the Business;

(f)    Sellers (i) hold, maintain and are in compliance with all material Environmental Permits (each of which is in full force and effect and is not subject to appeal) required for the Business, any of their operations, or for the ownership, operation or use of the Real Properties; (ii) are, or have been, in compliance with all Environmental Permits, in all material respects; (iii) have used commercially reasonable efforts to cause all contractors, lessees and other Persons occupying, operating or using the Real Properties to comply with Environmental Law and obtain all necessary Environmental Permits; and (iv) have not received any written notice that the Environmental Permits will not be renewed;

(g)    Sellers have made available copies of all material environmental, health and safety assessments, audits (including compliance audits), evaluations, policies,

47

procedures, studies, and tests within their possession or under their reasonable control which have been completed within the past three (3) years; and

(h)    none of the Acquired Assets contains underground storage tanks, above ground storage tanks, transformers or other equipment containing PCBs, underground injection wells, non-naturally occurring radioactive materials or septic tanks or waste disposal pits (to the extent such tanks or pits constitute Acquired Assets), in each case as would give rise to liability under Environmental Laws.

5.7    Title to Acquired Assets; Sufficiency of Acquired Assets.

(a)    Subject to obtaining the Sale Order, Sellers have good, valid and marketable title to, or, in the case of property leased or licensed by Sellers, a valid leasehold or licensed interest in, all of the Acquired Assets, free and clear of all Encumbrances, except (i) for the Assumed Liabilities and (ii) for Permitted Encumbrances.

(b)    The Acquired Assets constitute all of the material assets, properties, rights and interests sufficient for the operation of the Business in substantially the same manner as operated as of the date of this Agreement.

5.8    Taxes.

(a)    Sellers have each timely and duly filed all income Tax, Excise Tax and Real Property Tax Tax Returns and all other material Tax Returns required to be filed with the appropriate Governmental Authorities (taking into account any extension of time to file properly granted to Sellers).  All such Tax Returns are true and correct in all material respects and were prepared in substantial compliance with all applicable law, and, except as set forth on Schedule 5.8(a), all income Tax, Excise Tax and Real Property Tax Tax Returns and other material Taxes, including those relating to the Business and/or the Acquired Assets, that are due and payable, whether or not shown to be payable on such Tax Returns, have been timely paid. Except as set forth on Schedule 5.8(a), (i) no examination of any such Tax Return of Sellers is currently in progress by any Governmental Authority and no Seller has received notice of any contemplated examination of any such Tax Return; and (ii) no adjustment has been proposed in writing with respect to any Tax Returns for the previous five (5) fiscal years by any Governmental Authority.

(b)    Except as set forth in Schedule 5.8(b), Sellers have not received written notice of any Tax deficiency, proposed or assessed against or allocable to Sellers and have not executed any waiver of any statute of limitations in respect of Taxes nor agreed to any extension of time with respect to a Tax assessment or deficiency.  Except as set forth in Schedule 5.8(b), there are no pending or threatened audits, investigations, disputes, notices of deficiency, claims or other actions for or relating to any Liability for Taxes, and there is no dispute or claim concerning any Tax liability of Sellers claimed or raised by any Governmental Authority in writing.

(c)    Except as set forth on Schedule 5.8(c), Sellers are not in default under, nor does there exist any condition which, with the giving of notice or passage of time would constitute a default by Sellers under, any agreement with any Governmental Authority

48

that provides for or results in a reduction, rebate or exemption from Taxes or any other form of Tax incentive applicable to the Business.

(d)    Except as set forth on Schedule 5.8(d), each Seller has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, agent, nonresident, member, shareholder, independent contractor, creditor, stockholder, or other third party and all IRS Forms W-2 and Forms 1099 (or any other applicable form) required with respect thereto have been properly and timely distributed.

(e)    Except as set forth on Schedule 5.8(e), no Seller (i) is a party to any Tax allocation or sharing agreement, (ii) has been a member of an Affiliated Group filing a consolidated federal income Tax Return (other than a consolidated group of which the Company is the parent of such group) or (iii) has any liability for the Taxes of any Person (other than a Seller) under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local, or non-U.S. law), as a transferee or successor, by contract, or otherwise.  No Seller has used the cash method of accounting for income Tax purposes.

(f)    No Seller is or has been a party to any "listed transaction," as defined in Code Section 6707A(c)(2) and Treasury Regulation Section 1.6011-4(b)(2).

(g)    Within the past five (5) years, no claim has been made in writing by any Governmental Authority in a jurisdiction where Sellers do not file Tax Returns that Sellers are or may be subject to taxation by, or required to file Tax Returns with, that jurisdiction.

(h)    Each Seller has (i) collected from each receipt from any of the past and present customers relating to the Business and the Acquired Assets (or other Persons paying amounts to such Seller) the amount of all Taxes (including sales, use, valued added and similar Taxes) required to be collected and has paid and remitted such Taxes when due, in the form required under appropriate Laws and (ii) for all sales, leases or provision of services relating to the Business and the Acquired Assets that are exempt from sales, use, valued added and similar Taxes and that were made without charging or remitting sales, use, valued added or similar axes, received and retained any appropriate Tax exemption certificates and other documentation qualifying such sale, lease or provision of services as exempt.

(i)    None of the Acquired Assets constitute (i) "tax-exempt use property" within the meaning of Section 168(h) of the Code (or any similar provision of state, local or non-U.S. Law) or (ii) "tax-exempt bond-financed property" within the meaning of Section 168(g)(5) of the Code (or any similar provision of state, local or non-U.S. Law).  No portion of the cost of any Acquired Asset has been financed directly or indirectly from the proceeds of any tax-exempt state or local government obligation described in Code Section 103(a).

(j)    None of the Acquired Assets of the Specified Foreign Subsidiaries constitutes a "United States real property Interest" within the meaning of Section 897(c)(1) of the Code (or any similar provision of state, local or foreign Law).

49

(k)      None of the Assumed Liabilities is an obligation to make a payment that is not deductible under Section 280G of the Code.  None of the Assumed Liabilities are, actual or potential indemnity or gross-up obligation owed to any employee, director or consultant of the Business for any Taxes imposed under Sections 4999 or 409A of the Code (or any similar provision of state, local or non-U.S. Law).

(l)      None of Sellers have adopted as a method of accounting, or otherwise accounted for any advance payment or prepaid amount under, (i) the "deferral method" of accounting described in Rev. Proc. 2004-34, 2004-22 IRB 991 (or any similar method under state, local or non-U.S. law, including Section 451(c) of the Code) or (ii) the method described in Treasury Regulation Section 1.451-5(b)(l)(ii) (or any similar method under state, local or non-U.S. law).

(m)      Buyer will not be required to include an item of income in, or exclude an item of deduction from, taxable income for any Tax period (or portion thereof) ending after the Closing Date as a result of any prepaid amount received or deferred revenue accrued prior to the Closing Date in connection with the Business.

(n)      No Acquired Asset represents an interest in a partnership or other entity for any applicable Tax purpose.

(o)      (i) Each of the Canadian Borrowers other than Jack Cooper Canada 1 Limited Partnership and Jack Cooper Canada 2 Limited Partnership is not a "non-resident" of Canada within the meaning of the Canadian Tax Act; (ii) each of Jack Cooper Canada 1 Limited Partnership and Jack Cooper Canada 2 Limited Partnership is a "Canadian partnership" within the meaning of the Canadian Tax Act; and (iii) no Seller, other than the Canadian Borrowers, carries on business in Canada or owns any Acquired Assets that constitute "taxable Canadian property" within the meaning of the Canadian Tax Act.

(p)      (i) Each of the Canadian Borrowers is duly registered under Part IX of the GST Act (and, where applicable, any similar provincial legislation) with respect to GST/HST and the QST Legislation (and, where applicable, any other similar provincial Tax), with the registration numbers set forth on Schedule 5.8(p); and (ii) each of the Canadian Borrowers has complied with all registration, reporting, payment, collection and remittance requirements in respect of GST/HST and QST (and, where applicable, any other similar provincial Tax).

(q)      Within the meaning of Treasury Regulation Section 1.897-2(b)(2)(ii), no more than 50% of the fair market value of any Seller's aggregate assets, or 25% of the book value of any Seller's  aggregate assets, is comprised of "United States real property interests" within the meaning of Section 897(c)(1) of the Code (or any similar provision of state, local or foreign Law).

5.9      Legal Proceedings.

Except (x) for the Bankruptcy Cases (and proceedings related thereto) and (y) as set forth on Schedule 5.9, there is no Proceeding, Claim or Order pending, outstanding or, to Sellers' Knowledge, threatened against or related to the Business, the Sellers or any of their

respective Affiliates, whether at law or in equity, whether civil or criminal in nature or by or before any Governmental Authority, nor, to Sellers' Knowledge, are there any investigations relating to the Business, the Sellers, or any other their respective Affiliates, pending or, to Sellers' Knowledge, threatened by or before any arbitrator or any Governmental Authority, in each case, which would be material to the Business or the Acquired Assets, individually, or in the aggregate.

5.10    Compliance with Legal Requirements; Permits.

(a)    Except as set forth in Schedule 5.10(a), Sellers hold all of the Permits necessary for the current operation and conduct of the Business and the Acquired Assets in compliance with Legal Requirements, except for any such Permits the absence of which would be immaterial to the operation of the Business or the Acquired Assets from and after the Closing.  The Permits set forth on Schedule 2.1(f) are all of the Permits held by Sellers with respect to the current operation and conduct of the Business and the Acquired Assets, the absence of which would be reasonably expected to adversely affect the operation of the Business or the Acquired Assets from and after the Closing.

(b)    Except (x) as set forth on Schedule 5.10(b), and (y) as would not reasonably be expected to be material to the Business or the Acquired Assets, Sellers have conducted the Business for the past three (3) years and currently own and operate the Acquired Assets in accordance, with all Legal Requirements, Orders and Permits applicable to Sellers and the Acquired Assets during such period, and the Business is in compliance with all applicable Legal Requirements, Orders and Permits (including any anti-bribery Legal Requirements) and has obtained all approvals necessary for owning and operating its assets and has made all necessary filings with all Governmental Authorities having jurisdiction necessary for owning and operating its assets.

(c)    Except (x) as set forth on Schedule 5.10(c) and (y) as would not be material to the Business or the Acquired Assets neither Sellers, nor to Sellers' Knowledge, any of their Representatives have received within the past three (3) years any written notice or other communication from a Governmental Authority that alleges that the Business is not in compliance with any Legal Requirement, Order or Permit applicable to the Business or the operations or properties of the Business or the Acquired Assets or that threatens or states the intention on the part of any issuing authority to revoke, cancel, suspend or modify any Permit necessary for the current operation and conduct of the Business and the Acquired Assets (except with respect to regular periodic expirations and renewals thereof).  Except as would not be material to the Business or the Acquired Assets: (i) no Seller has had any Permits that are necessary for the operation and conduct of the Business and the Acquired Assets appealed, denied, revoked, restricted or suspended during the past three (3) years; and (ii) no Seller is currently a party to any Proceedings involving the possible appeal, denial, revocation, restriction or suspension of any Permits that are necessary for the current operation and conduct of the Business and the Acquired Assets or any of the privileges granted thereunder (except where the obligation to hold such a Permit is being contested in good faith by appropriate proceedings diligently conducted or is excused by the Bankruptcy Code).

51

5.11    <u>Labor Matters</u>.

(a)    Except as set forth on <u>Schedule 5.11(a)</u>, none of Sellers are party to or subject to any collective bargaining agreements, works council agreements, labor union contracts, trade union agreements, and other similar agreements (each a "<u>Collective Bargaining Agreement</u>") with any union, works council, or labor organization (each a "<u>Union</u>" and collectively "<u>Unions</u>").

(b)    Except as set forth on <u>Schedule 5.11(b)</u>, to Sellers' Knowledge, in the past three (3) years, other than pursuant to procedures established in connection with the Bankruptcy Cases, (i) no Union or group of Employees or former Employees has sought to organize any employees for purposes of collective bargaining, sought to decertify any Union with whom any Seller has or had a collective bargaining relationship, sought to bargain collectively with any of Sellers, made a demand for recognition or certification as an employee representative for purposes of collective bargaining or filed a petition for recognition or decertification with any Governmental Authority; (ii) as of this date, no Collective Bargaining Agreement is being negotiated by any of Sellers, other than pursuant to procedures established in connection with the Bankruptcy Cases or in connection with the negotiation of the CBA Term Sheet; and (iii) in the past three (3) years, there have been no strikes, lockouts, slowdowns, work stoppages, boycotts, handbilling, picketing, walkouts, demonstrations, leafleting, sit-ins, sick-outs, or other material forms of organized labor disruption with respect to any of Sellers.

(c)    Except as set forth on <u>Schedule 5.11(c)</u> within the past three (3) years, Sellers have not violated or failed to provide sufficient advance notice of layoffs or terminations as required by, or incurred any material Liability under, the Worker Adjustment and Retraining Notification Act of 1988, and including any similar state or local Legal Requirement (collectively, the "<u>WARN Act</u>"), or any applicable Legal Requirement for employees outside the United States regarding the termination or layoff of employees.  <u>Schedule 5.11(c)(i)</u> sets forth all employee layoffs, by date and location, implemented by Sellers with respect to the Business in the 90-day period preceding the Closing Date.  Except as set forth on <u>Schedule 5.11(c)(ii)</u> or as would not, individually or in the aggregate, reasonably be expected to be material to the Business or the Acquired Assets or pursuant to procedures established in connection with the Bankruptcy Cases; (i) within the past three (3) years, Sellers have been in compliance with all applicable Legal Requirements relating to labor and employment, including all Legal Requirements relating to employment practices; the hiring, promotion, assignment, and termination of employees; discrimination; equal employment opportunities; disability; labor relations; wages and hours; FLSA, classification of independent contractors, hours of work; payment of wages; immigration; workers' compensation; employee benefits; background and credit checks; working conditions; occupational safety and health; family and medical leave; employee terminations; and data privacy and data protection; (ii) there are no pending, or to Sellers' Knowledge, threatened, Actions against Sellers brought (or that would be brought) by or on behalf of any applicant for employment, any current or former Employee, any person alleging to be a current or former employee, any representative, agent, consultant, independent contractor, subcontractor, or leased employee, volunteer, or "temp" of Sellers, or any group or class of the foregoing, or any Governmental Authority, alleging violation of any labor or employment Legal Requirements, breach of any Collective Bargaining Agreement, breach of any express or implied contract of employment, wrongful termination of employment, or any other discriminatory, wrongful, or

tortious conduct in connection with the employment relationship; (iii) each of the Employees has all work permits, immigration permits, visas, or other authorizations required by any Legal Requirement for such Employee given the duties and nature of such Employee's employment; and (iv) no individual has been improperly excluded from, or wrongly denied benefits under, any Benefit Plan.

      5.12   <u>Employee Benefits</u>.

      (a)   <u>Schedule 5.12(a)</u> sets forth a correct and complete list of (i) each Multiemployer Plan to which any of the Sellers currently contributes, has an obligation to contribute or otherwise has any Liability, (ii) each Canadian Multi-Employer Plan to which any of the Sellers currently contributes, has an obligation to contribute or otherwise has any Liability, (iii) each Title IV Plan, and (iv) each other material Benefit Plan.

      (b)   Except as set forth in <u>Schedule 5.12(b)</u>, (i) no Benefit Plan (or any benefit plans, programs or arrangements of an ERISA Affiliate that would be a Benefit Plan if such ERISA Affiliate were a Seller) (A) is, or has been within the past three (3) years, a Title IV Plan or subject to Section 412 of the Code; (B) is maintained by more than one employer within the meaning of Section 413(c) of the Code; (C) is subject to Sections 4063 or 4064 of ERISA; or (D) is a Canadian Defined Benefit Plan; (ii) no Benefit Plan is (A) a "multiple employer welfare arrangement" as defined in Section 3(40) of ERISA; or (B) an "employee pension benefit plan" (within the meaning of Section 3(2) of ERISA) that is not intended to be qualified under Section 401(a) of the Code; and (iii) none of the Sellers or any of their respective ERISA Affiliates contributes to, or is obligated to contribute to, or within the three (3) years preceding this Agreement contributed to or was obligated to contribute to, a Multiemployer Plan.

      (c)   Sellers' sole funding obligation to or in respect of any Canadian Multiemployer Plan is to make the required contributions to the Canadian Multiemployer Plan in the amounts and in the manner set forth in the collective agreement, statute or municipal by-law, as applicable, pursuant to which Sellers are required to contribute to the Canadian Multiemployer Plan. Except as would not reasonably to expected to result in a material Liability, all contributions (including all employer contributions and employee salary reduction contributions) required to have been made to or in respect of any Canadian Multiemployer Plan under the terms of such Canadian Multiemployer Plan as of the Execution Date have been timely made or reflected on the applicable Financial Statements.

      (d)   (i) Each Benefit Plan has been established and administered by Sellers in all material respects in accordance with its terms and in compliance with the applicable provisions of ERISA, the Code and all other Legal Requirements; (ii) with respect to each Benefit Plan, except as would not reasonably be expected to be material, all reports, returns, notices and other documentation that are required to have been filed with or furnished to the Internal Revenue Service (the "<u>IRS</u>"), the United States Department of Labor ("<u>DOL</u>") or any other Governmental Authority, or to the participants or beneficiaries of such Benefit Plan in the past three (3) years have been filed or furnished on a timely basis; (iii) each Benefit Plan that is intended to be qualified within the meaning of Section 401(a) of the Code has received a favorable opinion or determination letter from the IRS to the effect that such Benefit Plan satisfies the requirements of Section 401(a) of the Code and, to Sellers' Knowledge, there are no

facts or circumstances that could reasonably be expected to cause the loss of such qualification or the imposition of any material liability, penalty or tax under ERISA, the Code or any other Legal Requirements; (iv) no Benefit Plan that is intended to be qualified within the meaning of Section 401(a) of the Code has been partially or completely terminated; (v) other than routine claims for benefits, no material liens, lawsuits or complaints to or by any person or Governmental Authority have been filed in the past three (3) years against any Benefit Plan or against Sellers with respect to any Benefit Plan and, to Sellers' Knowledge, no such material liens, lawsuits or complaints are contemplated or threatened with respect to any Benefit Plan; (vi) there are no corrections, audits or proceedings initiated pursuant to the IRS Employee Plans Compliance Resolution System (currently set forth in Revenue Procedure 2019-20) or similar proceedings pending with the IRS or DOL or anticipated being initiated by any of the Sellers with respect to any Benefit Plan, including any tax qualified Benefit Plan from which distributions are eligible to be rolled over; and (vii) no Benefit Plan that is maintained for employees in the United States that is a group health plan has a waiting period in excess of 90 days, and each such Benefit Plan satisfies the "minimum value" and "affordability" requirements of the Patient Protection and Affordable Care Act.

(e)     Within the past three (3) years, there has been no "reportable event" (as defined in Section 4043 of ERISA and the regulations thereunder) with respect to any Title IV Plan that required or would require the giving of notice to the Pension Benefit Guaranty Corporation (the "PBGC") under Section 4041(c)(3)(C) or 4063(a) of ERISA.

(f)     Except as set forth in Schedule 5.12(f), (i) no Seller has terminated any Title IV Plan within the last three (3) years or incurred any outstanding liability under Section 4062 of ERISA to the PBGC, or to a trustee appointed under Section 4042 of ERISA; (ii) all premiums due the PBGC and all contributions to or with respect to the Title IV Plans set forth in Schedule 5.12(a) have been fully paid; (iii) no Seller has filed a notice of intent to terminate any Title IV Plan set forth in Schedule 5.12(a) and has not adopted any amendment to treat such Title IV Plan as terminated; (iv) the PBGC has not instituted, or to Sellers' Knowledge, threatened to institute, proceedings to treat any Title IV Plan set forth in Schedule 5.12(a) as terminated; and (v) to Sellers' Knowledge no event has occurred or circumstance exists that may constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Title IV Plan set forth in Schedule 5.12(a).

(g)     Except as set forth in Schedule 5.12(g), no Seller or ERISA Affiliate has, within the past three (3) years, withdrawn from a Multiemployer Plan in a "complete withdrawal" or a "partial withdrawal" as defined in Sections 4203 and 4205 of ERISA, respectively, so as to result in an unsatisfied liability, contingent or otherwise (including the obligations pursuant to an agreement entered into in accordance with Section 4204 of ERISA), of such Seller or ERISA Affiliate.

(h)     No Seller or any organization to which such Seller is a successor or parent corporation, within the meaning of Section 4069(b) of ERISA, has engaged in any transaction described in Sections 4069 or 4212(c) of ERISA.

(i)     Neither Sellers nor, to Sellers' Knowledge, any other "party in interest" or "disqualified person" with respect to any Benefit Plan has engaged in a non-exempt "prohibited transaction" within the meaning of Section 406 of ERISA or Section 4975 of the

Code involving such Benefit Plan which, individually or in the aggregate, could reasonably be expected to subject Sellers to Liability, tax or penalty imposed by Section 4975 of the Code or Sections 501, 502 or 510 of ERISA.  To Sellers' Knowledge, no fiduciary has incurred any liability for breach of fiduciary duty or any other failure to act or comply with the requirements of ERISA, the Code or any other Legal Requirements in connection with the administration or investment of the assets of any Benefit Plan.

(j)     Except as would not, individually or in the aggregate, reasonably be expected to result in a material Liability, (i) all liabilities or expenses of Sellers in respect of any  Benefit Plan which are due and payable but have not been paid, have been properly accrued on the applicable Financial Statements; and (ii) all contributions (including all employer contributions and employee salary reduction contributions) or premium payments required to have been made to or in respect of any  Benefit Plan under the terms of such  Benefit Plan or in accordance with Legal Requirements, as of the Execution Date have been timely made or reflected on the applicable Financial Statements.

(k)     Except as set forth in Schedule 5.12(k), no Benefit Plan provides and none of Sellers has any obligation to provide or make available post-employment benefits under any Benefit Plan which is a "welfare plan" (as defined in Section 3(1) of ERISA), except as may be required under COBRA or similar Legal Requirements, and at the sole expense of such individual.

(l)     Except as set forth in Schedule 5.12(l) or expressly provided herein or if the payment thereof is otherwise excused as a result of the Bankruptcy Cases, neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (either alone or in combination with another event), (i) result in any payment (whether in cash or property) becoming due and payable, or increase the amount of any compensation due and payable, to any current or former officer, director, employee, leased employee, consultant or agent (or their respective beneficiaries) of Sellers; (ii) increase any benefits otherwise payable under any Benefit Plan; or (iii) result in the acceleration of the time of payment, funding or vesting of any compensation or benefits under any Benefit Plan.

(m)     To the extent applicable, each  Benefit Plan that is a "nonqualified deferred compensation plan" within the meaning of Section 409A(d)(1) of the Code (i) complies and has been operated in all material respects in compliance with the requirements of Section 409A of the Code and the final regulations and official guidance promulgated thereunder, or (ii) is exempt from compliance under the "grandfather" provisions of IRS Notice 2005-1 and applicable regulations and has not been "materially modified" (within the meaning of IRS Notice 2005-1 and Treasury Regulation §1.409A-6(a)(4)) subsequent to October 3, 2004.

(n)     With respect to each Benefit Plan, except with respect to such Benefit Plans copies of which have been publicly filed under the Exchange Act, Sellers have made available to Buyer, true, correct (in all material respects) and materially complete copies of, to the extent applicable: (i) all documents constituting such Benefit Plans and all amendments thereto (or, to the extent no such copies exist or the Benefit Plan is not in writing, a materially accurate written description); (ii) any related trust agreement or other funding instrument and all other material contracts currently in effect with respect to such Benefit Plans (including all

55

administrative agreements, group insurance contracts and group annuity contracts); (iii) the most recent IRS determination letter and/or opinion letter for each such Benefit Plan, if applicable; (iv) the most recent summary plan description, summary of material modifications and any other written communication by Sellers to Employees within the three (3) years immediately preceding the Execution Date concerning the extent of benefits provided under a Benefit Plan; (v) to the extent not publicly available, the three most recent (A) Forms 5500 and schedules thereto, and (B) audited financial statements; (vi) for the past three (3) years, all material correspondence with the IRS, the DOL and any other Governmental Authority regarding the operation or the administration of such Benefit Plans; and (vii) all discrimination tests for the most recent plan year.

(o)    Sellers have no direct or indirect material liability, whether absolute or contingent, under any Benefit Plan, with respect to any misclassification of any person as an independent contractor rather than as an employee, or with respect to any employee leased from another employer.

(p)    Except as required in connection with the Bankruptcy Cases, Sellers have no plan, contract or commitment, whether legally binding or not, to create any new employee benefit or compensation plans, policies or arrangements for any Buyer Employee or, except as may be required by applicable Legal Requirements, to modify any Benefit Plan.

5.13    Sellers' Intellectual Property.

(a)    Schedule 5.13(a) sets forth a true and complete list of all U.S. and foreign (i) issued Patents and pending applications for Patents; (ii) registered Trademarks and pending applications for Trademarks; and (iii) registered Copyrights and pending applications for Copyrights, in each case which are owned by a Seller and indicating which Seller is the owner of each asset.  Except as set forth on Schedule 5.13(a), each Seller is the sole owner of all of the applications and registrations set forth on Schedule 5.13(a) for which it is identified as the owner thereon, and all applications and registrations on Schedule 5.13(a)  are in effect and valid, subsisting, and enforceable.

(b)    Except as disclosed on Schedule 5.13(b) and as would not be material to the Business (taken as a whole), (i) the conduct of the Business by Sellers as currently conducted, and as conducted in the past three (3) years (including the products and services currently or previously sold or provided by Sellers) does not infringe or otherwise violate any Person's Intellectual Property, and no such claims are pending or threatened in writing against a Seller, and (ii) no Person is, or has in the past three (3) years been, infringing or otherwise violating any Intellectual Property owned by a Seller, and no such claims are pending or threatened in writing against any Person by a Seller.

(c)    The Acquired Assets and any rights provided to Buyer pursuant to the Transaction Documents include all Intellectual Property owned by the Seller and third party Intellectual Property licensed to a Seller that are used in, or required to conduct the Business in a substantially similar manner as it is presently being conducted by Sellers, except such Intellectual Property rights as exist under the Excluded Contracts.

(d)     Each current and former employee, consultant, and independent contractor of a Seller has entered into a valid and enforceable written agreement with such Seller assigning to such Seller all Intellectual Property created by such Person within the scope of such Person's duties to such Seller and prohibiting such Person from using or disclosing Trade Secrets of such Seller.  To Sellers' Knowledge, no current or former employee, consultant, or independent contractor of such Seller is in violation of such agreement.

(e)     Each Seller complies with, and has complied with, all Data Security Requirements in all material respects.  Neither the execution and delivery of this Agreement nor the consummation of the Closing will result in a breach or violation of, or constitute a default under, any Data Security Requirement.  In the past three (3) years, no Seller has experienced any material breach of security, phishing incident, ransomware or malware attack, or other incident in which confidential or sensitive information, payment card data, Personal Information, or other protected information relating to individuals was or may have been accessed, disclosed, or exfiltrated in an unauthorized manner, and no Seller has received any written notices or complaints from any Person or been the subject of any claim, proceeding, or investigation with respect thereto.

(f)     Each Seller uses commercially reasonable efforts to protect the confidentiality, integrity and security of the Computer Systems used by it in the operation of the Business and to prevent any unauthorized use, access, interruption, or modification of the Computer Systems.  The Computer Systems (i) are sufficient for the immediate and currently anticipated future needs of the Business, taken as a whole, including as to capacity, scalability and ability to process current and anticipated peak volumes in a timely manner, and (ii) are in sufficiently good working condition to effectively perform all material information technology operations in all material respects and include a sufficient number of license seats for all software as necessary for the operation of the Business.  In the past three (3) years, there have been no material breaches of security, failures, breakdowns, continued substandard performance, or other material and adverse events affecting any Computer System that have caused any substantial disruption of or interruption in or to the use of the Computer Systems.  Sellers maintain commercially reasonable disaster recovery and business continuity plans, procedures and facilities in connection with the operation of the Business, act in compliance therewith, and have taken commercially reasonable steps to test such plans and procedures on a periodic basis, and such plans and procedures have been proven effective upon such testing in all material respects.

5.14    Contracts.  Schedule 5.14(i) sets forth a true, correct and complete list of all Material Contracts to which any Seller is a party.  Each Material Contract is in full force and effect and is a valid and binding obligation of each Seller party thereto, and, to the Knowledge of the Sellers, each other party thereto, in accordance with its terms and conditions, in each case except (x) as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity, (y) as set forth on Schedule 5.14(ii) and (z) as would not, individually or in the aggregate, be material to the Business or the Acquired Assets.  Except as set forth on Schedule 5.14(iii), upon entry of the Sale Order, other than the payment of Cure Costs; (i) no Seller will be in breach or default of its obligations under any Material Contract; (ii) no condition exists that with notice or lapse of time or both would constitute a default, by any

57

Seller, a loss of material rights, result in the payment of any damages or penalties or result in the creation of any Liens thereunder or pursuant thereto other than Permitted Liens, under any Material Contract; and (iii) to Sellers' Knowledge, no other party to any Material Contract is in breach or default thereunder.  None of the Material Contracts have been cancelled or otherwise terminated by Sellers, and Sellers have not delivered any written notice to any counterparty to such Material Contract regarding any such cancellation or termination by Sellers.

      5.15   <u>Insurance</u>.

     <u>Schedule 5.15</u> sets forth a true, correct and complete list of all insurance policies held by Sellers or that name any Seller as an insured or loss payee, covering the property, assets, Employees and operations of the Business (including policies providing property, casualty, liability and workers' compensation coverage) and a list of all material pending claims under each of such insurance policies pertaining to the ownership and operation of the Business or the Acquired Assets.  Such policies are in full force and effect (subject to periodic renewals thereof). Except as set forth on <u>Schedule 5.15</u>, Sellers have paid all premiums on such policies due and payable, or, if not yet due, have properly accrued for such payables.  Since the Petition Date, to Sellers' Knowledge, Sellers have not done anything by way of action or inaction that invalidates any such policies in whole or in part.  Sellers have within the past three (3) years reported all known material Claims or incidents to the respective insurers that have issued current and prior insurance policies insuring the Business to the extent that any such Claims or incidents would reasonably be expected to create a covered event under the terms and conditions of such policies and Sellers were required to report them pursuant to the terms of the policies.

      5.16   <u>Brokers or Finders</u>.

     Except as set forth on <u>Schedule 5.16</u>, neither Sellers nor any of their Subsidiaries that are not Sellers have incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby for which Buyer is or will become liable, and, except as otherwise contemplated hereby, Sellers shall indemnify and hold harmless Buyer from any claims with respect to any such fees or commissions.

      5.17   <u>Affiliate Interests</u>.

     Other than any employment arrangements, compensation benefits, equity incentive compensation agreements, and travel advances entered into the Ordinary Course of Business, all Contracts between any Seller and any director, officer or Affiliate of any Seller (but not including another Seller or a Subsidiary of a Seller) are listed on <u>Schedule 5.17</u>.  Other than employment arrangements, compensation benefits, equity incentive compensation agreements, and travel advances entered into in the Ordinary Course of Business, no such director, officer or Affiliate of any Seller controls or is a director, officer, employee or partner of, or consultant to, or lender to or borrower from or has the right to participate in the profits of, other than through the ownership of any publicly traded entity, (i) any Person which does business with any Seller or is competitive with the Business in any material respect, or (ii) any material property, asset or

right which is used by any Seller.  All Indebtedness of any such Affiliate to any Seller, and all Indebtedness of any Seller to any Affiliate of any Seller, is listed on Schedule 5.17.

5.18    Bank Accounts.

Schedule 5.18 sets forth a complete list of all bank accounts (including, any deposit accounts, securities accounts and any sub-accounts) of Sellers.

5.19    Undue Influence.

(a)    Each Seller, and, to the Knowledge of Sellers, all of their respective directors, officers, agents or employees, has been for the past three (3) years and currently is in compliance in all material respects with, Anti-Corruption Laws and Sanctions, Anti-Money Laundering Laws and Export Control and Customs Laws.

(b)    None of Sellers, or, to the Knowledge of Sellers, any directors, officers, agents or employees or Affiliates of Sellers or any of their Subsidiaries, or any other Person acting on their behalf has, (i) directly or indirectly, engaged in any Anti-Corruption Prohibited Activity, (ii) directly or indirectly engaged in any transaction or other business with a Restricted Party, or (iii) been or is the subject of any investigation by any Governmental Entity concerning compliance with Anti-Corruption Laws, Anti-Money Laundering Laws, Export Control and Customs Laws, or Sanctions.  None of Sellers or any of their Subsidiaries, nor to the Knowledge of Sellers any of their respective officers, directors, employees, Affiliates or agents acting on their behalf, is a Restricted Party.

5.20    Financial Statements.

(a)    The Company's annual report on Form 10-K includes the consolidated balance sheets of the Company and its Subsidiaries as of, and consolidated statements of operations, comprehensive income, changes in stockholder's equity and cash flows for, the fiscal years ended December 31, 2018 and December 31, 2017, respectively (collectively, the "Audited Financial Statements").  The Audited Financial Statements have been prepared in accordance with generally accepted accounting principles ("GAAP") consistently applied in accordance with the Company's past practice throughout the periods indicated. Sellers have made available to Buyer unaudited condensed consolidated balance sheets for the Company and its Subsidiaries as of May 31, 2019 and the condensed consolidated statements of operations, stockholder's equity (deficit) and cash flows for the five (5)-month period ending May 31, 2019 (collectively, the "Unaudited Financial Statements").  The Unaudited Financial Statements have been prepared in accordance with GAAP consistently applied except for the absence of footnotes and customary year-end adjustments.  The Audited Financial Statements and the Unaudited Financial Statements (together the "Financial Statements") (i) were prepared based on the books and records of Sellers and (ii) fairly present in all material respects the financial position of Sellers at and as of the dates specified and the results of their operations for the period covered, subject to customary year-end adjustments.  The copies of the Financial Statements made available to Buyer are true, correct and complete copies of such Financial Statements.

59

(b)     Except as set forth on <u>Schedule 5.20(b)</u>, Sellers have no Liabilities of the type required by GAAP to be reflected on the Financial Statements, and there is no basis for any Action with respect to any such Liabilities, except in either case for (i) Liabilities set forth on the Financial Statements, (ii) Liabilities which have arisen since the date of the Unaudited Financial Statements in the Ordinary Course of Business (none of which is material and none of which relates to breach of contract, breach of warranty, tort, infringement, environmental, health or safety matters, violation of law or any Action) or (iii) Liabilities that are not material to the Business or the Acquired Assets taken as a whole.

5.21    <u>Inventory</u>.

All Inventory included in the Acquired Assets consists of a quantity and quality that is in all material respects usable and salable in the Ordinary Course of Business, subject only to the reserves for Inventory write-downs or unmarketable, obsolete, defective or damaged Inventory included in the latest balance sheet included in the Financial Statements.

5.22    <u>Absence of Certain Changes</u>.

(a)     Since January 1, 2019 through the date hereof, there has not been a Material Adverse Effect.

(b)     Except as set forth on <u>Schedule 5.22(b)</u>, or as expressly contemplated by this Agreement or any other orders entered in the Bankruptcy Cases from and after January 1, 2019 through the date hereof, Sellers have not:

(i)     except for executory contracts and unexpired leases rejected by Sellers with the prior written consent of Buyer, terminated, modified, amended or waived any material right or remedy under any Available Contract that is a Material Contract other than due to the expiration of the term or automatic renewals, in each case, in accordance with the terms of any such Available Contract that is a Material Contract;

(ii)     purchased or otherwise acquired any material Acquired Asset (tangible or intangible) or sold, leased, licensed, transferred, abandoned, allowed to lapse, or otherwise disposed of any Acquired Assets, except for purchases of Inventory in the Ordinary Course of Business, (A) permitted, allowed or suffered any of the Acquired Assets to be subjected to any Encumbrance (other than Permitted Encumbrances), or (B) removed any (non-surplus) Equipment or other material assets (other than Inventory) from the Real Property other than in the Ordinary Course of Business;

(iii)     disclosed any Trade Secrets to any Person, other than in the Ordinary Course of Business pursuant to a written confidentiality agreement;

(iv)     suffered any material damage, destruction to, loss of, or any material interruption in the use of, any Acquired Assets whether or not covered by insurance;

(v)     (A) increased the annual rate of base salary or any target bonus opportunity of any Employee whose annual rate of base salary prior to such increase was in excess of $200,000; (B) paid any bonus, benefit, or other direct or indirect incentive

compensation (other than any such payments authorized pursuant to any first or second day orders in the Bankruptcy Case); (C) awarded any equity or equity-based compensation awards (whether phantom or equity) with respect to the equity of the Company or its Affiliates; (D) modified, amended or terminated any Benefit; (E) entered into any employment, compensation, severance, non-competition or similar contract (or amended any such contract) to which any Seller is a party; (F) entered into, established or adopted any new severance pay, termination pay, deferred compensation, bonus, or other compensation or employee benefit plan, program, policy or arrangement with respect to Employees that would be a Benefit Plan if it existed on the Execution Date (including any employment agreement, severance agreement, change of control agreement, or transaction or retention bonus agreements), (G) commenced contributions to, or the obligation to contribute to, a Multiemployer Plan, or (H) hired or terminated (other than for "cause") any individual with annual compensation in excess of $100,000, except, in the case of each of clauses (A) through (H), (i) to the extent  required by any order of the Bankruptcy Courts or as required by applicable Legal Requirements; (ii) pursuant to the terms of any Benefit Plan, as in effect on the date hereof, set forth on Schedule 5.12(a); (iii) as required under the terms of any Canadian Multi-Employer Plan; or (iv) for immaterial changes to Benefit Plans available to all employees generally (other than changes that materially increase the amount, or accelerate (to any extent) the timing of the payment, funding or vesting of compensation or benefits);

(vi)     changed in any material respect Sellers' accounting methods, principles or practices other than required by changes in GAAP;

(vii)     made, changed or revoked any material election relating to Taxes, changed any annual accounting period for applicable Tax purposes, adopted or changed any Tax accounting method, filed any amended Tax Return, entered into any closing agreement, settled any claim or assessment, surrendered any right to claim a refund, offset or other reduction in Tax liability, or requested or consented to any extension or waiver of the limitation periods applicable to any claim or assessment with respect to Taxes, in each case that adversely affects the Business or the Acquired Assets;

(viii)    commenced or settled any Proceeding with respect to the Business, or received any written notice that any Person was commencing or threatening to commence a Proceeding against any Seller with respect to the Acquired Assets;

(ix)     allowed any material Permit held by any Seller to terminate, expire or lapse; or

(x)     agreed or committed in writing to do any of the foregoing.

5.23    Warranties Exclusive.

EXCEPT AS EXPRESSLY SET FORTH IN THIS ARTICLE 5 (AS MODIFIED BY THE DISCLOSURE SCHEDULES) OR ANY OTHER TRANSACTION DOCUMENT, SELLERS MAKE NO REPRESENTATION OR WARRANTY, STATUTORY, EXPRESS OR IMPLIED, WRITTEN OR ORAL, AT LAW OR IN EQUITY, IN RESPECT OF ANY OF THEIR ASSETS (INCLUDING THE ACQUIRED ASSETS), LIABILITIES (INCLUDING

THE ASSUMED LIABILITIES) OR THE BUSINESS, INCLUDING, WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, OR NON-INFRINGEMENT, AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY.  NEITHER SELLERS NOR ANY OTHER PERSON, DIRECTLY OR INDIRECTLY, HAS MADE OR IS MAKING, ANY REPRESENTATION OR WARRANTY, WHETHER WRITTEN OR ORAL, REGARDING THE PRO-FORMA FINANCIAL INFORMATION, FINANCIAL PROJECTIONS OR OTHER FORWARD-LOOKING STATEMENTS OF SELLERS.  NOTHING IN THIS SECTION 5.23 SHALL LIMIT BUYER'S OR ITS AFFILIATES' RIGHTS IN THE CASE OF FRAUD WITH RESPECT TO DETERMINING WHETHER THE CLOSING CONDITION SET FORTH IN SECTION 9.1 HAS BEEN SATISFIED.

## ARTICLE 6

### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers as of the date hereof and as of the Closing Date as follows:

6.1     Organization and Good Standing.

Buyer is a corporation (or is an entity disregarded as separate from a corporation for U.S. federal income tax purposes), duly organized, validly existing and in good standing under the laws of the State of Delaware.  Buyer has the requisite power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted.

6.2     Authority; Validity; Consents.

Buyer has, subject to entry of the Sale Order, the requisite power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby.  Subject to entry of the Sale Order, the execution, delivery and performance of this Agreement and the other Transaction Documents by Buyer and the consummation by Buyer of the transactions contemplated herein and therein have been duly and validly authorized by all requisite limited liability company or corporate actions in respect thereof.  Subject to entry of the Sale Order, this Agreement has been duly and validly executed and delivered by Buyer and each other Transaction Document to which Buyer is a Party will be duly and validly executed and delivered by Buyer, as applicable, at the Closing.  Subject to entry of the Sale Order, this Agreement and the other Transaction Documents to which Buyer is a party constitute the legal, valid and binding obligation of Buyer (assuming the due authorization, execution and delivery by all other parties hereto and thereto), except in each case as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity.  Subject to entry of the Sale Order, except as required to comply with the HSR Act or as set forth on Schedule 6.2, Buyer is not nor will be required to give any notice to, make any registration, declaration or filing with or obtain any consent, waiver or approval from any Person in connection with the

62

execution and delivery of this Agreement and the other Transaction Documents to which it is a Party or the consummation or performance of any of the transactions contemplated hereby or thereby, except for such notices, registrations, declarations or filings and consents, the failure of which to provide, make or obtain, would not, individually or in the aggregate, materially affect Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

6.3    No Conflict.

Neither the execution and delivery by Buyer of this Agreement or the other Transaction Documents to which it is a party nor the consummation of the transactions contemplated hereby or thereby nor compliance by it with any of the provisions hereof or thereof (a) conflict with or result in a violation of (i) any provision of the organizational documents of Buyer or (ii) any judgment, order, writ, injunction, decree, statute, law, ordinance, rule or regulation in any material respect binding upon Buyer or (b) other than as would not be material to the business of Buyer, violate, conflict with, or result in a breach of any of the terms of, or constitute a default under, or give rise to any right of termination, modification, cancellation or acceleration under (i) any note, bond, mortgage, indenture, deed of trust, contract, commitment, arrangement, license, agreement, lease or other instrument or obligation to which Buyer is a party or by which Buyer may be bound or to which any of Buyer's assets may be subject or affected in any material respect, or (ii) any material license, permit, authorization, consent, order or approval of, or registration, declaration or filings with, any Governmental Authority.

6.4    Brokers or Finders.

Neither Buyer nor any Person acting on behalf of Buyer has paid or become obligated to pay any fee or commission to any broker, finder, investment banker, agent or intermediary for or on account of the transactions contemplated by this Agreement for which any Seller is or will become liable, and Buyer shall hold harmless and indemnify Sellers from any claims with respect to any such fees or commissions.

6.5    Legal Proceedings.

There is no Proceeding or Order pending against, or to Buyer's Knowledge, threatened against or affecting, Buyer before any arbitrator or any Governmental Authority which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the transactions contemplated by this Agreement and the other Transaction Documents or which would or would reasonably be expected to materially impair Buyer's ability to consummate the transactions contemplated by this Agreement and the other Transaction Documents.

6.6    Financing.

Buyer shall, at the Closing (after giving effect to the Credit Bid and Release), have sufficient available funds to permit Buyer to pay the Cash Consideration and all other amounts to be paid or repaid by Buyer under the Transaction Documents to the extent payable on or about the Closing Date, including amounts to be paid for the Cure Costs.

6.7    Qualification.

(a)    To Buyer's Knowledge, there exist no facts or circumstances that would cause, or be reasonably expected to cause, Buyer and/or its Affiliates not to qualify as "good faith" purchasers under Section 363(m) of the Bankruptcy Code.

(b)    As of the Closing, Buyer and/or each relevant Buyer Designee, as applicable, will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Assumed Contracts.

6.8    No Other Representations or Warranties; Condition of the Business; Buyer's Reliance.

Buyer acknowledges that neither Sellers nor any other Person is making, and Buyer is not relying on, any representations or warranties whatsoever, statutory, expressed or implied, written or oral, at law or in equity, beyond those expressly made by Sellers in Article 5 hereof (as modified by the Disclosure Schedules or in any other Transaction Document).  Buyer acknowledges that, except as expressly set forth in Article 5 (as modified by the Disclosure Schedules or in any other Transaction Document), neither Sellers nor any other Person has, directly or indirectly, made any representation or warranty, statutory, expressed or implied, written or oral, at law or in equity, as to the accuracy or completeness of any information that Sellers furnished or made available to Buyer and its Representatives in respect of the Business, and Sellers' operations, assets, stock, Liabilities, condition (financial or otherwise) or prospects. Buyer acknowledges that neither Sellers nor any other Person, directly or indirectly, has made, and Buyer has not relied on, any representation or warranty, whether written or oral, regarding the pro-forma financial information, financial projections or other forward-looking statements of Sellers, and Buyer will make no claim with respect thereto.  Buyer acknowledges that the Acquired Assets are being transferred on an "AS IS, WHERE IS" basis.  Nothing in this Section 6.8 shall limit Buyer's or its Affiliates' rights in the case of Fraud with respect to determining whether the closing condition set forth in Section 9.1 has been satisfied.

6.9    Information.

Buyer has conducted such investigations of the Company and its Subsidiaries as it deems necessary and appropriate in connection with the execution and delivery of this Agreement and the other Transaction Documents to which Buyer is a party and the consummation of the transactions contemplated hereby and thereby.  Buyer acknowledges that it and its Representatives have been permitted access to the books and records, facilities, equipment, Contracts, insurance policies (or summaries thereof) and other properties and assets of Sellers, and that it and its Representatives have had an opportunity to meet with the officers and employees of Sellers to discuss the Business.  Neither Sellers nor any other Person (including any officer, director, member or partner of Sellers or any of their Affiliates) shall have or be subject to any liability to Buyer, or any other Person, resulting from Buyer's use of any information, documents or material made available to Buyer in any "data rooms", management presentations, due diligence or in any other form in expectation of the transactions contemplated hereby or by the other Transaction Documents, except to the extent that such information, documents or material are incorporated by reference into this Agreement or the Disclosure

Schedules.  Nothing in this Section 6.9 shall limit Buyer's or its Affiliates' rights in the case of Fraud with respect to determining whether the closing condition set forth in Section 9.1 has been satisfied.

# ARTICLE 7

## ACTIONS PRIOR TO THE CLOSING DATE

7.1     Access and Reports; Confidentiality.

(a)     From and after the Execution Date through and including the Closing Date or the earlier termination of this Agreement in accordance with the provisions of Article 11, Sellers shall (i) afford Buyer and its Representatives reasonable access, upon reasonable notice, to its personnel, properties, books, Permits, Contracts and records, and furnish promptly to Buyer all reasonable information concerning the Acquired Assets, the Business, properties, any Benefit Plans and personnel as may be reasonably requested; (ii) furnish to Buyer such financial and operating data and other information (including Tax Returns) relating to Sellers, the Business and the Acquired Assets as may be reasonably requested; (iii) permit Buyer, to make such reasonable inspections, including any soil or other environmental analysis subject to the restrictions of this Section 7.1, and, at Buyer's sole cost and expense, copies thereof as Buyer may require; and (iv) instruct the executive officers and senior business managers, counsel, auditors and financing advisors of Sellers to reasonably cooperate with Buyer and its Representatives regarding the same; provided, that any such access shall be conducted in a manner not to unreasonably interfere with the Business.  All requests for information made pursuant to this Section 7.1 shall be directed to Houlihan Lokey, Attention: Adam L. Dunayer and Justin Zammit, 100 Crescent Court, Suite 900, Dallas, Texas 75201, or to such other person as designated by either such person or Sellers and the Sellers shall deliver any authorizations reasonably required by the Buyer to conduct its diligence on the Acquired Assets, subject to customary limitations.  Notwithstanding the foregoing, Buyer and its Representatives shall not (A) have access to personnel records of Sellers relating to medical histories or other information which in Sellers' good faith opinion is sensitive or the disclosure of which could subject a Seller to risk of liability and (B) have any right to perform or conduct, or cause to be performed or conducted, any subsurface environmental sampling or testing at, in, on or underneath any of Sellers' properties without written consent from the Company, which consent shall not be unreasonably withheld, conditioned or delayed; provided, that no fact or condition discovered in connection with any such sampling or testing will constitute a basis for the failure of any Closing condition or result in any adjustment to the terms of this Agreement.  No investigation pursuant to this Section 7.1 or by Buyer or its Representatives at any time prior to or following the date hereof shall affect or be deemed to modify any representation, warranty, covenant or agreement made by Sellers herein.

(b)     Notwithstanding the foregoing, this Section 7.1 shall not require Sellers to permit any access to, or to disclose any information that, in the reasonable, good faith judgment (after consultation with outside counsel) of the Company, is reasonably likely to result in any violation of any Legal Requirement or any Contract to which the Company or any Seller is a party or cause any privilege (including attorney-client privilege) or work product protection that Sellers would be entitled to assert to be waived; provided, that, Sellers shall inform Buyer

that such information is being withheld pursuant to this Section 7.1(b) and describe the information being so withheld, and the Parties shall reasonably cooperate in seeking to find a way to allow (but in a manner that would not waive the privilege) disclosure of such information.

(c)     Buyer shall, and shall cause its Affiliates and Representatives to, hold and continue to hold in strict confidence and not utilize in its or their respective business all confidential information and documents concerning Sellers, any of their Affiliates, the Business, the Acquired Assets, the Excluded Assets or the Excluded Liabilities, including the Confidential Information ("Buyer Confidential Information"), except where disclosure may be necessary for Buyer (i) to enforce its rights under this Agreement or (ii) as may be permitted under this Agreement.  Notwithstanding the foregoing, the following will not constitute Buyer Confidential Information for purposes of this Agreement:  (a) information that is (or becomes) generally available to the public other than as the result of a disclosure by Buyer or any Affiliate thereof or their respective Representatives in violation of this Agreement, (b) information that was available to Buyer or any Affiliate thereof or their respective Representatives on a non-confidential basis prior to its disclosure to Buyer or any Affiliate thereof or their respective Representatives, (c) information that becomes available to Buyer or any Affiliate thereof or their respective Representatives on a non-confidential basis from a source other than Sellers and that is not, to the knowledge of Buyer or such Affiliate, provided in violation of any confidentiality obligation of such source to Sellers or their respective Affiliates, (d) information that is developed by Buyer or any Affiliate thereof or their respective Representatives without use of or reference to any Buyer Confidential Information, and (e) information that Buyer is legally obligated to disclose pursuant to a valid subpoena or a valid request from any Governmental Authority, subject to Buyer's obligation to give Sellers reasonable advance notice of such disclosure (to the extent not prohibited by applicable Legal Requirements) and to cooperate with Sellers in seeking a protective order or other appropriate means for limiting the scope of the disclosure.  The foregoing restrictions in this Section 7.1(c) shall terminate on the first to occur of (x) the Closing and (y) the one year anniversary of the date hereof.

(d)     Buyer acknowledges that its rights under this Section 7.1 are subject in all respects to the Bidding Procedures.  In the event of any conflict between this Section 7.1 and the Bidding Procedures, the Bidding Procedures will control.

7.2     Operations Prior to the Closing Date.

Sellers covenant and agree that, except (w) as expressly contemplated by this Agreement, (x) as disclosed in Schedule 7.2, (y) with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed) or (z) to the extent required by the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the CCAA or any orders entered by the Bankruptcy Courts in the Bankruptcy Cases, after the Execution Date and prior to the Closing Date:

(a)     Sellers shall:

(i)     carry on the Business in the Ordinary Course of Business and use reasonable best efforts to maintain, preserve and protect the Acquired Assets in the

condition in which they exist on the date hereof, except for ordinary wear and tear and except for replacements, modifications or maintenance in the Ordinary Course of Business;

(ii)     maintain their books, accounts and records in the Ordinary Course of Business;

(iii)    use commercially reasonable efforts to pay all post-petition Trade Payables and collect all Accounts Receivable after the Petition Date;

(iv)    use commercially reasonable efforts to (A) retain the services of its current executive officers (or their successors) who are in good standing and who are necessary to conduct the Business as it is currently being conducted in all material respects and (B) maintain their relationships with and preserve for the Business the goodwill of their key suppliers and customers in all material respects (it being understood that no increases to any payments or compensation, including any incentive, retention or similar compensation, shall be required in respect of either clause (A) or (B) hereof or other expenditures of funds (other than pursuant to the existing terms of any Contracts) or modification of Contract terms);

(v)     (A) comply in all material respects with all Legal Requirements applicable to them or having jurisdiction over the Business or any Acquired Asset, (B) comply in all material respects with contractual obligations applicable to or binding upon them pursuant to any Material Contracts (other than those obligations the compliance with which is excused during the Bankruptcy Case), and (C) maintain in full force and effect all material Permits and comply in all material respects with the terms of each such Permit (but only to the extent such Permits are necessary for the Business and the Acquired Assets in the Ordinary Course of Business);

(vi)    cause any of their current property insurance policies with respect to the Business or any of the other Acquired Assets not to be canceled or terminated or any of the coverage thereunder to lapse unless, simultaneously with such termination, cancellation or lapse, replacement, policies providing coverage equal to or greater than the coverage under the canceled, terminated or lapsed policies are in full force and effect, to the extent such coverage is reasonably available;

(vii)   maintain each Buyer Benefit Plan in accordance with its terms and applicable Legal Requirements or, where such Buyer Benefit Plan is not maintained by a Seller, to comply with all of its obligations under the terms of such Buyer Benefit Plan and applicable Legal Requirements related thereto;

(viii)  maintain, preserve and protect in full force and effect the existence of all Intellectual Property owned by a Seller and included in the Acquired Assets, except for abandonment of Intellectual Property that is de minimis to the Business in Sellers' reasonable business judgment; and

(ix)    use commercially reasonable efforts not to take or agree to or commit to assist any other Person in taking any action (A) that would reasonably be expected to result in a failure of any of the conditions to the Closing or (B) that would reasonably be

expected to impair the ability of Sellers or Buyer to consummate the Closing in accordance with the terms hereof or to materially delay such consummation.

(b)    Sellers shall not, without Buyer's prior written consent:

(i)    take any action enumerated in Section 5.22(b), except as set forth on Schedule 5.22(b);

(ii)    assume, reject or assign any Material Contract, other than pursuant to Section 2.5;

(iii)    enter into, materially amend or renew any Material Contract (other than automatic renewals of Material Contracts in the Ordinary Course of Business in accordance with the terms thereof as in effect on the Execution Date); or

(iv)    (A) terminate (other than for "cause") or hire any management level, non-union Employees having annual base or guaranteed compensation in excess of $100,000; (B) increase the annual rate of base salary or any target bonus opportunity of any Employee whose annual rate of base salary prior to such increase was in excess of $100,000 except in accordance with the DIP Budget; (C) pay or award any bonus, benefit, or other direct or indirect incentive compensation (other than any such payments authorized pursuant to any first or second day orders in the Bankruptcy Case), or award or promise to award any equity or equity-based compensation awards (whether phantom or equity) with respect to the equity of the Company or its Affiliates; (D) modify, amend or terminate any Benefit Plan; (E) enter into any employment, compensation, severance, non-competition or similar contract (or amend any such contract) to which any Seller is a party; (F) enter into, establish or adopt any new severance pay, termination pay, deferred compensation, bonus, or other employee benefit plan with respect to Employees that would be a Benefit Plan if it existed on the Execution Date (including any employment agreement, severance agreement, change of control agreement, or transaction or retention bonus agreements), or (G) commence contributions to, or the obligation to contribute to, a Multiemployer Plan, except, in the case of each of clauses (B) through (G), (i) to the extent required by any order of the Bankruptcy Courts or as required by applicable Legal Requirements; (ii) pursuant to the terms of any Benefit Plan set forth on Schedule 5.12(a), as in effect on the date hereof; (iii) as required under the terms of any Canadian Multi-Employer Plan; or (iv) for immaterial changes to Benefit Plans available to all employees generally (other than changes that materially increase the amount, or accelerate (to any extent) the timing of the payment, funding or vesting of compensation or benefits).

7.3    Regulatory Matters; Cooperation.

(a)    Subject to Section 7.3(c), before September 10, 2019 (or such later date as agreed in writing by all of the Parties hereto), (i) Sellers, on the one hand, and Buyer, on the other hand, shall each prepare and file, or cause to be prepared and filed, any notifications required to be filed under the HSR Act with the United States Federal Trade Commission and the Antitrust Division of the United States Department of Justice, and request early termination of the waiting period under the HSR Act.

68

(b)     Buyer, on the one hand, and Sellers, on the other hand, shall promptly respond to any requests for additional information or documentary materials in connection with such filings and shall take all other actions necessary to cause the applicable waiting periods under the HSR Act to terminate or expire or be waived at the earliest practicable date after the date of filing. Buyer shall be responsible for payment of any applicable filing fees under the HSR Act, and each Party shall be responsible for any other payment of its own respective costs and expenses incurred by such Party (including attorneys' fees and other legal fees and expenses) associated with the preparation of its portion of any antitrust filings.

(c)     Sellers, on the one hand, and Buyer, on the other hand, shall use commercially reasonable efforts to obtain (and Buyer shall cause its Subsidiaries to use commercially reasonable efforts to obtain), at the earliest practicable date, all necessary Governmental Authorizations and all necessary registrations, declarations and filings (including registrations, declarations and filings with Governmental Authorities, if any) and take all reasonable steps as may be necessary to avoid any Proceeding by any Governmental Authority. In addition to such actions and the actions to be taken under Section 7.3(a), Sellers, on the one hand, and Buyer, on the other hand, shall use commercially reasonable efforts to take (and Buyer shall cause its Subsidiaries to use commercially reasonable efforts to take), or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated hereby, including using commercially reasonable efforts to accomplish the following: (i) taking all reasonable acts necessary to cause the conditions precedent set forth in Article 9 and Article 10 to be satisfied; (ii) taking all reasonable acts necessary in connection with meeting with any Governmental Authority regarding the transferring of the Permits held by Sellers; and (iii) executing and delivering any additional instruments necessary to consummate the transactions contemplated hereby and to fully carry out the purposes of this Agreement.

(d)     Sellers, on the one hand, and Buyer, on the other hand, shall, (i) promptly inform each other of any communication from any Governmental Authority concerning this Agreement, the transactions contemplated hereby, and any filing, notification or request for approval and (ii) permit the other to review in advance any proposed written or material oral communication or information submitted to any such Governmental Authority in response thereto.  In addition, none of Parties shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry with respect to this Agreement or the transactions contemplated hereby, unless such Party consults with the other Parties in advance and, to the extent permitted by any such Governmental Authority, gives the other Parties the opportunity to attend and participate thereat, in each case to the maximum extent practicable.  Subject to restrictions under any Legal Requirements, Buyer, on the one hand, and Sellers, on the other hand, shall furnish the other with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and its Affiliates and their respective Representatives on the one hand, and the Governmental Authority or members of its staff on the other hand, with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine or which refer to valuation of the Business are otherwise competitively-sensitive) or any such filing, notification or request for approval.  Each Party shall also furnish the other Party

with such necessary information and assistance as such other Party and its Affiliates may reasonably request in connection with their preparation of necessary filings, registration or submissions of information to the Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval.

(e)     Subject to the terms and conditions of this Agreement, Buyer shall, and shall cause its Subsidiaries to, use commercially reasonable efforts to take any and all steps reasonably necessary to avoid or eliminate impediments under any Antitrust Law or the CTA that may be asserted by any Governmental Authority with respect to the transactions contemplated hereby so as to enable the Closing to occur as soon as reasonably possible; provided, that (i) Sellers shall not take any such action without the prior written consent of Buyer and (ii) Buyer shall not be obligated to (x) sell, divest or dispose of any assets or businesses of Buyer or any of its Subsidiaries, (y) commence any suit or proceeding or (z) take any such action if such action would be material to the Business or the Acquired Assets, taken as a whole.

(f)     Assuming the accuracy of the representations and warranties of Sellers with respect thereto set forth in Section 5.2, Buyer expressly acknowledges and agrees that the Closing is not contingent upon, and may not be delayed or conditioned as a result of the failure to obtain, any required approvals under the Competition Act or the CTA.

### 7.4    Tax Cooperation.

Sellers and Buyer intend that Buyer's acquisition of the Acquired Assets be treated, and agree to cooperate in good faith to structure Buyer's acquisition of the Acquired Assets, for U.S. federal income tax purposes, as a taxable purchase of the Acquired Assets. Sellers and Buyer shall not take any position inconsistent with such treatment unless otherwise required pursuant to a "determination" within the meaning of Section 1313 of the Code.

### 7.5    Bankruptcy Court Matters; Milestones.

(a)     Assumption of CBA Term Sheet.  As soon as reasonably practicable, but in any event no later than twenty-five (25) calendar days following the Petition Date (or such later date as agreed in writing by all of the Parties), the U.S. Bankruptcy Court shall have entered an order of the U.S. Bankruptcy Court authorizing and approving the Debtors' Motion for Entry of an Order Authorizing the Debtors to Assume the CBA Term Sheet [Docket No. 118].

(b)     Final DIP Order and Bidding Procedures Order.  As soon as reasonably practicable, but in any event no later than twenty-five (25) calendar days following the Petition Date (or such later date as agreed in writing by all of the Parties), the U.S. Bankruptcy Court shall have entered the Final DIP Order and Bidding Procedures Order.

(c)     Final Recognition Order.  As soon as reasonably practicable, but in any event not later than five (5) calendar days after the entry of the Final DIP Order and the Bidding Procedures Order, the CCAA Court shall have entered the Final Recognition Order and Bidding Procedures Recognition Order.

(d)      Ratification of CBAs.  Sellers shall obtain ratification of the Modified CBAs consistent with the CBA Term Sheet, the Restructuring Term Sheet, the CSPF Term Sheet, and the Restructuring Support Agreement no later than September 23, 2019; provided, however, and for the avoidance of doubt that any deviations between the Modified CBAs and the Restructuring Term Sheet, the CBA Term Sheet, the CSPF Term Sheet or the Restructuring Support Agreement, or any new provisions in the CBAs not contemplated by the Restructuring Term Sheet, the CBA Term Sheet, the CSPF Term Sheet, the CSPF Term Sheet, or the Restructuring Support Agreement, shall be subject to the consent of Buyer.

(e)      Hybrid Plan Participation Agreement.  The U.S. Bankruptcy Court shall have entered an order approving the definitive documentation with the Central States Plan, including the Hybrid Plan Participation Agreement, no later than September 23, 2019.

(f)      Bid Deadline.  The bid deadline shall take place no later than the date set forth in the Bidding Procedures Order (the "Bid Deadline").

(g)      Auction.  The Auction (as defined in the Bidding Procedures Order), if necessary, shall have been held pursuant to the Bidding Procedures Order and in accordance with the timing set forth therein.

(h)      Sale Order.

(i)      Not later than sixty-five (65) calendar days following the Petition Date (or such later date as agreed in writing by all of the Parties hereto), the U.S. Bankruptcy Court shall have entered the U.S. Sale Order, which shall be in form and substance acceptable to Sellers and Buyer; and

(ii)      Not later than five (5) calendar days following the entry of the U.S. Sale Order, the CCAA Court shall have entered the Canadian Sale Order.

(i)      Contracts.  Not later than twenty-one (21) days prior to the date of the Sale Hearing (as defined in the Bidding Procedures Order) (the "Cure Notice Date"), Sellers shall serve on all non-debtor counterparties to all of the material Available Contracts a Cure Notice stating that Sellers are or may be seeking the assumption and assignment of such Available Contracts and shall notify such non-debtor counterparties of the deadline for objecting to the Cure Costs, if any, which deadline shall not be later than October 2, 2019; provided, that Sellers, subject to consultation with the Consultation Parties (as defined in the Bidding Procedures Order), may modify such deadline by filing a notice of such modification on the U.S. Bankruptcy Court's docket.

(j)      Bankruptcy Filings.  From and after the Execution Date and until the Closing Date, Sellers shall deliver to Buyer, no less than three (3) days in advance of Sellers' filing or submission thereof, drafts of any and all material pleadings, motions, notices, statements, schedules, applications, reports and other papers to be filed or submitted in connection with this Agreement for Buyer's prior review and comment by Sellers, and such filings shall be acceptable to Buyer in its reasonable discretion to the extent they relate to the Acquired Assets, any Assumed Liabilities or any of Buyer's obligations hereunder.  Sellers agree to diligently prosecute the entry of the Interim DIP Order, the Final DIP Order and the Sale

Order as provided herein.  In the event the entry of the Interim DIP Order, the Final DIP Order or the Sale Order shall be appealed, Sellers and Buyer shall use their reasonable efforts to defend such appeal.  Sellers shall comply with all notice requirements imposed by the Sale Order in connection with any pleading, notice or motion to be filed in connection herewith.

          (k)     <u>Approval of Bankruptcy Courts</u>. Sellers and Buyer acknowledge that this Agreement and the transactions contemplated hereby are subject to the approval of the Bankruptcy Courts and entry of, as applicable, the Bidding Procedures Order and the Sale Order. In the event of any discrepancy between the milestones set forth in this <u>Section 7.5</u> and the Bidding Procedures Order and the Sale Order, the Bidding Procedures Order and the Sale Order, as applicable, shall govern.  Notwithstanding anything to the contrary in this <u>Section 7.5</u>, the deadlines set forth in subsections (a), (b), (c), (e), and (h) may be extended by Sellers for up to five (5) calendar days if the purpose of such extension is solely to accommodate the schedule of the U.S. Bankruptcy Court or the CCAA Court, as applicable.

      7.6     <u>Notice of Developments</u>.

Sellers shall promptly notify Buyer of, and furnish Buyer any information it may reasonably request with respect to, any event that would reasonably be expected to cause any of the conditions set forth in <u>Article 9</u> not to be fulfilled.

      7.7     <u>Transition of Business</u>.

From and after the Execution Date until the Closing Date or earlier termination of this Agreement, Sellers shall use commercially reasonable efforts to assist Buyer in accomplishing a smooth transition of the Business from Sellers to Buyer, including, holding discussions with respect to personnel policies and procedures, and other operational matters relating to the Business.

      7.8     <u>Sale Free and Clear</u>.

On the Closing Date, the Acquired Assets shall be transferred to Buyer and/or one or more Buyer Designees, as applicable, free and clear of all Encumbrances and Liabilities (including, for the avoidance of doubt all successor liability, including any successorship obligations under any Existing CBA (to the extent such Existing CBA is rejected and not assumed by Buyer at the Closing) and/or with respect to any Benefit Plan that is not an Acquired Asset), other than (i) the Permitted Encumbrances, (ii) the Assumed Liabilities and (iii) any successor Liabilities that arise by operation of Canadian Legal Requirement.

## ARTICLE 8

### ADDITIONAL AGREEMENTS

      8.1     <u>Taxes</u>.

          (a)     From and after the Closing, Sellers and Buyer agree to furnish or cause to be furnished to each other, upon reasonable request, as promptly as practicable, such information and assistance relating to the Business and the Acquired Assets (including access to

books and records and Tax Returns and related working papers dated before Closing) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any taxing authority, the prosecution or defense of any claims, suit or proceeding relating to any Tax, and the claiming by Buyer of any federal, state, provincial or local business tax credits or incentives that Buyer may qualify for in any of the jurisdictions in which any of the Acquired Assets are located; provided, however, that neither Buyer nor Sellers shall be required to disclose the contents of its income Tax Returns to any Person other than the Parties.  Any expenses incurred in furnishing such information or assistance pursuant to this Section 8.1 shall be borne by the requesting party. Notwithstanding the foregoing, this Section 8.1 shall not require Sellers to permit any access to, or to disclose any information that, in the reasonable, good faith judgment (after consultation with outside counsel) of the Company, is reasonably likely to result in any violation of any Legal Requirement or cause any attorney-client privilege or work product protection that Sellers would otherwise be validly entitled to assert to be waived in full; provided, that, the Parties shall reasonably cooperate in seeking to find a way to allow disclosure of such information to the extent doing so (A) would not (in the good faith belief of the Company (after consultation with outside counsel, which may be in-house counsel)) be reasonably likely to result in the violation of any such Legal Requirement or Contract or be reasonably likely to cause such privilege or work product protection to be waived in full with respect to such information or (B) could reasonably (in the good faith belief of the Company (after consultation with outside counsel)) be managed through the use of customary "clean-room" arrangements pursuant to which non-employee Representatives of Buyer could be provided access to such information.

(b)    Buyer shall pay all Transfer Taxes for which Buyer is liable under applicable state or local Transfer Tax Law.  Buyer, at its own cost and expense, shall file all necessary Tax Returns and other documentation with respect to all such Transfer Taxes, and, if required by applicable Law, Sellers will join in the execution of any such Tax Returns and other documentation.

(c)    Buyer (or the applicable Buyer Designee) and each Canadian Borrower shall jointly make, if determined to be available and provided Buyer or applicable Buyer Designee is registered under the GST Act and QST Legislation and provides its registration number to Sellers prior to the Closing Date, the election provided for under each of section 167 of the GST Act and section 75 of the QST Legislation (and any equivalent election applicable under provincial legislation) so that no GST/HST or QST (or similar provincial Tax) will be payable in respect of the purchase of the Acquired Assets by Buyer (or the applicable Buyer Designee) contemplated by this Agreement. Buyer (or the applicable Buyer Designee) and the Canadian Borrowers shall complete the election forms in respect of such elections and Buyer (or the applicable Buyer Designee) shall file such elections no later than the due date for Buyer's GST/HST or QST return, as applicable, for the first reporting period in which GST/HST would, in the absence of filing such elections, become payable in connection with the purchase of the Acquired Assets contemplated by this Agreement  Notwithstanding such election(s), in the event it is determined by the Canada Revenue Agency or Revenue Quebec (or another applicable provincial Governmental Authority) that there is a liability of Buyer (or the applicable Buyer Designee) to pay, or of a Seller to collect and remit, any Taxes payable under the GST and HST Legislation or the QST Legislation (or any applicable provincial legislation) in respect of the sale

73

and transfer of the Acquired Assets, such Taxes shall be paid by Buyer (or the applicable Buyer Designee).

(d)    Buyer hereby acknowledges that the supply of any Owned Real Property in Canada that is not the subject of an election under section 167 of the GST Act shall be taxable under the GST Act. In that case, however, Buyer and Sellers acknowledge that such supply shall be subject to the provisions of subsections 221(2) and 228(4) of the GST Act, thereby relieving the Sellers of their obligation to collect the GST/HST in respect of such supply. Buyer undertakes to, or to cause the applicable Buyer Designee to, self-assess all GST/HST payable with respect to the supply of any Owned Real Property situated in Canada that is not subject to an election under section 167 of the GST Act. Buyer represents and warrants that such GST/HST shall be accounted for, in accordance with the GST Act, in its (or the applicable Buyer Designee's) GST/HST return for the reporting period during which such GST/HST becomes payable, which returns shall be filed, along with all required remittances, on or before the statutory deadline for filing such returns. Provided that Buyer (or the applicable Buyer Designee) delivers to Sellers on or prior to Closing a certificate substantially in the form attached hereto as **Exhibit F** (the "HST Undertaking"), Buyer (or the applicable Buyer Designee) shall not be obliged to remit to the applicable Seller payment of any GST/HST relating to such supplies but will remain exclusively liable for the payment of such GST/HST.

(e)    Each Canadian Borrower and Buyer (or the applicable Buyer Designee) shall jointly, if determined to be available, execute an election under section 22 of the Canadian Tax Act (and any equivalent election applicable under provincial legislation) with respect to the sale of the Accounts Receivable and shall designate therein the portion of the Purchase Price allocated to such Accounts Receivable under Section 3.2 as consideration paid by Buyer (or the applicable Buyer Designee) for such Accounts Receivable. The Canadian Borrowers and Buyer (or the applicable Buyer Designee) shall each file such elections forthwith after the Closing Date (and, in any event, with their respective income Tax Returns for the taxation year in which Closing Date occurs).

(f)    At least five (5) Business Days prior to the Closing, Sellers shall provide Buyer with a written schedule identifying each Acquired Asset that is a "United States real property interest" within the meaning of Section 897(c)(1) of the Code (or any similar provision of state, local or foreign Law).

8.2    Bulk Sales.

To the extent required by or permissible under the Bankruptcy Code or required under the CCAA, the Sale Order shall provide either that (i) Sellers have complied with the requirements of any Legal Requirement relating to bulk sales and transfer or (ii) compliance with the Legal Requirements relating to bulk sales and transfers is not necessary or appropriate under the circumstances.

Prior to the Closing Date the Canadian Borrowers shall have obtained, at their expense, and shall have delivered to the Buyer certificates pursuant to the PST Acts stating that all amounts owing by such Sellers under the PST Acts have been paid.

8.3    Payments Received.

Sellers, on the one hand, and Buyer, on the other hand, each agree that, after the Closing, in the event that (i) any Seller receives any payment of cash, checks with appropriate endorsements (using commercially reasonable efforts not to convert such checks into cash) or other property from a third party after the Closing Date pursuant to any of the Assumed Contracts (or with respect to the operation by Buyer of the Business or any Acquired Asset during the post-Closing period) and to the extent such payment is not in respect of an Excluded Asset or an Excluded Liability, or (ii) Buyer or any of its Affiliates receives any payment of cash, checks with appropriate endorsements (using commercially reasonable efforts not to convert such checks into cash) or other property from a third party after the Closing on account of, or in connection with, any Excluded Asset or which is otherwise payable for the account of any Seller pursuant to this Agreement, then such receiving Party will hold and will promptly transfer and deliver such payment to the other Party, as promptly as practicable but in any event within fifteen (15) days after such receipt, and will notify such third party to remit all future payments to the appropriate Party.

8.4    Assumed Contracts: Adequate Assurance and Performance.

Buyer shall, and shall cause its Subsidiaries to, use commercially reasonable efforts to provide adequate assurance of the future performance by Buyer of each Assumed Contract as required under Section 365 of the Bankruptcy Code.  Buyer and Sellers agree that they will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code, such as furnishing timely requested and factually accurate affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Courts and making Buyer's and Sellers' Representatives available to testify before the Bankruptcy Courts.

8.5    Employee Matters.

(a)    Employees.  No later than five (5) Business Days prior to the Closing Date, (i) Seller shall notify its Employees located in the United States of the termination of their Employment by Seller that will be effective on, but conditioned upon the occurrence of, the Closing, and (ii) except as required by applicable Canadian Legal Requirements, Buyer shall offer employment to (A) all union-represented Seller Employees and Seller Employees who are party to a Key Employment Agreement, in each case, that are actively at work five (5) Business Days prior to the Closing Date no later than such date, and (B) all non-union-represented Seller Employees designated by Buyer no later than five (5) Business Days prior to the Closing Date no later than such date, in each case, with such offers to be effective on, but conditioned upon the occurrence of, the Closing.  With respect to non-union-represented Employees of Seller (other than Employees who are party to a Key Employment Agreement) and any union-represented Employees who are not subject to a Collective Bargaining Agreement that is an Assumed Contract (including such Employees who are on approved medical or military leaves of absence), except as, but then only to the extent, required by applicable Legal Requirements, Buyer shall set the initial terms and conditions of employment for such Employees, including wages, benefits, job duties and responsibilities and work assignment, and shall determine which such Employees

75

will be offered employment in Buyer's sole discretion. With respect to non-union-represented Employees of Seller who are party to a Key Employment Agreement, such Employees shall be offered employment in accordance with the terms of such Key Employment Agreement (as modified in accordance with Section 2.5(a)(i)).  With respect to union-represented Employees who are subject to Collective Bargaining Agreements that are Assumed Contracts (if any), such Employees shall be offered employment in accordance with the terms of such Collective Bargaining Agreement, provided, however, that any such Employee who is away from work on leave or layoff status as of the Closing Date shall be entitled to recall, if it all, in accordance with the terms of their applicable Collective Bargaining Agreement and applicable Legal Requirements.  Except as required by applicable Canadian Legal Requirements, with respect to any Employee who is not actively employed on the Closing Date due to a long-term disability or extended leave of absence and who is entitled to an offer of employment from Buyer under applicable Legal Requirements (including the terms of any Collective Bargaining Agreement that is an Assumed Contract), such offer of employment by Buyer will be provided upon such Employee seeking reinstatement with Buyer and otherwise in accordance with such Legal Requirements.  Only Employees who are offered and accept offers of employment with Buyer based on the foregoing terms and conditions and who actually commence employment with Buyer will become "Buyer Employees" after the Closing.  Notwithstanding the foregoing, nothing herein will, after the Closing Date, impose on Buyer any obligation to retain any Buyer Employee in its employment for any amount of time or on any terms and conditions of employment.  Except as otherwise required by Legal Requirement, specified in this Agreement, or otherwise agreed in writing by Buyer, Buyer shall not be obligated to provide any severance, separation pay, or other payments or benefits, including any key employee retention payments, to any Employee on account of any termination of such Employee's employment on or before the Closing Date, and such benefits (if any) shall remain obligations of Sellers.

(b)     Access to Information.  Subject to Section 7.7, after the Execution Date, Sellers shall provide Buyer, its Affiliates, and their Representatives with reasonable access to the Employees and with information, including employee records and Benefit Plan data, reasonably requested by Buyer and such Affiliates, except as otherwise prohibited by Legal Requirements.

(c)     Benefit Plans.  Buyer shall not assume the sponsorship of, or any Liabilities under or related to any Benefit Plan or Multiemployer Plan.  Notwithstanding the foregoing, with respect to each Benefit Plan set forth on Schedule 5.12(a)(iv), to the extent Seller provides to Buyer, within fourteen (14) calendar days after the date hereof, Benefit Plan documentation and sufficient information to enable Buyer to confirm which Benefit Plans (if any) can be transferred to Buyer without exposing Buyer to material Liabilities and/or are required to be maintained by Buyer pursuant to a Collective Bargaining Agreement that is an Assumed Contract, Buyer may determine that it will assume such Benefit Plan, will notify Seller of such determination, and, in the event of such notice, the Parties agree that Schedule 8.5(c) shall be added to this Agreement listing such Benefit Plans (such plans, the "Buyer Benefit Plans"), and Sellers shall transfer to Buyer, and Buyer shall assume sponsorship of, and the obligations under, those Buyer Benefit Plans consistent with Section 2.3(e) of this Agreement as Assumed Liabilities.  Notwithstanding anything to the contrary in this Section 8.5(c), the Buyer Benefit Plans shall include any Benefit Plan or Canadian Multi-Employer Plan where participation in such plan is provided for under the Canadian CBAs, to the extent required by any

76

applicable Legal Requirement in Canada. The Buyer Benefit Plans shall be assumed by and assigned to Buyer as of the Closing Date (or such Buyer Affiliates as Buyer so directs) in the manner described in this Agreement. To the extent that service is relevant for purposes of eligibility and vesting, but not accrual, under any 401(k) or group health or welfare employee benefit plan of Buyer or its Subsidiaries, and to the extent permitted under the terms of such plan, Buyer shall, to the extent permitted under the terms of its and its Affiliates' applicable plans, credit (or cause to be credited) the Buyer Employees for service earned prior to the Closing with Sellers to the same extent and for the same purpose as such service was credited to such Buyer Employee under the corresponding Benefit Plan as of the Closing; provided that duplication of benefits would not result. To the extent the Buyer Employees and their eligible dependents enroll in any newly established group health benefit plan of Buyer or its Subsidiaries that replace a corresponding Benefit Plan in the year in which Closing occurs ("New Buyer Health Plan"), Buyer shall, to the extent permitted under the terms of the New Buyer Health Plan, waive, or cause such waiver of, any preexisting condition limitations applicable to such Buyer Employees to the same extent such limitations were waived under the corresponding Benefit Plan for such individual. In addition, subject to the terms of, and to the extent permitted by, the applicable New Buyer Health Plan, Buyer shall (i) waive all waiting periods under such New Buyer Health Plan otherwise applicable to the Buyer Employees and their eligible dependents, other than waiting periods that are in effect with respect to such individuals as of the Closing to the extent not satisfied under the corresponding Benefit Plan, and (ii) provide each Buyer Employee and his or her dependents with corresponding credit under such New Buyer Health Plan for any co-payments and deductibles paid by them under Sellers' applicable corresponding Benefit Plans during the portion of the respective plan year prior to the Closing. At any time and from time to time after the Execution Date, Sellers and Buyer shall take, or cause to be taken, any and all actions necessary to effectuate the terms of this Section 8.5(c), including taking all action necessary to assign and assume and adopt each Buyer Benefit Plan in the manner contemplated by this Agreement effective as of the Closing.  Prior to the Closing, Sellers shall reasonably cooperate with Buyer and its Affiliates and give commercially reasonable assistance as Buyer may reasonably request in order to effectuate the foregoing. Nothing herein shall prohibit Buyer or its Affiliates, as applicable, from terminating, amending, or otherwise affecting any Buyer Benefit Plan, at any time and from time to time following the Closing.  Notwithstanding anything to the contrary in this Agreement, no Seller will be deemed to be in breach of any of the representations and warranties in Sections 5.12(d) and 5.12(i)-(p) of this Agreement applicable to Benefit Plans that are not designated as Buyer Benefit Plans on Schedule 8.5(c), and the condition to the Closing described in Section 9.1 will not be deemed to have failed as a result of any such breach related to such Excluded Benefit Plan.

(d)    Change of Control, Severance or Similar Benefits.  Prior to the Closing Date, and to the extent necessary to implement this sentence, Sellers shall, to the extent permitted by applicable Legal Requirements and provided that the terms of the applicable Buyer Benefit Plan or any other agreement with the beneficiary under such Buyer Benefit Plan and any other applicable agreement or arrangement with the affected participant or beneficiary permit such amendments and other actions to be made unilaterally and without the consent of any other party, amend all Buyer Benefit Plans and take or cause to be taken all other actions as may be required or necessary to provide that (i) the transactions contemplated hereunder shall not constitute a "change of control" (or similar transaction) for purposes of providing, enhancing or accelerating benefits or payments under any such Buyer Benefit Plans, and (ii) severance or

separation payments and/or benefits (including payments of accrued vacation) shall not be payable to any Buyer Employee on account of the termination of such employee's employment with Sellers, and that the termination by Sellers of any Buyer Employee shall not constitute a "separation from service" under Treasury Regulations Section 1.409A-1(h).  To the extent the amendments and other actions described in the preceding sentence require the consent of the affected participant or beneficiary, Sellers shall use their commercially reasonable efforts to obtain such consents prior to the Closing Date.

(e)     <u>Payroll Taxes</u>.  For purposes of payroll taxes with respect to the Buyer Employees, Sellers shall treat the transactions contemplated by this Agreement, as a transaction described in Treasury Regulation Sections 31.3121(a)(1)-1(b)(2) and 31.3306(b)(1)-(b)(2) (i.e., Buyer shall be treated as a successor for payroll tax purposes); and as such, Sellers and Buyer shall report on a predecessor/successor basis as set forth under the "Standard Procedure" provided in Section 4 of Revenue Procedure 2004-53, 2004-2 C.B. 320.

(f)     <u>WARN Act</u>.  Provided that on or before the Closing Date Sellers have provided Buyer with a true and complete list, by date and location, of all Employee layoffs implemented by Sellers during the 90-day period preceding the Closing Date, Buyer shall be responsible for, and shall indemnify and hold Sellers harmless from, all Liabilities that arise under the WARN Act as a result, in whole or in part, of the actions or omissions of Buyer or any of its Affiliates occurring after the Closing Date.  Sellers shall be responsible for, and shall indemnify and hold Buyer harmless from, all Liabilities that arise under the WARN Act solely as a result of the actions or omissions of Sellers on or before the Closing Date.  Unless otherwise agreed to by Sellers and Buyer, no later than sixty (60) days prior to the Closing Date Sellers shall issue WARN Act notices to potentially affected Employees (if any) and all other parties required by Legal Requirement, such notices to be in a form acceptable to Buyer.

(g)     <u>No Third-Party Beneficiaries; Employment Status</u>.  All provisions contained in this Agreement with respect to employee benefit plans or compensation of Buyer Employees are included for the sole benefit of the respective parties hereto.  Nothing contained herein (i) shall confer upon any Employee or former, current or future employee of Sellers or Buyer or any legal representative or beneficiary thereof any rights or remedies, including any right to employment or continued employment, of any nature, for any specified period; (ii) shall cause the employment status of any former, present or future Employee to be other than terminable at will; or (iii) shall confer any third party beneficiary rights upon any Buyer Employee or any dependent or beneficiary thereof or any heirs or assigns thereof.

(h)     <u>Withdrawal from Multiemployer Pension Plans</u>.  Effective prior to the Closing, the applicable Sellers shall, subject to the Hybrid Plan Participation Agreement, permanently cease to have an obligation to contribute to all Multiemployer Plans, and shall terminate participation in and completely withdraw from all multiemployer pension plans (other than the Canadian Multi-Employer Plans) to which they are currently obligated to make contributions.

8.6    Post-Closing Books and Records; Properties; and Personnel.

From and after the Closing Date for a period of three (3) years, each Party shall provide the other Parties (and their respective Representatives, including any trustee in bankruptcy of any Seller) with access, at reasonable times, upon reasonable notice and in a manner so as not to unreasonably interfere with their normal business, to the assets, books, records, systems and other property and any employees of the other Parties so as to enable Buyer and Sellers to prepare Tax, financial or court filings or reports, to respond to court orders, subpoenas or inquiries, investigations, audits or other proceedings of Governmental Authorities, to prosecute and defend legal Actions or for other like purposes, including Claims, objections and resolutions, and to enable Sellers to wind down the Business.  During such three-(3) year period, each Party (and their respective Representatives, including any trustee in bankruptcy of any Seller) shall be permitted to make copies of any books and records described in this Section 8.6, subject to the confidentiality requirements set forth in Section 7.1.  If any Party desires to dispose of any such books and records, such Party shall, thirty (30) days prior to such disposal, provide the other Party with a reasonable opportunity to remove or copy such records to be disposed of at the removing Party's expense.  Buyer shall retain such books and records for a period of seven (7) years following the Closing.  Nothing in this Section 8.6 shall prevent any Seller from liquidating or dissolving following the Closing in accordance with an order by the Bankruptcy Court.

8.7    Casualty Loss.

Notwithstanding any provision in this Agreement to the contrary, if, before the Closing, all or any portion of the Acquired Assets is condemned or taken by eminent domain, or is damaged or destroyed by fire, flood or other casualty, Sellers shall notify Buyer promptly in writing of such fact, and (a) in the case of condemnation or taking, Sellers shall assign or pay, as the case may be, any condemnation or taking proceeds thereof (of which are payable to Sellers) to Buyer at the Closing, and (b) in the case of fire, flood or other casualty to the Acquired Assets, Sellers shall, at Buyer's option, either use insurance proceeds to restore such damage, or to the extent such proceeds were not previously applied, assign the insurance proceeds therefrom to Buyer at Closing.

8.8    Change of Name.

Promptly following the Closing, each Seller shall, and shall cause its direct and indirect Subsidiaries to, discontinue the use of its current name (and any other trade names or "d/b/a" names currently utilized by each Seller or its direct or indirect Subsidiaries) and shall not subsequently change its name to or otherwise use or employ any name which includes the words "Jack Cooper" without the prior written consent of Buyer, and each Seller shall cause the names of Sellers in the caption of the Bankruptcy Cases to be changed to the new names of each Seller as provided in the last sentence of this Section 8.8; provided, however, that each Seller and each of its direct and indirect Subsidiaries may use its current name (and any other trade name or "d/b/a" names currently utilized by each Seller or its direct or indirect Subsidiaries) included on any business cards, stationery and other similar materials following the Closing for a period of up to ninety (90) days solely for purposes of winding down the affairs of each Seller, provided that when utilizing such materials, other than in incidental respects, each Seller and each of its

79

direct and indirect Subsidiaries shall use commercially reasonable efforts to indicate its new name and reference its current name (and any other trade names or "d/b/a" names currently utilized by each Seller or its direct Subsidiaries) as "formally known as" or similar designation. From and after the Closing, except as otherwise set forth in this Agreement (including this Section 8.8), each Seller covenants and agrees not to use or otherwise employ any Trademark that is likely to cause confusion with any Acquired Assets. Within sixty (60) days following the Closing, Sellers shall file all necessary organizational amendments with the applicable Secretary of State or equivalent Governmental Authority of each Seller's jurisdiction of formation and in each jurisdiction in which each such Seller is qualified to do business and with the Bankruptcy Courts to effectuate the foregoing.

8.9     No Successor Liability.

Except as required by applicable Canadian Legal Requirement, the Parties intend that upon the Closing, Buyer shall not be deemed to: (a) be the successor of or successor employer to any of the Sellers, (b) have any common law successor liability in relation to any Multiemployer Plan, including with respect to withdrawal liability or contribution obligations; (c) have, *de facto*, or otherwise, merged with or into Sellers; (d) be a mere continuation or substantial continuation of Sellers or the enterprise(s) of Sellers; or (e) be liable for any acts or omissions of Sellers in the conduct of the Business or operation or administration of the Benefit Plans or Multiemployer Plans or arising under or related to the Acquired Assets, other than as specifically set forth in this Agreement.  Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the Buyer shall not be liable for any Encumbrances (other than Assumed Liabilities and Permitted Encumbrances) against any Seller or any of its predecessors or Affiliates, and Buyer shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date or whether fixed or contingent, existing or hereafter arising, with respect to the Business, the operation or administration of the Benefit Plans or Multiemployer Plans, the Acquired Assets or any Liabilities of any Seller arising prior to the Closing Date.  The Parties agree that the provisions substantially in the form of this Section 8.9 shall be reflected in the Sale Order.

8.10     Liens.

Buyer agrees to direct that the Liens securing the Junior Credit Agreements and any Liens under the DIP Facilities in favor of Solus to be released and terminated with respect to the Acquired Assets.

8.11     Assumed Workers' Compensation Programs.

During the period from the date hereof through the date that is three (3) Business Days prior to the date scheduled for the Auction in the Bidding Procedures Order entered by Bankruptcy Court, Buyer may add or remove any workers' compensation program or insurance from Schedule 1.1(a) in its sole discretion after good faith discussion with Sellers.  Any such policies added to Schedule 1.1(a) in accordance with this Section 8.11 shall be considered Acquired Assets, and any such policies removed from Schedule 1.1(a) in accordance with this Section 8.11 shall be considered Excluded Assets, for all purposes of this Agreement.

8.12    Adjustments to Wind-Down Amount.

Within forty-five (45) days following the Petition Date, the Company will provide the lenders under the DIP Facilities with a reasonably detailed budget for the Wind-Down Amount setting forth the expenses projected to be incurred by Sellers to effectuate such winding down of their estates, such budget to be negotiated in good faith by the parties, but shall in any case not exceed (x) $250,000 or (y) such greater amount as agreed by Buyer, in its sole discretion, following review of a budget prepared by Sellers to fund the wind down and dissolution of Sellers' and their Affiliates estates (including, for the avoidance of doubt, the necessary professional fees) following the Closing Date, which shall be funded into an escrow account on the Closing Date.

8.13    Registrations, Operating Authorities and Vehicle Re-Identification .

Buyer and Sellers shall work together in good faith to, at or prior to the Closing, (a) obtain all necessary licenses, permits, registrations and operating authorities for Buyer and each of its applicable designees under any applicable Motor Vehicle Laws, and (b) complete the re identification (if required) and titling of all vehicles included in the Acquired Assets in the name of Buyer or its applicable designee, as applicable.  If, notwithstanding such efforts, Buyer or any of its applicable designees have not obtained all requisite licenses, permits, registrations, certificates and operating authorities, or any vehicles included in the Acquired Assets have not been re-identified in the name of the Buyer or its applicable designees, as applicable, Sellers will take such actions, at Buyer's sole cost and expense, as may be reasonably necessary to enable Buyer and its designees, as applicable, to continue operating the Business following the Closing, including, where necessary, by entering into reasonable and appropriate agreements with Buyer or such designees that would permit the operation of any transferred vehicles under the applicable Seller's identification information until such time as the re-identification of such transferred vehicle in the name of Buyer or its applicable designee is complete and Buyer or such designee has received all paperwork and evidence thereof required under applicable Legal Requirements.

## ARTICLE 9

### CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE

The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to fulfillment, at or prior to the Closing, of each of the following conditions, any one or more of which may be waived by Buyer in writing, in its sole and absolute discretion:

9.1    Accuracy of Representations.

The representations and warranties of Sellers set forth in Article 5, disregarding all qualifications contained herein relating to materiality, Material Adverse Effect or similar qualification or exception, shall be true and correct in all respects at and as of the Closing Date with the same effect as though such representations and warranties had been made at and as of the Closing Date (except those representations and warranties that address matters only as of a

specified date, which shall be true and correct in all respects as of such date), except, in each case, where the failure of such representations and warranties to be true and correct would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Buyer shall have received a certificate of Sellers to such effect signed by a duly authorized officer of each Seller.

  9.2  Sellers' Performance.

  The covenants and agreements that Sellers are required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with in all material respects and Buyer shall have received a certificate of Sellers to such effect signed by a duly authorized officer thereof.

  9.3  No Order.

  No Governmental Authority shall have enacted, issued, promulgated, decreed or entered any Order or Legal Requirement, which is in effect and has the effect of restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement, and there shall be no Proceeding pending before any Governmental Authority which seeks to enjoin or prohibit the consummation of the transactions contemplated by this Agreement.

  9.4  Governmental Authorizations.

  (a)  To the extent that the HSR Act is applicable, any waiting period (and any extension thereof) thereunder and the antitrust legislation of any other relevant jurisdiction applicable to the purchase of the Acquired Assets or the Business contemplated by this Agreement shall have expired or shall have been terminated; and

  (b)  Subject to Section 2.5, all of the Closing Required Permits (if any) shall have been transferred to, or obtained by, Buyer, except for any such Closing Required Permits the absence of which would not be material and adverse to the operation of the Acquired Assets following the Closing.

  9.5  Sellers' Deliveries.

  Each of the deliveries required to be made to Buyer pursuant to Section 4.3 shall have been so delivered.

  9.6  Sale Order.

  The Bankruptcy Courts shall have entered the Sale Order.

  9.7  Assumed Contracts.

  The Bankruptcy Courts shall have approved and authorized, other than with respect to Cure Costs, the assumption and assignment of each Assumed Contract, except as would not have a material effect on the Business from and after the Closing.

9.8    Material Adverse Effect.

Since the Execution Date, no Material Adverse Effect shall have occurred.

9.9    Collective Bargaining Agreements.

To the extent Buyer refuses to assume any of the Existing CBAs and such CBAs are treated as Excluded Asset hereunder:

(a)    (i) the U.S. Bankruptcy Court shall have determined that Sellers can sell the Acquired Assets free and clear of any successor clauses in any collective bargaining agreements, or (ii) the U.S. Bankruptcy Court shall have granted a motion acceptable to Buyer filed by the applicable Seller pursuant to Section 1113(c) of the Bankruptcy Code authorizing the applicable Seller to reject the applicable collective bargaining agreement; or

(b)    prior to September 23, 2019, all relevant Union(s) will have successfully ratified and executed a new or amended Collective Bargaining Agreement with Buyer, with all terms and conditions therein consistent in all material respects with the Restructuring Support Agreement, the CBA Term Sheet and the CSPF Term Sheet.

9.10    Exit Facilities.

(a)    The Exit First Lien Term Loan Facility shall have been entered into by each of the parties thereto in full and final satisfaction, compromise, settlement, release, discharge and exchange for all obligations outstanding under the First Lien Term Loan Facility; and

(b)    The Exit Revolver Facility shall have been entered into by each of the parties thereto in full and final satisfaction, compromise, settlement, release, discharge and exchange for all obligations outstanding under the U.S. Revolver Facility and the Canadian Sub-Facility.

9.11    Withdrawal from Multiemployer Pension Plans.

The applicable Sellers (a) shall have made no payments or contributions to any Multiemployer Plan after June 30, 2019 (except as permitted under the CBA Term Sheet with respect to Multiemployer Plans other than the Central States Plan) and (b) shall have, effective no later than immediately prior to the Closing, (i) permanently ceased to have an obligation to contribute to all Multiemployer Plans, (ii) terminated participation in and (iii) completely withdrawn from all multiemployer pension plans to which they are currently obligated to make contributions.  To the extent an assumed Existing CBA or Modified CBA provides for participation in the Central States, Southeast and Southwest Areas Pension Plan ("Central States Plan"), the Parties shall have entered into the Hybrid Plan Participation Agreement.

9.12    DIP Financing Orders; DIP Term Loan Credit Agreement; Restructuring Support Agreement.

The DIP Financing Orders, the DIP Term Loan Credit Agreement and the Restructuring Support Agreement shall not have been validly terminated.

# ARTICLE 10

### CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLERS TO CLOSE

The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to fulfillment, at or prior to the Closing, of each of the following conditions, any one or more of which may be waived by Sellers in writing, in their sole and absolute discretion:

10.1    Accuracy of Representations.

The representations and warranties of Buyer set forth in Article 6, disregarding all qualifications contained herein relating to materiality, Material Adverse Effect or similar qualification or exception, shall be true and correct in all respects at and as of the Closing Date with the same effect as though such representations and warranties had been made at and as of the Closing Date (except those representations and warranties that address matters only as of a specified date, which shall be true and correct in all respects as of such date), except, in each case, where the failure of such representations and warranties to be true and correct would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the ability of Buyer to consummate the transactions contemplated by this Agreement.  Sellers shall have received a certificate of Buyer to such effect signed by a duly authorized officer of Buyer.

10.2    Buyer's Performance.

The covenants and agreements that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with in all material respects, and Sellers shall have received a certificate of Buyer to such effect signed by a duly authorized representative thereof.

10.3    No Order.

No Governmental Authority shall have enacted, issued, promulgated, decreed, or entered any Order or Legal Requirement, which is in effect and has the effect of restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement, and there shall be no Proceeding pending before any Governmental Authority which seeks to enjoin or prohibit the consummation of the transactions contemplated by this Agreement.

10.4    Governmental Authorizations.

To the extent that the HSR Act is applicable, any waiting period (and any extension thereof) thereunder and the antitrust legislation of any other relevant jurisdiction

84

applicable to the purchase of the Acquired Assets or the Business contemplated by this Agreement shall have expired or shall have been terminated.

10.5    Buyer's Deliveries.

Each of the deliveries required to be made to Sellers pursuant to Section 4.2 shall have been so delivered, and Buyer shall have paid the Purchase Price in full pursuant to Section 3.1.

10.6    Sale Order.

Subject to Section 2.5, the Bankruptcy Courts shall have entered the Sale Order.

10.7    Exit Facilities.

(a)    The Exit First Lien Term Loan Facility shall have been entered into by each of the parties thereto in full and final satisfaction, compromise, settlement, release, discharge and exchange for all obligations outstanding under the First Lien Term Loan Facility; and

(b)    The Exit Revolver Facility shall have been entered into by each of the parties thereto in full and final satisfaction, compromise, settlement, release, discharge and exchange for all obligations outstanding under the U.S. Revolver Facility and the Canadian Sub-Facility.

10.8    Buyer Liquidity.

Buyer, or the applicable Buyer Designees, together with their subsidiaries, shall have at least $20,000,000 of Liquidity on a pro forma basis after taking into effect the consummation of the transactions contemplated hereby and incurrence or assumption of the Exit Facilities.

10.9    Restructuring Support Agreement.

The Restructuring Support Agreement shall not have been validly terminated.

## ARTICLE 11

### TERMINATION

11.1    Termination Events.

Notwithstanding anything to the contrary in this Agreement, this Agreement may be terminated at any time prior to the Closing only as follows.

(a)    other than as contemplated by the Bidding Procedures, automatically upon the U.S. Bankruptcy Court's entry of an order approving an Alternative Transaction.

(b)     by mutual written consent of Sellers and Buyer;

(c)     by written notice from either Sellers or Buyer:

(i)     if a Governmental Authority issues a final, non-appealable ruling or Order permanently restraining, enjoining or otherwise prohibiting consummation of the transactions contemplated hereby where such ruling or Order was not requested, encouraged or supported by any of Sellers or Buyer; provided that the right to terminate this Agreement under this Section 11.1(c)(i) shall not be available to any Party whose willful failure to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur;

(ii)     if the Closing shall not have occurred on or prior to November 19, 2019 (the "Outside Date"); provided, however, that if the Closing has not occurred by such date, but on such date all of the conditions set forth in Article 9 and Article 10 have been satisfied or waived (to the extent such conditions may be waived) other than the conditions set forth in Sections 9.4 and 10.4, then the Outside Date shall automatically be extended until thirty (30) days after such initial Outside Date (and such extended date shall be deemed to be the "Outside Date" for all purposes hereunder); provided, further that the terminating Party under this Section 11.1(d)(ii) is not (at such time of termination) in breach of any representation, warranty, covenant or other agreement in this Agreement so as to cause any conditions to Closing not to be satisfied and shall not have been the proximate cause of the failure of the Closing to occur on or prior to the Outside Date;

(iii)     if, at the end of the Auction, Buyer is not determined by Sellers to be the (A) prevailing bidder or (B) backup bidder with respect to the Acquired Assets; provided that in the event Buyer is determined to be the backup bidder with respect to the Acquired Assets, then, this Agreement will terminate automatically without further action by any Party upon the earlier to occur of (x) the closing of a successful bid and (y) the date that is sixty (60) days after the date of the sale hearing;

(iv)     if the U.S. Bankruptcy Court shall have entered an Order dismissing, or converting into cases under chapter 7 of the Bankruptcy Code, any of the cases commenced by Sellers under chapter 11 of the Bankruptcy Code and comprising part of the Bankruptcy Cases; provided, further that the terminating Party under this Section 11.1(c)(iv) is not (at such time of termination) in breach of any representation, warranty, covenant or other agreement in this Agreement;

(v)     upon the final, non-appealable ruling or denial of the Governmental Authorizations described in Sections 9.4 and 10.4 and required to be obtained by Closing; or

(vi)     upon the termination of the Restructuring Support Agreement in accordance with its terms.

(d)      by written notice from Buyer:

(i)      if any of the events set forth in clauses (a) through (i) of Section 7.5 shall not have occurred by the respective dates set forth therein;

(ii)      if any Seller seeks to have the Bankruptcy Courts enter an Order dismissing, or converting into cases under chapter 7 of the Bankruptcy Code, any of the cases commenced by Sellers under chapter 11 of the Bankruptcy Code and comprising part of the Bankruptcy Cases, or if a responsible officer or an examiner with enlarged powers is appointed (other than a fee examiner) relating to the operation of Sellers' businesses pursuant to Section 1104 of the Bankruptcy Code and the order of appointment is not vacated or reversed within fourteen (14) days after the entry thereof;

(iii)      in the event of any breach of, or failure to perform, by Sellers of any of their agreements, covenants, representations or warranties contained herein or in the Sale Order, which breach or failure to perform (A) would result in a condition set forth in Article 9 not to be satisfied and (B) cannot be cured within ten (10) Business Days after Buyer notifies Sellers of such breach in writing; provided that Buyer shall not have a right of termination pursuant to this Section 11.1(d)(iii) if it is then in material breach of any of its agreements, covenants, representations or warranties contained herein or in the Sale Order;

(iv)      if, Buyer (other than as a result of Buyer's own breach of this Agreement) is unable, pursuant to Section 363(k) of the Bankruptcy Code, to credit bid in payment of all or any portion of the Purchase Price as set forth in Section 3.1 (other than the Assumed Liabilities and the cash portion of the Purchase Price); or

(v)      upon the valid termination of the DIP Financing Orders or DIP Term Loan Credit Agreement in accordance with their respective terms.

(e)      by written notice from Sellers:

(i)      in the event of any breach of, or failure to perform, by Buyer of any of its agreements, covenants, representations or warranties contained herein or in the Sale Order, which breach or failure to perform (A) would result in a condition set forth in Article 10 not to be satisfied and (B) cannot be cured within ten (10) Business Days after Sellers notify Buyer of such breach in writing; provided that Sellers shall not have a right of termination pursuant to this Section 11.1(e) if Sellers are then in material breach of any of their agreements, covenants, representations or warranties contained herein or in the Sale Order;

(ii)      if, following the occurrence of an Event of Default under (and as defined in) the DIP Term Loan Credit Agreement and the Company's delivery to Solus of a written notice of such Event of Default by the Company and request for a waiver thereof, Solus has not waived such default in writing within five (5) Business Days following the Company's delivery of such written notice; or

Each condition set forth in this Section 11.1 shall be considered separate and distinct from each other such condition.  If more than one of the termination conditions set forth in this Section 11.1

are applicable, the applicable party shall have the right to choose the termination condition pursuant to which this Agreement is to be terminated.

11.2    Effect of Termination.

In the event of termination of this Agreement by Buyer or Sellers pursuant to this Article 11, this Agreement shall become null and void and have no effect, and all rights and obligations of the Parties under this Agreement shall terminate without any Liability of any Party to any other Party (other than as expressly provided herein); provided, that the provisions of Sections 7.1(c) (Access and Reports; Confidentiality), 11.1 (Termination Events), 11.3 (Expense Reimbursement), 12.9 (Expenses), 12.10 (Governing Law, Consent to Jurisdiction and Venue; Jury Trial Waiver) and this Section 11.2 (and, to the extent applicable to the interpretation or enforcement of such provisions, Article 1), shall expressly survive the termination of this Agreement.  If this Agreement is terminated in the circumstances set forth in Section 11.3, then Sellers shall pay to Buyer the Expense Reimbursement amount, as applicable, subject to and in accordance with Section 11.3, and Buyer's right to enforce payment(s) thereof shall survive the termination of this Agreement.  Notwithstanding anything to the contrary in this Agreement, (a) the maximum liability of Buyer for monetary damages based on any breach of this Agreement or for any claim based on tort, breach of contract or otherwise that relates to or arises out of this Agreement or the transactions contemplated hereby shall be equal to the reasonable and documented out-of-pocket costs, fees and expenses incurred by Sellers after the Petition Date (including fees and expenses of their respective legal, accounting and financial advisors) in connection with the development, execution, delivery and approval by the Bankruptcy Courts of this Agreement and the transactions contemplated hereby to the extent such out-of-pocket costs, fees and expenses have not otherwise been paid or reimbursed as of such time and (b) the maximum liability of Sellers for monetary damages based on any breach of this Agreement or for any claim based on tort, breach of contract or otherwise that relates to or arises out of this Agreement or the transactions contemplated hereby shall be the amount of the Expense Reimbursement in accordance with Section 11.3. Nothing in this Section 11.2 shall limit Buyer's or Sellers' (or any of their respective Affiliates') rights in the case of Fraud.

11.3    Expense Reimbursement.

(a)    If this Agreement is terminated pursuant to Section 11.1(a) or 11.1(c)(iii), and Sellers close an alternative transaction with respect to the sale of the Acquired Assets for an aggregate purchase price that is greater than the Purchase Price hereunder, then Sellers shall pay to Buyer in cash no later than the date that is the later of (i) the closing date of such alternative transaction and (ii) two (2) Business Days following receipt of documentation supporting the request for reimbursement of out-of-pocket costs, fees and expenses equal to the reasonable and documented out-of-pocket costs, fees and expenses incurred by Buyer whether prior to or after the Petition Date (including fees and expenses of their respective legal, accounting and financial advisors), in connection with the development, execution, delivery and approval by the Bankruptcy Courts of this Agreement and the transactions contemplated hereby to the extent such out-of-pocket costs, fees and expenses have not otherwise been paid or reimbursed as of such time ("Expense Reimbursement").

88

(b)      The obligations of Sellers to pay the Expense Reimbursement amount as provided herein shall be entitled to superpriority administrative expense status pursuant to sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code, and shall be senior to all other general administrative expense claims and superpriority administrative expense claims granted such status pursuant to sections 503(b)(1) and 507(a)(2) thereof, but subject to the Carve-Out (as defined in the DIP Term Sheet) and prior payment in full of the First Lien Term Loan Facility.

(c)      Sellers agree and acknowledge that Buyer's due diligence, efforts, negotiation, and execution of this Agreement have involved substantial investment of management time and have required significant commitment of financial, legal, and other resources by Buyer and its Affiliates, and that such due diligence, efforts, negotiation, and execution have provided value to Sellers and, in Sellers' reasonable business judgment, is necessary for the preservation of the value of Sellers' estate.  Sellers further agree and acknowledge that the Expense Reimbursement amount is reasonable in relation to Buyer's efforts, Buyer's lost opportunities from pursuing this transaction, and the magnitude of the transactions contemplated hereby.  The provision of the Expense Reimbursement amount is an integral part of this Agreement, without which Buyer would not have entered into this Agreement.

## ARTICLE 12

### GENERAL PROVISIONS

12.1    Survival.

All covenants and agreements contained herein which by their terms are to be performed in whole or in part, or which prohibit actions, subsequent to the Closing shall, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to the Closing, survive the Closing in accordance with their terms until fully performed or satisfied.  All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder shall not survive the Closing and shall thereupon terminate, including any Actions for damages in respect of any breach or inaccuracy thereof. Nothing in this Section 12.1 shall limit Buyer's or its Affiliates' rights in the case of Fraud but only to the extent contemplated by Section 12.16.

12.2    Confidentiality.

Following the Closing, each Seller agrees not to, and to cause its Subsidiaries not to, disclose any confidential or non-public information concerning the Acquired Assets, the Business, the negotiation or existence and terms of this Agreement or the business affairs of Buyer or the Assumed Liabilities ("Confidential Information") except disclosure of Confidential Information (excluding Personal Information) that (a) was or is lawfully obtained from a source that, to the knowledge of such Seller, was not under an obligation of confidentiality to Buyer or Sellers with respect to such information, (b) is independently developed by such Seller without violating any of its obligations under this Agreement, (c) is or becomes available to the public through no action of such Seller, (d) is or may be necessary to wind down any of Sellers' estates,

89

or in connection with the enforcement of the rights of, or the defense of any Proceeding against or involving, any Seller provided that the Confidential Information is afforded confidential treatment, in each case subject to providing Buyer with a reasonable opportunity to review prior to disclosure, to the extent permitted by Legal Requirements (e) primarily relates to any Excluded Assets and/or Excluded Liabilities, or (f) is or may be necessary in connection with the Bankruptcy Cases provided that the Confidential Information is afforded confidential treatment, subject to providing Buyer with a reasonable opportunity to review three (3) days prior to disclosure, to the extent permitted by Legal Requirements.  Notwithstanding the foregoing, a Seller may disclose Confidential Information if such Seller believes (upon the advice of counsel) it is legally required to make such disclosure in order to comply with applicable law, regulation, rule or legal, judicial or administrative process (including any rule, regulation or policy statement of (i) any organized securities exchange, market or automated quotation system on which the Company's securities are listed or quoted, (ii) any self-regulatory organization of which a party is a member) or (iii) in connection with the Bankruptcy Cases if so required under the Bankruptcy Code or Bankruptcy Court local rules.  If a Seller or any of its Representatives becomes required (including by deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar process) or it becomes necessary in connection with the Bankruptcy Cases to disclose any of the Confidential Information, such Seller or Representative shall use reasonable efforts to provide Buyer with prompt notice, to the extent allowed by law, rule and regulation, of such requirement so that Buyer may seek an appropriate protective order. Each Seller agrees to disclose only that portion of the Confidential Information which it believes it is necessary or required to disclose and to use commercially reasonable efforts to obtain confidential treatment of such Confidential Information.

12.3    <u>Public Announcements</u>.

Prior to the Closing, unless otherwise required by applicable Legal Requirement or by obligations of Buyer or Sellers or their respective Affiliates pursuant to any listing agreement with or rules of any securities exchange, Buyer, on the one hand, and Sellers, on the other hand, shall consult with each other before issuing any press release or otherwise making any public statement with respect to this Agreement or the transactions contemplated hereby and shall not issue any such release or make any such statement without the prior written consent of the other (such consent not to be unreasonably withheld, conditioned or delayed).  From and after the Closing, the Parties may make public statements with respect to this Agreement or the transactions contemplated hereby so long as such announcements do not disclose the specific terms or conditions of this Agreement except where such terms and conditions have already been disclosed as required by Legal Requirement or by obligations of Buyer or Sellers or their respective Affiliates pursuant to any listing agreement with or rules of any securities exchange; provided, that the issuing party shall use its commercially reasonable efforts to consult with the other party with respect to the text thereof to the extent practicable.  Notwithstanding the foregoing, Buyer may disclose information regarding the transactions contemplated by the Agreement or the other Transaction Documents (a) to any of its direct or indirect equity holders, Affiliates, Representatives and its and their respective Affiliates' financing sources, so long as such Persons are informed of the confidential nature of such information and Buyer shall liable for any failure by such Person to hold in confidence such information under this <u>Section 12.3</u>, (b) for purposes of compliance with its or their respective Affiliates' financial reporting obligations or (c) in connection with its or their respective Affiliates' fundraising or marketing activities, so

90

long as such Persons are informed of the confidential nature of such information and Buyer shall be liable for any failure by such Person to hold in confidence such information under this Section 12.3.

        12.4   Notices.

        All notices, requests, demands, waivers and other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given if delivered personally or sent by overnight courier or email transmission:

        (a)   If to Sellers, then to:

> Jack Cooper Investments, Inc.
> 630 Kennesaw Due West Road
> Kennesaw, GA 30152
> Attn:  Theo Ciupitu
> Email: tciupitu@jackcooper.com

> with a copy (which shall not constitute notice) to:

> King & Spalding LLP
> 1180 Peachtree Street, N.E.
> Atlanta, GA 30309
> Attn:  Rahul Patel
>       Sarah Borders
>       John Hyman
> Email: rpatel@kslaw.com
>       sborders@kslaw.com
>       jhyman@kslaw.com

> and

> Paul, Weiss, Rifkind, Wharton & Garrison LLP
> 1285 Avenue of the Americas
> New York, NY 10019-6064
> Attn:  Kelley A. Cornish
>       Brian S. Hermann
> Email: kcornish@paulweiss.com
>       bhermann@paulweiss.com

        (b)   If to Buyer:

> JC Buyer Company, Inc.
> 410 Park Avenue, 11th Floor
> New York, NY 10022
> Attn:  Tom Higbie
>       Stephen Blauner
> Email: thigbie@soluslp.com

sblauner@soluslp.com

with a copy (which shall not constitute notice) to:

Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
Attn:   Marc Kieselstein, P.C.
        Alexandra Schwarzman
Email: marc.kieselstein@kirkland.com
        alexandra.schwarzman@kirkland.com
and

Kirkland & Ellis LLP
333 South Hope Street
Los Angeles, CA 90071
Attn: Tana M. Ryan, P.C.
Email: tryan@kirkland.com

or to such other person or address as any party shall specify by notice in writing to the other party.  All such notices, requests, demands, waivers and communications shall be deemed to have been received on the date on which so personally-delivered or emailed or delivered by overnight courier.

12.5    Waiver.

The terms, covenants, representations, warranties or conditions may be waived only by the Party waiving compliance.  Neither the failure nor any delay by any Party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement shall operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power, or privilege shall preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege.  To the maximum extent permitted by Legal Requirements, (a) no waiver that may be given by a Party shall be applicable except in the specific instance for which it is given, and (b) no notice to or demand on one Party shall be deemed to be a waiver of any right of the Party giving such notice or demand to take further action without notice or demand.

12.6    Entire Agreement; Amendment.

This Agreement (including the Disclosure Schedules and the Exhibits), the Sale Order, and the other Transaction Documents supersede all prior agreements, negotiations and discussions, whether written or oral, between Buyer, on the one hand, and Sellers, on the other hand, with respect to the subject matter hereof and constitute a complete and exclusive statement of the terms of the agreements between Buyer, on the one hand, and Sellers, on the other hand, with respect thereto.  This Agreement may not be amended, modified or supplements except by a written agreement executed by each of the Parties.

12.7    Assignment.

This Agreement, and the rights, interests and obligations hereunder, shall not be assigned by any Party by operation of law or otherwise without the express written consent of all of the other Parties (which consent may be granted or withheld in the sole discretion of such other Party) and any assignment in contravention of this Section 12.7 shall be null and void *ab initio*; provided, however, that, subject to compliance with Section 4.4, Buyer shall be permitted to assign all or part of its rights or obligations hereunder to (a) one or more Buyer Designees, (b) at or following the Closing, any of its rights to any of Buyer's financing sources as collateral or (c) following the Closing, to any successor or purchaser of all or part of the business of Buyer or any of its Subsidiaries without the prior consent of Sellers; provided, further, that Sellers shall be permitted to assign their rights hereunder in part to the acquiror of any Excluded Assets or Excluded Liabilities without the prior consent of Buyer; provided that no such assignment shall relieve Sellers from their liabilities or obligations hereunder, other than with respect to such Excluded Assets or Excluded Liabilities.

12.8    Severability.

The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible; and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

12.9    Expenses.

Except as otherwise expressly provided in this Agreement, whether or not the transactions contemplated by this Agreement are consummated, the Parties shall bear their own respective expenses (including all compensation and expenses of counsel, financial advisors, consultants, actuaries and independent accountants) incurred in connection with this Agreement and the transactions contemplated hereby.

12.10    Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of New York applicable hereto.

(b)    Without limitation of any Party's right to appeal any Order of the Bankruptcy Courts, (i) the Bankruptcy Courts shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions

contemplated hereby and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the applicable Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Courts and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or Proceeding; provided, however, that, if the U.S. Bankruptcy Case has been closed pursuant to Section 350(a) of the Bankruptcy Code, all Actions and Proceedings arising out of or relating to this Agreement shall be heard and determined in a New York state court or a federal court sitting in the state of New York, and the Parties hereby irrevocably submit to the exclusive jurisdiction and venue of such courts in any such Action or Proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or Proceeding.  The Parties consent to service of process by mail (in accordance with Section 12.4) or any other manner permitted by law.

(c)    THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF SELLERS, BUYER OR THEIR RESPECTIVE REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF.

12.11    Counterparts.

This Agreement and any amendment hereto may be executed in two or more counterparts, each of which shall be deemed to be an original of this Agreement or such amendment and all of which, when taken together, shall constitute one and the same instrument. Notwithstanding anything to the contrary in Section 12.4, delivery of an executed counterpart of a signature page to this Agreement or any amendment hereto by telecopier, facsimile or email attachment that contains a portable document format (.pdf) file of an executed signature shall be effective as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable.

12.12    Parties in Interest; Third Party Beneficiaries; No Amendment.

This Agreement and the other Transaction Documents shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns.  Except with respect to the parties released and/or exculpated pursuant to Section 12.16, this Agreement and the other Transaction Documents are for the sole benefit of the Parties and their permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind. Notwithstanding anything to the contrary, nothing in this Agreement shall constitute an amendment to any Benefit Plan.

12.13    Remedies.

Neither the exercise of nor the failure to exercise a right of set-off or to give notice of a claim under this Agreement will constitute an election of remedies or limit Sellers or Buyer in any manner in the enforcement of any other remedies that may be available to any of them, whether at law or in equity.

12.14   Specific Performance.

Each Party recognizes that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by them in accordance with the terms hereof or were otherwise breached, and that monetary damages alone would not be adequate to compensate the non-breaching Party or Parties for their injuries.  Accordingly, a non-breaching Party shall be entitled to injunctive relief to enforce the terms and provisions of this Agreement. If any Action or Proceeding is brought by the non-breaching Party or Parties to enforce any of the terms or provisions of this Agreement pursuant to this Section 12.14, the Party in breach shall waive the defense that there is an adequate remedy at law.  Each Party agrees to waive any requirement for the security or posting of any bond in connection with any Action or Proceeding seeking specific performance of such terms or provisions and that the only permitted objection that it may raise in response to any action for specific performance of such terms or provisions is that it contests the existence of a breach or threatened breach of such provisions.  The rights set forth in this Section 12.14 shall be in addition to any other rights which a Party may have at law or in equity pursuant to this Agreement.

12.15   Sellers' Representative; Reliance.

Subject to entry of the Sale Order, Sellers, jointly and severally, by their execution of this Agreement, hereby agree that, as of the Execution Date:

(a)     The Company is authorized, and empowered to act, in connection with, and to facilitate the consummation of, the transactions contemplated by this Agreement and the other Transaction Documents and in connection with any activities to be performed by Sellers under this Agreement and the other Transaction Documents, for the purposes and with the powers, and authority set forth in this Agreement, which will include the sole power and authority:

(i)     to receive and distribute the Purchase Price or any other amount paid in connection with this Agreement or the other Transaction Documents to Sellers or to the Persons legally entitled thereto;

(ii)     to enforce and protect the rights and interests of Sellers arising out of or under or in any manner relating to this Agreement and the other Transaction Documents (including in connection with any claims related to the transactions contemplated hereby and thereby) and, in connection therewith, to (A) assert any claim or institute any action, (B) investigate, defend, contest or litigate any action initiated by Buyer or any other Person pursuant to this Agreement and the other Transaction Documents and receive process on behalf of each Seller in any such action and compromise or settle on such terms as the Company will determine to be appropriate, give receipts, releases and discharges on behalf of all or any Seller with respect to any such action, (C) file any proofs, debts, claims and petitions as the Company may deem advisable or necessary, (D) settle or compromise any claims related to the transactions contemplated by this Agreement and the other Transaction Documents, (E) assume, on each Sellers' behalf, the defense of any claims related to the transactions contemplated by this Agreement and the other Transaction Documents, and (F) file and prosecute appeals from any decision, judgment or award rendered in any of the foregoing actions;

(iii)    to enforce or refrain from enforcing any right of any Seller (prior to the Closing) and/or of the Company arising out of or under or in any manner relating to this Agreement or the other Transaction Documents;

(iv)    to take any action to be taken by one or more Sellers under or in connection with this Agreement or the other Transaction Documents; or

(v)    to make, execute, acknowledge and deliver all such other Contracts, guarantees, orders, receipts, endorsements, notices, requests, instructions, certificates, stock powers, letters and other writings, and, in general, to do any and all things and to take any and all action that the Company, in its sole and absolute discretion, may consider necessary or proper or convenient in connection with or to carry out the activities described in Section 12.15(a)(i) through Section 12.15(a)(iii) and the transactions contemplated by this Agreement and the Transaction Documents.

(b)    The Company's power and grant of authority is (i) coupled with an interest and is irrevocable and survives the bankruptcy or liquidation of any Seller and will be binding on any successor thereto; and (ii) may be exercised by the Company acting by signing as the representative of any Seller.

(c)    Buyer and its Affiliates and representatives may conclusively and absolutely rely, without inquiry, upon the notice, consent, waiver or any other action of the Company as the notice, consent, waiver or such other action of each Seller (and may ignore any action taken or notice given by any Seller other than the Company) in all matters relating to this Agreement, the Transaction Documents or the transactions contemplated hereby and thereby. Any document delivered, payment made or notice delivered by or on behalf of Buyer or its Affiliates to, or action taken by or on behalf of Buyer or its Affiliates with respect to, the Company shall be deemed to have been delivered or paid to, or taken with respect to, all Sellers. Any amounts to be paid by Buyer to Sellers pursuant to this Agreement shall be divided by Sellers among themselves in accordance with their respective entitlements, but may be paid by Buyer to the Company. Sellers shall be jointly and severally liable for any amounts due to be paid or owed by Sellers to Buyer pursuant to this Agreement.

12.16    No Liability; Releases.

(a)    (i) No past, present or future director, officer, manager, employee, incorporator, member, partner or equityholder or other Affiliates of (A) Sellers, or (B) Buyer, and (ii) none of the lenders or agents under the Junior Credit Agreements, the DIP Facilities or the Exit Facilities, in any case, shall have any Liability for any obligations or liabilities of Sellers or Buyer, as applicable, under this Agreement or any agreement, document or instrument entered into in connection herewith of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby. Any claim or cause of action based upon, arising out of, or related to this Agreement or any agreement, document or instrument contemplated hereby may only be brought against Persons that are expressly named as parties hereto or thereto, and then only with respect to the specific obligations set forth herein or therein. Other than the Parties, no other party shall have any Liability or obligation for any of the representations, warranties, covenants, agreements, obligations or liabilities of any party under this Agreement or

96

the agreements, documents or instruments contemplated hereby or of or for any Proceeding based on, in respect of, or by reason of, the transactions contemplated hereby or thereby (including the breach, termination or failure to consummate such transactions), in each case whether based on contract, tort, strict liability, other Legal Requirements or otherwise and whether by piercing the corporate veil, by a claim by or on behalf of a Party or another Person or otherwise. Nothing in this Section 12.16(a) shall limit Buyer's or its Affiliates' rights in the case of Fraud.

(b)      Effective upon the Closing Date, and subject to entry of the Sale Order (with any discrepancy between the release provided in the Sale Order and this Agreement being controlled by the Sale Order), each Seller acknowledges that it has no claim, counterclaim, setoff, recoupment, action or cause of action of any kind or nature whatsoever against any of the individuals or entities within the Buyer Group or any lenders or agents under the Junior Credit Agreements or the Exit Facilities, that directly or indirectly arises out of, is based upon, or is in any manner connected with any Prior Event, the Excluded Assets or the Excluded Liabilities (collectively, the "Seller Released Claims"); and, should any Seller Released Claims nonetheless exist, each Seller hereby (i) releases and discharges each member of the Buyer Group and each lender and agent under the Junior Credit Agreements and the Exit Facilities from any liability whatsoever on such Seller Released Claims that directly or indirectly arises out of, is based upon, or is in any manner connected with the Seller Released Claims, and (ii) releases, remises, waives and discharges all such Seller Released Claims against the Buyer Group and any lender and agent under any of the Junior Credit Agreements and the Exit Facilities; provided that nothing herein shall release the Buyer or any Buyer Designee of its obligations under this Agreement (including the Disclosure Schedules and the Exhibits), the Sale Order, and the other Transaction Documents, or otherwise constitute a release by Seller or any of its Affiliates of any claims that Seller or any of its Affiliates have in the Bankruptcy Case. Nothing in this Section 12.16(b) shall limit Sellers' or their respective Affiliates' rights in the case of Fraud

(c)      Effective upon the Closing Date, Buyer acknowledges that it has no claim, counterclaim, setoff, recoupment, action or cause of action of any kind or nature whatsoever against any of the individuals or entities within the Sellers Group, that directly or indirectly arises out of, is based upon, or is in any manner connected with any Prior Event, the Acquired Assets or the Assumed Liabilities (collectively, the "Buyer Released Claims"); and, should any Buyer Released Claims nonetheless exist, Buyer hereby (i) releases and discharges each member of the Sellers Group from any liability whatsoever on such Buyer Released Claims that directly or indirectly arises out of, is based upon, or is in any manner connected with the Buyer Released Claim, and (ii) releases, remises, waives and discharges all such Buyer Released Claims against the Sellers Group; provided that nothing herein shall release any Seller of its obligations under this Agreement (including the Disclosure Schedules and the Exhibits), the Sale Order, and the other Transaction Documents, or otherwise constitute a release by Buyer or any of its Affiliates of any claims against the Debtors that Buyer or any of its Affiliates have in the Bankruptcy Case. Nothing in this Section 12.16(c) shall limit Buyer's or its Affiliates' rights in the case of Fraud

(d)      Without limiting in any way the scope of the release contained in subparagraph (a),(b) or (c) of this Section 12.16 and effective upon the Closing Date, each Seller and Buyer, to the fullest extent allowed under applicable law, hereby waives and relinquishes all

statutory and common law protections purporting to limit the scope or effect of a general release, whether due to lack of knowledge of any claim or otherwise, including, waiving and relinquishing the terms of any law which provides that a release may not apply to material unknown Claims.  Each Seller and Buyer hereby affirms its intent to waive and relinquish such unknown Claims and to waive and relinquish any statutory or common law protection available in any applicable jurisdiction with respect thereto.  Notwithstanding anything set forth herein to the contrary, the releases set forth in this <u>Section 12.16</u> do not extend to (A) any obligations that are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the willful misconduct, Fraud or gross negligence of such Person, (B) any obligations of the Parties under this Agreement (including the Disclosure Schedules and the Exhibits), the Sale Order, and the other Transaction Documents or (C) any claims held by lenders or agents under the Junior Credit Agreements and the Exit Facilities against the Sellers Group and any rights, remedies or causes of action arising out of such claims or Liens and security interests relating to such claims; <u>provided</u> that any claims, or any Liens or superpriority claims related thereto that would otherwise attach or be payable out of the Cash Consideration, shall be waived.

*[Signature pages follow.]*

**IN WITNESS WHEREOF,** the Parties have caused this Asset Purchase Agreement to be executed and delivered by their duly authorized representatives, all as of the Execution Date.

JC BUYER COMPANY, INC.

By: _____

Name: Stephen Blauner

Title:   Secretary

JACK COOPER INVESTMENTS, Inc.

By: _____
Name: T. Michael Riggs
Title: Chief Executive Officer, President, Treasurer and
Assistant Secretary


AUTO & BOAT RELOCATION SERVICES LLC

By: _____
Name: T. Michael Riggs
Title: Chief Executive Officer, Treasurer and Assistant
Secretary


AUTO HANDLING CORPORATION

By: _____
Name: T. Michael Riggs
Title: Chief Executive Officer, President, Treasurer and
Assistant Secretary


AXIS LOGISTIC SERVICES, INC.

By: _____
Name: T. Michael Riggs
Title: Chief Executive Officer, Treasurer and Assistant
Secretary


**[Signature Page to Asset Purchase Agreement]**

CTEMS, LLC

By: _____
Name: T. Michael Riggs
Title: Chief Executive Officer, Treasurer and Assistant
Secretary


JACK COOPER CANADA 1 LIMITED PARTNERSHIP

By: _____
Name: T. Michael Riggs
Title: Chief Executive Officer


JACK COOPER CANADA 2 LIMITED PARTNERSHIP

By: _____
Name: T. Michael Riggs
Title: Chief Executive Officer


JACK COOPER CANADA GP 1 INC.

By: _____
Name: T. Michael Riggs
Title: Chief Executive Officer


JACK COOPER CANADA GP 2 INC.

By: _____
Name: T. Michael Riggs
Title: Chief Executive Officer


JACK COOPER CT SERVICES, INC.

By: _____
Name: T. Michael Riggs
Title: Chief Executive Officer, Treasurer and Assistant
Secretary


[Signature Page to Asset Purchase Agreement]

JACK COOPER DIVERSIFIED, LLC

By: _____

Name: T. Michael Riggs
Title: Chief Executive Officer, Treasurer and Assistant
Secretary


JACK COOPER ENTERPRISES, INC.

By: _____

Name: T. Michael Riggs
Title: Chief Executive Officer, President, Treasurer and
Assistant Secretary


JACK COOPER HOLDINGS CORP.

By: _____

Name: T. Michael Riggs
Title: Chief Executive Officer, President, Treasurer and
Assistant Secretary


JACK COOPER LOGISTICS, LLC

By: _____

Name: T. Michael Riggs
Title: Chief Executive Officer, Treasurer and Assistant
Secretary


JACK COOPER RAIL AND SHUTTLE, INC.

By: _____

Name: T. Michael Riggs
Title: Chief Executive Officer, Treasurer and Assistant
Secretary


**[Signature Page to Asset Purchase Agreement]**

JACK COOPER TRANSPORT CANADA INC.

By: _____
Name: T. Michael Riggs
Title: Chief Executive Officer, Treasurer and Assistant
Secretary

JACK COOPER TRANSPORT COMPANY, INC.

By: _____
Name: T. Michael Riggs
Title: Chief Executive Officer, Treasurer and Assistant
Secretary

JACK COOPER VENTURES, INC.

By: _____
Name: T. Michael Riggs
Title: Chief Executive Officer, President, Treasurer and
Assistant Secretary

NORTH AMERICAN AUTO TRANSPORTATION
CORP

By: _____
Name: T. Michael Riggs
Title: Chief Executive Officer, Treasurer and Assistant
Secretary

**[Signature Page to Asset Purchase Agreement]**

**<u>Exhibit 2</u>**

**Bidding Procedures**

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| JACK COOPER VENTURES, INC., *et al.*,[1] | ) | Case No. 19-62393 (PWB) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**BIDDING PROCEDURES FOR THE SALE OF
SUBSTANTIALLY ALL ASSETS OF JACK COOPER
VENTURES, INC. AND CERTAIN DEBTOR AFFILIATES**

On September 3, 2019, the United States Bankruptcy Court for the Northern District of Georgia (the "Court") entered the *Order (I) Authorizing the Debtors to Enter into and Perform Under the Stalking Horse Asset Purchase Agreement, (II) Approving Bidding Procedures for the Sale of the Debtors' Assets, (III) Approving the Expense Reimbursement, (IV) Scheduling Hearings and Objection Deadlines with Respect to the Sale, (V) Scheduling Bid Deadlines and an Auction, (VI) Approving the Form and Manner of Notice Thereof, (VII) Approving Contract Assumption and Assignment Procedures, and (VIII) Granting Related Relief* [Docket No. __] (the "Bidding Procedures Order"),[2] by which the Court approved the following procedures. These Bidding Procedures set forth the process by which the Debtors are authorized, in consultation with the Consultation Parties, to conduct an auction (the "Auction"), if any, for the sale (the "Sale") of all or substantially all of the Debtors' assets (the "Assets").

JC Buyer Company, Inc. (including its assignees or designees, the "Stalking Horse Bidder") submitted a bid (the "Stalking Horse Bid") for certain of the Debtors' assets to set a floor for the Sale. Having announced and received Bankruptcy Court approval of the Stalking Horse Bid, the Debtors will now conduct a round of open bidding intended to obtain the highest or

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Jack Cooper Ventures, Inc. (0805); Jack Cooper Diversified, LLC (9414); Jack Cooper Enterprises, Inc. (3001); Jack Cooper Holdings Corp. (2446); Jack Cooper Transport Company, Inc. (3030); Auto Handling Corporation (4011); CTEMS, LLC (7725); Jack Cooper Logistics, LLC (3433); Auto & Boat Relocation Services, LLC (9095); Axis Logistic Services, Inc. (2904); Jack Cooper CT Services, Inc. (3523); Jack Cooper Rail and Shuttle, Inc. (7801); Jack Cooper Investments, Inc. (6894); North American Auto Transportation Corp. (8293); Jack Cooper Transport Canada Inc. (8666); Jack Cooper Canada GP 1 Inc. (7030); Jack Cooper Canada GP 2 Inc. (2373); Jack Cooper Canada 1 Limited Partnership (3439); and Jack Cooper Canada 2 Limited Partnership (7839). The location of the Debtors' corporate headquarters and service address is: 630 Kennesaw Due West Road NW, Kennesaw, Georgia 30152.

[2] All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order.

otherwise best bid for all or substantially all of the Assets, culminating in an Auction for such Assets if competing bids are received.

> **Copies of the Bidding Procedures Order or other documents related thereto are available upon request to Prime Clerk, LLC by calling (917) 994-8409 or toll free at (844) 234-1463, emailing jackcooperinfo@primeclerk.com, or visiting the Debtors' restructuring website at https://cases.primeclerk.com/jackcooper.**

To the extent that these Bidding Procedures require the Debtors to consult with any Consultation Party in connection with making a determination or taking any action, or in connection with any other matter related to these Bidding Procedures or at the Auction, if any, the Debtors shall do so in a regular and timely manner prior to making such determination or taking any such action.

## Key Dates

These Bidding Procedures provide interested parties with the opportunity to qualify for and participate in the Auction to be conducted by the Debtors and to submit competing bids for the Assets. The Debtors shall assist interested parties in conducting their respective due diligence investigations and shall accept Bids until **October 1, 2019 at 5:00 p.m. (prevailing Eastern time)** (the "Bid Deadline").

The key dates for the sale process are as follows:[3]

| | |
|---|---|
| October 1, 2019 at 5:00 p.m. (prevailing Eastern time) | Bid Deadline - Due Date for Bids and Deposits |
| October 2, 2019 at 5:00 p.m. (prevailing Eastern time) | Debtors to determine which Bids are Qualified Bids and notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder. |
| October 2, 2019 at 5:00 p.m. (prevailing Eastern time) | Debtors to provide the Stalking Horse Bidder and each Qualified Bidder a schedule setting forth (i) the highest or otherwise best fully binding offer for the Assets and/or (ii) the highest or otherwise best fully binding offer(s) for all or any portion of the Assets. |
| October 4, 2019 at 10:00 a.m. (prevailing Eastern time) | Auction (if necessary), which will be held at Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019. |

---

[3] These dates are subject to extension or adjournment as provided for herein.

| October 10, 2019 at 2:30 p.m. (prevailing Eastern time) | Sale Hearing, which will be held at the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division, 75 Ted Turner Drive, Atlanta, Georgia 30303. |
|---|---|

Unless otherwise approved by the Bankruptcy Court, no modification, extension, waiver or addition to these Bidding Procedures shall be inconsistent with the Stalking Horse Agreement, the Bidding Procedures Order or any other Order of the Bankruptcy Court, unless otherwise ordered by the Bankruptcy Court.

**A.      Submissions to the Debtors.**

These Bidding Procedures set forth the terms by which prospective bidders, if any, may qualify for and participate in an Auction, thereby competing to make the highest or otherwise best offer for all or substantially all of the Assets, which in the aggregate will make the highest or otherwise best offer to purchase the Assets. The Debtors will offer for sale substantially all or all of the Assets through an Auction. The Debtors, in consultation with the Consultation Parties, may consider bids from multiple bidders (including multiple bids submitted by the same bidder) for the Assets. The Stalking Horse APA and Stalking Horse Bid referenced herein provide for the Stalking Horse Bidder's acquisition of substantially all of the Debtors' assets, subject to the terms and conditions thereof.

**B.      Potential Bidders.**

To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity (other than the Stalking Horse Bidder) interested in consummating a Sale (a "Potential Bidder") must deliver or have previously delivered to the Debtors:

(i)      an executed confidentiality agreement on terms acceptable to the Debtors (a "Confidentiality Agreement"), to the extent not already executed;

(ii)     in a form acceptable to the Debtors and their advisors, in consultation with the Consultation Parties: (x) evidence of the financial capability to consummate the Sale, and (y) a written commitment from the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the Sale); and

(iii)    any other evidence the Debtors, in consultation with the Consultation Parties, may reasonably request to evaluate the buyer.

3

C.      **Due Diligence.**

Only Potential Bidders shall be eligible to receive due diligence information and access to the Debtors' electronic data room and to additional non-public information regarding the Debtors. **No Potential Bidder will be permitted to conduct any due diligence that includes confidential information without entering into a Confidentiality Agreement with the Debtors.** The Debtors will provide to each Potential Bidder that satisfies the foregoing commercially reasonable due diligence information, as requested by such Potential Bidder in writing, as soon as reasonably practicable after such request, and the Debtors shall post all written due diligence provided to any Potential Bidder to the Debtors' electronic data room. For all Potential Bidders, the due diligence period will end on the Bid Deadline and subsequent to the Bid Deadline the Debtors shall have no obligation to furnish any due diligence information.

The Debtors shall not furnish any confidential information relating to the Assets, liabilities of the Debtors, or the Sale to any person except to a Potential Bidder or to such Potential Bidder's duly authorized representatives to the extent provided in the applicable Confidentiality Agreement. The Debtors and their advisors shall coordinate all reasonable requests from Potential Bidders for additional information and due diligence access; *provided that* the Debtors may decline to provide such information to Potential Bidders who, at such time and in the Debtors' reasonable business judgment, after consultation with the Consultation Parties, have not established, or who have raised doubt, that such Potential Bidder intends in good faith to, or has the capacity to, consummate the Sale.

The Debtors also reserve the right to, in consultation with the Consultation Parties, withhold any diligence materials that the Debtors determine are sensitive or otherwise not appropriate for disclosure to a Potential Bidder who the Debtors determine is a competitor of the Debtors or is affiliated with any competitor of the Debtors. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Potential Bidder.

**All due diligence requests must be directed to** Houlihan Lokey, Inc., 100 Crescent Court, Suite 900, Dallas, Texas 75201, Attn: Adam Dunayer (adunayer@hl.com) and Justin Zammit (jzammit@hl.com).

(a)      **Communications with Potential Bidders.**

Notwithstanding anything to the contrary in these Bidding Procedures, all substantive communications related to the Sale with Potential Bidders shall exclusively be through the Debtors and the Debtors' advisors. Communications between and amongst Potential Bidders or the Consultation Parties and Potential Bidders is expressly prohibited unless the Debtors expressly consent in writing to such communication, which consent shall not be unreasonably withheld or conditioned.

    **(b)**       **Due Diligence of Potential Bidders.**

Each Potential Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors, in consultation with the Consultation Parties and their respective advisors, regarding the ability of the Potential Bidder to consummate the Sale.  Failure by a Potential Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors, in consultation with the Consultation Parties, to determine that such bidder is no longer a Potential Bidder or that a bid made by such Potential Bidder is not a Bid.

The Debtors and each of their respective advisors and representatives shall be obligated to maintain in confidence any confidential information in accordance with any applicable confidentiality agreement, except as otherwise set forth in these Bidding Procedures.  Each recipient of confidential information agrees to use, and to instruct their advisors and representatives to use, such confidential information only in connection with the evaluation of Bids during the bidding process or otherwise in connection with the chapter 11 cases, in each case in accordance with the terms of any applicable confidentiality agreement.

Notwithstanding the foregoing and the provisions contained in any applicable confidentiality agreement, the Debtors and the Debtors' advisors may disclose confidential information: (i) with the prior written consent of such bidder; (ii) to the applicable bidder; (iii) in accordance with these Bidding Procedures, including to any Consultation Party; and (iv) as otherwise required or allowed by any applicable confidentiality agreement with respect to a particular bidder or other agreement, law, court or other governmental order, or regulation, including, as appropriate, to regulatory agencies.

**D.**     **Qualified Bidders.**

    **(a)**     A "Qualified Bidder" is a Potential Bidder (i) who demonstrates the financial capability to consummate the Sale (as determined by the Debtors in consultation with the Consultation Parties), (ii) whose Bid is a Qualified Bid (as defined herein), and (iii) that the Debtors, in consultation with the Consultation Parties, determine should be considered a Qualified Bidder.  Within two (2) business days after the Bid Deadline, the Debtors' advisors will notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder.  The Stalking Horse Bidder shall be deemed a Qualified Bidder for all purposes under these Bidding Procedures and at all times.

    **(b)**     If any Potential Bidder is determined by the Debtors, in consultation with the Consultation Parties, not to be a Qualified Bidder, the Debtors will refund such Qualified Bidder's Deposit and all accumulated interest thereon on or within five (5) business days after the Bid Deadline.

    **(c)**     For the avoidance of doubt, the Debtors, in consultation with the Consultation Parties, expressly reserve the right to notify a Potential Bidder that its bid is not a

Qualifying Bid (a "Non-Qualifying Bid") and permit a Potential Bidder to revise or supplement a Non-Qualifying Bid to make it a Qualified Bid.  Notwithstanding the foregoing, other than as may be provided in the Stalking Horse Bid, Bidders shall be prohibited from including in their Bid a proposed use of any cash component of the Purchase Price that would be received by the Debtors if such Bidder were the Successful Bidder.

(d)    Between the date that the Debtors notify a Potential Bidder that it is a Qualified Bidder and the Auction, if any, the Debtors, in consultation with the Consultation Parties, may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder.  Except as otherwise set forth in the Stalking Horse APA, without the written consent of the Debtors, in consultation with the Consultation Parties, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase their consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; *provided* that any Qualified Bid may be improved at the Auction, if any, as set forth herein. Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

**E.    Bid Requirements.**

A proposal, solicitation, or offer (each, a "Bid") by a Qualified Bidder that is submitted in writing and satisfies each of the following requirements (the "Bid Requirements") as determined by the Debtors, in their reasonable business judgment and after consultation with the Consultation Parties, shall constitute a "Qualified Bid".  The Stalking Horse Bid shall be deemed a Qualified Bid for all purposes under these Bidding Procedures and at all times.

(a)    **Assets.**  Each Bid must clearly state which Assets that the Qualified Bidder is agreeing to purchase and assume.

(b)    **Assumption of Obligations.**  Each Bid must clearly state which liabilities and obligations of the Debtors the Qualified Bidder is agreeing to assume.  In particular, each Bid must state whether or not the Potential Bidder intends to assume (i) sponsorship of all or any part of, or (ii) any of the potential liabilities associated with the Jack Cooper Transport Co. Inc. Retirement Plan for Maintenance Employees of Arlington, Texas (the "Single-Employer Pension Plan").

(c)    **Purchase Price.**  Each Bid must clearly set forth the purchase price to be paid for the Assets, including and identifying separately any cash and non-cash components, which non-cash components shall be limited only to credit-bids and assumed liabilities (the "Purchase Price"), which, for the avoidance of doubt, shall be no less than $425,000,000 and the Expense Reimbursement.

**(d)**     **Minimum Bid.**  At a minimum, each Bid seeking to acquire all of the Debtors' assets that are the subject of the Stalking Horse Bid must have a Purchase Price that in the Debtors' reasonable business judgment, after consultation with the Consultation Parties, has a monetary value equal or greater than the aggregate Assumed Liabilities, Credit Bid and Release, and the Expense Reimbursement contemplated by the Stalking Horse Bid, plus $1 million in cash or cash equivalents (collectively, the "Minimum Overbid"). For purposes of the Minimum Overbid, the Expense Reimbursement amount is estimated to be $2.5 million.

**(e)**     **Markup of the Stalking Horse APA.**  Each Bid must be accompanied by an executed asset purchase agreement ("APA") as well as a redline of such agreement marked to reflect the amendments and modifications made to the form of the Stalking Horse APA provided by the Debtors to Potential Bidders.  Each such purchase agreement must provide a representation that the Qualified Bidder will (i) make all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), if applicable, and (ii) submit and pay the fees associated with all necessary filings under the HSR Act as soon as reasonably practicable; *provided*, *however*, that the timing and likelihood of receiving HSR Act approval will be a consideration in determining the highest or otherwise best Bid.

**(f)**     **Deposit.**  Each Bid, other than the Stalking Horse Bid, must be accompanied by a cash deposit in the amount equal to ten percent (10%) of the aggregate cash Purchase Price of the Bid, to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "Deposit").

**(g)**     **Employee and Customer Obligations.**  Each Bid must expressly propose a treatment of the Debtors' prepetition collective bargaining agreements and the Debtors' participation in the Single-Employer Pension Plan and its multi-employer pension plans (collectively, the "Employee Obligations").  For the avoidance of doubt, notwithstanding ratification of any proposed modifications to any of the Debtors' current collective bargaining agreements prior to the Bid Deadline, Potential Bidders may continue to submit Bids that provide for the assumption of, or such other proposed treatment that may be agreeable among the parties with respect to, any or all of the Employee Obligations.

**(h)**     **Qualified Bid Documents.**  Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid and shall include a schedule of assumed contracts to the extent applicable to the Bid, and a copy of the APA clearly marked to show all changes requested by the Qualified Bidder, including those related to the respective Purchase Price and assets to be acquired by such Qualified Bidder, as well as all other material documents integral to such bid (the "Qualified Bid Documents").

7

(i)    **Committed Financing.** To the extent that a Bid is not accompanied by evidence of the Qualified Bidder's capacity to consummate the sale set forth in its Bid with cash on hand, each Bid must include unconditional committed financing from a reputable financing institution, documented to the satisfaction of the Debtors in consultation with the Consultation Parties, that demonstrates that the Qualified Bidder has: (i) received sufficient debt and/or equity funding commitments to satisfy the Qualified Bidder's Purchase Price and other obligations under its Bid; and (ii) adequate working capital financing or resources to finance going concern operations for the Assets and the proposed transactions. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions reasonably acceptable to the Debtors, in consultation with the Consultation Parties.

(j)    **Contingencies; No Financing or Diligence Outs.** A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions, which shall be acceptable to the Debtors in their business judgment, after consultation with the Consultation Parties.

(k)    **Identity.** Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Qualified Bidder if such Qualified Bidder is an entity formed for the purpose of consummating the proposed transaction contemplated by such Bid), and the complete terms of any such participation. Each Bid must also fully disclose whether any current or former officer, director or equity holder of the Debtors, or any entity affiliated with any current or former officer, director or equity holder of the Debtors, will be bidding or otherwise participating in connection with such Bid. Under no circumstances shall any undisclosed insiders, principals, equity holders, or financial backers of the Debtors be associated with any Bid (including any Overbid at the Auction). Each Bid must also include contact information for the specific persons and counsel whom Houlihan Lokey, Inc., Paul, Weiss, Rifkind, Wharton & Garrison LLP and King & Spalding LLP should contact regarding such Bid. All information disclosed pursuant to this paragraph shall be made available by the Debtors to the Consultation Parties promptly upon the Debtors' receipt thereof but in any event no later than one business day following the Bid Deadline.

(l)    **Demonstrated Financial Capacity.** A Qualified Bidder must have, in the Debtors' business judgment, after consultation with the Consultation Parties, the necessary financial capacity to consummate the proposed transactions required by its Bid.

(m)  **Adequate Assurance of Future Performance.**  Each Bid must (i) identify the executory contracts and unexpired leases to be assumed and assigned in connection with the proposed Sale, (ii) provide for the payment of all cure costs related to such executory contracts and unexpired leases by the Qualified Bidder and (iii) demonstrate, in the Debtors' reasonable business judgment, after consultation with the Consultation Parties, that the Qualified Bidder can provide adequate assurance of future performance under all such executory contracts and unexpired leases.

(n)  **Time Frame for Closing.**  A Bid by a Qualified Bidder must be reasonably likely (based on availability of financing, antitrust, or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid, within a time frame acceptable to the Debtors, after consultation with the Consultation Parties, which time frame shall include a closing by no later than 105 days after the Petition Date.

(o)  **Binding and Irrevocable.**  A Qualified Bidder's Bid for the Assets shall be irrevocable unless and until the Debtors accept a higher Bid for the Assets and such Qualified Bidder is not selected as the Backup Bidder for the Assets.

(p)  **Expenses; Disclaimer of Fees.**  Each Bid (other than a Stalking Horse Bid, solely to the extent set forth in the Stalking Horse APA) must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation.  For the avoidance of doubt, no Qualified Bidder (other than the Stalking Horse Bidder, solely to the extent set forth in the Stalking Horse Agreement) will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction, if any, or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

(q)  **Authorization.**  Each Bid must contain evidence that the Qualified Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors, in consultation with the Consultation Parties) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

(r)  **As-Is, Where-Is.**  Each Bid must include a written acknowledgement and representation that the Qualified Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding

the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidder's APA.

(s)  **Adherence to Bid Procedures.**  By submitting its Bid, each Qualified Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction, if any.

(t)  **Government Approvals.**  Each Bid must include a description of all governmental, licensing, regulatory, or other approvals or consents that are required to close the proposed Sale, together with evidence satisfactory to the Debtors, after consultation with the Consultation Parties, of the ability to obtain such consents or approvals in a timely manner, as well as a description of any material contingencies or other conditions that will be imposed upon, or that will otherwise apply to, the obtainment or effectiveness of any such consents or approvals;

(u)  **Government Approvals Timeframe.**  Each Bid must set forth an estimated timeframe for obtaining any required internal, governmental, licensing, regulatory or other approvals or consents for consummating any proposed Sale.

(v)  **Consent to Jurisdiction.**  The Qualified Bidder must submit to the jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of bids, the Auction, if any, the construction and enforcement of these Bidding Procedures, the Sale documents, and the Closing, as applicable.

(w)  **Bid Deadline.**  Each Bid must be transmitted via email (in .pdf or similar format) so as to be **actually received** on or before **5:00 p.m. (prevailing Eastern Time) on October 1, 2019** by:

   (i)  **Debtors**.  Jack Cooper Ventures, Inc., 630 Kennesaw Due West Road NW, Kennesaw, Georgia 30152, Attn.: Theo Ciupitu (tciupitu@jackcooper.com) and Taejin Kim (tkim@jackcooper.com).

   (ii)  **Debtors' Counsel**.  Counsel to the Debtors, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019, Attn.: Kelley A. Cornish (kcornish@paulweiss.com), Brian S. Hermann (bhermann@paulweiss.com), and John T. Weber (jweber@paulweiss.com).

   (iii)  **Debtors' Co-Counsel**.  Co-Counsel to the Debtors, King & Spalding LLP, 1180 Peachtree Street NE, Atlanta, Georgia 30309, Attn.: Sarah R. Borders (sborders@kslaw.com), Leia Clement Shermohammed (lshermohammed@kslaw.com), and Britney Baker (bbaker@kslaw.com).

(iv)  **Debtors' Financial Advisors**.  Financial advisors to the Debtors, Houlihan Lokey, Inc., 100 Crescent Court, Suite 900, Dallas, Texas 75201, Attn.: Adam Dunayer (adunayer@hl.com) and Justin Zammit (jzammit@hl.com) and AlixPartners, 909 Third Avenue, 30th Floor, New York, NY 10022, Attn: David Orlofsky (dorlofsky@alixpartners.com) and Joel Amico (jamico@alixpartners.com).

(v)  **Committee's Counsel**.  Sidley Austin LLP, 787 Seventh Avenue, New York, New York, 10019, Attn.: Michael G. Burke (mgburke@sidley.com) and Matthew A. Clemente (mclemente@sidley.com).

(vi)  **Committee's Co-Counsel**.  Co-Counsel to the Committee, Scroggins & Williamson, P.C., 4401 Northside Parkway, Suite 450, Atlanta, Georgia 30327, Attn.: J. Robert Williamson (rwilliamson@swlawfirm.com) and Ashley R. Ray (aray@swlawfirm.com).

(vii)  **Committee's Financial Advisors**.  Financial advisors to the Committee, FTI Consulting, Inc., Three Times Square, 9th Floor, New York, New York, 10036, Attn.: Samuel Star (Samuel.star@FTIConsulting.com) and Conor Tully (conor.tully@FTIConsulting.com).

(viii)  **PBGC**.  Pension Benefit Guaranty Corporation, 1200 K Street, N.W., Washington, D.C. 20005, Attn.: Ralph L. Landy (landy.ralph@pbgc.gov), but only to the extent such Bid includes the assumption of the sponsorship of the Single-Employer Pension Plan, any liabilities associated with the Single-Employer Pension Plan, or the assumption of any liabilities associated with any multi-employer pension plan.

**F.  Right to Credit Bid.**

At the Auction, if any, any Qualified Bidder, including the Stalking Horse Bidder, who has a valid and perfected lien on any assets of the Debtors' estates (a "<u>Secured Creditor</u>") shall have the right to credit bid all or a portion of the value of such Secured Creditor's claims within the meaning of section 363(k) of the Bankruptcy Code.  Notwithstanding anything herein to the contrary, the Stalking Horse Bidder shall: (a) have the right (including as part of any applicable Overbid) to credit bid all or a portion of the value of the secured portion of its claims for the assets pursuant to section 363(k) of the Bankruptcy Code, which amount shall be capped at $321,928,903, reflecting a reduction from the aggregate principal amount of $351,928,903 outstanding under the Junior Credit Agreements and DIP Credit Agreement (as defined in the Stalking Horse APA) (the "<u>Stalking Horse Credit Bid Amount</u>"); *provided*, that nothing herein shall impact any parties' rights with respect to challenges to the liens or claims of the Stalking Horse Bidder or any Secured Creditor.  For the avoidance of doubt, the Stalking Horse Bidder shall be considered a Qualified Bidder with respect to its right to acquire all or any of the Assets.

### G.    Auction.

The Debtors shall evaluate Qualified Bids and identify the Qualified Bid that is, in the Debtors' judgment, after consultation with the Consultation Parties, the highest or otherwise best Qualified Bid(s) for the Assets (the "Baseline Bid"), and provide copies of the applicable Qualified Bid Documents supporting the applicable Baseline Bid to each Qualified Bidder at or prior to the Auction.  When determining the highest or otherwise best Qualified Bid and selecting the winning bidder, as compared to other Qualified Bids, the Debtors may, in consultation with the Consultation Parties, consider the following factors in addition to any other factors that the Debtors deem appropriate: (a) the number, type, and nature of any changes to the Stalking Horse APA, if any, requested by the Qualified Bidder, including the type and amount of Assets sought and obligations to be assumed in the Qualified Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Qualified Bidder's ability to close the Sale and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Qualified Bid Documents; (e) the tax consequences of such Qualified Bid; and (f) the Employee Obligations, including the assumption of sponsorship of or liabilities associated with the Single-Employer Pension Plan or the assumption of any liabilities associated with any multi-employer pension plan (collectively, the "Bid Assessment Criteria"). For the avoidance of doubt, when determining the highest or otherwise best Qualified Bid, one dollar of the Stalking Horse Credit Bid Amount shall be equal in all respects to one dollar of cash that may be bid by another Qualified Bidder.

If no Qualified Bids other than the Stalking Horse Bid are received by the Bid Deadline, then the Debtors may cancel the Auction, and may decide, in the Debtors' reasonable business judgment, in consultation with the Consultation Parties, to designate the Stalking Horse Bid as the Successful Bid, and pursue entry of the order approving a Sale of the Debtors' assets to the Stalking Horse Bidder pursuant to the Stalking Horse APA.

The Auction, if any, shall take place at **10:00 a.m. (prevailing Eastern Time) on October 4, 2019** at the offices of Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, New York 10019, or such later date and time as selected by the Debtors after consultation with the Consultation Parties, and subject to the consent of the Stalking Horse Bidder.  The Auction, if any, shall be conducted in a timely fashion according to the following procedures:

### (a)    The Debtors Shall Conduct the Auction.

The Debtors and their professionals shall direct and preside over the Auction, if any, in consultation with the Consultation Parties.  At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid(s) for the Assets.  The Debtors explicitly reserve the right, in their business judgment and after consultation with the Consultation Parties, to exercise their discretion in conducting the Auction, including determining whether to adjourn the Auction to facilitate separate discussions between Qualified Bidders, the Debtors, and the Consultation Parties, as applicable. The Debtors shall maintain a written transcript of the Auction and all Bids made and announced at the Auction, if any, including the Baseline Bid, all applicable Overbids, and the Successful Bid.

Only (i) Qualified Bidders and their legal and financial advisors, including the Stalking Horse Bidder, (ii) the members and advisors of the Committee, and (iii) the other Consultation Parties and their respective advisors shall be entitled to attend the Auction, if any, and the Qualified Bidders shall appear at the Auction in person and may speak or bid themselves or through duly authorized representatives.  Only Qualified Bidders shall be entitled to bid at the Auction, if any.

**(b)** **Terms of Overbids.**

"Overbid" means any bid made at the Auction, if any, by a Qualified Bidder subsequent to the Debtors' announcement of the Baseline Bid(s).  Each applicable Overbid must comply with the following conditions:

(i) **Minimum Overbid Increment.**  The initial Overbid(s) for all of the Debtors' assets shall provide for total consideration to the Debtors with a value that exceeds the value of the consideration under the Baseline Bid by an incremental amount that is not less than $1 million, and successive Overbids higher than the previous bid, as Debtors shall, in consultation with the Consultation Parties, announce at the Auction (the "Minimum Overbid Increment").

The Debtors reserve the right, in consultation with the Consultation Parties, to announce reductions or increases in the Minimum Overbid Increment at any time during the Auction, if any.  Additional consideration in excess of the amount set forth in the respective Baseline Bid may include: (a) cash; and (b) in the case of a Bid by a Secured Creditor, a credit bid of up to the full amount of the such secured creditors' allowed secured claim including, for the avoidance of doubt, a Bid by the Stalking Horse Bidder up to the full amount of the Stalking Horse Credit Bid Amount; *provided, however*, that, subject to the terms of the DIP Financing Orders, nothing herein shall impact any parties' rights with respect to challenges to the liens or claims of a Secured Creditor including, for purposes of this paragraph, the Stalking Horse Bidder.

(ii) **Conclusion of Each Overbid Round.**  Upon the solicitation of each round of applicable Overbids, the Debtors may announce a deadline (as the Debtors may, in their business judgment, after consultation with the Consultation Parties, extend from time to time, the "Overbid Round Deadline") by which time any Overbids must be submitted to the Debtors.

(iii) **Overbid Alterations.**  An applicable Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Bid or Overbid, as determined in the Debtors' reasonable business judgment after consultation with the Consultation Parties, but shall otherwise comply with the terms of these Bidding Procedures.

13

(iv)    **Announcing Highest Bid.**  Subsequent to each Overbid Round Deadline, the Debtors, shall announce whether the Debtors have identified in the initial applicable Overbid round, an Overbid as being higher or otherwise better than the Initial Minimum Overbid, or in subsequent rounds, the Overbid previously designated by the Debtors as the prevailing highest or otherwise best Bid (the "<u>Prevailing Highest Bid</u>").  The Debtors shall describe to all Qualified Bidders the material terms of any new Overbid designated by the Debtors as the Prevailing Highest Bid as well as the value attributable by the Debtors to such Prevailing Highest Bid based on, among other things, the Bid Assessment Criteria.

**(c)**    **Consideration of Overbids.**

The Debtors reserve the right, in their reasonable business judgment and after consultation with the Consultation Parties, to adjourn the Auction, if any, one or more times to, among other things: (i) facilitate discussions between and amongst the Debtors, the Qualified Bidders and the Consultation Parties, as appropriate; (ii) allow Qualified Bidders to consider how they wish to proceed; and (iii) provide Qualified Bidders the opportunity to provide the Debtors and the Consultation Parties with such additional evidence as the Debtors, in their reasonable business judgment, after consultation with the Consultation Parties, may require that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing Overbid amount.

**(d)**    **Closing the Auction.**

(i)    The Auction, if any, shall continue until there is one Bid for the Assets that the Debtors determine, in their reasonable business judgment, after consultation with the Consultation Parties, to be the highest or otherwise best Bid for all Assets.  Each such Bid shall be declared the "<u>Successful Bid</u>" and such Qualified Bidder, the "<u>Successful Bidder</u>," at which point the Auction will be closed.  The Auction, if any, shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid.  Such acceptance by the Debtors of the Successful Bid is conditioned upon approval by the Bankruptcy Court of the Successful Bid.

(ii)    The Successful Bidder shall, within one business day after the conclusion of the Auction, submit to the Debtors fully executed revised documentation memorializing the terms of the Successful Bid.  The Successful Bid may not be assigned to any party without the consent of the Debtors after consulting with the Consultation Parties.

(iii)    For the avoidance of doubt, nothing in these Bidding Procedures shall prevent the Debtors from exercising their respective fiduciary duties under applicable law.

14

(iv)   The Debtors shall not consider any Bids or Overbids submitted after the conclusion of the Auction, if any, and any such Bids or Overbids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

(v)   As soon as reasonably practicable after closing the Auction, if any, and in any event not less than one business day following closing the Auction, the Debtors shall cause a notice of Successful Bid and Successful Bidder, and the Qualified Bid Documents for the Successful Bid and Backup Bid, to be filed with the Bankruptcy Court.

**(e)   No Collusion; Good-Faith *Bona Fide* Offer.**

Each Qualified Bidder participating at the Auction, if any, will be required to confirm on the record at the Auction that: (i) it has not engaged in any collusion with respect to the bidding; and (ii) its Bid is a good-faith *bona fide* offer and it intends to consummate the proposed transaction if selected as the Successful Bidder.

**H.   Backup Bidder.**

**(a)**   Notwithstanding anything in these Bidding Procedures to the contrary, if an Auction is conducted for the Assets, the Qualified Bidder with the next-highest or otherwise second-best Bid at the Auction for such Asset(s), as determined by the Debtors in the exercise of their reasonable business judgment, after consultation with the Consultation Parties (the "Backup Bid"), shall be required to serve as a backup bidder (the "Backup Bidder") for such Asset(s), and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors.

**(b)**   The identity of the Backup Bidder and the amount and material terms of the Backup Bid shall be announced by the Debtors at the conclusion of the Auction, if any, at the same time the Debtors announce the identity of the Successful Bidder. The Backup Bidder shall be required to keep its Bid (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable until the closing of the transaction with the applicable Successful Bidder. The Backup Bidder's Deposit shall be held in escrow until the closing of the transaction with the applicable Successful Bidder.

**(c)**   If the Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors may select the Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed the Successful Bidder for all purposes. The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party. In such case, the defaulting Successful Bidder's Deposit shall be forfeited to the Debtors, and the Debtors

specifically reserve the right to seek all available remedies against the defaulting Successful Bidder, including with respect to specific performance.

All Qualified Bids (other than the Successful Bid and the Backup Bid) shall be deemed rejected by the Debtors on and as of the date of approval of the Successful Bid and Backup Bid by the Bankruptcy Court.

**I.    Reservation of Rights.**

The Debtors reserve their rights to modify these Bidding Procedures, in their reasonable business judgment and after consultation with the Consultation Parties, in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, if any, additional customary terms and conditions on the sale of the Assets, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction, at the Auction and/or adjourning the Sale Hearing in open court without further notice; (c) modifying the Bidding Procedures and/or adding procedural rules or methods of bidding that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; (e) waiving, or imposing additional, terms and conditions set forth herein with respect to Potential Bidders and (f) rejecting any or all bids or Bids; *provided, however*, that any modification, extension, waiver, or addition to the Bidding Procedures shall not be inconsistent with the Stalking Horse APA, the Bidding Procedures Order, or any other Order of the Bankruptcy Court, unless otherwise ordered by the Bankruptcy Court.

**J.    Approval of Sale Transactions.**

A hearing to consider approval of the Sale of the Assets to the Successful Bidders (the "**Sale Hearing**") is currently scheduled to take place at **2:30 p.m. (prevailing Eastern Time) on October 10, 2019** before the Honorable Paul W. Bonapfel, at the Bankruptcy Court, 75 Ted Turner Drive, Atlanta, Georgia 30303.

**The Sale Hearing may be continued to a later date by the Debtors, after consultation with the Consultation Parties, by sending notice prior to, or making an announcement at, the Sale Hearing. No further notice of any such continuance will be required to be provided to any party (including the Stalking Horse Bidder).**

At the Sale Hearing, the Debtors, in consultation with the Consultation Parties, shall present the Successful Bid to the Court for approval.

**K.    Return of Deposits**

The Deposits of all Qualified Bidders shall be held in one or more interest-bearing escrow accounts by the Debtors, but shall not become property of the Debtors' estates absent further order of the Bankruptcy Court or as expressly provided below. The Deposit of any Qualified Bidder that is neither a Successful Bidder nor a Backup Bidder shall be returned to such Qualified Bidder not later than five (5) business days after the Sale Hearing. The Deposit of the Backup Bidder, if

any, shall be returned to such Backup Bidder no later than three (3) business days after the closing of the transaction with the Successful Bidder.  Upon the return of the Deposits, their respective owners shall receive any and all interest that will have accrued thereon.  If the Successful Bidder timely closes on its transaction, its Deposit shall be credited towards the applicable purchase price(s).  If the Successful Bidder (or Backup Bidder, if applicable) fails to consummate a sale transaction because of a breach or failure to perform on the part of the Successful Bidder (or Backup Bidder, if applicable), the Debtors will not have any obligation to return the Deposit deposited by the Successful Bidder (or Backup Bidder, if applicable), and such Deposit shall irrevocably become property of the Debtors.

**M.    Fiduciary Out.**

Nothing in these Bidding Procedures shall require the board of directors, board of managers, or such similar governing body of any of the Debtors to take any action, or to refrain from taking any action, with respect to these Bidding Procedures, to the extent such board of directors, board of managers, or such similar governing body determines, based on the written advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law; *provided, however*, that the Debtors shall provide the Consultation Parties with advance written notice of such action or inaction within two (2) business days prior to taking such action or inaction.

17

## Exhibit 3

**Sale Notice**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| JACK COOPER VENTURES, INC., *et al.*,[1] | ) | Case No. 19-62393 (PWB) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF AUCTION FOR THE SALE OF THE DEBTORS' ASSETS**

> **PLEASE TAKE NOTICE** that on September 3, 2019, the United States Bankruptcy Court for the Northern District of Georgia (the "Bankruptcy Court") entered the *Order (I) Authorizing the Debtors to Enter Into and Perform Under the Stalking Horse Purchase Agreement, (II) Approving Bidding Procedures for the Sale of the Debtors' Assets, (III) Approving the Expense Reimbursement, (IV) Scheduling Hearings and Objection Deadlines with Respect to the Salem, (V) Scheduling Bid Deadlines and an Auction, (VI) Approving the Form and Manner of Notice Thereof, (VII) Approving Contract Assumption and Assignment Procedures, and (VIII) Granting Related Relief* [Docket No. __] (the "Bidding Procedures Order"),[2] authorizing the above-captioned debtors and debtors in possession (collectively, the "Debtors") to conduct an auction (the "Auction") to select the party or parties to purchase the Debtors' assets.  The Auction will be governed by the bidding procedures approved pursuant to the Bidding Procedures Order (attached to the Bidding Procedures Order as Exhibit 2, the "Bidding Procedures").

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Jack Cooper Ventures, Inc. (0805); Jack Cooper Diversified, LLC (9414); Jack Cooper Enterprises, Inc. (3001); Jack Cooper Holdings Corp. (2446); Jack Cooper Transport Company, Inc. (3030); Auto Handling Corporation (4011); CTEMS, LLC (7725); Jack Cooper Logistics, LLC (3433); Auto & Boat Relocation Services, LLC (9095); Axis Logistic Services, Inc. (2904); Jack Cooper CT Services, Inc. (3523); Jack Cooper Rail and Shuttle, Inc. (7801); Jack Cooper Investments, Inc. (6894); North American Auto Transportation Corp. (8293); Jack Cooper Transport Canada Inc. (8666); Jack Cooper Canada GP 1 Inc. (7030); Jack Cooper Canada GP 2 Inc. (2373); Jack Cooper Canada 1 Limited Partnership (3439); and Jack Cooper Canada 2 Limited Partnership (7839). The location of the Debtors' corporate headquarters and service address is: 630 Kennesaw Due West Road NW, Kennesaw, Georgia 30152.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures Order or the Bidding Procedures, as applicable.

---

Copies of the Bidding Procedures Order or other documents related thereto are available upon request to Prime Clerk, LLC by calling (844) 234-1463 or toll free at (917) 994-8409, emailing jackcooperinfo@primeclerk.com, or visiting the Debtors' restructuring website at https://cases.primeclerk.com/jackcooper.

---

**PLEASE TAKE FURTHER NOTICE** that the **Bid Deadline is October 1, 2019 at 5:00 p.m. (prevailing Eastern Time)**, and that any person or entity who wishes to participate in the Auction must comply with the participation requirements, bid requirements, and other requirements set forth in the Bidding Procedures.

**PLEASE TAKE FURTHER NOTICE** that the Debtors intend to conduct the Auction, if necessary, at which they will consider proposals submitted to the Debtors and their professionals, by and pursuant to the Bidding Procedures as set forth in the Bidding Procedures Order, on **October 4, 2019 at 10:00 a.m. (prevailing Eastern Time)**, at the offices of Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019.

**PLEASE TAKE FURTHER NOTICE** that the Debtors reserve the right to modify the Bidding Procedures, in their reasonable business judgment in accordance with the Bidding Procedures.

**PLEASE TAKE FURTHER NOTICE** that **October 10, 2019 at 2:30 p.m. (prevailing Eastern Time)** or as soon thereafter as the Debtors may be heard, shall be the date and time for the hearing at which the Bankruptcy Court will consider approval of the Sale (the "Sale Hearing").

**PLEASE TAKE FURTHER NOTICE** that the deadline to object to approval of the Sale (the "**Sale Objection Deadline**") is set for **October 2, 2019 at 5:00 p.m. (prevailing Eastern Time);** *provided*, that if there is an Auction, the Sale Objection Deadline shall be **October 5, 2019 at 5:00 p.m. (prevailing Eastern Time)**.[3] Any objection must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, the Complex Case Procedures, the Bankruptcy Local Rules for the Northern District of Georgia, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection; and (iv) be filed with the Bankruptcy Court and served and **actually received** by the no later than the Sale Objection Deadline by the Bankruptcy Court and the following parties: (a) the Debtors, 630 Kennesaw Due West Road, Kennesaw, Georgia 30152, Attn.: Theo Ciupitu; (b)(1) counsel to the Debtors, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019, Attn.:  Brian S. Hermann and Kelley A. Cornish, and (2) King & Spalding LLP, 1180 Peachtree Street NE, Atlanta, Georgia 30309, Attn.:  Sarah R. Borders, Leia Clement Shermohammed, and Britney Baker; (c) the Office of the United States Trustee for the Northern District of Georgia, 75 Ted Turner Dr. S.W., Room 362, Atlanta, Georgia 30303; (d) counsel to the Debtors' prepetition secured revolving lenders, Buchalter, P.C., 1000 Wilshire Blvd., 15th Floor, Los Angeles, California 90017, Attn.: Robert J. Davidson; (e) counsel to the Debtors'

---

[3]    Parties may object to the Sale based on the identity of the Successful Bidder (if other than the Stalking Horse Bidder) at any time prior to the commencement of the Sale Hearing.

prepetition first lien term loan lenders, Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022, Attn.: Adam Harris; (f) counsel to the Debtors' prepetition junior lien term loan lenders, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn.: Jonathan Henes and 300 North LaSalle, Chicago, IL 60654, Attn.: Marc Kieselstein and Alexandra Schwarzman; and (g) counsel to the Committee, Sidley Austin LLP, 787 Seventh Avenue, New York, NY 10019, Attn.: Michael G. Burke and Matthew A. Clemente.

Dated: [__], 2019
        Atlanta, Georgia

/s/_____
Sarah R. Borders
Georgia Bar No. 610649
Leia Clement Shermohammed
Georgia Bar No. 972711
Britney Baker
Georgia Bar No. 625752
**KING & SPALDING LLP**
1180 Peachtree Street NE
Atlanta, Georgia 30309
Telephone: (404) 572-4600
Email: sborders@kslaw.com
Email: lshermohammed@kslaw.com
Email: bbaker@kslaw.com

-and-

Kelley A. Cornish (admitted *pro hac vice*)
New York Bar No. 1930767
Brian S. Hermann (admitted *pro hac vice*)
New York Bar No. 2810232
**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Email: kcornish@paulweiss.com
Email: bhermann@paulweiss.com

*Counsel for the Debtors in Possession*

**<u>Exhibit 4</u>**

**Cure Notice**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| JACK COOPER VENTURES, INC., *et al.*,[1] | ) | Case No. 19-62393 (PWB) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE TO CONTRACT PARTIES TO POTENTIALLY**
**ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

> **YOU ARE RECEIVING THIS NOTICE BECAUSE YOU**
> **OR ONE OF YOUR AFFILIATES IS A COUNTERPARTY TO AN**
> **EXECUTORY CONTRACT OR UNEXPIRED LEASE WITH ONE OR MORE**
> **OF THE DEBTORS AS SET FORTH ON <u>EXHIBIT A</u> ATTACHED HERETO.**

  **PLEASE TAKE NOTICE** that on September 3, 2019, the United States Bankruptcy Court for the Northern District of Georgia (the "<u>Court</u>") entered the *Order (I) Authorizing the Debtors to Enter Into and Perform Under the Stalking Horse Purchase Agreement, (II) Approving Bidding Procedures for the Sale of the Debtors' Assets, (III) Approving the Expense Reimbursement, (IV) Scheduling Hearings and Objection Deadlines with respect to the Sale, (V) Scheduling Bid Deadlines and an Auction, (VI) Approving the Form and Manner of Notice Thereof, (VII) Approving Contract Assumption and Assignment Procedures, and (VIII) Granting Related Relief* [Docket No. ___] (the "<u>Bidding Procedures Order</u>"),[2] authorizing the Debtors to conduct an auction (the "<u>Auction</u>") to select the party to purchase the Debtors' assets.  The Auction will be governed by the bidding procedures approved pursuant to the Bidding Procedures Order (attached to the Bidding Procedures Order as <u>Exhibit 2</u>, the "<u>Bidding Procedures</u>").

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Jack Cooper Ventures, Inc. (0805); Jack Cooper Diversified, LLC (9414); Jack Cooper Enterprises, Inc. (3001); Jack Cooper Holdings Corp. (2446); Jack Cooper Transport Company, Inc. (3030); Auto Handling Corporation (4011); CTEMS, LLC (7725); Jack Cooper Logistics, LLC (3433); Auto & Boat Relocation Services, LLC (9095); Axis Logistic Services, Inc. (2904); Jack Cooper CT Services, Inc. (3523); Jack Cooper Rail and Shuttle, Inc. (7801); Jack Cooper Investments, Inc. (6894); North American Auto Transportation Corp. (8293); Jack Cooper Transport Canada Inc. (8666); Jack Cooper Canada GP 1 Inc. (7030); Jack Cooper Canada GP 2 Inc. (2373); Jack Cooper Canada 1 Limited Partnership (3439); and Jack Cooper Canada 2 Limited Partnership (7839). The location of the Debtors' corporate headquarters and service address is: 630 Kennesaw Due West Road NW, Kennesaw, Georgia 30152.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures Order or the Bidding Procedures, as applicable.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Bidding Procedures and the terms of any Successful Bid, the Debtors **may** assume and assign to the Successful Bidder certain of the Assigned Contracts listed on the Assigned Contracts Schedule, attached hereto as **Exhibit A**, to which you are a counterparty, upon approval of the Sale.  The Assigned Contracts Schedule can also be viewed on the Debtors' restructuring website (https://cases.primeclerk.com/jackcooper). The Debtors have conducted a review of their books and records and have determined that the cure amount for unpaid monetary obligations under such Assigned Contracts is as set forth on **Exhibit A** attached hereto (the "Cure Costs").

**PLEASE TAKE FURTHER NOTICE** that if you disagree with the proposed Cure Costs, object to a proposed assignment to the Successful Bidder of any Assigned Contract, or object to the ability of the Successful Bidder to provide adequate assurance of future performance with respect to any Assigned Contract, your objection must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, the Complex Case Procedures, the Bankruptcy Local Rules for the Northern District of Georgia, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Costs, state the correct cure amount alleged to be owed to the objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with the Bankruptcy Court **no later than October 2, 2019, 2019 at 5:00 p.m. (prevailing Eastern Time)** (the "Cure Objection Deadline") by the Bankruptcy Court and the following parties: (a) counsel for the Debtors, 1285 Avenue of the Americas, New York, New York 10019, Attn: Kelley A. Cornish and Brian S. Hermann; (b) counsel to the prepetition junior lien term loan lenders, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY 10022, Attn: Jonathan Henes and 300 North LaSalle, Chicago, IL 60654, Attn.: Marc Kieselstein and Alexandra Schwarzman; (c) counsel to the Committee, Sidley Austin LLP, 787 Seventh Avenue, New York, NY 10019, Attn.: Michael G. Burke and Matthew A. Clemente; and (d) the Office of the United States Trustee for the Northern District of Georgia; *provided*, that to the extent there is an Auction, the Cure Objection Deadline may be filed as set forth above no later than **October 5, 2019 at 5:00 p.m. (prevailing Eastern Time)**

**PLEASE TAKE FURTHER NOTICE** that if no objection to (a) the Cure Costs(s), (b) the proposed assignment and assumption of any Assigned Contract, or (c) adequate assurance of the Successful Bidder's ability to perform is filed by the Cure Objection Deadline, then (i) you will be deemed to have stipulated that the Cure Costs as determined by the Debtors are correct, (ii) you will be forever barred, estopped, and enjoined from asserting any additional cure amount under the proposed assigned Contract, and (iii) you will be forever barred, estopped, and enjoined from objecting to such proposed assignment to the Successful Bidder on the grounds that the Successful Bidder has not provided adequate assurance of future performance as of the closing date of the Sale.

**PLEASE TAKE FURTHER NOTICE** that any objection to the proposed assumption and assignment of an Assigned Contract or related Cure Costs in connection with the Successful Bid that otherwise complies with these procedures yet remains unresolved as of the

commencement of the Sale Hearing, shall be heard at a later date as may be fixed by the Bankruptcy Court.

**PLEASE THAT FURTHER NOTICE** that, notwithstanding anything herein, the mere listing of any Assigned Contract on the Cure Notice does not require or guarantee that such Assigned Contract will be assumed by the Debtors at any time or assumed and assigned, and all rights of the Debtors and the Successful Bidder with respect to such Executory Contracts and/or Unexpired Leases are reserved.  Moreover, the Debtors explicitly reserve their rights, in their reasonable discretion, to seek to reject or assume each Assigned Contract pursuant to section 365(a) of the Bankruptcy Code and in accordance with the procedures allowing the Debtors and/or the Successful Bidder, as applicable, to designate any Assigned Contract as either rejected or assumed on a post-closing basis.

**PLEASE TAKE FURTHER NOTICE** that, nothing herein (i) alters in any way the prepetition nature of the Assigned Contracts or the validity, priority, or amount of any claims of a counterparty to any Assigned Contract against the Debtors that may arise under such Assigned Contract, (ii) creates a postpetition contract or agreement, or (iii) elevates to administrative expense priority any claims of a counterparty to any Assigned Contract against the Debtors that may arise under such Assigned Contract.

[*Remainder of page intentionally left blank.*]

Dated: [__], 2019
    Atlanta, Georgia

                /s/_____
                Sarah R. Borders
                Georgia Bar No. 610649
                Leia Clement Shermohammed
                Georgia Bar No. 972711
                Britney Baker
                Georgia Bar No. 625752
                **KING & SPALDING LLP**
                1180 Peachtree Street NE
                Atlanta, Georgia 30309
                Telephone: (404) 572-4600
                Email: sborders@kslaw.com
                Email: lshermohammed@kslaw.com
                Email: bbaker@kslaw.com

                -and-

                Kelley A. Cornish (admitted *pro hac vice*)
                New York Bar No. 1930767
                Brian S. Hermann (admitted *pro hac vice*)
                New York Bar No. 2810232
                **PAUL, WEISS, RIFKIND, WHARTON &**
                **GARRISON LLP**
                1285 Avenue of the Americas
                New York, New York 10019
                Telephone: (212) 373-3000
                Email: kcornish@paulweiss.com
                Email: bhermann@paulweiss.com

                *Counsel for the Debtors in Possession*