

**IT IS ORDERED as set forth below:**

**Date: September 13, 2019**

_____

**Paul W. Bonapfel
U.S. Bankruptcy Court Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

_____

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| JACK COOPER VENTURES, INC., *et al.,*[1] | ) | Case No. 19-62393 (PWB) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | Related Doc. Nos. 18, 69 |

_____

## FINAL ORDER PURSUANT TO
## 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, AND 507
## (I) AUTHORIZING THE DEBTORS TO OBTAIN
## SENIOR AND JUNIOR SECURED SUPERPRIORITY
## POSTPETITION FINANCING; (II) GRANTING (A) LIENS AND
## SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS AND
## (B) ADEQUATE PROTECTION TO CERTAIN PREPETITION LENDERS; (III)

---

[1] The Debtors in these chapter 11 cases (the "Chapter 11 Cases"), along with the last four digits of each Debtor's federal tax identification number, include: Jack Cooper Ventures, Inc. (0805); Jack Cooper Diversified, LLC (9414); Jack Cooper Enterprises, Inc. (3001); Jack Cooper Holdings Corp. (2446); Jack Cooper Transport Company, Inc. (3030); Auto Handling Corporation (4011); CTEMS, LLC (7725); Jack Cooper Logistics, LLC (3433); Auto & Boat Relocation Services, LLC (9095); Axis Logistic Services, Inc. (2904); Jack Cooper CT Services, Inc. (3523); Jack Cooper Rail and Shuttle, Inc. (7801); Jack Cooper Investments, Inc. (6894); North American Auto Transportation Corp. (8293); Jack Cooper Transport Canada, Inc. (8666); Jack Cooper Canada GP 1 Inc. (7030); Jack Cooper Canada GP 2 Inc. (2373); Jack Cooper Canada 1 Limited Partnership (3439); and Jack Cooper Canada 2 Limited Partnership (7839). The location of the Debtors' corporate headquarters and service address is: 630 Kennesaw Due West Road NW, Kennesaw, Georgia 30152.

**AUTHORIZING USE OF CASH COLLATERAL; (IV) MODIFYING
THE AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2) and 364(c)(3), 364(d), 364(e), and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and Rules 7007-1, 9013-1, 9013-4, and 9014-2 of the Local Bankruptcy Rules (the "Local Rules") for the United States Bankruptcy Court for the Northern District of Georgia (this "Court"), and the Procedures for Complex Chapter 11 Bankruptcy Cases (the "Complex Case Procedures") promulgated by the Court, *inter alia*, requesting on an interim and final basis, among other things:

(1)     authorization for the Borrowers (as defined in the respective DIP Credit Agreements (as defined below)) to obtain postpetition financing pursuant to the DIP Facilities (as defined below), and for each of the Guarantors (as defined in the respective DIP Credit Agreements) to guarantee unconditionally on a joint and several basis, and subject to the terms and limitations set forth in the DIP Credit Agreements in all respects, the applicable Borrowers' obligations under the respective DIP Facilities, consisting of:

a)  a senior secured super-priority asset-based revolving credit facility (the "Revolver Facility"), including Canadian Revolver Commitments for Canadian Borrowers (as defined in the Revolver DIP Agreement referred to below) (the "Canadian DIP Sub-Facility"), on the terms and conditions substantially in the form annexed hereto as **Exhibit A** (as the same may be amended, restated, amended and restated, supplemented, waived, extended or otherwise modified from time to time, the "Revolver DIP Agreement," and, together with any other related agreements, documents, security agreements, or pledge agreements, including the Interim Order and Final Order (each as defined below), collectively, the "Revolver DIP Documents"), by and among the Borrowers (as defined in the Revolver DIP Documents), the Guarantors

---

[2]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

(as defined in the Revolver DIP Documents), Wells Fargo Capital Finance, LLC ("Wells") as administrative agent (in such capacity, the "Revolver Administrative Agent"), and the lenders from time to time party thereto (in such capacity, the "Revolver Lenders" and, together with the Revolver Administrative Agent, the "Revolver Secured Parties"), in an aggregate principal amount (subject to availability) of (i) up to (x) $85 million  in revolving commitments available for borrowing by the U.S. Borrowers (as defined in the Revolver DIP Agreement, and, such commitments, the "U.S. Revolving Commitments") (of which up to $5 million shall be available for the issuance of U.S. letters of credit) minus (y) outstanding loans under the Canadian Revolving Commitments (as defined below) (the "Canadian Revolving Loans"), and (ii) up to $5 million in revolving commitments available for borrowing by the Canadian Borrowers (such commitments, the "Canadian Revolving Commitments" and, together with the U.S. Revolving Commitments, the "Revolving Commitments," and the loans outstanding under any of the Revolving Commitments from time to time, collectively, the "Revolving Loans") (of which up to $500,000 shall be available for the issuance of Canadian letters of credit); and

b) a junior secured super-priority multi-draw term loan credit facility (the "DIP Term Loan Facility," and, together with the Revolver Facility, collectively, the "DIP Facilities"), on the terms and conditions substantially in the form annexed hereto as **Exhibit B** (as the same may be amended, restated, amended and restated, supplemented, waived, extended, or otherwise modified from time to time, the "DIP Term Loan Agreement," and, together with the Revolver DIP Agreement, collectively, the "DIP Credit Agreements" and the DIP Term Loan Agreement, together with any other related agreements, documents, security agreements, or pledge agreements, including the Interim Order and this Final Order, collectively, the "DIP Term Documents," and the DIP Term Documents, together with the Revolver DIP Documents, the "DIP Loan Documents"), by and among the Borrowers (as defined in the DIP Term Loan Agreement), the Guarantors (as defined in the DIP Term Loan Agreement), Wilmington Trust, National Association ("Wilmington"), as administrative agent (in such capacity, the "DIP Term Administrative Agent," and, together with the Revolver Administrative Agent, the "DIP Agents"), and the lenders party thereto from time to time (the "DIP Term Lenders," and, together with the DIP Term Administrative Agent, the "DIP Term Secured Parties," and the DIP Term Lenders, together with the Revolver Lenders, the "DIP Lenders," and the DIP Lenders, together with the DIP Agents, collectively, the "DIP Secured Parties"), in an aggregate principal amount of $15 million in term loan commitments (the "DIP Term Loan Commitment," and, together with the DIP Revolving Commitments, the "DIP Commitments") which shall be available as term loans (the "DIP Term Loans," and, together with the Revolving Loans, the "DIP Loans") to the U.S. Borrowers (as defined in the DIP Term Loan Agreement) upon entry of the interim order (the "Interim Order") and satisfaction of the other conditions set forth therein in an initial amount not to exceed $7 million (the "Initial DIP Term Loan") with up to an additional $3 million being available prior to entry of the final order (the "Final Order"), with the full undrawn commitments under the DIP Term Loan Facility being available upon entry of this Final Order to the extent set forth herein.

(2)    authorization for Debtors to execute, deliver, and enter into the DIP Loan Documents, including the Amended and Restated Intercreditor Agreement, by and among Wells, in its capacity as Prepetition ABL Agent (as defined below) and Revolver Administrative Agent, the Prepetition Term Loan Agents (as defined below), and the DIP Term Administrative Agent (the "DIP Intercreditor Agreement"), and to perform all of the Debtors' respective obligations thereunder, and such other and further acts as may be required in connection with the DIP Loan Documents;

(3)    authorization for the Debtors to pay all amounts, obligations, and liabilities owing or payable to the DIP Secured Parties pursuant to the DIP Loan Documents, including, without limitation, any principal, interest, fees, commitment fees, administrative agent fees, audit fees, closing fees, service fees, facility fees, or other fees, costs, expenses, charges, and disbursements of the respective DIP Secured Parties (including the reasonable and documented fees and expenses of each of the DIP Secured Parties' attorneys, advisors, accountants and other consultants), any obligations in respect of indemnity claims, whether contingent or absolute, including, without limitation, any and all obligations in connection with any interest rate, currency swap, or other hedging agreement or arrangement, in each case, to the extent constituting all Debtor and/or Guarantor obligations of any kind under the DIP Loan Documents (such obligations as to the Revolver Facility, the "Revolver Obligations," and such obligations as to the DIP Term Loan Facility, the "DIP Term Loan Obligations," and, collectively, the "DIP Obligations");

(4)    authorization for the Debtors to use proceeds of the DIP Facilities (collectively the "DIP Loan Proceeds") as expressly provided in the DIP Loan Documents and solely in accordance with the Interim Order, and this Final Order, as applicable, and the Approved Budget (as defined below) (subject to permitted variances and other exclusions set forth in the DIP Loan Documents)

to:  (A) pay costs, premiums, fees, and expenses related to the above-captioned cases (collectively, the "Cases") and in connection with the DIP Facilities; (B) to immediately use borrowings under the Revolver Facility to fully and indefeasibly repay the Prepetition ABL Obligations; (C) make permitted adequate protection payments in respect of the Prepetition Obligations (as defined below) as provided for in the Interim Order, and this Final Order, as applicable, and the DIP Loan Documents; and (D) provide financing for working capital and for other general corporate purposes of the Debtors in accordance with the Approved Budget (subject to permitted variances and other exclusions set forth in the DIP Loan Documents);

(5)     the grant and approval of superpriority administrative expense claim status, pursuant to sections 364(c)(1), 503(b)(1), and 507(b) of the Bankruptcy Code, to the DIP Agents, for the benefit of themselves and the other DIP Secured Parties, in respect of all DIP Obligations, subject only to the Carve Out (as defined below);

(6)     granting the DIP Secured Parties valid, enforceable, non-avoidable, automatically and fully perfected DIP Liens (as defined below) in all DIP Collateral (as defined below), including, without limitation, all property constituting Prepetition Collateral (as defined below), including, without limitation, any Cash Collateral (as that term is defined in section 363(a) of the Bankruptcy Code and defined below), to secure the DIP Obligations, which DIP Liens shall be subject to the relative rankings and priorities set forth herein;

(7)     authorization for the Debtors to use, among other things, solely in accordance with the Approved Budget (subject to permitted variances and other exclusions set forth in the DIP Loan Documents), any Cash Collateral in which any of the Prepetition Secured Parties (as defined below), including, for the avoidance of doubt, the Prepetition First Lien Secured Parties (as defined below), may have an interest, and the granting of adequate protection solely to the extent of any

postpetition diminution in the value of their respective interests in the Prepetition Collateral, including without limitation, the Cash Collateral, as a result of (i) the incurrence of the DIP Obligations, (ii) the Debtors' use of Cash Collateral as set forth in the Interim Order or this Final Order, as applicable, (iii) the subordination of the Prepetition Secured Obligations to the Carve Out, (iv) any other diminution in value of the Prepetition Collateral arising from the Debtors' use, sale, or disposition of such Prepetition Collateral or the proceeds thereof, (v) the priming of the Prepetition Term Loan Liens by the Revolver DIP Liens on the Prepetition ABL Priority Collateral, and (vi) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (collectively, "Diminution in Value");

(8)     the modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim Order or this Final Order, as applicable, and the other DIP Loan Documents to the extent hereinafter set forth;

(9)     a waiver of the Debtors' ability to surcharge pursuant to section 506(c) of the Bankruptcy Code against any DIP Collateral and the Prepetition Collateral, and any right of the Debtors under the "equities of the case" exception in section 552(b) of the Bankruptcy Code; and

(10)     granting the Debtors such other and further relief as is just and proper.

The initial hearing on the Motion having been held by the Court on August 8, 2019 (the "Interim Hearing"), and the final hearing on the Motion having been held by this Court on September 12, 2019 (the "Final Hearing"), and upon the record made by the Debtors at the Interim Hearing and the Final Hearing, including the Motion and the Dunayer Declaration; any exhibits in connection with the foregoing, and the filings and pleadings in these Cases, the Court having found that the final relief requested in the Motion is fair and reasonable and is in the best interests of the

Debtors, the Debtors' bankruptcy estates (as defined under section 541 of the Bankruptcy Code, the "Estates"), their stakeholders and other parties in interest, and represents a sound exercise of the Debtors' business judgment and is essential for the continued operation of the Debtors' businesses; and appropriate and adequate notice of the Motion, the final relief requested therein, and the Final Hearing (the "Notice") having been given under the circumstances; and the Notice having been served by the Debtors in accordance with the Interim Order, Bankruptcy Rules 4001 and 9014 and the Local Rules on: (a) the United States Trustee for the Northern District of Georgia (the "U.S. Trustee"); (b) the entities listed as holding the 30 largest unsecured claims against the Debtors (on a consolidated basis) (the "30 Largest Unsecured Creditors"); (c) the agents for each of the Debtors' prepetition secured credit facilities (the "Prepetition Agents"); (d) the Prepetition Secured Parties (as defined below); (e) the DIP Agents; (f) the Committee, (g) the respective counsel to each of the parties referenced in clauses (c) through (f); (h) the United States Attorney's Office for the Northern District of Georgia; (i) the Internal Revenue Service; (j) the United States Securities and Exchange Commission; (k) the Environmental Protection Agency and all similar state environmental agencies for states in which the Debtors conduct business; (l) the attorneys general in the states where the Debtors conduct their business operations; (m) any other notice parties required under any Prepetition Loan Document; (n) all parties which, to the best of the Debtors' knowledge, information, and belief, have asserted or may assert a lien in the Debtors' assets; and (o) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"); and the opportunity for a final hearing on the Motion was appropriate in connection with the Motion and no other notice need be provided; and all objections, if any, to the relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and after due deliberation sufficient cause appearing therefor;

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

A. <u>Petition Date</u>.  On August 6, 2019 (the "<u>Petition Date</u>"), each Debtor filed a voluntary petition (each, a "<u>Petition</u>") under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No chapter 11 trustee or examiner has been appointed in any of the Cases.

B. <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over these proceedings pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief sought herein are sections 105, 361, 362, 363, 364, 503 and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 9013 and 9014 and Local Rules 7007-1, 9013-1, 9013-4, and 9014-2.

C. <u>Committee Formation</u>.  On August 19, 2019, an official committee of unsecured creditors under section 1102 of the Bankruptcy Code (the "<u>Committee</u>") was appointed by the U.S. Trustee in the Cases.

D. <u>Notice</u>.  The Notice was given in the manner described in the Motion and the Interim Order.  Under the circumstances, the Notice given by the Debtors of the Motion, the Final Hearing, and the relief granted under this Final Order constitutes due and sufficient notice thereof and complies with Bankruptcy Rule 4001 and the Local Rules.

---

[3]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

E.    <u>Parties' Acknowledgments, Agreements, and Stipulations</u>.  In requesting the DIP

Facilities and use of Cash Collateral, and in exchange for and as a material inducement to the DIP

Lenders and the Prepetition Secured Parties to agree to provide, or consent to, the DIP Facilities,

access to the Cash Collateral, and subordination of the Prepetition Liens to the Carve Out and as a

condition to providing financing under the DIP Facilities and consenting to the use of Cash

Collateral, subject to the rights of the parties-in-interest (other than the Debtors) set forth in

Section 4.1, the Debtors permanently and irrevocably admit, stipulate, acknowledge, and agree, as

follows:

(i)    <u>Prepetition ABL Facility</u>.  Jack Cooper Holdings Corp. and certain of its

affiliates designated therein, as borrowers, certain other parties designated as "Guarantors" thereto

(such parties, collectively, the "<u>Prepetition ABL Obligors</u>"), the financial institutions from time to

time party thereto (collectively, the "<u>Prepetition ABL Lenders</u>"), and Wells, as administrative

agent (in such capacity, the "<u>Prepetition ABL Agent</u>" and, together with the Prepetition ABL

Lenders, the "<u>Prepetition ABL Secured Parties</u>"), are parties to that certain Second Amended and

Restated Credit Agreement, dated as of February 15, 2018 (as amended, restated, amended and

restated, supplemented, or otherwise modified from time to time, the "<u>Prepetition ABL Credit

Agreement</u>," and, together with all other agreements, documents, and instruments executed and/or

delivered with, to or in favor of the Prepetition ABL Secured Parties, including, without limitation,

all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing

statements, documents, and instruments, including any fee letters, executed and/or delivered in

connection therewith or related thereto, the "<u>Prepetition Revolving Financing Documents</u>").  The

Prepetition ABL Credit Agreement provided the Prepetition ABL Obligors with an asset-based

credit facility (the "<u>Prepetition ABL Facility</u>") with $85.0 million of maximum aggregate

availability to the borrowers thereunder, including a $5 million Canadian Revolver Commitment (the "Prepetition ABL Canadian Sub-Facility"), as applicable, subject to a domestic borrowing base and a Canadian borrowing base (and, in each case, as reduced by reserves), as set forth in the Prepetition ABL Credit Agreement.  As of the Petition Date, approximately $49,831,585.15 in principal was outstanding under the Prepetition ABL Facility in the form of "Revolving Loans" (as defined under the Prepetition ABL Credit Agreement), plus letters of credit in the approximate stated amount of approximately $350,000, plus interest accrued and accruing at the rates set forth in the Prepetition ABL Credit Agreement (together with any other amounts outstanding under the Prepetition ABL Facility as provided in the Prepetition ABL Credit Agreement, including obligations in respect of cash management, cash collateral for letters of credit, purchase charge cards, purchase card services, fees, expenses, and indemnity, the "Prepetition ABL Obligations"). The Prepetition ABL Facility is secured by (a) first priority security interests in and liens on certain of the Debtors' property, including (i) all accounts receivable (except to the extent such accounts receivable constitutes identifiable proceeds of Prepetition Term Loan Priority Collateral (as defined below)) (the "ABL A/R"), (ii) all inventory, (iii) instruments, chattel paper and other contracts, in each case, evidencing, or substituted for the ABL A/R, (iv) guarantees, letters of credit, security and other enhancements, in each case for the ABL A/R, (v) claims and causes of actions (including commercial tort claims) relating to inventory or the ABL A/R, (vi) deposit accounts and security accounts not used exclusively to hold Prepetition Term Loan Priority Collateral (including all cash and other funds on deposit therein, except to the extent constituting identifiable proceeds of Prepetition Term Loan Priority Collateral), (vii) all tax refunds (other than tax refunds relating to Prepetition Term Loan Priority Collateral), (viii) all documents, books and records, accounting systems, general intangibles and supporting obligations related to any of the

foregoing (other than (A) intellectual property and (B) pledged stock), (ix) all books and records relating to any of the foregoing (including all books, databases, customer lists, and records, whether tangible or electronic, which contain any information relating to any of the foregoing), and (x) all substitutions, replacements, accessions, products, or proceeds of the foregoing (such property, whether now existing or hereafter arising or acquired, in clauses (i) through (x), collectively, the "Prepetition ABL Priority Collateral"); and (b) fourth priority security interests in and liens on certain of the Debtors' property, including (i) pledged stock, subject to any relevant exclusions set forth in the Prepetition Revolving Financing Documents, (ii) certain real estate assets, including fixtures related thereto, (iii) equipment (including vehicles), (iv) intellectual property, (v) pledged debt instruments, (vi) all general intangibles, instruments, documents, chattel paper, letters-of-credit rights, books and records, and supporting obligations related to the foregoing and proceeds of the foregoing (except to the extent any of the foregoing constitute Prepetition ABL Priority Collateral or Excluded Collateral (as defined in the relevant Prepetition Documents (as defined below)); (vii) all other goods and assets not constituting Prepetition ABL Priority Collateral, whether tangible or intangible, (viii) all books and records relating to any of the foregoing (including all books, databases, customer lists, and records, whether tangible or electronic, which contain any information relating to any of the foregoing), and (ix) proceeds of the foregoing (such property, whether now existing or hereafter arising or acquired, in clauses (i) through (ix), collectively, the "Prepetition Term Loan Priority Collateral," and such liens and security interests in clauses (a) and (b), the "Prepetition ABL Liens"); *provided* that the Prepetition ABL Canadian Sub-Facility is secured by a first priority security interest in substantially all of the assets of those Debtors organized under the laws of Canada or any province thereof (such Debtors,

the "Canadian Debtors," and such collateral, whether now existing or hereafter arising or acquired, the "Canadian Collateral").

(ii)     Prepetition First Lien Term Loan Facility.  Jack Cooper Ventures, Inc., as borrower, certain other domestic affiliates designated as "Guarantors" thereto (such parties, collectively, the "Prepetition First Lien Term Loan Obligors"), the financial institutions from time to time party thereto (collectively, the "Prepetition First Lien Lenders"), and Cerberus Business Finance Agency, LLC ("Cerberus"), as agent (in such capacity, the "Prepetition First Lien Agent" and, together with the Prepetition First Lien Lenders, the "Prepetition First Lien Secured Parties"), are parties to that certain Credit Agreement, dated as of June 28, 2018 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Prepetition First Lien Credit Agreement").   The Prepetition First Lien Credit Agreement provided the Prepetition First Lien Term Loan Obligors with term loan facilities in an aggregate principal amount of approximately $196 million (the "Prepetition First Lien Term Loan Facility") and under which approximately $188,650,000 in principal amount was outstanding as of the Petition Date (together with any other amounts outstanding under the Prepetition First Lien Term Loan Facility as provided in the Prepetition First Lien Credit Agreement, including interest, fees, and expenses, the "Prepetition First Lien Obligations").   The Prepetition First Lien Term Loan Facility is secured by (a) first priority security interests in and liens on the Prepetition Term Loan Priority Collateral and (b) second priority security interests in and liens on the Prepetition ABL Priority Collateral (such liens and security interests in clauses (a) and (b), the "Prepetition First Lien Term Loan Liens").

(iii)     Prepetition 1.5 Lien Term Loan Facility.  Jack Cooper Ventures, Inc., as borrower, certain other domestic affiliates designated as "Guarantors" thereto (such parties,

collectively, the "<u>Prepetition 1.5 Lien Term Loan Obligors</u>"), the financial institutions from time to time party thereto (collectively, the "<u>Prepetition 1.5 Lien Lenders</u>"), and Wilmington, as agent (in such capacity, the "<u>Prepetition 1.5 Lien Agent</u>" and, together with the Prepetition 1.5 Lien Lenders, the "<u>Prepetition 1.5 Lien Secured Parties</u>"), are parties to that certain Amended and Restated Credit Agreement, dated as of June 28, 2018 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "<u>Prepetition 1.5 Lien Credit Agreement</u>"). The Prepetition 1.5 Lien Credit Agreement provided the Prepetition 1.5 Lien Term Loan Obligors with term loan facilities in an aggregate initial principal amount of $41 million (the "<u>Prepetition 1.5 Lien Term Loan Facility</u>") and under which approximately $45,515,729.68 in principal amount was outstanding as of the Petition Date (together with any other amounts outstanding under the Prepetition 1.5 Lien Term Loan Facility as provided in the Prepetition 1.5 Lien Credit Agreement, including interest, fees, and expenses, the "<u>Prepetition 1.5 Lien Obligations</u>"). The Prepetition 1.5 Lien Term Loan Facility is secured by (a) second priority security interests in and liens on the Prepetition Term Loan Priority Collateral and (b) third priority security interests in and liens on the Prepetition ABL Priority Collateral (such liens and security interests in clauses (a) and (b), the "<u>Prepetition 1.5 Lien Term Loan Liens</u>").

(iv)    <u>Prepetition Second Lien Term Loan Facility</u>. Jack Cooper Ventures, Inc., as borrower, certain other domestic affiliates designated as "Guarantors" thereto (such parties, collectively, the "<u>Prepetition Second Lien Term Loan Obligors</u>," and, together with the Prepetition ABL Obligors, the Prepetition First Lien Obligors, and the Prepetition 1.5 Lien Obligors, collectively, the "<u>Prepetition Obligors</u>"), the financial institutions from time to time party thereto (collectively, the "<u>Prepetition Second Lien Lenders</u>," and, together with the Prepetition 1.5 Lien Lenders, collectively, the "<u>Junior Term Loan Lenders</u>," together with the Prepetition ABL Lenders

and the Prepetition First Lien Lenders, collectively, the "Prepetition Lenders"), and Wilmington, as agent (in such capacity, the "Prepetition Second Lien Agent" and, together with the Prepetition Second Lien Lenders, the "Prepetition Second Lien Secured Parties," and, together with the Prepetition 1.5 Lien Secured Parties, the "Prepetition Junior Lien Secured Parties," and the Prepetition Second Lien Agent, together with the Prepetition First Lien Agent and the Prepetition 1.5 Lien Agent, the "Prepetition Term Loan Agents," and the Prepetition Second Lien Secured Parties, together with the Prepetition First Lien Secured Parties and the Prepetition 1.5 Lien Secured Parties, the "Prepetition Term Loan Secured Parties" and, together with the Prepetition ABL Secured Parties, the "Prepetition Secured Parties"), are parties to that certain Amended and Restated Credit Agreement, dated as of June 28, 2018 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Prepetition Second Lien Credit Agreement," and, together with the Prepetition 1.5 Lien Credit Agreement, collectively, the "Junior Credit Agreements," together with the Prepetition ABL Credit Agreement and the Prepetition First Lien Credit Agreement, collectively, the "Prepetition Credit Agreements"). The Prepetition Second Lien Credit Agreement provided the Prepetition Second Lien Obligors with term loan facilities in an aggregate principal amount of $261.625 million (the "Prepetition Second Lien Term Loan Facility," and, together with the Prepetition First Lien Term Loan Facility, and the Prepetition 1.5 Lien Term Loan Facility, collectively, the "Prepetition Term Loan Facilities," and, together with the Prepetition ABL Facility, collectively, the "Prepetition Credit Facilities") and under which approximately $291,413,174.61 in principal amount was outstanding as of the Petition Date (together with any other amounts outstanding under the Prepetition Second Lien Term Loan Facility as provided in the Prepetition Second Lien Credit Agreement, including interest, fees, and expenses, the "Prepetition Second Lien Obligations," and, together with the

Prepetition First Lien Obligations and the Prepetition 1.5 Lien Obligations, collectively, the "Prepetition Term Loan Obligations," and, together with the Prepetition ABL Obligations, the "Prepetition Obligations").  The Prepetition Second Lien Term Loan Facility is secured by (a) third priority security interests in and liens on the Prepetition Term Loan Priority Collateral and (b) fourth priority security interests in and liens on the Prepetition ABL Priority Collateral (such liens and security interests in clauses (a) and (b), the "Prepetition Second Lien Term Loan Liens," and, together with the Prepetition First Lien Term Loan Liens and the Prepetition 1.5 Lien Term Loan Liens, the "Prepetition Term Loan Liens," and, together with the Prepetition ABL Liens, the "Prepetition Liens").

> (v)    *Prepetition Intercreditor Agreement*.  Wells, in its capacity as Prepetition ABL Agent, Cerberus, in its capacity as Prepetition First Lien Agent, and Wilmington, in its capacity as the Prepetition 1.5 Lien Agent and Prepetition Second Lien Agent, are parties to that certain Intercreditor Agreement, dated as of June 28, 2018 (the "Prepetition Intercreditor Agreement.") The Prepetition Intercreditor Agreement is a valid and enforceable "subordination agreement" under section 510(a) of the Bankruptcy Code and is, as of the Petition Date, binding on all parties thereto.

> (vi)    *Prepetition Collateral*.  To secure the Prepetition Obligations, the Debtors entered into certain guaranty and collateral agreements, certain other security documents, and certain intercreditor agreements, including the Prepetition Intercreditor Agreement, governing the Prepetition Secured Parties' respective security interests in the Prepetition Collateral (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, and together with any ancillary collateral documents, including, without limitation, any related mortgages and deeds of trust, the "Prepetition Collateral Documents") and, together with the

Prepetition Credit Agreements, the "Prepetition Documents"). Pursuant to the Prepetition Collateral Documents, and on the terms set forth therein and subject to the Prepetition Intercreditor Agreement and any other applicable intercreditor agreements, the Debtors granted to the Prepetition Secured Parties the Prepetition Liens on the Prepetition ABL Priority Collateral, the Prepetition Term Loan Priority Collateral, and, with respect to the Prepetition ABL Canadian Sub-Facility, the Canadian Collateral, but subject to any exclusions in the Prepetition Documents (the "Prepetition Collateral").

(vii)    Prepetition Obligations.    The Prepetition Obligations owing to the Prepetition Secured Parties constitute legal, valid, and binding obligations of the Debtors and their applicable affiliates, enforceable against them in accordance with their respective terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and no portion of the Prepetition Obligations owing to the Prepetition Secured Parties is subject to avoidance, recharacterization, reduction, set-off, offset, counterclaim, cross-claim, recoupment, defenses, disallowance, impairment, recovery, subordination, or any other challenges pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity, including in any Successor Cases (as defined below).

(viii)    Prepetition Liens.  The Prepetition Liens granted to the Prepetition Secured Parties constitute legal, valid, binding, enforceable (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and perfected security interests in and liens on the Prepetition Collateral, were granted to, or for the benefit of, the applicable Prepetition Secured Parties for fair consideration and reasonably equivalent value, and are not subject to defense, counterclaim, recharacterization, subordination, avoidance, or recovery pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity.

(ix)   <u>No Challenges/Claims</u>.  No offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Liens or Prepetition Obligations exist, and no portion of the Prepetition Liens or Prepetition Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law.  The Debtors and their Estates have no valid Claims (as such term is defined in section 101(5) of the Bankruptcy Code) objections, challenges, causes of action, and/or choses in action against any of the Prepetition Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees with respect to the Prepetition Credit Agreements, the Prepetition Obligations, the Prepetition Liens, or otherwise, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, avoidance, recovery, disallowance, reduction, or other claims arising under or pursuant to sections 105, 502, 510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code or applicable state law equivalents.  The Prepetition Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

(x)   <u>Indemnity</u>.  The DIP Agents, the DIP Lenders, and the Prepetition Secured Parties have acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining the requisite approvals of the DIP Facilities and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Prepetition Term Loan Adequate Protection Liens (as defined below), any challenges or objections to the DIP Facilities or the use of Cash Collateral, and all documents related to any and all transactions contemplated by the foregoing.  Accordingly, the Prepetition Secured Parties, the DIP Agents, and

the DIP Lenders shall be and hereby are indemnified and held harmless by the Debtors in respect of any claim or liability incurred in respect thereof or in any way related thereto, provided that no such parties will be indemnified for any cost, expense, or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such parties' gross negligence or willful misconduct.  No exception or defense exists in contract, law, or equity as to any obligation set forth, as the case may be, in this paragraph E(x), in the Prepetition Credit Agreements, or in the DIP Loan Documents, to the Debtors' obligation to indemnify and/or hold harmless the Prepetition Secured Parties, the DIP Agents, or the DIP Lenders, as the case may be.

(xi)      Sale and Credit Bidding.  Subject to Section 4.1 hereof, the Debtors and the Prepetition Obligors admit, stipulate, acknowledge, and agree that any of the DIP Lenders, DIP Agents, or Prepetition Secured Parties, including, for the avoidance of doubt, JC Buyer Company, Inc., as the designated buyer on behalf of the Junior Term Loan Lenders (in such capacity, the "Purchaser"), in its capacity as the holder (or the representative of the holders) of claims under the Junior Credit Agreements and DIP Term Loan Agreement, shall have the right to credit bid, including the Stalking Horse Credit Bid (as defined below), up to $321,928,903 of the Prepetition Obligations and/or the DIP Obligations, as applicable, including the Prepetition Obligations under the Junior Credit Agreements and the DIP Obligations under the DIP Term Loan Agreement; *provided*, that nothing in this order shall constitute a finding or determination by this Court that the Purchaser is authorized to purchase the Avoidance Proceeds through a credit bid of the DIP Obligations under the DIP Term Loan Agreement.

(xii)      Release.  Subject to Section 4.1 and the challenge rights granted thereunder, each of the Debtors, their Estates, the Borrowers, the Guarantors, and the Prepetition Obligors, on

their own behalf and on behalf of each of their past, present, and future predecessors, successors, heirs, subsidiaries, and assigns, hereby forever, unconditionally, permanently, and irrevocably release, discharge, and acquit each of the Prepetition Secured Parties, and each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns (collectively, the "Released Parties") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, attorneys' fees), debts, liens, actions, and causes of action of any and every nature whatsoever, whether arising in law or otherwise, and whether known or unknown, matured or contingent, arising under, in connection with, or relating to the Prepetition Obligations or the Prepetition Loan Documents, including, without limitation, (a) any so-called "lender liability" or equitable subordination claims or defenses, (b) any and all "claims" (as defined in the Bankruptcy Code) and causes of action arising under the Bankruptcy Code, and (c) any and all offsets, defenses, claims, counterclaims, set off rights, objections, challenges, causes of action, and/or choses in action of any kind or nature whatsoever, whether arising at law or in equity, including any recharacterization, recoupment, subordination, avoidance, or other claim or cause of action arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state, federal, or foreign law, including, without limitation, any right to assert any disgorgement or recovery, in each case, with respect to the extent, amount, validity, enforceability, priority, security, and perfection of any of the Prepetition Obligations, the Prepetition Loan Documents, or the Prepetition Liens, and further waive and release any defense, right of counterclaim, right of setoff, or deduction to the payment of the

Prepetition Obligations that the Debtors now have or may claim to have against the Released Parties, arising under, in connection with, based upon, or related to any and all acts, omissions, conduct undertaken, or events occurring prior to entry of this Final Order.

(xiii)    ABL Cash Collateral.   The Debtors admit, stipulate, acknowledge, and agree that all of the cash of the Debtors that are Prepetition ABL Obligors (the "Debtor ABL Obligors"), wherever located, and all cash equivalents, including any cash in deposit accounts of the Debtor ABL Obligors, whether as Prepetition ABL Priority Collateral or which represents income, proceeds, products, rents or profits of other Prepetition ABL Priority Collateral, constitutes "cash collateral" of the Prepetition ABL Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "ABL Cash Collateral").

(xiv)    Term Loan Cash Collateral.   The Debtors admit, stipulate, acknowledge, and agree that all of the cash of the Debtors who were obligors under the Prepetition Term Loan Facilities, wherever located, and all cash equivalents, including any cash in deposit accounts of the Debtors who were borrowers under the Prepetition Term Loan Facilities, whether as Prepetition Term Loan Priority Collateral or which represents income, proceeds, products, rents or profits of other Prepetition Term Loan Priority Collateral, constitutes "cash collateral" of the Prepetition Term Loan Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "Term Loan Cash Collateral," and, together with the ABL Cash Collateral, collectively the "Cash Collateral").

F.    Findings Regarding the Postpetition Financing.

(i)    Postpetition Financing.   The Debtors have requested from each of the DIP Secured Parties, and the DIP Secured Parties are willing, subject to the terms of the Interim Order and this Final Order, as applicable, and satisfaction of the conditions set forth in the DIP Credit

Agreements, to extend the DIP Loans on the terms and conditions set forth in the Interim Order and this Final Order, as applicable, and the DIP Loan Documents, respectively.

(ii)    <u>Need for Postpetition Financing</u>.  The Debtors do not have sufficient liquidity, including Cash Collateral, to operate their businesses in the ordinary course of business without the financing requested in the Motion.  The Debtors' ability to maintain business relationships with their vendors, suppliers, and customers, to pay their employees, pay certain fees and expenses as set forth herein, and to otherwise fund their operations is essential to the Debtors' continued viability as the Debtors seek to maximize the value of the assets of the Estates for the benefit of all creditors of the Debtors.  The ability of the Debtors to obtain sufficient working capital and liquidity through the proposed postpetition financing arrangements with the DIP Secured Parties as set forth in the Interim Order, this Final Order, the DIP Credit Agreements, and other DIP Loan Documents, as applicable, is vital to the preservation and maintenance of the going concern value of each Debtor.  Accordingly, the Debtors have a need to obtain the postpetition financing on a final basis to, among other things, permit the orderly continuation of the operation of their businesses, minimize the disruption of their business operations, and preserve and maximize the value of the assets of the Debtors' Estates to maximize the recovery to all creditors of the Estates.

(iii)    <u>Stalking Horse Credit Bid</u>.  As described in greater detail in the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Enter Into and Perform Under the Stalking Horse Asset Purchase Agreement, (II) Approving Bidding Procedures for the Sale of the Debtors' Assets, (III) Approving the Expense Reimbursement, (IV) Scheduling Hearings and Objection Deadlines with Respect to the Sale, (V) Scheduling Bid Deadlines and an Auction, (VI) Approving the Form and Manner of Notice Thereof, (VII) Approving Contract Assumption*

*and Assignment Procedures, and (VIII) Granting Related Relief* [Docket No. 21] filed on the Petition Date (the "Sale Motion"), Purchaser has agreed to purchase all or substantially all of the DIP Collateral (as defined below) substantially on the terms and conditions set forth in that certain Asset Purchase Agreement attached to the Sale Motion as Exhibit 1 (as may be amended, restated, modified, or supplemented, from time to time, the "Stalking Horse Agreement") (collectively, the "Stalking Horse Credit Bid").

(iv)    No Credit Available on More Favorable Terms.  The Debtors are unable to procure financing in the form of unsecured credit allowable as an administrative expense under sections 364(a), 364(b), or 503(b)(1) of the Bankruptcy Code or in exchange for the grant of a superpriority administrative expense, or liens on property of the Estates not subject to a lien pursuant to sections 364(c)(1), 364(c)(2), or 364(c)(3) of the Bankruptcy Code.  The Debtors assert in the Motion, the First Day Declaration, and in the Dunayer Declaration, and demonstrated at the Interim Hearing and the Final Hearing, that they have been unable to procure the necessary financing on terms more favorable, taken as a whole, than the financing offered by each of the DIP Secured Parties pursuant to the DIP Loan Documents.  In light of the foregoing, and considering all alternatives, the Debtors have reasonably and properly concluded, in the exercise of their sound business judgment, that the DIP Facilities represent the best financing available to the Debtors at this time, and are in the best interests of the Debtors, their estates, and all of their stakeholders.

(v)    Budget.  The Debtors prepared and delivered to the DIP Secured Parties an initial budget (the "Initial Budget"), a copy of which is attached to the Interim Order as **Exhibit C**. The Initial Budget reflected the Debtors' anticipated cash receipts and anticipated disbursements for each calendar week during the period from the Petition Date through and including the end of the thirteenth (13th) calendar week following the Petition Date (the Initial Budget and each

subsequent Budget approved by the DIP Lenders in accordance with the DIP Loan Documents then in effect, an "Approved Budget").  The Debtors shall provide a copy of each Approved Budget to the Committee upon the effectiveness thereof.  The DIP Secured Parties are relying upon the Debtors' agreement to comply on the terms set forth in the DIP Credit Agreements, with the Approved Budget, the other DIP Loan Documents, the Interim Order and this Final Order in determining to enter into, and to provide the financing under, the postpetition financing arrangements contemplated herein.

(vi)    Certain Conditions to DIP Facilities.  The DIP Lenders' willingness to make the DIP Loans is conditioned upon, among other things:  (a) the Debtors obtaining Court approval to enter into the DIP Loan Documents and to incur all of the respective obligations thereunder, and to confer upon the DIP Secured Parties all applicable rights, powers, and remedies thereunder in each case as modified by this Final Order; (b) the provision of adequate protection of the Prepetition Term Loan Secured Parties' interests in the Prepetition Collateral pursuant to sections 361, 363, and 364 of the Bankruptcy Code; (c) the DIP Secured Parties being granted, as security for the prompt payment of the DIP Facilities and all other obligations of the Debtors under the DIP Loan Documents, subject to the priorities described in **Exhibit D** annexed hereto, superpriority perfected security interests in and liens upon all property and assets of the Debtors, including, but not limited to, a valid and perfected security interest in and lien upon all of the now or hereafter arising or acquired:  (i) Prepetition ABL Priority Collateral (whether in existence on the Petition Date or thereafter arising), (ii) the Canadian Collateral (whether in existence on the Petition Date or thereafter arising), (iii) Prepetition Term Loan Priority Collateral (whether in existence on the Petition Date or thereafter arising), and (iv) any assets of the Debtors (or their estates) that are not otherwise subject to valid, perfected, enforceable, and unavoidable security interests, including

any other assets consisting of Excluded Collateral (under any of the Prepetition Documents) (collectively hereinafter referred to as the "DIP Collateral," and, for avoidance of doubt, the DIP Collateral shall include the proceeds (the "Avoidance Proceeds") of any claim or cause of action arising under or pursuant to chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state, federal, or foreign law (including any other avoidance actions under the Bankruptcy Code) (collectively, the "Avoidance Actions")).

(vii)   Business Judgment and Good Faith Pursuant to Section 364(e). Any credit extended, loans made, and other financial accommodations extended to the Debtors by the DIP Secured Parties, including, without limitation, pursuant to the Interim Order or this Final Order, have been extended, issued, or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by Bankruptcy Code section 364(e), and the DIP Facilities, the DIP Liens, and the DIP Superpriority Claims (as defined below) shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that the Interim Order or this Final Order or any provision thereof or hereof is vacated, reversed, or modified on appeal or otherwise.

(viii)   Credit Bid Rights.

(a)   The Debtors, Prepetition ABL Secured Parties, Prepetition Junior Lien Secured Parties, and DIP Secured Parties hereby acknowledge and agree that they shall not object, or support any objection, to the DIP Secured Parties' or Prepetition Secured Parties' rights to credit bid, including the Stalking Horse Credit Bid, up to $321,928,903 of their DIP Obligations and/or Prepetition Obligations, in each case including, without limitation, any accrued interest and expenses, in any sale effectuated through section 363 of the Bankruptcy Code, whether in a chapter 11 or chapter 7 proceeding.

(b)      The Prepetition First Lien Secured Parties' support of the DIP Secured Parties' and other Prepetition Secured Parties' rights to credit bid shall be as set forth in the Restructuring Support Agreement and subject to the terms thereof.

(ix)      Sections 506(c) and 552(b).  The Debtors have agreed as a condition to obtaining financing under the DIP Facilities and the use of Cash Collateral that as a material inducement to the DIP Secured Parties to agree to provide the DIP Facilities and the Prepetition Secured Parties' consent to the use of Cash Collateral, and in exchange for (a) the DIP Secured Parties' willingness to provide the DIP Facilities to the extent set forth herein, (b) the DIP Secured Parties' and the Prepetition Secured Parties' agreement to subordinate their liens and superpriority claims to the Carve Out, and (c) the consensual use of Cash Collateral consistent with the Approved Budget, the terms of the DIP Credit Agreements, and the terms of this Final Order, each of the DIP Secured Parties and the Prepetition Secured Parties are entitled to receive (1) a waiver of any equities of the case exceptions or claims under section 552(b) of the Bankruptcy Code and a waiver of unjust enrichment and similar equitable relief as set forth below, and (2) a waiver of the provisions of section 506(c) of the Bankruptcy Code.

(x)      Good Cause.  Good cause has been shown for the entry of this Final Order. The relief requested in the Motion on a final basis is necessary, essential, and appropriate and is in the best interest of and will benefit the Debtors, their creditors, and their Estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to (1) minimize disruption to the Debtors' businesses and on-going operations, (2) preserve and maximize the value of the Debtors' Estates for the benefit of all the Debtors' creditors, and (3) avoid immediate and irreparable harm to the Debtors, their creditors, their businesses, their employees, and their assets.  The terms of the DIP Facilities are fair and reasonable, reflect each

Debtor's exercise of its business judgment, and are supported by reasonably equivalent value and fair consideration. The DIP Facilities are the product of reasonable, arm's length, good faith negotiations between the Debtors and the respective DIP Lenders.

(xi)     <u>Refinancing of Prepetition ABL Obligations</u>. The full payoff of the Prepetition ABL Obligations with the proceeds of borrowings under the Revolver Facility in accordance with the Interim Order was necessary as the Prepetition ABL Secured Parties would not have otherwise consented to the use of their Cash Collateral, the subordination of their liens to the Carve Out and the Prepetition Term Loan Adequate Protection Liens provided herein, or the extension of credit to fund the Debtors' critical working capital needs in the form of the Revolver Facility.

(xii)    <u>Adequate Protection</u>. The Prepetition Term Loan Secured Parties are entitled, pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code, to receive adequate protection against any Diminution in Value of their respective interests in the Prepetition Collateral (including Cash Collateral), to the extent set forth in the Interim Order and this Final Order, as applicable.

(xiii)   <u>Objections</u>. Any objections that were made to the entry of this Final Order (to the extent such objections have not been withdrawn, waived, resolved, or settled) are hereby overruled on the merits.

Based upon the foregoing, and upon the record made before the Court at the Interim Hearing and Final Hearing, and based on the agreement of the Revolver Administrative Agent as set forth in Section 4.2 hereof to support the Restructuring Transactions (as defined in the Restructuring Support Agreement), and after due consideration and good cause appearing therefor;

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

Section 1.     <u>Authorization and Conditions to Financing</u>.

1.1    <u>Motion Granted</u>.   The Motion is granted on a final basis to the extent provided in this Final Order.  Any objections to the entry of this Final Order that have not been withdrawn, waived, resolved, or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits.

1.2    <u>Authorization of DIP Financing</u>.

(a)    The Debtors are hereby authorized and empowered to borrow, incur, and guarantee (as applicable), (i) pursuant to the terms and conditions of the Revolver DIP Agreement, loans under the Revolving Credit Facility (A) up to an aggregate principal amount of $85 million in U.S. Revolving Commitments (minus outstanding Canadian Revolving Loans) and (B) up to $5 million in Canadian Revolving Commitments; and (ii) DIP Term Loans, pursuant to the terms and conditions of the DIP Term Loan Agreement, in an aggregate principal amount not to exceed $15 million, and consistent with the applicable Approved Budget and the DIP Term Documents.

(b)    The Debtors are hereby authorized on a final basis to (i) borrow under the DIP Facilities in accordance with, and for the purposes permitted by, the DIP Loan Documents, the Interim Order, and this Final Order, as applicable, (ii) pay all interest, costs, fees, and other amounts and obligations accrued or accruing under the DIP Credit Agreements and other DIP Loan Documents, all pursuant to the terms and conditions of the Interim Order, this Final Order, as applicable, the DIP Credit Agreements, and the other DIP Loan Documents, and (iii) complete the ABL Refinancing (as defined below).  The Initial Budget is hereby approved on a final basis in all respects.  The Debtors shall use the proceeds of the DIP Facilities solely in a manner consistent with the Approved Budget and the terms and conditions of the DIP Loan Documents, the Interim Order, and this Final Order, as applicable.

1.3     Financing Documents.

(a)     Authorization.  The Debtors are hereby authorized and directed to enter into, execute, deliver, and perform all obligations under the DIP Loan Documents.  Subject to Section 4.1 hereof, no obligation, payment, transfer, or grant of security hereunder or under the DIP Loan Documents shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable state, federal, or foreign law (including, without limitation, under chapter 5 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or be subject to any defense, reduction, setoff, counterclaim, recoupment, offset, recharacterization, subordination (whether equitable, contractual or otherwise), cross-claims, or any other challenge under the Bankruptcy Code or any applicable law, rule, or regulation by any person or entity.

(b)     Approval; Evidence of Borrowing Arrangements.   All terms, conditions, and covenants set forth in the DIP Loan Documents (including, without limitation, each of the DIP Credit Agreements) are approved on a final basis.  All such terms, conditions, and covenants shall be sufficient and conclusive evidence of (i) the borrowing arrangements by and among the Debtors, the DIP Agents, and the DIP Lenders, and (ii) each Debtor's assumption and adoption of, and agreement to comply with, all the terms, conditions, and covenants of each DIP Credit Agreement and the other DIP Loan Documents for all purposes, including, without limitation, to the extent applicable, the payment of all DIP Obligations arising thereunder, including, without limitation, all principal, interest, fees, and other expenses, including, without limitation, all of each DIP Agent's and DIP Lender's closing, arranger, and administrative fees, consultant fees, professional fees, attorney's fees and legal expenses, as more fully set forth in the

28

DIP Loan Documents. Upon effectiveness thereof, the DIP Loan Documents shall evidence the DIP Obligations, which DIP Loan Documents and DIP Obligations shall be valid, binding, and enforceable against the Debtors, their Estates, and any successors thereto, including, without limitation, any trustee appointed in any of these Cases or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of these Cases (collectively, the "Successor Cases"), and their creditors and other parties-in-interest, in each case, in accordance with the terms of the Interim Order, this Final Order, and the DIP Loan Documents.

(c)    Payment of DIP Fees and Other Expenses. Any and all fees and expenses payable pursuant to the DIP Loan Documents (collectively, any and all such fees and expenses, the "DIP Fees") are hereby approved on a final basis and the Debtors are hereby authorized and directed to pay, in cash and on a current basis, all reasonable and documented out-of-pocket costs, disbursements, and expenses of the DIP Agents and the DIP Lenders incurred at any time, as provided by the DIP Loan Documents, the Interim Order, and this Final Order in accordance with Section 5.15 hereof. The DIP Fees shall not be subject to any offset, defense, claim, counterclaim, or diminution of any type, kind, or nature whatsoever.

(d)    Amendments to DIP Loan Documents. Subject to the terms and conditions of the applicable DIP Loan Documents, the Debtors and the applicable DIP Secured Parties may make amendments, modifications, or supplements to any DIP Loan Document, and the DIP Agents (acting at the direction of the Required Lenders (as defined in the DIP Loan Documents) if so required by the applicable DIP Documents) and the DIP Lenders may waive any provisions in the DIP Loan Documents, without further approval of the Court; *provided* that any amendments, modifications, or supplements to any DIP Loan Documents that operate to increase the aggregate commitments, the rate of interest payable thereunder, or existing fees or add new

fees thereunder (excluding, for the avoidance of doubt, any amendment, consent or waiver fee) other than as currently provided in the DIP Loan Documents (collectively, the "Material DIP Amendments"), shall be filed with the Court, and the Debtors shall provide, to the extent reasonably practicable, at least five (5) calendar days prior written notice of any Material DIP Amendment to (i) counsel to the DIP Agents, (ii) counsel to the DIP Lenders, (iii) counsel for each of the Prepetition Secured Parties, (iv) counsel to the Committee, and (v) the U.S. Trustee (collectively, the "Amendment Notice Parties"); *provided,* that the consent of the foregoing parties will not be necessary to effectuate any such amendment, modification, or supplement, except that any Material DIP Amendment that is subject to a timely (filed with the Court and served on the Amendment Notice Parties within 5 calendar days of notice of such Material DIP Amendment) and unresolved objection must be approved by the Court.  For the avoidance of doubt, the Debtors must receive written consent as to any Material DIP Amendment prior to filing notice thereof with the Court (i) from the applicable DIP Secured Parties and (ii) from the applicable Prepetition Agents for any amendment, modification, supplement, or waiver that materially adversely affects any rights of any Prepetition Secured Parties hereunder or the treatment of the Prepetition Obligations hereunder.

   1.4 Refinancing of Prepetition ABL Obligations.  Upon the entry of the Interim Order and the satisfaction or waiver of all other closing conditions in the Revolver DIP Agreement, without any further action by the Debtors or any other party, the Debtors (i) were authorized, directed, and deemed to immediately borrow under the Revolver DIP Agreement the full amount necessary to fully and immediately pay off all Prepetition ABL Obligations and (ii) were deemed to have contemporaneously fully and indefeasibly repaid all Prepetition ABL Obligations (clauses (i) and (ii) together, the "ABL Refinancing").  Upon entry of the Interim Order, all Bank Products,

Cash Management Services, and Letters of Credit (each as defined in the Prepetition ABL Credit Agreement) were to and shall continue in place and all obligations under or in connection therewith shall be subject to the Revolver DIP Agreement and shall constitute Revolver Obligations.

1.5    <u>Continuation of Prepetition Procedures</u>.  Except to the extent expressly set forth in the Prepetition Loan Documents, DIP Loan Documents, or in other "first day" orders, all prepetition practices and procedures for the payment and collection of proceeds of the Prepetition Collateral, sweeping, the turnover of cash, the delivery of property to the Prepetition Agents and the Prepetition Lenders, including the Control Agreements (as such term is defined in the Prepetition Credit Agreements) and any other similar lockbox or blocked depository bank account arrangements, are hereby approved and shall continue without interruption.

1.6    <u>Indemnification</u>.  The Debtors are authorized to indemnify and hold harmless the DIP Agents, each DIP Lender, and, solely in their capacities as such, each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders and employees, past, present and future, and their respective heirs, predecessors, successors and assigns (each, an "<u>Indemnified Party</u>"), in accordance with, and subject to, the DIP Loan Documents, which indemnification is hereby authorized and approved on a final basis.

Section 2.    <u>Postpetition Lien; Superpriority Administrative Claim Status</u>.

2.1    <u>Postpetition Lien</u>.

(a)    <u>Postpetition DIP Lien Granting</u>.  To secure performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of any and all DIP Obligations of the Debtors to the DIP Secured Parties of whatever kind, nature, or description, whether absolute or contingent, now existing or hereafter arising, the DIP Agents, for the benefit

of themselves and the DIP Lenders, shall have and are hereby granted, effective as of the Petition Date, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens (such security interests and liens as to the Revolver Facility, the "Revolver DIP Liens" and, such security interests and liens as to the DIP Term Loan Facility, the "DIP Term Loan Liens," and, collectively, the "DIP Liens") in and upon all DIP Collateral, subject to the priority set forth in Section 2.1(b) below and as set forth on **Exhibit D** hereto.

(b)    DIP Lien Priority in DIP Collateral.

(i)    Revolver DIP Liens Priority.  The Revolver DIP Liens on the DIP Collateral securing the Obligations (as defined in the Revolver DIP Agreement) shall be first and senior in priority to all other interests and liens of every kind, nature, and description, whether created consensually, by an order of the Court or otherwise, including, without limitation, liens or security interests granted in favor of third parties in conjunction with sections 363, 364, or any other section of the Bankruptcy Code or other applicable law; *provided*, *however*, that the Revolver DIP Liens on (A) the Prepetition ABL Priority Collateral (whether in existence on the Petition Date or hereafter arising) shall be subject to the Carve Out and certain Permitted Liens (as defined in the Revolver DIP Documents); (B) the Prepetition Term Loan Priority Collateral (whether in existence on the Petition Date or hereafter arising) shall be subject to the Carve Out, such Permitted Liens, the Prepetition First Lien Term Loan Liens, the DIP Term Loan Liens, the Prepetition Term Loan Adequate Protection Liens, the Prepetition 1.5 Lien Term Loan Liens, and the Prepetition Second Lien Term Loan Liens; (C) the Canadian Collateral shall be subject to any CCAA statutory charge to the extent set forth in the CCAA Order, and (D) any other assets of the Debtors that were not subject to any validly perfected liens or security interest as of the Petition Date, shall be *pari passu* with the Prepetition Term Loan Adequate Protection Liens granted in

favor of the Prepetition First Lien Secured Parties, in each case as such priorities are set forth in

**Exhibit D**.[4]

        (ii)  <u>DIP Term Loan Liens Priority</u>.  The DIP Term Loan Liens on the DIP Collateral securing the DIP Term Loan Obligations shall be first and senior in priority to all other interests and liens of every kind, nature, and description, whether created consensually, by an order of the Court or otherwise, including, without limitation, liens or interests granted in favor of third parties in conjunction with sections 363, 364, or any other section of the Bankruptcy Code or other applicable law; *provided*, *however*, that the DIP Term Loan Liens on (A) the Prepetition ABL Priority Collateral (whether in existence on the Petition Date or hereafter arising) shall be subject to the Carve Out, certain permitted senior liens, the Revolver DIP Liens, and the Prepetition Term Loan Adequate Protection Liens granted in favor of the Prepetition First Lien Secured Parties and the Prepetition First Lien Term Loan Liens; (B) the Prepetition Term Loan Priority Collateral (whether in existence on the Petition Date or hereafter arising) shall be subject to the Carve Out, certain permitted senior liens, the Prepetition Term Loan Adequate Protection Liens granted in favor of the Prepetition First Lien Secured Parties, and the Prepetition First Lien Term Loan Liens; (C) the Canadian Collateral shall be subject to, the Carve Out, certain CCAA statutory charges to the extent set forth in the CCAA Order, and the Revolver DIP Liens; and (D) any unencumbered assets as of the Petition Date, including Avoidance Proceeds, shall be subject to the Carve Out, such permitted senior liens, the Revolver DIP Liens, and the Prepetition Term Loan Adequate Protection Liens granted in favor of the Prepetition First Lien Secured Parties, in each case as such priorities are set forth in **Exhibit D**.

---

[4]  In the event of any conflict or inconsistency between the terms and provisions of the Interim DIP Order or this Final Order on one hand and Exhibit D on the other hand, Exhibit D shall control.

(c)    <u>Postpetition Lien Perfection</u>.  This Final Order shall be sufficient and conclusive evidence of the priority, perfection, and validity of the DIP Liens, the Prepetition Term Loan Adequate Protection Liens, and the other security interests granted herein, effective as of the Petition Date, without any further act and without regard to any other federal, state, or local requirements or law requiring notice, filing, registration, recording, or possession of the DIP Collateral, or other act to validate or perfect such security interest or lien, including, without limitation, control agreements with any financial institution(s) party to a Control Agreement or other depository account consisting of DIP Collateral, or requirement to register liens on any certificates of title (a "<u>Perfection Act</u>").  Notwithstanding the foregoing, if any DIP Agent or Prepetition Term Loan Agent, as applicable, shall, in its sole discretion, elect for any reason to file, record, or otherwise effectuate any Perfection Act, then such DIP Agent or Prepetition Term Loan Agent, as applicable, is authorized to perform such act, and the Debtors and Guarantors are authorized and directed to perform such act to the extent necessary or required by the DIP Loan Documents, which act or acts shall be deemed to have been accomplished as of the date and time of entry of the Interim Order notwithstanding the date and time actually accomplished, and, in such event, the subject filing or recording office is authorized to accept, file, or record any document in regard to such act in accordance with applicable law.  The DIP Agents or Prepetition Term Loan Agents, as applicable, may choose to file, record, or present a certified copy of this Final Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file, or record such certified copy of this Final Order in accordance with applicable law.  Should any DIP Agent or Prepetition Term Loan Agent, as applicable, so choose and attempt to file, record, or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive,

34

or alter the validity, enforceability, attachment, priority, or perfection of the postpetition liens and security interests granted herein by virtue of the entry of the Interim Order or this Final Order.

(d)    To the extent that any applicable non-bankruptcy law otherwise would restrict the granting, scope, enforceability, attachment, or perfection of any liens and security interests granted and created by the Interim Order or this Final Order (including the DIP Liens and the Prepetition Term Loan Adequate Protection Liens) or otherwise would impose filing or registration requirements with respect to such liens and security interests, such law is hereby pre-empted to the maximum extent permitted by the Bankruptcy Code, applicable federal or foreign law, and the judicial power and authority of this Court; *provided, however,* that nothing herein shall excuse the Debtors from payment of any local fees, if any, required in connection with such liens.  By virtue of the terms of this Final Order, to the extent that any DIP Agent or Prepetition Term Loan Agent, as applicable, has filed Uniform Commercial Code financing statements, mortgages, deeds of trust, or other security or perfection documents under the names of any of the Debtors (including all Guarantors), such filings shall be deemed to properly perfect its liens and security interests granted and/or confirmed by this Final Order without further action by the applicable DIP Agent or Prepetition Term Loan Agent, as applicable.

(e)    Except as provided in section 2.3 herein, the DIP Liens, the DIP Superpriority Claims, the Prepetition Term Loan Adequate Protection Liens, and the Prepetition Term Loan Adequate Protection Claims (i) shall not be made subject to or *pari passu* with (A) any lien, security interest, or claim heretofore or hereinafter granted in any of these Cases or any Successor Cases and shall be valid and enforceable against the Debtors, their Estates, any trustee, or any other estate representative appointed or elected in these Cases or any Successor Cases and/or upon the dismissal of any of these Cases or any Successor Cases; (B) any lien that is avoided and

preserved for the benefit of the Debtors and their Estates under section 551 of the Bankruptcy Code or otherwise; and (C) any intercompany or affiliate lien or claim; and (ii) shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code.

      2.2    Superpriority Administrative Expenses.

      (a)    DIP Loans.  Subject to the priorities set forth on **Exhibit D** and the Carve Out, all DIP Obligations now existing or hereafter arising pursuant to  the Interim Order, this Final Order, the DIP Loan Documents, or otherwise, the DIP Agents, for the benefit of themselves and the DIP Lenders, are granted an allowed superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities, and indebtedness of the Debtors, whether now in existence or hereafter incurred by the Debtors, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, *inter alia*, sections 105, 326, 328, 330, 331, 364(c)(1), 503(b), 507(a), 507(b), 546(c), 1113, or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which allowed superpriority administrative claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (including proceeds of Avoidance Actions) (such superpriority administrative expense claim as to the Revolver Facility, the "Revolver Superpriority Claim," and, as to such superpriority administrative expense claim as to the DIP Term Loan Facility, the "DIP Term Loan Superpriority Claim," and, collectively, the "DIP Superpriority Claims").

      2.3    Carve Out Provisions.

      (a)    For purposes of this Final Order, "Carve Out" shall mean the sum of:  (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section

1930(a) of title 28 of the United States Code plus interest at the statutory rate; (ii) all reasonable

fees and expenses up to $75,000[5] incurred by a trustee under section 726(b) of the Bankruptcy

Code; (iii) to the extent allowed at any time, whether by interim order, procedural order, or

otherwise, all unpaid fees, costs, disbursements and expenses (the "Allowed Professional Fees")

incurred or earned by persons or firms retained by the Debtors pursuant to sections 327, 328, or

363 of the Bankruptcy Code or Canadian counsel for the Debtors (the "Debtor Professionals") and

the Committee pursuant to sections 328 or 1103 of the Bankruptcy Code (the "Committee

Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time

before or on the first business day following delivery by either of the DIP Agents of a Carve Out

Trigger Notice (as defined below), whether allowed by the Court prior to, on or after delivery of a

Carve Out Trigger Notice (the amounts in (i) – (iii), collectively, the "Pre-Trigger Carve Out

Cap"); and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to

exceed $1,000,000 incurred after the first business day following delivery by either of the DIP

Agents of the Carve Out Trigger Notice (such date, the "Trigger Date"), to the extent allowed at

any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this

clause (iv) being the "Post-Carve Out Trigger Notice Cap" and such amounts set forth in clauses

(i) through (iv), the "Carve Out Cap"); *provided* that nothing herein shall be construed to impair

any party's ability to object to court approval of the fees, expenses, reimbursement of expenses or

compensation of any Professional Person.  For purposes of the foregoing, "Carve Out Trigger

Notice" shall mean a written notice delivered by email by either of the DIP Agents to the Debtors,

their lead restructuring counsel, the U.S. Trustee, counsel to each of the Prepetition Agents, and

counsel to the Committee (collectively, the "Carve Out Trigger Notice Parties"), which notice shall

---

[5]    For the avoidance of doubt, the Stalking Horse Agreement also provides for up to $250,000 to be set aside to
fund the winddown of the Estates following consummation of the Sale Transaction.

be delivered upon the expiration of the Remedies Notice Period, and shall describe in reasonable detail such Event of Default that is alleged to have occurred and to be continuing at the end of such Remedies Notice Period and stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)     On the date on which a Carve Out Trigger Notice is given by either of the DIP Agents to the Carve Out Trigger Notice Parties (the "Termination Declaration Date"), the Carve Out Trigger Notice shall (i) be deemed an irrevocable draw request and notice of borrowing by the Debtors for DIP Term Loans under the DIP Term Loan Facility as further described in clause (c) below, in an amount equal to the lesser of (x) the Pre-Trigger Carve Out Cap and (y) the unused DIP Term Loan Commitments (determined without regard to any limitation thereon resulting from any Default or Event of Default, failure to satisfy the CBA Milestone (as defined in the DIP Term Loan Agreement) or otherwise), and (ii) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter generated by the Debtors to fund the Carve Out Account (as defined below) up to the Carve Out Cap, but only after giving effect to the funding contemplated by clause (i) and the amounts funded by the Revolving Lenders contemplated by section 2.1(d) of the Revolver DIP Agreement (the "Revolver Advance").  Any such amounts advanced by the DIP Term Secured Parties pursuant to this Section 2.3(b)(i) shall constitute DIP Term Loans.

(c)     On the first business day after the Termination Declaration Date (or as soon thereafter as the amount of the Pre-Trigger Carve Out Cap has been determined), notwithstanding anything in the DIP Term Documents to the contrary, including with respect to the existence of a Default or an Event of Default (each as defined in the DIP Term Documents), the failure of the Debtors to satisfy any or all of the conditions precedent for the funding of DIP Term Loans, including the CBA Milestone, or any termination of the DIP Term Loan

Commitments, or as a result of an event or events giving rise to the Termination Declaration Date, (i) each DIP Term Lender with an outstanding DIP Term Loan Commitment (on a pro rata basis based on the then outstanding DIP Term Loan Commitments) shall make available to the DIP Term Administrative Agent such DIP Term Lender's pro rata share of the borrowing contemplated by clause (b)(i) of this Section 2.3 and (ii) the DIP Term Administrative Agent shall fund such amount into the Carve Out Account.

(d)     Upon delivery of a Carve Out Trigger Notice, and prior to the payment to any DIP Secured Party or Prepetition Secured Party on account of any adequate protection or otherwise, the Debtors shall be required to deposit, in a segregated account not subject to the control of the DIP Agents, the DIP Secured Parties or the Prepetition Secured Parties (the "Carve Out Account"), in an amount equal to the Carve Out Cap (i) the proceeds of the DIP Term Loans made pursuant to clause (c) above, (ii) the Revolver Advance, (iii) cash available on the Termination Declaration Date after giving effect to the DIP Term Loans and the Revolver Advances under clauses (i) and (ii) above, and (iv) with available cash from time to time after the Termination Declaration Date after giving effect to the DIP Term Loans, the Revolver Advances and cash contributions under clauses (i), (ii) and (iii) above.  The funds on deposit in the Carve Out Account shall only be available to satisfy the obligations set forth in the definition of Carve Out, and the DIP Agents, the DIP Secured Parties and the Prepetition Secured Parties (x) shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of assets) of the Debtors to the extent necessary to fund the Carve Out Account as provided above and (y) shall have a security interest upon any residual amount in the Carve Out Account available following satisfaction in cash in full of all obligations benefiting from the Carve Out as further described in clause (e) below.  Notwithstanding the foregoing, so long as a Carve Out Trigger

Notice has not been issued, the Debtors shall be permitted to pay fees to the Professional Persons

and reimburse expenses incurred by Professional Persons and that are allowed or authorized by

the Court and payable under sections 328, 330, 331, and 1103 of the Bankruptcy Code and

compensation procedures approved by the Court, as the same may be due and payable, it being

understood that the Pre-Trigger Carve Out Cap shall be reduced by actual payments of allowed

Professional Fees included in the Pre-Trigger Carve Out Cap made after the Termination

Declaration Date.  Notwithstanding anything to the contrary in this Final Order, (A) the failure of

the Carve Out Account to satisfy in full the Allowed Professional Fees shall not affect the priority

of the Carve Out and (B) in no way shall the Approved Budget, the Carve Out, the Carve Out

Trigger Notice, the Pre-Trigger Carve Out Cap, the Post-Carve Out Trigger Notice Cap, or any of

the foregoing be construed as a cap or limitation on the amount of Allowed Professional Fees due

and payable to the Professional Persons.  Any payment or reimbursement made on or after the

occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall

permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out by

the DIP Term Lenders shall be added to, and made a part of, the DIP Term Obligations secured by

the DIP Collateral and shall be otherwise entitled to the protections granted under this Final Order,

the DIP Documents, the Bankruptcy Code, and applicable law.

     (e)  All funds in the Carve Out Account shall be used first to pay all

obligations set forth in clauses (i) through (iii) of the definition of Carve Out, until paid in full, and

then the obligations set forth in clause (iv) thereof.  If, after paying all amounts set forth in the

definition of Carve Out, the Carve Out Account has not been reduced to zero, all remaining funds

in the Carve Out Account that are funded pursuant to Section 2.3(d)(iii) out of (I) the Prepetition

ABL Priority Collateral or proceeds thereof shall be distributed first to the Revolver

Administrative Agent on account of the Revolver Obligations until indefeasibly paid in full, with the balance distributed to the Prepetition First Lien Agent on account of the Prepetition First Lien Obligations until indefeasibly paid in full, and (II) the Prepetition Term Loan Priority Collateral or proceeds thereof shall be distributed first to the Prepetition First Lien Agent on account of the Prepetition First Lien Obligations until indefeasibly paid in full, with the balance distributed to the Revolver Administrative Agent on account of the Revolver Obligations until indefeasibly paid in full.

(f)    To the extent the Carve Out Account is funded pursuant to Section 2.3(d) with cash proceeds of DIP Collateral, then, the Revolver Secured Parties and the Prepetition First Lien Secured Parties shall negotiate in good faith with respect to an allocation methodology so that the Revolver Secured Parties and the Prepetition First Lien Secured Parties effectively share the cost of funding the Carve Out.

(g)    No portion of the Carve Out, any Cash Collateral or proceeds of the DIP Facility or DIP Collateral may be used for or in connection with (i) preventing, hindering, or delaying any of the DIP Agents' or other DIP Secured Parties' enforcement or realization upon the DIP Collateral following the expiration of the Remedies Notice Period, (ii) using or seeking to use Cash Collateral or selling or otherwise disposing of DIP Collateral in a manner not permitted by the DIP Loan Documents, or (iii) incurring any indebtedness other than the DIP Facilities, as otherwise permitted by the DIP Loan Documents or as authorized by the Court.

2.4    Prepetition Term Loan Secured Lenders' Adequate Protection.

(a)    Adequate Protection Claims and Liens.  The Prepetition Term Loan Secured Parties are entitled, pursuant to sections 361, 363(e), and 364(d)(1) of the Bankruptcy Code and *nunc pro tunc* to the Petition Date, to adequate protection of their respective interests in

the Prepetition Collateral, including the Cash Collateral, in an amount equal to the aggregate Diminution in Value of the Prepetition Term Loan Secured Parties' respective interests in the Prepetition Collateral from and after the Petition Date (each such Prepetition Term Loan Secured Party's claim, a "Prepetition Term Loan Adequate Protection Claim").   On account of such Prepetition Term Loan Adequate Protection Claims, the Prepetition Term Loan Secured Parties are hereby granted the following, in each case subject to the Carve Out (collectively, the "Adequate Protection"):

(i)        Prepetition Term Loan Adequate Protection Liens.   The Prepetition Term Loan Secured Parties are hereby granted (effective and perfected upon the date of the Interim Order and without the necessity of any Perfection Act) valid and perfected postpetition replacement security interests in and liens upon the DIP Collateral (other than the Canadian Collateral) (the "Prepetition Term Loan Adequate Protection Liens"), which liens shall: (i) be subject and subordinate to the Carve Out and certain existing permitted liens; (ii) be senior to all other security interests in, liens on, or claims against the Prepetition Term Loan Priority Collateral, whether now existing or hereafter arising or acquired, but subject and subordinate, solely in the case of the Prepetition Term Loan Adequate Protection Liens granted in favor of the Prepetition 1.5 Lien Secured Parties and the Prepetition Second Lien Secured Parties, to the Prepetition Term Loan Adequate Protection Liens granted in favor of the Prepetition First Lien Secured Parties, the Prepetition First Lien Term Loan Liens, and DIP Term Loan Liens;  (iii) be junior to the security interests in, liens on, and claims against the Prepetition ABL Priority Collateral, whether now existing or hereafter arising or acquired, of the Revolver Secured Parties, the Prepetition ABL Secured Parties, and the Prepetition First Lien Secured Parties, including on account of the Prepetition Term Loan Adequate Protection Liens granted to the Prepetition First

Lien Secured Parties; and (iv) in each case, for the avoidance of doubt, shall have the priorities set forth in **Exhibit D** hereto.

(ii)    Adequate Protection Payments.  The Debtors are authorized and directed to pay to the Prepetition First Lien Secured Parties on the last business day of each calendar month after the entry of the Interim Order, in each case in an amount equal to all accrued and unpaid prepetition or postpetition interest (at the non-default rate), fees, and costs under the Prepetition First Lien Credit Agreement.  For the avoidance of doubt, the payment of interest pursuant to this paragraph shall be without prejudice to the rights of the Prepetition First Lien Secured Parties to assert claims for payment of interest at the default rate in accordance with the Prepetition First Lien Credit Agreement; and

(iii)    Section 507(b) Claim.  The Prepetition Term Loan Adequate Protection Claims granted to the Prepetition Term Loan Secured Parties shall also be allowed superpriority administrative expense claims pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code (the "Superpriority Claim"), which Superpriority Claim shall be an allowed claim against each of the Debtors (jointly and severally), with priority (except as otherwise provided herein) over any and all administrative expenses and all other claims against the Debtors now existing or hereafter arising, of any kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 327, 328, 330, 331, 503(b), 507(a), 507(b), or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy, or attachment. The Superpriority Claims shall be payable from and have recourse to all pre- and post-petition

property of the Debtors (including Avoidance Proceeds), subject to the Carve Out and the priorities set forth in **Exhibit D**.

(b)    Reporting.  The Debtors shall timely provide the Prepetition Secured Parties with (x) reasonable access to the Debtors' facilities, management, books, and records required under the Prepetition Documents and (y) copies of all financial reporting provided to the DIP Lenders pursuant to the DIP Documents substantially simultaneously with such delivery to the DIP Lenders.

(c)    Fees and Expenses.  The Debtors are authorized and directed to pay on an ongoing basis, from time to time after the Petition Date, and without duplication, all reasonable and documented fees and out-of-pocket expenses incurred by the Prepetition Secured Parties and required to be paid by the Debtors under the Prepetition Credit Agreements (but no more than one set of primary counsel for each of the Prepetition First Lien Secured Parties (taken as a whole) and the Prepetition Junior Lien Secured Parties (taken as a whole)), including the reasonable and documented fees and out-of-pocket expenses of (and their respective local counsel) (A)(i) Buchalter, P.C., counsel to the Prepetition ABL Agent, the Revolver Administrative Agent, and Wells in its capacity as a Revolver Lender, (ii) Goodmans LLP, as Canadian counsel to the Prepetition ABL Agent and Revolver Administrative Agent, (iii) Burr & Forman LLP, as local counsel to the Prepetition ABL Agent and the Revolver Administrative Agent, and (iv) Vorys, Sater, Seymour and Pease LLP, as counsel to Fifth Third Bank, in its capacity as a Revolver Lender, (B) (i) Schulte Roth & Zabel LLP, counsel to certain of the Prepetition First Lien Secured Parties, (ii) Cassels Brock & Blackwell LLP, as Canadian counsel to the Prepetition First Lien Secured Parties, and (iii) Kikpatrick Townsend & Stockton LLP, as local counsel to the Prepetition First Lien Secured Parties, (C)(i) Kirkland & Ellis LLP, counsel to certain of the Prepetition Term

Loan Secured Parties, (ii) Bennett Jones LLP, as Canadian counsel to certain of the Prepetition Term Loan Secured Parties, and (iii) Bryan Cave Leighton Paisner LLP, as local counsel to certain of the Prepetition Term Loan Secured Parties, and (D) PJT Partners, Inc., financial advisor to certain of the Prepetition Term Loan Secured Parties (such professionals, the "Adequate Protection Professionals," and such fees and expenses, collectively, the "Adequate Protection Professional Fees and Expenses").

(d)    With respect to Adequate Protection Professional Fees and Expenses incurred postpetition, such Adequate Protection Professionals shall deliver an invoice in summary form (which shall not be required to include time entry detail and may be redacted for privileged, confidential, or otherwise sensitive information) to the Debtors, the U.S. Trustee, and the Committee, with a copy of such invoices delivered simultaneously to the DIP Lenders, the DIP Agent, and the Prepetition First Lien Agent (or their respective counsel). If no written objection is received by 12:00 p.m., prevailing Eastern Time, on the date that is ten (10) business days after delivery of such invoice to the Debtors, the U.S. Trustee, and the Committee, the Debtors shall promptly pay such fees and expenses in full. If an objection to a professional's invoice is timely received, the Debtors shall promptly pay the undisputed amount of the invoice, and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually. The Adequate Protection Professionals shall not be required to comply with the U.S. Trustee fee guidelines or file applications or motions with, or obtain approval of, the Court for the payment of any of their fees or out-of-pocket expenses (other than with respect to disputed amounts). Payments of any amounts set forth in this paragraph are not subject to recharacterization, avoidance, subordination, or disgorgement.

Section 3.    Default; Waivers; Rights and Remedies; Relief from Stay.

      3.1   <u>Events of Default</u>.  The occurrence of (i) any "Event of Default" as that term is defined in either of the DIP Credit Agreements; (ii) any failure to meet or satisfy any Milestone in accordance with the applicable DIP Credit Agreement; (iii) the Maturity Date under any DIP Credit Agreement; or (iv) any material violation, breach, or default by any Debtor with respect to any of its obligations under this Final Order, shall constitute a "<u>DIP Termination Event</u>" hereunder unless waived in writing by the applicable DIP Secured Parties and in accordance with the applicable DIP Loan Documents.

      3.2   <u>Debtors' Waivers</u>.

      (a)   Prior to the payment in full of all Prepetition Obligations and all DIP Obligations, any request by the Debtors with respect to the following shall also constitute a DIP Termination Event:  (i) to obtain postpetition loans or other financial accommodations pursuant to section 364(c) or 364(d) of the Bankruptcy Code that does not provide for the repayment in full of the DIP Obligations, other than as provided in this Final Order or as may be otherwise permitted pursuant to the DIP Loan Documents; (ii) to challenge the application of any payments authorized by this Final Order pursuant to section 506(b) of the Bankruptcy Code; (iii) to file a motion seeking approval of any sale or restructuring transaction other than the Sale Transaction; (iv) to propose or support any challenge by any party in interest to seek to limit or prevent the DIP Lenders, the Prepetition Lenders, or the Purchaser from exercising their credit bid rights in connection with the sale of any assets of the Debtors, including the Stalking Horse Credit Bid; *provided*, that nothing in this order shall constitute a finding or determination by this Court that the Purchaser is authorized to purchase the Avoidance Proceeds through a credit bid of the DIP Obligations under the DIP Term Loan Agreement; or (v) to seek relief under the Bankruptcy Code, including, without limitation, under section 105 of the Bankruptcy Code, to the extent any such relief would restrict

or impair (A) the rights and remedies of any of the DIP Agents or the DIP Lenders against the Debtors as provided in this Final Order or any of the DIP Loan Documents or (B) the exercise of such rights or remedies by any of the DIP Agents or the DIP Lenders against the Debtors in accordance with the DIP Credit Agreements or this Final Order; *provided*, *however*, that the DIP Agents may otherwise consent in writing, but no such consent shall be implied from any other action, inaction, or acquiescence by DIP Agents or any DIP Lender.

(b)    Other than as contemplated by the Sale Motion, it shall also be a DIP Termination Event under the respective DIP Facility if, prior to the payment in full of such DIP Facility, the Debtors propose or support any chapter 11 plan or sale of all or substantially all of the Debtors' assets, or order confirming such plan or approving such sale, that is not conditioned upon the payment of the DIP Obligations (other than indemnities then due and payable) in full in cash and the payment of the Debtors' obligations with respect to the adequate protection hereunder, in full in cash, within a commercially reasonable period of time, and in any event no later than the effective date of such chapter 11 plan or sale, without the written consent of the DIP Agents and the DIP Lenders.

3.3    [Reserved].

3.4    Rights and Remedies upon a DIP Termination Event.    After five (5) calendar days following the delivery of a written notice to the Debtors and the Committee of the occurrence of and during the continuance of a DIP Termination Event (the "Remedies Notice Period"), the DIP Agents shall each be entitled to independently take any act or exercise any right or remedy as provided in this Final Order or any DIP Loan Document, as applicable, including, without limitation, (i) declare all DIP Obligations owing under their respective DIP Loan Documents to be immediately due and payable; (ii) terminate, reduce, or restrict any commitment

47

to extend additional credit to the Debtors to the extent any such commitment remains (including provision of any Letters of Credit); (iii) terminate the DIP Facilities and any DIP Loan Document as to any future liability or obligation of the DIP Secured Parties, but without affecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations; (iv) terminate and/or revoke the Debtors' right, if any, under this Final Order and the other DIP Loan Documents to use any Cash Collateral and all authority to use Cash Collateral shall cease; (v) invoke the right to charge interest at the default rate under the DIP Loan Documents; and/or (vi) stop lending; *provided* that any termination of the DIP Facilities or cessation of lending or exercise of remedies thereunder shall be subject to the funding of the Carve Out Cap contemplated by Section 2.3 herein.  For the avoidance of doubt, notwithstanding the foregoing, during the Remedies Notice Period, the Debtors may use Cash Collateral in amounts that the Debtors have determined in good faith are necessary to the preservation of the Debtors and their Estates, including funding payroll and paying other administrative expenses, all in accordance with the Approved Budget, or that have otherwise been approved in advance in writing by the applicable DIP Lenders.

          3.5    <u>Modification of Automatic Stay</u>.  The automatic stay provisions of section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are hereby modified without further notice, application, or order of the Court to the extent necessary to (i) permit the DIP Agents to perform any act authorized or permitted under or by virtue of the Interim Order or this Final Order, the DIP Credit Agreements, or the other DIP Loan Documents, as applicable, including, without limitation, (A) to implement the postpetition financing arrangements authorized by the Interim Order or this Final Order, (B) to take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the DIP Collateral, (C) to assess, charge, collect, advance, deduct and receive payments with respect to the

Prepetition Obligations and DIP Obligations (or any portion thereof), including, without limitation, all interests, fees, costs, and expenses permitted under any of the DIP Loan Documents and apply such payments to the Prepetition Obligations, and (D) subject to the Remedies Notice Period, to take any action and exercise all rights and remedies provided to it by this Final Order, the DIP Loan Documents, or applicable law; and (ii) permit the Purchaser to terminate the Stalking Horse Agreement in accordance with its terms and to deliver any notice or election contemplated thereunder.  Notwithstanding the foregoing, the DIP Agents shall provide notice to the Prepetition Agents at least five (5) calendar days prior to the exercise of the actions outlined in clause (D) of this section.

Section 4.       <u>Representations and Covenants</u>.

4.1     <u>Reservation of Third Party Challenge Rights</u>.  The stipulations, releases, agreements, and admissions contained in this Final Order, including, without limitation, paragraph E hereof, and the releases contained in clause (xii) thereof (collectively, the "<u>Debtors' Stipulations</u>"), shall be binding on the Debtors in all circumstances.  The Debtors' Stipulations shall be binding on each other party in interest, including, without limitation, the Committee, unless, and solely to the extent that (a) any such party in interest, including the Committee, with standing and requisite authority has timely commenced an adversary proceeding or other appropriate contested matter (subject to the limitations contained herein, including, *inter alia*, in this Section 4.1) by no later than (i) the earlier of (A) October 22, 2019 and (B) the date objections to the Sale Transaction are due, and (ii) any such later date as has been agreed to, in writing, by the applicable Prepetition Agent (with the consent of the applicable Prepetition Secured Parties) (such time period established by the foregoing clauses (i) and (ii), the "<u>Challenge Period</u>") against the Prepetition Secured Parties in connection with matters related to the Prepetition Credit Agreements, the Prepetition Obligations, the Prepetition Liens, and the Prepetition Collateral, and

notwithstanding the ABL Refinancing, including by (A) objecting to or challenging the amount, validity, perfection, enforceability, priority, or extent of the Prepetition Obligations or Prepetition Liens, or (B) otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims, or causes of action, objections, contests, or defenses with respect to the Prepetition Obligations or Prepetition Liens (a "Challenge Proceeding") and (b) there is a final, non-appealable order in favor of the plaintiff sustaining any Challenge Proceeding in any such timely filed adversary proceeding or contested matter; *provided* that any pleadings filed in connection with any Challenge Proceeding shall set forth with specificity the basis for such Challenge and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever waived, released, and barred.  For the avoidance of doubt, a party in interest's commencement of a timely Challenge Proceeding shall preserve the Challenge Period only with respect to such party in interest commencing the Challenge Proceeding.  If no such Challenge Proceeding is timely commenced, then:  (v) the Debtors' stipulations, admissions, agreements, and releases contained in this Final Order, including, without limitation, those contained in paragraph E of this Final Order, and the releases contained in clause (xii) thereof, shall be binding on all parties in interest, (w) any and all Challenge Proceedings by any party (including, without limitation, the Committee, any chapter 11 trustee, or any examiner and/or other estate representative appointed or elected in these Cases, and any chapter 7 trustee and/or examiner or other estate representative appointed or elected in any Successor Case) shall be deemed to be forever waived, released, and barred; (x) to the extent not theretofore repaid, the Prepetition Obligations shall constitute allowed claims, not subject to counterclaim, setoff, subordination, recharacterization, reduction, defense or avoidance, for all purposes in these Cases and any subsequent chapter 7 case; (y) the Prepetition Liens on the

Prepetition Collateral shall be deemed to have been, as of the Petition Date, and to be, legal, valid, binding, perfected and of the priority specified in paragraph E hereof, not subject to defense, counterclaim, recharacterization, subordination or avoidance; and (z) the obligations under the Prepetition Credit Agreements and the Prepetition Liens on the Prepetition Collateral shall not be subject to any other or further challenge by the Debtors, the Committee, or any other party in interest, each of whom shall be enjoined from seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any estate representative or a chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors with respect thereto). If any Challenge Proceeding is timely commenced, the stipulations, releases, agreements, and admissions contained in paragraph E of this Final Order, and the releases contained in clause (xii) thereof, shall nonetheless remain binding and preclusive (as provided in this paragraph) on the Debtors, the Committee, and any other person or entity, except as to any such findings and admissions that were expressly and successfully challenged in such Challenge Proceeding as set forth in a final, non-appealable order of a court of competent jurisdiction. Nothing in this Final Order vests or confers on any Person (as defined in the Bankruptcy Code), including the Committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, claims and defenses with respect to the Prepetition Credit Agreements or the Prepetition Liens on the Prepetition Collateral. Furthermore, upon a successful Challenge as against any Prepetition Secured Party, including that any of Prepetition Obligations are undersecured, the Court may fashion an appropriate remedy.

4.2   <u>Revolver Administrative Agent Support of Restructuring Transactions</u>. The Revolver Administrative Agent confirms and agrees that it shall:

(a)   support the Restructuring Transactions in the form of:

(i)       providing the Revolver Facility pursuant to the terms and conditions in the Revolver Loan Documents;

(ii)      not objecting to the Sale Transaction;

(iii)     not objecting to the Purchaser's right to credit bid the Prepetition Obligations under the Junior Credit Agreements and the DIP Obligations under the DIP Term Loan Agreement, including the Stalking Horse Credit Bid;

(iv)      not objecting to the Sale Motion, Bidding Procedures Order, or the order approving the Sale Transaction (the "Sale Order"); *provided* that, for the avoidance of doubt, none of the foregoing (a)(i)-(iv) shall in any way affect the Revolver Secured Parties' rights under the Revolver DIP Documents, including, *inter alia*, their consent and approval rights with respect to the form and substance of the Bidding Procedures Order and the Sale Order and the Revolver Secured Parties' right to file, and be heard regarding, an objection on that basis; and

(b)       not object to, impede, or take any action to interfere with:

(i)       the acceptance, implementation, or consummation of the Restructuring Transactions;

(ii)      the Purchaser's right to credit bid the Prepetition Obligations under the Junior Credit Agreements and the DIP Obligations under the DIP Term Loan Agreement, including the Stalking Horse Credit Bid; *provided* that, for the avoidance of doubt, none of the foregoing (b)(i)-(ii) shall in any way affect the Revolver Secured Parties' rights under the Revolver DIP Documents, including, *inter alia*, their consent and approval rights with respect to the form and substance of the Bidding Procedures Order and the Sale Order and the Revolver Secured Parties' right to file, and be heard regarding, an objection on that basis; and

(c)       use commercially reasonable efforts as a commercial lender to

obtain approvals for the Exit Revolving Facility (as defined in the Restructuring Support Agreement in effect as of the date hereof) and negotiate in good faith the definitive documentation for the Exit Revolving Facility by no later than the hearing on the bidding procedures contemplated by the Sale Motion.

Section 5.    <u>Other Rights and DIP Obligations.</u>

5.1    <u>No Modification or Stay of this Final Order</u>.  The DIP Agents and the DIP Lenders have acted in good faith in connection with the DIP Facilities and with the Interim Order and this Final Order, and their reliance on the Interim Order and this Final Order is in good faith, and the DIP Agents and the DIP Lenders are entitled to the protections of Bankruptcy Code section 364(e).

5.2    <u>Rights of Access and Information</u>.  The Debtors shall comply with the rights of access and information afforded to the DIP Secured Parties under the DIP Loan Documents and the Prepetition Secured Parties under the Prepetition Loan Documents.

5.3    <u>Power to Waive Rights; Duties to Third Parties</u>.

(a)    Subject to the terms of the DIP Loan Documents, the DIP Agents shall have the right (acting at the direction of the Required Lenders (as defined in the applicable DIP Loan Documents) if so required by the applicable DIP Loan Documents) to waive any of the terms, rights, and remedies provided or acknowledged in this Final Order that are in favor of the DIP Lenders (the "<u>DIP Lender Rights</u>"), and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any DIP Lender Right(s); *provided* that the DIP Agents shall obtain the prior written consent of the Prepetition First Lien Agent for any waiver that affects any rights of the Prepetition First Lien Secured Parties hereunder or any treatment of the Prepetition First Lien Obligations.  Any waiver by the DIP Agents of any DIP Lender Rights shall not be nor shall it constitute a continuing waiver unless

otherwise expressly provided therein. Any delay in or failure to exercise or enforce any DIP Lender Right shall neither constitute a waiver of such DIP Lender Right, subject the DIP Agents or any DIP Lender to any liability to any other party, nor cause or enable any party other than the Debtors to rely upon or in any way seek to assert as a defense to any obligation owed by the Debtors to the DIP Agents or any DIP Lender.

(b)     The Prepetition Agents shall have the right to waive any of the terms, rights, and remedies provided or acknowledged in this Final Order that are in favor of the Prepetition Lenders (the "Prepetition Lender Rights"), and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any Prepetition Lender Right(s). Any waiver by the Prepetition Agents of any Prepetition Lender Rights shall not be nor shall it constitute a continuing waiver unless otherwise expressly provided therein. Any delay in or failure to exercise or enforce any Prepetition Lender Right shall neither constitute a waiver of such Prepetition Lender Right, subject the Prepetition Agents or any Prepetition Lender to any liability to any other party, nor cause or enable any party other than the Debtors to rely upon or in any way seek to assert as a defense to any obligation owed by the Debtors to the Prepetition Agents or any Prepetition Lender.

5.4     No Unauthorized Disposition of Collateral; Use of Cash Collateral. The Debtors shall not sell, transfer, lease, encumber, use, or otherwise dispose of any portion of the DIP Collateral (including inventory and Cash Collateral), other than pursuant to the terms of this Final Order or as permitted by the DIP Loan Documents, and the Debtors are authorized to use Cash Collateral in a manner consistent with the Interim Order or this Final Order, as applicable, the Approved Budget and the DIP Loan Documents (including the permitted variances and exclusions to the Approved Budget permitted thereunder). Notwithstanding the foregoing, no

more than $100,000 of the proceeds of the DIP Facilities, DIP Collateral, or Cash Collateral may be used by the Committee in connection with the investigation of, but not litigation, or any objection or challenge to, the Prepetition Liens or Prepetition Obligations (the "Investigation Budget").

5.5    No Waiver.  The failure of the DIP Lenders or the Prepetition Lenders, as applicable, to seek relief or otherwise exercise their rights and remedies under the DIP Loan Documents, the DIP Facilities, the Prepetition Documents, the Prepetition Facilities, the Interim Order or this Final Order, as applicable, shall not constitute a waiver of any of the DIP Lenders' or Prepetition Lenders' rights hereunder, thereunder, or otherwise.  Notwithstanding anything herein, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair the rights of the DIP Lenders or the Prepetition Lenders under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the rights of the DIP Lenders and the Prepetition Lenders to: (a) request conversion of the Cases to cases under chapter 7, dismissal of the Cases, or the appointment of a trustee in the Cases; (b) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a plan; or (c) exercise any of the rights, claims, or privileges (whether legal, equitable, or otherwise) of the DIP Lenders or the Prepetition Lenders.

5.6    Maintenance of Collateral.  Unless the DIP Agents, acting at the direction of the applicable Required Lenders (as defined in the DIP Loan Documents), otherwise consent in writing, until (i) the payment in full or otherwise acceptable satisfaction of all DIP Obligations and (ii) the termination of the DIP Agents' and the DIP Lenders' obligations to extend credit under the DIP Facilities, the Debtors shall comply with the covenants contained in the DIP Loan Documents regarding the maintenance and insurance of the DIP Collateral.  Upon entry of the Interim Order

and to the fullest extent provided by applicable law, each of the DIP Agents (on behalf of the applicable DIP Lenders) shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.

5.7    Reservation of Rights.  The terms, conditions, and provisions of this Final Order are in addition to and without prejudice to the rights of each DIP Secured Party and Prepetition Secured Party, subject to the DIP Intercreditor Agreement and the Prepetition Intercreditor Agreement, as applicable, to pursue any and all rights and remedies under the Bankruptcy Code, the DIP Loan Documents, the Prepetition Documents, or any other applicable agreement or law, including, without limitation, rights to seek adequate protection and/or additional or different adequate protection, to seek relief from the automatic stay, to seek an injunction, to oppose any request for use of cash collateral or granting of any interest in the DIP Collateral or the Prepetition Collateral, as applicable, or priority in favor of any other party, to object to any sale of assets, and to object to applications for allowance and/or payment of compensation of professionals or other parties seeking compensation or reimbursement from the Estates.

5.8    Binding Effect.

(a)    All of the provisions of this the Interim Order, this Final Order, and the DIP Loan Documents, the DIP Obligations, all liens, and claims granted hereunder or thereunder in favor of each of the DIP Secured Parties and the Prepetition Secured Parties, and any and all rights, remedies, privileges, immunities and benefits in favor of each DIP Agent, DIP Lender, and Prepetition Secured Party set forth herein or therein, including, without limitation, the parties' acknowledgements, stipulations, and agreements in Section E of this Final Order, subject

to Section 4.1 hereof (without each of which the DIP Secured Parties would not have entered into or provided funds under the DIP Loan Documents and the Prepetition Secured Parties would not have consented to the priming of the Prepetition Liens as set forth herein and use of Cash Collateral provided for hereunder) provided or acknowledged in this Final Order, and any actions taken pursuant hereto or thereto, shall be effective and enforceable *nunc pro tunc* to the Petition Date immediately upon entry of this Final Order and not subject to any stay of execution or effectiveness (all of which are hereby waived), notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, and 9024, or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, shall continue in full force and effect, and shall survive entry of any other order or action, including, without limitation, any order which may be entered confirming any chapter 11 plan providing for the refinancing, repayment, or replacement of the DIP Obligations, converting one or more of the Cases to any other chapter under the Bankruptcy Code, dismissing one or more of the Cases, approving any sale of any or all of the DIP Collateral or the Prepetition Collateral, or vacating, terminating, reconsidering, revoking, or otherwise modifying this Final Order or any provision hereof.

(b)    No order dismissing one or more of the Cases under section 1112 or otherwise may impair the DIP Superpriority Claim, the Superpriority Claim, and the DIP Secured Parties' and the Prepetition Secured Parties' respective liens on and security interests in the DIP Collateral and the Prepetition Collateral, respectively, and all other claims, liens, adequate protections, and other rights granted pursuant to the terms of the Interim Order or this Final Order, as applicable, which shall continue in full force and effect notwithstanding such dismissal until the DIP Obligations and Prepetition Obligations are indefeasibly paid and satisfied in full. Notwithstanding any such dismissal, this Court shall retain jurisdiction for the purposes of

enforcing all such claims, liens, protections, and rights referenced in this paragraph and otherwise in this Final Order.

(c)     Except as set forth in this Final Order, in the event this Court modifies, reverses, vacates, or stays any of the provisions of this Final Order or any of the DIP Loan Documents following the Final Hearing, such modifications, reversals, vacatur, or stays shall not affect the (i) validity, priority, or enforceability of any DIP Obligations incurred prior to the actual receipt of written notice by the DIP Agents or Prepetition Agents, as applicable, of the effective date of such modification, reversal, vacatur, or stay, (ii) validity, priority, or enforceability of the DIP Liens or the DIP Superpriority Claims, or (iii) rights or priorities of any DIP Agent or DIP Lender pursuant to the Interim Order or this Final Order, as applicable, with respect to the DIP Collateral or any portion of the DIP Obligations.

(d)     This Final Order shall be binding upon the Debtors, the Prepetition Obligors, all parties in interest in the Cases, and their respective successors and assigns, including, without limitation, (i) any trustee or other fiduciary appointed in the Cases or any subsequently converted bankruptcy case(s) of any Debtor and (ii) any liquidator, receiver, administrator, or similar such person or entity appointed in any jurisdiction or under any applicable law.  This Final Order shall also inure to the benefit of the Debtors, DIP Agents, DIP Lenders, Prepetition Secured Parties, and each of their respective successors and assigns.

5.9     <u>Discharge</u>.  The DIP Obligations and the obligations of the Debtors with respect to adequate protection hereunder, including granting the Prepetition Term Loan Adequate Protection Liens and the Prepetition Term Loan Adequate Protection Claims, shall not be discharged by the entry of an order confirming any plan of reorganization in any of these Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations

have been indefeasibly paid in full in cash, on or before the effective date of such confirmed plan

of reorganization, or each of the DIP Secured Parties or the Prepetition Secured Parties, as

applicable, has otherwise agreed in writing.

        5.10   No Priming of Prepetition Obligations.  Notwithstanding anything to the

contrary herein, absent the express written consent of the Prepetition Lenders, no Debtor shall seek

authorization from this Court to obtain or incur any Indebtedness or enter into an alternative

financing facility other than the DIP Facilities (a "Competing DIP Facility") seeking to impose

liens on any Prepetition Collateral ranking on a *pari passu* or priming basis with respect to the

Prepetition Liens held by the Prepetition Lenders; *provided*, however, that nothing herein shall

preclude the Debtors from seeking authorization to incur any Indebtedness or enter into any

Competing DIP Facility that provides for the payment in full of the Prepetition Obligations.

        5.11   Section 506(c) Waiver.  No costs or expenses of administration which have

been or may be incurred in these Cases at any time (including, without limitation, any costs and

expenses incurred in connection with the preservation, protection, or enhancement of value by the

DIP Agents or the DIP Lenders upon the DIP Collateral, or by the Prepetition Secured Parties upon

the Prepetition Collateral, as applicable) shall be charged against any of the DIP Agents, DIP

Lenders, or Prepetition Secured Parties, or any of the DIP Obligations or Prepetition Obligations

or the DIP Collateral or the Prepetition Collateral pursuant to sections 105 or 506(c) of the

Bankruptcy Code or otherwise without the prior express written consent of the affected DIP

Secured Parties and/or affected Prepetition Secured Parties, in their sole discretion, and no such

consent shall be implied, directly or indirectly, from any other action, inaction, or acquiescence by

any such agents or creditors (including, without limitation, consent to the Carve Out or the

approval of any budget hereunder).

5.12    Section 552(b) Waiver.  The Prepetition Secured Parties are and shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and that the "equities of the case" exception under section 552(b) shall not apply to the DIP Agents, the DIP Lenders, the DIP Obligations, the Prepetition Secured Parties, and the Prepetition Obligations.

5.13    No Marshaling/Application of Proceeds.

(a)    In no event shall the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral, as applicable, and all proceeds shall be received and applied in accordance with the DIP Loan Documents and the Prepetition Credit Agreements, as applicable.

(b)    Notwithstanding anything to the contrary in this Final Order, but subject in all respects to the priorities set forth on **Exhibit D** hereto and the DIP Intercreditor Agreement, the respective DIP Obligations shall be satisfied from the proceeds of DIP Collateral constituting property of those Debtors located in the United States before looking to the Canadian Collateral; *provided, however*, that the foregoing shall not apply to the Canadian DIP Sub-Facility or the Prepetition ABL Canadian Sub-Facility.

5.14    [Reserved].

5.15    Payment of DIP Lender Fees and Expenses.

(a)    The Debtors shall pay (i) the reasonable and documented fees and expenses reimbursable under the DIP Facilities, the DIP Credit Agreements, or the other DIP Loan Documents, as applicable, whether incurred before or after the Petition Date and (ii) all reasonable and documented out-of-pocket costs and expenses of the DIP Secured Parties including, without limitation, reasonable and documented fees and disbursements of counsel in connection with the

enforcement or preservation of any rights under the DIP Facilities, the DIP Credit Agreements, or the other DIP Loan Documents.

(b)    Under no circumstances shall professionals for any of the DIP Secured Parties be required to comply with the U.S. Trustee fee guidelines or otherwise be required to file a fee or retention application with the Court; *provided* that any such professionals retained by the DIP Secured Parties shall comply with the requirements set forth in Section 2.4(d).  The Debtors shall promptly pay, and/or the DIP Agents are hereby authorized to make an advance under the DIP Loan Documents to timely pay, the submitted invoices for any of the DIP Secured Parties in accordance with the procedures set forth in Section 2.4(d).

5.16    <u>Limits on Lender Liability</u>.

(a)    In determining to make any loan under the DIP Credit Agreements, authorizing the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Final Order or the DIP Loan Documents, the DIP Agents, the DIP Lenders, and the Prepetition Secured Parties shall not be deemed to (i) be in control of the operations of the Debtors or to be acting as a "controlling person," "responsible person," or "owner or operator" with respect to the operation or management of the Debtors, so long as the such party's actions do not constitute, within the meaning of 42 U.S.C. § 9601(20)(F), actual participation in the management or operational affairs of a facility owned or operated by a Debtor, or otherwise cause liability to arise to the federal or state government or the status of responsible person or managing agent to exist under applicable law (as such terms, or any similar terms, are used in the Internal Revenue Code, WARN Act, the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq., as amended, or any similar federal or state statute) or (ii) owe any fiduciary duty to any of the Debtors.  Furthermore, nothing in the

Interim Order or this Final Order shall in any way be construed or interpreted to impose or allow

the imposition upon any of the DIP Secured Parties or the Prepetition Secured Parties of any

liability for any claims arising from the prepetition or postpetition activities of any of the Debtors

and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

(b)      Nothing in this Final Order or the DIP Loan Documents shall permit

the Debtors to violate 28 U.S.C. § 959(b).

(c)      As to the United States, its agencies, departments, or agents, nothing

in this Final Order or the DIP Loan Documents shall discharge, release or otherwise preclude any

valid right of setoff or recoupment that any such entity may have.

5.17    Release.  Each of the Debtors, their Estates, the Borrowers, the Guarantors,

and the Prepetition Obligors, on their own behalf and on behalf of each of their past, present and

future predecessors, successors, heirs, subsidiaries, and assigns, hereby forever, unconditionally,

permanently, and irrevocably release, discharge, and acquit each of the DIP Secured Parties, and

each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling

persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals,

officers, directors, members, managers, shareholders, and employees, past, present and future, and

their respective heirs, predecessors, successors and assigns (collectively, the "Postpetition

Released Parties") of and from any and all claims, controversies, disputes, liabilities, obligations,

demands, damages, expenses (including, without limitation, attorneys' fees), debts, liens, actions,

and causes of action of any and every nature whatsoever, whether arising in law or otherwise, and

whether known or unknown, matured or contingent, arising under, in connection with, or relating

to the DIP Facilities or the DIP Loan Documents, including, without limitation, (a) any so-called

"lender liability" or equitable subordination claims or defenses, (b) any and all "claims" (as

defined in the Bankruptcy Code) and causes of action arising under the Bankruptcy Code, and (c) any and all offsets, defenses, claims, counterclaims, set off rights, objections, challenges, causes of action, and/or choses in action of any kind or nature whatsoever, whether arising at law or in equity, including any recharacterization, recoupment, subordination, avoidance, or other claim or cause of action arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state, federal, or foreign law, including, without limitation, any right to assert any disgorgement or recovery, in each case, with respect to the extent, amount, validity, enforceability, priority, security, and perfection of any of the DIP Obligations, the DIP Loan Documents, or the DIP Liens, and further waive and release any defense, right of counterclaim, right of setoff, or deduction to the payment of the DIP Obligations that the Debtors now have or may claim to have against the Postpetition Released Parties, arising under, in connection with, based upon, or related to any and all acts, omissions, conduct undertaken, or events occurring prior to entry of this Final Order (each and all of the foregoing, the "Postpetition Released Claims").  Notwithstanding the foregoing, this Section 5.17 shall not apply to, and the Releasing Parties shall not release the Postpetition Released Parties from, any Postpetition Released Claims that a court of competent jurisdiction finally determines to have resulted from the gross negligence or willful misconduct of such Postpetition Released Party.

5.18    Survival.  The provisions of this Final Order, the validity, priority, and enforceability of the DIP Liens, the DIP Superpriority Claims, the Prepetition Term Loan Adequate Protection Liens, the Superpriority Claims, and any actions taken pursuant hereto shall survive, and shall not be modified, impaired or discharged by, entry of any order that may be entered (a) confirming any plan of reorganization in any of these Cases, (b) converting any or all of these Cases to a case under chapter 7 of the Bankruptcy Code, (c) dismissing any or all of these

Cases, (d) terminating the joint administration of these Cases or any other act or omission, (e) approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Loan Documents), or (f) pursuant to which the Court abstains from hearing any of these Cases. The terms and provisions of this Final Order, including the claims, liens, security interests, and other protections (as applicable) granted to the DIP Agents, the DIP Lenders, and the Prepetition Secured Parties pursuant to the Interim Order or this Final Order, notwithstanding the entry of any other order, shall continue in any of these Cases, following dismissal of any of these Cases or any Successor Cases, and shall maintain their priority as provided by the Interim Order and this Final Order until (i) in respect of the DIP Facilities, all of the DIP Obligations, pursuant to the DIP Loan Documents, the Interim Order, and this Final Order, have been indefeasibly paid in full in cash (such payment being without prejudice to any terms of provisions contained in the DIP Facilities which survive such discharge by their terms) and all commitments to extend credit under the DIP Facilities are terminated, and (ii) in respect of the Prepetition Obligations, all of the adequate protection obligations owed to the Prepetition Secured Parties provided for in the Interim Order, this Final Order, and under the Prepetition Credit Agreements have been indefeasibly paid in full in cash.

5.19    <u>Proofs of Claim</u>. None of the Prepetition Secured Parties shall be required to file proofs of claim in any of these Cases or subsequent cases of any of the Debtors under any chapter of the Bankruptcy Code, and the Debtors' Stipulations in this Order shall be deemed to constitute a timely filed proof of claim against the applicable Debtor(s). Notwithstanding the foregoing, any Prepetition Agent (on behalf of itself and the Prepetition Lenders) is hereby authorized and entitled, in its discretion, but not required, to file (and amend and/or supplement, as applicable) a master proof of claim for any claims of any of the Prepetition Secured Parties

arising from the Prepetition Credit Agreements or in respect of the Prepetition Obligations; *provided*, *however*, that nothing in this Order shall waive the right of any Prepetition Lender to file its own proof of claim against any of the Debtors.

      5.20   No Third Party Rights. Except as specifically provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holders, or any direct, indirect, or incidental beneficiary.

      5.21   No Avoidance.  No obligations incurred or payments or other transfers made by or on behalf of the Debtors on account of the DIP Facilities shall be avoidable or recoverable from the DIP Agents or the DIP Lenders under any section of the Bankruptcy Code, or any other federal, state, or other applicable law, provided that nothing within this paragraph is intended to limit or curtail the provisions of section 4.1 hereof, with respect to the Prepetition Obligations.

      5.22   Reliance on Order.  All postpetition advances under the DIP Loan Documents are made in reliance on the Interim Order or this Final Order, as applicable.

      5.23   Payments Free and Clear.  Any and all payments or proceeds remitted to the DIP Agents on behalf of the applicable DIP Secured Parties or, subject to Section 4.1 hereof, the Prepetition Agents on behalf of the applicable Prepetition Secured Parties, pursuant to the provisions of the Interim Order or this Final Order, as applicable, any subsequent order of this Court or the DIP Loan Documents, shall, subject to the terms of this Section 5.23, be irrevocable, received free and clear of any claims, charge, assessment, or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code or section 552(b) of the Bankruptcy Code, whether asserted or assessed

by, through or on behalf of the Debtors, and in the case of payments made or proceeds remitted after the delivery of a Trigger Notice, subject to the Carve Out in all respects.

5.24    Limited Effect.  In the event of a conflict between the terms and provisions of any of the DIP Loan Documents (including the DIP Intercreditor Agreement) and this Final Order, the terms and provisions of this Final Order shall govern.  In the event of a conflict between the terms and provisions of the Interim Order and this Final Order, the terms and provisions of this Final Order shall govern.  With respect to the Revolver Facility, (a) the rights and obligations of the Revolver Secured Parties, on the one hand, and the Loan Parties (as defined in the Revolver DIP Agreement), on the other hand, under the Revolver Facility shall be governed solely and exclusively by the terms and conditions of this Final Order and the Revolver DIP Documents and (b) for the avoidance of doubt, (i) the Restructuring Support Agreement shall not bind or commit any of the Revolver Secured Parties that do not execute such document in any way, and (ii) in the event of any conflict between the terms and conditions of this Final Order and any Revolver DIP Document, on the one hand, and the terms and conditions of the Restructuring Support Agreement, on the other hand, with respect to the Revolver Facility, the terms and conditions of this Final Order and the applicable Revolver DIP Documents shall govern.

5.25    Headings.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Final Order.

5.26    Bankruptcy Rules.  The requirements of Bankruptcy Rules 4001, 6003, and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

5.27    General Authorization. The Debtors, the DIP Secured Parties, and the Prepetition Secured Parties are authorized to take any and all actions necessary to effectuate the relief granted in this Final Order.

5.28   <u>Retention of Exclusive Jurisdiction</u>.   This Court shall retain exclusive jurisdiction and power with respect to all matters arising from or related to the implementation or interpretation of the Interim Order, this Final Order, the DIP Credit Agreements, and the other DIP Loan Documents.

**\*\*\* END OF DOCUMENT \*\*\***

Prepared and presented by:

*/s/ Sarah R. Borders*
Sarah R. Borders
Georgia Bar No. 625752
Britney Baker
Georgia Bar No. 610649
**KING & SPALDING LLP**
1180 Peachtree Street NE
Atlanta, Georgia 30309
Telephone: (404) 572-4600
Email: sborders@kslaw.com
Email: bbaker@kslaw.com
-and-

Kelley A. Cornish (admitted *pro hac vice*)
New York Bar No. 1930767
Brian S. Hermann (admitted *pro hac vice*)
New York Bar No. 2810232
**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Email: kcornish@paulweiss.com
Email: bhermann@paulweiss.com

*Proposed Counsel for the Debtors in Possession*

## EXHIBIT A

**Revolver DIP Agreement**

*[Intentionally omitted]*

# **EXHIBIT B**

### **DIP Term Loan Agreement**

*[Intentionally omitted]*

## EXHIBIT C

**Initial DIP Budget**

*[Intentionally omitted]*

## EXHIBIT D

### Lien Priority

| Order of Priority | Prepetition ABL Priority Collateral (whether in existence on the Petition Date or thereafter arising) | Prepetition Term Loan Priority Collateral (whether in existence on the Petition Date or thereafter arising) | Unencumbered Assets | Canadian Collateral |
|---|---|---|---|---|
| 1st | Carve Out | Carve Out | Carve Out | Carve Out and CCAA Charges |
| 2nd | Revolver Facility | Prepetition First Lien Term Loan Facility (and adequate protection with respect thereto) | Revolver Facility<br><br>Adequate protection lien for Prepetition First Lien Secured Parties under Prepetition First Lien Term Loan Facility | Revolver Facility |
| 3rd | Prepetition First Lien Term Loan Facility (and adequate protection with respect thereto) | DIP Term Loan Facility | DIP Term Loan Facility | DIP Term Loan Facility |
| 4th | DIP Term Loan Facility | Prepetition 1.5 Lien Term Loan Facility (and adequate protection with respect thereto) | Adequate protection lien for Prepetition 1.5 Lien Secured Parties under Prepetition 1.5 Lien Term Loan Facility | |
| 5th | Prepetition 1.5 Lien Term Loan Facility (and adequate protection with respect thereto) | Prepetition Second Lien Term Loan Facility (and adequate protection with respect thereto) | Adequate protection lien for Prepetition Second Lien Secured Parties under Prepetition Second Lien Term Loan Facility | |
| 6th | Prepetition Second Lien Term Loan Facility (and adequate protection with respect thereto) | Revolver Facility | | |