## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| JACK COOPER VENTURES, INC., *et al.*,[1] | ) | Case No. 19-62393 (PWB) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## NOTICE OF FILING OF (A) MODIFIED PROPOSED ORDER (I) APPROVING THE SALE OF THE ACQUIRED ASSETS FREE AND CLEAR OF CLAIMS, LIENS AND ENCUMBRANCES; (II) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF, AND (B) STIPULATION OF SETTLEMENT

**PLEASE TAKE NOTICE** that on October 9, 2019, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed the proposed *Order (I) Approving the Sale of the Acquired Assets Free and Clear of Claims, Liens and Encumbrances; (II) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* (the "Initial Proposed Order"). [Docket No. 362, Exhibit A].

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file a modified version of the Initial Proposed Order (the "Modified Proposed Order"), attached hereto as **Exhibit A**.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Jack Cooper Ventures, Inc. (0805); Jack Cooper Diversified, LLC (9414); Jack Cooper Enterprises, Inc. (3001); Jack Cooper Holdings Corp. (2446); Jack Cooper Transport Company, Inc. (3030); Auto Handling Corporation (4011); CTEMS, LLC (7725); Jack Cooper Logistics, LLC (3433); Auto & Boat Relocation Services, LLC (9095); Axis Logistic Services, Inc. (2904); Jack Cooper CT Services, Inc. (3523); Jack Cooper Rail and Shuttle, Inc. (7801); Jack Cooper Investments, Inc. (6894); North American Auto Transportation Corp. (8293); Jack Cooper Transport Canada Inc. (8666); Jack Cooper Canada GP 1 Inc. (7030); Jack Cooper Canada GP 2 Inc. (2373); Jack Cooper Canada 1 Limited Partnership (3439); and Jack Cooper Canada 2 Limited Partnership (7839). The location of the Debtors' corporate headquarters and service address is: 630 Kennesaw Due West Road NW, Kennesaw, Georgia 30152.

**PLEASE TAKE FURTHER NOTICE** that attached as Exhibit 1 to the Modified Proposed Order is a Stipulation of Settlement among the Debtors, the Committee, the Solus Entities and the other Parties thereto.

**PLEASE TAKE FURTHER NOTICE** that a redline reflecting the modifications between the Initial Proposed Order and the Modified Proposed Order is attached hereto as **Exhibit B**.

**PLEASE TAKE FURTHER NOTICE** that the hearing on this matter will be held before the Honorable Paul W. Bonapfel, United States Bankruptcy Judge, Courtroom 1401, 75 Ted Turner Drive, SW, Atlanta, Georgia 30303 on **October 11, 2019 at 10:00 a.m. (prevailing Eastern Time)**.

**PLEASE TAKE FURTHER NOTICE** that a copy of each document filed in the above-captioned chapter 11 cases can be viewed on the Court's website at www.ganb.uscourts.gov and the website of the Debtors' notice and claims agent, Prime Clerk LLC, at https://cases.primeclerk.com/jackcooper/. Further information may be obtained by calling Prime Clerk LLC (844) 234-1463 (toll-free) or (917) 994-8409 (toll).

*[Remainder of page intentionally left blank.]*

2

Dated: October 10, 2019
     Atlanta, Georgia

/s/ Sarah R. Borders
Sarah R. Borders
Georgia Bar No. 610649
Leia Clement Shermohammed
Georgia Bar No. 972711
Britney Baker
Georgia Bar No. 625752
**KING & SPALDING LLP**
1180 Peachtree Street NE
Atlanta, Georgia 30309
Telephone: (404) 572-4600
Email: sborders@kslaw.com
Email: lshermohammed@kslaw.com
Email: bbaker@kslaw.com

-and-

Kelley A. Cornish (admitted *pro hac vice*)
New York Bar No. 1930767
Brian S. Hermann (admitted *pro hac vice*)
New York Bar No. 2810232
**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Email: kcornish@paulweiss.com
Email: bhermann@paulweiss.com

*Counsel for the Debtors in Possession*

## **Exhibit A**

Modified Proposed Order

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| JACK COOPER VENTURES, INC., *et al.*,[1] | ) Case No. 19-62392 (PWB) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) Re Docket Nos. 21, 224 |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Jack Cooper Ventures, Inc. (0805); Jack Cooper Diversified, LLC (9414); Jack Cooper Enterprises, Inc. (3001); Jack Cooper Holdings Corp. (2446); Jack Cooper Transport Company, Inc. (3030); Auto Handling Corporation (4011); CTEMS, LLC (7725); Jack Cooper Logistics, LLC (3433); Auto & Boat Relocation Services, LLC (9095); Axis Logistic Services, Inc. (2904); Jack Cooper CT Services, Inc. (3523); Jack Cooper Rail and Shuttle, Inc. (7801); Jack Cooper Investments, Inc. (6894); North American Auto Transportation Corp. (8293); Jack Cooper Transport Canada Inc. (8666); Jack Cooper Canada GP 1 Inc. (7030); Jack Cooper Canada GP 2 Inc. (2373); Jack Cooper Canada 1 Limited Partnership (3439); and Jack Cooper Canada 2 Limited Partnership (7839). The location of the Debtors' corporate headquarters and service address is: 630 Kennesaw Due West Road NW, Kennesaw, Georgia 30152.

**ORDER (I) APPROVING THE SALE OF THE ACQUIRED ASSETS FREE AND CLEAR OF CLAIMS, LIENS, INTERESTS AND ENCUMBRANCES; (II) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF**

Upon the motion [Docket No. 21] (the "Motion")[2] of the Debtors, dated August 6, 2019, for, among other things, entry of an order (this "Order"): (I) approving the sale of the Acquired Assets (the "Sale Transaction") pursuant to the Stalking Horse APA, as amended, and which for purposes of this Order shall include all exhibits, schedules and ancillary documents related thereto, including the Transaction Documents and the Escrow Agreement, free and clear of all claims, liens, interests and encumbrances (other than Assumed Liabilities and Permitted Encumbrances); (II) authorizing the assumption and assignment of certain executory contracts and unexpired leases (the "Assumed Contracts") and the assumption of the Assumed Liabilities, each as more fully described in the Stalking Horse APA; and (III) granting related relief, including as provided in the Committee Settlement (as defined below); and the Court having held a hearing on October 11, 2019 (the "Sale Hearing") to approve the Sale Transaction; and the Court having reviewed and considered the relief sought in the Motion with respect to the Sale Transaction, the declarations submitted in support of the Motion, all objections to the Motion and the Debtors' reply thereto, and the arguments of counsel made, and the testimony and evidence proffered or adduced, at the Sale Hearing; and all parties in interest having been heard or having had the opportunity to be heard regarding the Sale Transaction and the relief requested in this Order; and due and sufficient notice of the Sale Hearing and the relief sought therein having been given under the particular circumstances and in accordance with the Bidding Procedures Order; and it appearing that no other

---

[2]    Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the Motion, the Bidding Procedures Order (defined below) or the Stalking Horse APA (defined below), as applicable.

or further notice need be provided; and it appearing that the relief requested in the Motion with respect to the Sale Transaction is in the best interests of the Debtors, their estates, their creditors and other parties in interest; and upon the record of the Sale Hearing and these chapter 11 cases (the "Chapter 11 Cases"), and after due deliberation thereon, and good cause appearing therefor, it is hereby

**FOUND, CONCLUDED AND DETERMINED THAT:**[3]

A.    This Court has jurisdiction over the Motion and the Sale Transaction pursuant to 28 U.S.C. §§ 157 and 1334 and may enter a final order on the Motion consistent with Article III of the United States Constitution.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.  The legal predicates for the relief requested in the Motion are Bankruptcy Code sections 105, 363, 364, 365 and 503.  Such relief is also warranted pursuant to Bankruptcy Rules 2002, 6004, 6006, 9006, 9007, and 9014.

B.    A reasonable opportunity to object or to be heard regarding the requested relief has been afforded to all interested parties and entities.  Certain parties filed objections to the Motion (each, an "Objection" and, collectively, the "Objections") as more particularly identified and described in Exhibit B to the *Debtors' Omnibus Reply In Support of Entry of the Order Approving the Sale of the Acquired Assets Free and Clear of Claims, Liens and Encumbrances; (II) Approving*

---

[3]    The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. Furthermore, any findings of fact or conclusions of law made by the Court on the record at the close of the Sale Hearing are incorporated herein pursuant to Fed. R. Bank. P. 7052.

*the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (III)*
*Granting Related Relief* [Docket No. 362].

C.      On August 22, 2019, the Debtors entered into the Stalking Horse APA subject to
higher or better offers.

D.      On September 3, 2019, the Court entered an order [Docket No. 224] (the "<u>Bidding</u>
<u>Procedures Order</u>"), which, among other things, (i) authorized the Debtors' entry into the Stalking
Horse APA, (ii) approved the Bidding Procedures, (iii) approved the Expense Reimbursement,
(iv) scheduled the Bid Deadline, the Auction, the Sale Objection Deadline, and the Sale Hearing,
(v) approved the form and manner of notice with respect to the Sale (the "<u>Sale Notice</u>"), and
(vi) approved the Assumption and Assignment Procedures and the form and manner of the Cure
Notice in connection thereto.  In accordance with the Bidding Procedures Order, the Stalking
Horse APA was deemed a Qualified Bid and the Buyer was eligible to participate in the Auction
as a Qualified Bidder. The Bidding Procedures were substantively and procedurally fair to all
parties and all potential bidders and afforded notice and a full, fair and reasonable opportunity for
any person to make a higher or otherwise better offer to purchase the Acquired Assets.  The Debtors
conducted the sale process without collusion and in accordance with the Bidding Procedures. The
Debtors and their professionals adequately marketed the Acquired Assets and conducted the
marketing and sale process in compliance with the Bidding Procedures and the Bidding Procedures
Order. Based upon the record of these proceedings, creditors and other parties in interest and
prospective purchasers were afforded a reasonable and fair opportunity to bid for the Acquired
Assets. The Debtors and their professionals conducted the sale process in compliance with the
Bidding Procedures Order, and afforded potential purchasers a full, fair and reasonable opportunity

to make a higher or otherwise better offer for the Acquired Assets than that reflected in the Stalking Horse APA.

E.      On October 10, 2019, the Debtors, the Committee, the Buyer, Wells Fargo, Cerberus, and Wilmington Trust National Association entered into that certain Stipulation of Settlement (the "Settlement Stipulation" and the "Committee Settlement," as applicable), a copy of which is attached hereto as **Exhibit 1**, pursuant to which the parties thereto consensually resolved all of the Committee's issues in relation to the Challenge Period, Sale Motion, and other matters set forth therein. The effectiveness of the Committee Settlement is conditioned upon entry of this Order, and the Committee's support for the Sale Transaction is conditioned upon approval of the Committee Settlement.

F.      The Debtors have articulated good and sufficient business reasons for the Court to authorize (i) the Debtors' entry into the Stalking Horse APA and consummation of the Sale Transaction including the sale of the Acquired Assets to the Stalking Horse Bidder or any Buyer Designee (collectively, the "Buyer") pursuant to the terms of the Stalking Horse APA, (ii) the assumption and assignment of the Assumed Contracts as set forth herein and in the Stalking Horse APA, (iii) the Committee Settlement, and (iv) the assumption of the Assumed Liabilities as set forth herein and in the Stalking Horse APA.  Entry into the Stalking Horse APA and the Committee Settlement, and consummation of the Sale Transaction are sound exercises of business judgment, and such acts are in the best interests of the Debtors, their estates and creditors, and all parties in interest.

G.      The Debtors have articulated good and sufficient business reasons justifying the sale of the Acquired Assets to the Buyer.  Additionally: (i) the Debtors conducted a robust

marketing process to sell the Acquired Assets and the Stalking Horse APA constitutes the highest and best offer for the Acquired Assets; (ii) the Bidding Procedures utilized were designed to yield the highest or otherwise best bids for the Acquired Assets; (iii) the Stalking Horse APA and the closing of the Sale Transaction present the best opportunity to realize the highest value for the Acquired Assets; (iv) there is risk of deterioration of the value of the Acquired Assets if the Sale Transaction is not consummated promptly; (v) the Stalking Horse APA and the sale of the Acquired Assets to the Buyer provide greater value to the Debtors' estates than would be provided by any other presently available alternative; and (vi) based upon the Committee Settlement, the Committee supports consummation of the Sale Transaction.  Good and sufficient reasons for approval of the Stalking Horse APA and the Sale Transaction have been articulated by the Debtors. The Debtors have demonstrated compelling circumstances and a good, sufficient and sound business purpose for the sale outside: (i) the ordinary course of business, pursuant to Bankruptcy Code section 363(b); and (ii) a plan of reorganization, in that, among other things, the immediate consummation of the Sale Transaction is necessary and appropriate to maximize the value of the Debtors' estates.  To maximize the value of the Acquired Assets and preserve the viability of the operations to which the Acquired Assets relate, it is essential that the Sale Transaction occur within the time constraints set forth in the Stalking Horse APA and the Restructuring Support Agreement. Time is of the essence in consummating the Sale Transaction.

H.      Sound business justifications also exist for the establishment of the Professional Fees Escrow Account and the Wind-Down Escrow Account (together, the "Escrows") pursuant to the Escrow Agreement as provided in Section 4.2 of the Stalking Horse APA.  The Escrows will avoid a freefall shutdown of the Debtors' remaining estates, provide for, among other things, the

6

payment of accrued and unpaid professional fees and expenses in accordance with the Stalking Horse APA, the implementation of the Committee Settlement, the payment of payroll, withholding taxes, and other related expenses accrued and unpaid as of the Closing Date, and provide a mechanism to assist in the orderly and responsible wind-down of the Debtors' estates.

I.      As evidenced by the affidavits of service [Docket Nos. 45, 120, 128, 164, 166, 254, 262, 311, 313 and 342] and publication [Docket No. 264] previously filed with the Court, and based on the representations of counsel at the Sale Hearing, (i) proper, timely, adequate and sufficient notice of the Motion, the Sale Hearing, the Sale Transaction, the Assumption and Assignment Procedures and the assumption and assignment of the Assumed Contracts and the applicable Cure Amounts (as defined herein) has been provided in compliance with the Bidding Procedures Order and in accordance with Bankruptcy Code sections 102(1), 363, and 365, and Bankruptcy Rules 2002, 4001, 6004, 6006, 9006, 9007 and 9014, (ii) such notice was good and sufficient, and appropriate under the particular circumstances, and (iii) no other or further notice of the Motion, the Sale Hearing, the Sale Transaction, the assumption and assignment of the Assumed Contracts or the Cure Amounts is or shall be required.  With respect to entities whose identities were not reasonably ascertained by the Debtors, publication of the Sale Notice was made in the *USA Today (National Edition)* on September 10, 2019.  Such notice was sufficient and reasonably calculated under the circumstances to reach all known and unknown holders of claims and interests and non-Debtor counterparties to executory contracts.

J.      The Debtors' marketing process with respect to the Sale afforded a full, fair and reasonable opportunity for any person or entity to make a higher or otherwise better offer.  No other person or entity or group of entities or persons submitted a Qualified Bid prior to the Bid

Deadline.  Therefore, in accordance with the Bidding Procedures Order, no Auction was conducted

and the Debtors determined that the Stalking Horse APA constituted the highest and best offer and

selected the Stalking Horse APA as the Successful Bid.  The Debtors therefore determined in a

valid and sound exercise of their business judgment, and in accordance with the Bidding

Procedures and Bid Procedures Order, that the highest and best Qualified Bid for the Acquired

Assets is that of the Buyer and that the Stalking Horse APA will provide a greater recovery for the

Debtors' estates than would be provided by any other available alternative.  The Stalking Horse

APA was negotiated and is undertaken by the Debtors and the Buyer at arm's-length, without

collusion or fraud, and in good faith within the meaning of Bankruptcy Code section 363(m).  The

Buyer is not an "insider" of any of the Debtors as that term is defined by Bankruptcy Code section

101(31).  The Buyer recognized that the Debtors were free to deal with any other party interested

in acquiring the Acquired Assets, complied with the Bidding Procedures Order, and agreed to, and

did, subject its bid to the competitive Bidding Procedures approved in the Bidding Procedures

Order.  All releases and payments to be made by the Buyer and other agreements or arrangements

entered into by the Buyer in connection with the Sale Transaction, including the Committee

Settlement, have been disclosed.  The Buyer has not violated Bankruptcy Code section 363(n) by

any action or inaction on its part.  As a result of the foregoing, the Buyer is entitled to the

protections of Bankruptcy Code section 363(m), including in the event this Order or any portion

thereof is reversed or modified on appeal, and otherwise has proceeded in good faith in all respects

in connection with these cases.

K.      Pursuant to the Bidding Procedures, applicable law, including Bankruptcy Code

sections 363(b) and 363(k), and in accordance with the DIP Financing Orders, the Buyer (on behalf

of the Junior Term Loan Lenders (as defined in the RSA)) was authorized to credit bid for the

Acquired Assets, the obligations arising under the Junior Credit Agreements, and the DIP Term

Loan Credit Agreement, as well as adequate protection obligations granted pursuant to the DIP

Financing Orders, in each case, as contemplated by the Stalking Horse APA and the Bidding

Procedures Order.  Pursuant to the Stalking Horse APA, the Buyer credit bid (the "Credit Bid and

Release") a portion of such obligations, with the balance of the Purchase Price being paid in cash

and the assumption of liabilities.  The Credit Bid and Release, plus the assumption of the Assumed

Liabilities and the cash consideration provided for under the Stalking Horse APA, was a valid and

proper offer pursuant to the Bidding Procedures Order and Bankruptcy Code sections 363(b) and

363(k).  There is no cause to limit the amount of the Credit Bid and Release pursuant to section

363(k) of the Bankruptcy Code.

      L.      The Acquired Assets sought to be transferred and/or assigned, as applicable, by the

Debtors to the Buyer pursuant to the Stalking Horse APA are property of the Debtors' estates and

title thereto is vested in the Debtors' estates.  The Debtors:  (i) have full power and authority to

execute the Stalking Horse APA and all other documents contemplated thereby, (ii) have all of the

power and authority necessary to consummate the transactions contemplated by the Stalking Horse

APA, and (iii) have taken all corporate action necessary to authorize and approve the Stalking

Horse APA, the sale of the Acquired Assets, and all other actions required to be performed by the

Debtors in order to consummate the transactions contemplated in the Stalking Horse APA.  No

consents or approvals, other than those already obtained or expressly provided for in the Stalking

Horse APA or this Order, are required for the Debtors to consummate the Sale Transaction.

M.    The total consideration provided by the Buyer for the Acquired Assets represents the highest and best offer received by the Debtors, and the Purchase Price constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act and any other applicable laws, and may not be avoided under Bankruptcy Code section 363(n) or any provision of chapter 5 of the Bankruptcy Code or under any other law of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law. The Exit Facilities are being extended in good faith and for fair value and, therefore, the obligations thereunder and the liens granted therein are valid and binding and may not be avoided under the Bankruptcy Code, the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and any other applicable laws.  No other person or entity or group of persons or entities has offered to purchase the Acquired Assets for an amount that would provide greater economic value to the Debtors' estates than the Buyer.  The Debtors' determination that the Stalking Horse APA constitutes the highest and best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtors' business judgment.  The Court's approval of the Motion, the Sale Transaction, the Committee Settlement, and the Stalking Horse APA is in the best interests of the Debtors, their estates and creditors and all other parties in interest.

N.    The Buyer would not have entered into the Stalking Horse APA and would not consummate the Sale Transaction if the sale of the Acquired Assets to the Buyer were not free and clear of all claims, liens, interests and encumbrances (other than Permitted Encumbrances and

Assumed Liabilities)[4] pursuant to Bankruptcy Code section 363(f) or if the Buyer would, or in the future could, be liable for any of such claims, liens, interests and encumbrances.  Unless expressly included in the Assumed Liabilities and Permitted Encumbrances, neither the Buyer nor any of the Buyer's affiliates (including any subsidiary of Buyer, any person or entity that could be treated as a single employer with the Buyer pursuant to Section 4001(b) the Employee Retirement Income Security Act of 1974, as amended ("ERISA") or Section 414(b), (c), (m) or (o) of the  Internal Revenue Code of 1986, as amended ("IRC"), Solus Alternative Asset Management LP, any of its managed funds or accounts, any of its investors, shareholders, owners, representatives, officers, limited or general partners, directors, or agents or affiliates thereof (collectively, the "Buyer Group")) shall be responsible for any claims, liens, liabilities, obligations, interests and encumbrances, including in respect of the following:  (i) any labor or employment agreements (excluding, with respect to the Buyer, the Buyer's obligations under any Collective Bargaining Agreement and Key Employment Agreements that are assumed by the Buyer); (ii) any mortgages, deeds of trust and security interests; (iii) any intercompany loans and receivables between one or more of the Sellers and any Debtor; (iv) any pension, multiemployer plan (as such term is defined in Section 3(37) or Section 4001(a)(3) of ERISA), health or welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of any of the Debtors or any multiemployer plan to which the Debtors have at any time contributed to or had any liability or potential liability, except, for the avoidance of doubt

---

[4]    For the avoidance of doubt, "Assumed Liabilities" includes those obligations under the Prepetition ABL Facility, the DIP ABL Facility and the Prepetition First Lien Term Loan Facility, in each case that are being amended, amended and restated, supplemented or replaced by the Exit Facilities. In addition, "Permitted Encumbrances" includes the liens on and security interests in the Acquired Assets held by the agents under the Prepetition ABL Facility, the DIP ABL Facility, and the Prepetition First Lien Term Loan Facility, in each case that are continuing under the Exit Facilities.

11

with respect to the Buyer, the Buyer's obligations under the Hybrid Plan Participation Agreement that was approved by the Court upon entry of the *Order Authorizing the Debtors to Enter Into the Pension Plan Agreement and Release* [Docket No. __]; (v) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) ERISA, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the IRC and of any similar state law (collectively, "COBRA"), (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, or (k) any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors; (vi) any liabilities arising under any Environmental Laws with respect to any assets owned or operated by any of the Debtors or any corporate predecessor of any of the Debtors at any time prior to the Closing Date; (vii) any bulk sales or similar law; (viii) any tax statutes or ordinances, including, without limitation, the IRC; and (ix) any Excluded Liabilities.  There is no better available alternative to maximize the value of the Acquired Assets than the Sale Transaction with the Buyer.  The Sale Transaction contemplated by the Stalking Horse APA is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

O.    The Debtors may sell the Acquired Assets free and clear of all claims, liens, interests and encumbrances (other than Assumed Liabilities and Permitted Encumbrances) because, with respect to each creditor asserting a claim, lien, interest or encumbrance, one or more of the standards set forth in Bankruptcy Code section 363(f)(1)-(5) has been satisfied. Those holders of claims, liens, interests or encumbrances that did not object to or that withdrew their objections to the sale of the Acquired Assets or the Motion, are deemed to have consented to the Motion and the Sale Transaction pursuant to Bankruptcy Code section 363(f)(2). Those holders of claims, liens, interests, or encumbrances that did object fall within one or more of the other subsections of Bankruptcy Code section 363(f) or are adequately protected. The Revolving Lenders' consent to the Motion and the Sale Transaction is conditioned upon the payment in full in cash (whether pursuant to the Exit Revolving Facility or otherwise), by no later than the Closing Date, of all due and payable Obligations (as defined in the Revolver DIP Agreement, which is defined in the Final DIP Order).

P.    Neither the Debtors, the Buyer, the Committee, nor the administrative agents or lenders under the Exit Facilities engaged in any conduct that would cause or permit the Stalking Horse APA, the other Transaction Documents, including the Exit Facilities and the Committee Settlement, or the consummation of the Sale Transaction (including the extension of the Exit Facilities to the Buyer) to be avoided, or costs or damages to be imposed, under Bankruptcy Code section 363(n) or under any other law of the United States, any state, territory, possession thereof, the District of Columbia, or any other applicable law.

Q.    The Stalking Horse APA and the consideration offered by the Buyer pursuant to the Stalking Horse APA constitute reasonably equivalent value and fair consideration. The

Stalking Horse APA was not entered into, and the Sale Transaction is not consummated, for the

purpose of hindering, delaying or defrauding the Debtors' creditors under the Bankruptcy Code or

under any other law of the United States, any state, territory, possession thereof, or the District of

Columbia, or any other applicable law. Neither the Debtors, the Buyer, nor the administrative

agents or lenders under the Exit Facilities has entered into the Stalking Horse APA, the Committee

Settlement or the other Transaction Documents, including the Exit Facilities, or is consummating

the Sale Transaction for any fraudulent or otherwise improper purpose. The Committee's support

for the Sale Transaction, which was obtained by means of the Committee Settlement, is critical to

both the Debtors and the Buyer.

R. For the avoidance of doubt, following the Closing, the Acquired Assets shall be

subject in all respects to the liens securing the Exit Facilities, to the extent provided by the

documents governing the Exit Facilities.

S. Upon the Closing, no member of the Buyer Group shall, or shall be deemed to, (i)

be the successor of or successor employer to any of the Sellers, including without limitation, with

respect to any Collective Bargaining Agreements, any Benefit Plans, or any Multiemployer Plans,

and the Buyer shall instead be, and be deemed to be, a new employer, including with respect to,

among other things, any and all federal or state unemployment laws, including any unemployment

compensation or tax laws, or any other similar federal or state laws (provided that the Buyer shall

pay any employee-related liabilities to the extent included in the Assumed Employee Liabilities); (ii)

have any common law successorship liability in relation to any Benefit Plan or Multiemployer Plan,

including with respect to withdrawal liability or contribution obligations; (iii) have, *de facto*, or

otherwise, merged or consolidated with or into Sellers; (iv) be a mere continuation or substantial

continuation of Sellers or the enterprise(s) of Sellers; or (v) be liable for any acts or omissions of Sellers in connection with the Collective Bargaining Agreements, the conduct of the Business, or the operation, funding or administration of the Benefit Plans or Multiemployer Plans or arising under or related to the Acquired Assets other than as expressly set forth in the Stalking Horse APA and the Transaction Documents.  Without limiting the generality of the foregoing, and except as otherwise provided in the Stalking Horse APA or the Committee Settlement, the parties intend and the Court hereby finds that the Buyer Group shall not be liable for any Encumbrance or Liability (other than Assumed Liabilities and Permitted Encumbrances) against any Seller, or any of its predecessors or affiliates, and the Buyer Group shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, any Collective Bargaining Agreement, the operation, funding, or administration of the Benefit Plans or Multiemployer Plans, the Acquired Assets or any Liabilities of any Seller arising or attributable to periods prior to the Closing Date.  The Buyer would not have acquired the Acquired Assets but for the foregoing protections against potential claims based upon "successor liability," *de facto* merger, or theories of similar effect.

T.    The Debtors have proven and demonstrated that it is an exercise of their sound business judgment to assume and assign the Assumed Contracts to the Buyer in connection with the consummation of the Sale Transaction, and the assumption and assignment of the Assumed Contracts to the Buyer is in the best interests of the Debtors, their estates and creditors and all parties in interest.  The Assumed Contracts being assigned to the Buyer are an integral part of the Acquired Assets being purchased by the Buyer, and accordingly, such assumption and assignment

of the Assumed Contracts is reasonable and enhances the value of the Debtors' estates.  The cure amounts required to be paid pursuant to Bankruptcy Code section 365(b), whether agreed or judicially resolved (the "Cure Amounts"), are deemed to be the entire cure obligation due and owing under the Assumed Contracts under Bankruptcy Code section 365(b).  To the extent that any non-Debtor counterparty to an Assumed Contract failed to timely file an objection to the proposed Cure Amount filed with the Bankruptcy Court, the Cure Amount listed in the Cure Notice shall be deemed to be the entire cure obligation due and owing under the applicable Assumed Contract.

U.      Each provision of the Assumed Contracts or applicable non-bankruptcy law that purports to prohibit, restrict or condition, or could be construed as prohibiting, restricting or conditioning, assignment of any Assumed Contracts has been satisfied or is otherwise unenforceable under Bankruptcy Code section 365.

V.      Assumption and assignment of any Assumed Contract to the Buyer pursuant to this Order and the Stalking Horse APA and full payment of any applicable Cure Amount shall result in the full release and satisfaction of any and all cures, claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting change in control or ownership interest composition or other bankruptcy-related defaults, arising under any Assumed Contract at any time prior to the Closing Date, and shall relieve the Debtors and their estates from any liability for any breach of such Assumed Contract occurring after such assignment.

W.      No default exists under any of the Assumed Contracts to which General Motors LLC and/or General Motors Holdings LLC (collectively, "GM", and, such contracts, the "GM

16

Contracts") is a party, and therefore, the Debtors are not required to satisfy the requirements of section 365(b)(1) of the Bankruptcy Code.

X.    The Buyer's assumption of any Assumed Contracts to which GM is not a party, including the Agreement on Purchased Transportation between Jack Cooper Transport and Teamsters National Automobile Transporters Industry Negotiating Committee, shall not modify or change any right of GM, or the obligations of either GM or the Buyer under the GM Contracts.

Y.    Among the GM Contracts is the Master Contract for Vehicle Haulaway Transportation Services and the Master Contract for Yard Management Services, each dated March 28, 2019 and between Debtor Jack Cooper Transport Company, Inc. and General Motors Holdings, LLC (the "Haulaway and Yard Management Contracts"). In addition to and notwithstanding anything to the contrary herein, and consistent with Section 365 of the Bankruptcy Code but restated here for the sake of clarity, the Buyer shall assume responsibility for the Debtors' obligations under the Haulaway and Yard Management Contracts for unknown, unliquidated or pending amounts arising under "Section 7. Cargo Loss and Damage" of the Haulaway and Yard Management Contracts, that may have been incurred by the Debtors pre-Closing in the ordinary course, but which unknown, unliquidated or pending amounts only become known, liquidated and/or payable under Section 7 of the Haulaway Contract post-Closing, if any.

Z.    The Buyer has demonstrated adequate assurance of future performance of all Assumed Contracts, including the GM Contracts, within the meaning of Bankruptcy Code section 365.

AA.    Upon the assignment to the Buyer and the payment of the relevant Cure Amount (if applicable), (i) each Assumed Contract shall be deemed valid and binding and in full force and

effect in accordance with its terms, and all defaults thereunder, if any, shall be deemed cured, subject to the provisions of this Order; and (ii) the Buyer shall assume all obligations under each Assumed Contract.

BB.    An injunction against creditors and third parties pursuing claims against, and liens, interests and encumbrances on, the Acquired Assets is necessary to induce the Buyer to close the Sale Transaction, and the issuance of such injunctive relief is therefore necessary to avoid irreparable injury to the Debtors' estates and will benefit the Debtors' creditors.

CC.    The Sale Transaction does not constitute a *sub rosa* chapter 11 plan. The Sale Transaction neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates a Chapter 11 plan for any of the Debtors.

DD.    This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds that there is no just reason for delay in the implementation of this Order, and, sufficient cause having been shown, waives any such stay, and expressly directs entry of judgment as set forth herein. The Debtors have demonstrated compelling circumstances and a good, sufficient and sound business purpose and justification for the immediate approval and consummation of the Sale Transaction as contemplated by the Stalking Horse APA and the Committee Settlement. The Buyer, being a good faith purchaser under section 363(m) of the Bankruptcy Code, may close the Sale Transaction contemplated by the Stalking Horse APA at any time after entry of this Order.

EE.    The relief granted herein is in the best interests of the Debtors, their estates and creditors, and other parties in interest.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Motion is **GRANTED**, to the extent set forth herein.

2.      Any Objection to the Motion, or any other relief granted in this Order, to the extent not resolved, adjourned for hearing on a later date, waived or withdrawn or previously overruled, and all reservations of rights included therein, is hereby **OVERRULED** and **DENIED** on the merits.

3.      The Bidding Procedures utilized by the Debtors with respect to the Sale Transaction are hereby ratified and were appropriate under the circumstances in order to maximize the value obtained from the Sale Transaction for the benefit of the estates.

4.      Pursuant to Bankruptcy Code sections 105, 363, 364, 365 and 503 and the Stalking Horse APA, the Credit Bid and Release, the Sale Transaction, and the Committee Settlement are hereby approved and the Debtors are authorized to enter into and perform under the Stalking Horse APA, the Committee Settlement and the other Transaction Documents.  Pursuant to Bankruptcy Code sections 105, 363, 364, 365 and 503, each of the Debtors and the Buyer are hereby authorized and directed to take any and all actions necessary or appropriate to:  (i) consummate the Sale Transaction and the Closing in accordance with the Motion, the Stalking Horse APA, and this Order; (ii) assume and assign the Assumed Contracts; (iii) provide for the assumption of the Assumed Liabilities; (iv) perform, consummate, implement and close fully the Stalking Horse APA together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Stalking Horse APA; (v) perform, consummate, and implement the Committee Settlement and the Settlement Stipulation, as applicable; (vi) establish and fund the Escrows; and (vii) enter into the Exit Facilities on the Closing Date.  The Debtors and each other party to the Transaction Documents, including the Escrow Agreement (as defined in the Stalking

Horse APA) and the Committee Settlement, including the Escrow Agreement (as defined in the Settlement Stipulation) (the "Distribution Escrow Agreement") are hereby authorized and directed to perform each of their covenants and undertakings as provided in the Stalking Horse APA and the Transaction Documents, including the Escrow Agreement, the Committee Settlement, and the Distribution Escrow Agreement, prior to or after the Closing Date without further order of the Court.  The Buyer and the Debtors shall have no obligation to close the Sale Transaction except as is contemplated and provided for in the Stalking Horse APA.

5.      Pursuant to Bankruptcy Code section 365(f), notwithstanding any provision of any Assumed Contract or applicable non-bankruptcy law that prohibits, restricts or conditions the assignment of the Assumed Contracts, the Debtors are authorized to assume the Assumed Contracts and to assign the Assumed Contracts to the Buyer or to any Buyer Designee, which assignment shall take place on and be effective as of the Closing or as otherwise provided by order of this Court.  There shall be no accelerations, assignment fees, increases, or any other fees charged to the Buyer or the Debtors as a result of the assumption and assignment of the Assumed Contracts.

6.      The Buyer shall have assumed the Assumed Contracts (including the Key Employment Agreements), and pursuant to section 365(f) of the Bankruptcy Code, the assignment by the Debtors of such Assumed Contracts shall not be a default thereunder.  After the payment of the relevant Cure Amount (if applicable), neither the Debtors, their bankruptcy estates nor the Buyer shall have any further liabilities to the non-Debtor counterparties to the Assumed Contracts, other than the Buyer's obligations under the Assumed Contracts that accrue or become due and payable on or after the Closing Date.

7.      The Debtors' assumption of the Assumed Contracts is subject to the consummation of the Sale.  To the extent that an objection by a counterparty to any Assumed Contract, including all objections related to Cure Amounts, is not resolved prior to the Closing Date, the Debtors, with the consent of the Buyer and in accordance with the Stalking Horse APA, may elect to: (i) not assume and assign to the Buyer the Assumed Contract; (ii) postpone the assumption of such Assumed Contract until the resolution of such objection; or (iii) reserve the disputed portion of the Cure Amount and assume the Assumed Contract on the Closing Date.  So long as the claimed Cure Amount is held in reserve, and there are no other unresolved objections to the assumption and assignment of the applicable Assumed Contract, the Debtors can, without further delay, assume and assign the Assumed Contract that is the subject of the objection.  Under such circumstances, the respective objecting counterparty's recourse would be limited to the funds held in reserve.

8.      Notwithstanding anything to the contrary in the Motion, any Notices related thereto, or this Order, the Cigna Employee Benefits Agreements (as defined in the *Objection of Cigna Entities to Notice to Contract Parties to Potentially Assumed Executory Contracts and Unexpired Leases* [Docket No. 337] ("Cigna Objection")) shall be assumed and assigned to the Buyer as of the Closing Date; provided, however, that: (i) any unpaid obligations to Cigna due and accruing under the Cigna Employee Benefits Agreements as of the Closing Date shall pass through to the Buyer and survive assumption and assignment so that nothing in this Order or 11 U.S.C. § 365 shall affect the obligations accruing under the Cigna Employee Benefits Agreements Contracts prior to the Closing Date; and (ii) prior to the Closing Date, the Buyer shall provide Cigna with an executed form W-9 for the Buyer, and contact information for a Buyer representative to whom Employee Benefits Agreement questions can be directed.

9.      Notwithstanding anything to the contrary in the Motion, any Notices related thereto, or this Order, the Leases (as defined in the *Protective Objection of Stonebriar Commercial Finance LLC to Notice to Contract Parties to Potentially Assumed Executory Contracts and Unexpired Leases* [Docket No. 335] ("Stonebriar Objection")) shall be assumed and assigned to the Buyer as of the Closing Date; provided, however, that: (i) any unpaid obligations due under the Leases on and after November 1, 2019, shall pass through to the Buyer and survive assumption and assignment so that nothing in this Order or 11 U.S.C. § 365 shall affect the obligations accruing under the Leases.

10.     Notwithstanding anything in this Order or the Stalking Horse APA to the contrary, with respect to certain commercial automobile liability, general liability and workers' compensation insurance programs (collectively, the "Programs") of the Debtors with National Interstate Insurance Company and its affiliates, including National Interstate Insurance Company of Hawaii, Inc., Triumphe Casualty Company, Vanliner Insurance Company, Hudson Indemnity, Ltd. and American Money Management Corporation (collectively, "NIIC"), the executory contracts related thereto, as are identified and agreed among the Debtors, Buyer and NIIC at or prior to Closing, shall be assumed by the Debtors and assigned to the Buyer with such amendments and modifications and/or commutation as may be mutually agreed among the Debtors, Buyer and NIIC at or prior to Closing; provided, that to the extent the parties are unable to mutually agree on such amendments and modifications and/or commutation, the Debtors and Buyer reserve the right to classify the Programs, and executory contracts related thereto, as Excluded Contracts at any time on or prior to the Closing Date.  In addition, for avoidance of doubt, the terms of this Sale Order and the Stalking Horse APA shall, subject to any mutually agreed amendments and

modifications and/or commutation to the contracts related to the Programs, not alter, modify, affect or otherwise impair NIIC's rights and interests in the cash or other collateral maintained by NIIC related to the Programs, and such cash or other collateral remains subject to NIIC's rights under the contracts and applicable law that governs the Programs.  Regardless of whether or not the contracts related to the Programs are Assumed Contracts, the reversionary interests of the Debtors to the cash or other collateral securing or otherwise relating to the Programs shall transfer to Buyer subject to the terms and conditions of the contracts and agreements related to the Programs, as may be amended.

11.    Notwithstanding anything in this Order or the Stalking Horse APA to the contrary, all of the issued surety bonds (the "Bonds") referenced in the *Limited Objection of the Surety to the Stalking Horse APA* [Docket No. 317] (the "Surety Objection") shall be assumed by the Buyer, on the conditions that: (a) prior to the Closing, the Buyer and Surety (as defined in the Surety Objection) shall execute a general indemnity agreement, acceptable to the Surety and the Buyer (the "Indemnity Agreement"), regarding all of the assumed Bonds; and (b) the Buyer shall provide the Surety with a replacement irrevocable letter of credit issued by Wells Fargo, in its capacity as letter of credit issuer under the Exit Revolving Facility, in the amount of $250,000 in favor of the Surety to secure the Bonds and Buyer's obligations under the Indemnity Agreement (the "New L/C"), after which the Surety shall execute appropriate documents with the Debtors and Wells Fargo to effect a release and cancellation of that certain irrevocable letter of credit issued by Wells Fargo, No. IS009842U (as amended), in the amount of $250,000, obtained by one or more of the Debtors in favor of the Surety to collateralize the Bonds prior to the Petition Date.  The issuance of the New L/C shall comply in all respects with the terms and conditions of the Exit Revolving

Facility.  As part of the assumption of the Bonds, the Cure Amount shall be an amount equal to the Surety's reasonable and documented legal fees and costs in an amount not to exceed $10,000, to be paid either at the Closing, or thereafter by a draw on the New L/C.

12.    Upon the Closing:    (a) the Debtors are hereby authorized and directed to consummate, and shall be deemed for all purposes to have consummated, the sale, transfer and assignment of all of the Debtors' rights, title and interest in the Acquired Assets (which for the avoidance of doubt, and subject to paragraphs 35 through 37 hereof, includes any affirmative claims, demands, remedies, rights and/or causes of action against any third-party) to the Buyer free and clear of all claims, liens, interests, and encumbrances (other than the Assumed Liabilities and Permitted Encumbrances) and (b) except as otherwise expressly provided in the Stalking Horse APA, all Encumbrances and Liabilities (other than the Assumed Liabilities and the Permitted Encumbrances) shall not be enforceable as against any member of the Buyer Group or the Acquired Assets.    Unless otherwise expressly included in the Assumed Liabilities and Permitted Encumbrances, or as otherwise expressly provided by this Order, no member of the Buyer Group shall be responsible for any claims, liens, liabilities, obligations, interests or encumbrances, including in respect of the following: (i) any labor or employment agreements (excluding, with respect to the Buyer, the Buyer's obligations for any Collective Bargaining Agreement or Key Employment Agreement that is assumed by the Buyer); (ii) any mortgages, deeds of trust and security interests; (iii) any intercompany loans and receivables between one or more of the Sellers and any Debtor; (iv) any pension, multiemployer plan (as such term is defined in Section 3(37) or Section 4001(a)(3) of ERISA), health or welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of any of the

Debtors or any multiemployer plan to which the Debtors have at any time contributed to or had any liability or potential liability, except, for the avoidance of doubt, with respect to the Buyer, the Buyer's obligations under the Hybrid Plan Participation Agreement; (v) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) ERISA, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of 1990, (h) COBRA, (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, or (k) any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors; (vi) any liabilities arising under any Environmental Laws with respect to any assets owned or operated by any of the Debtors or any corporate predecessor of any of the Debtors at any time prior to the Closing Date; (vii) any bulk sales or similar law; (viii) any tax statutes or ordinances, including, without limitation, the IRC, as amended; and (ix) any Excluded Liabilities. A certified copy of this Order may be filed with the appropriate clerk and/or recorder to act to cancel any such lien, claim, interest or encumbrance of record.

13.     The transfer to the Buyer of the Debtors' rights, title, and interest in the Acquired Assets pursuant to the Stalking Horse APA shall be, and hereby is deemed to be, a legal, valid and effective transfer of the Debtors' rights, title, and interest in the Acquired Assets, and vests with or will vest in the Buyer all rights, title, and interest of the Debtors in the Acquired Assets, free and clear of all claims, liens, interests, and encumbrances of any kind or nature whatsoever (other

than the Permitted Encumbrances and the Assumed Liabilities), with any such claims, liens, interests, and encumbrances attaching to the net available proceeds with the same validity, extent, and priority as immediately prior to the sale of the Acquired Assets, subject to the provisions of the Stalking Horse APA and this Order, and any rights, claims, and defenses of the Debtors and other parties in interest.  For the avoidance of doubt, the Acquired Actions shall include all of the Debtors' claims and causes of action arising under Chapter 5 of the Bankruptcy Code.

14.    None of the Buyer or its affiliates, successors, assigns, equity holders, officers, directors,  employees or professionals shall have or incur any liability to, or be subject to any action by any of the Debtors or any of their estates, predecessors, successors, or assigns, arising out of the negotiation, investigation, preparation, execution, or delivery of the Stalking Horse APA and the entry into and consummation of the sale of the Acquired Assets, except as expressly provided in the Stalking Horse APA, the Committee Settlement and this Order.

15.    Except as expressly provided in the Stalking Horse APA, the other Transaction Documents, including the Exit Facilities and the Committee Settlement, or by this Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, vendors, suppliers, employees, trade creditors, litigation claimants, and other persons, holding claims, liens, interests, or encumbrances of any kind or nature whatsoever against or in the Debtors or the Debtors' interests in the Acquired Assets (whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated, or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, whether imposed by agreement, understanding, law, equity, or otherwise), including, without limitation, the non-Debtor party or

parties to each Assumed Contract, arising under or out of, in connection with, or in any way relating to, the Acquired Assets or the transfer of the Debtors' interests in the Acquired Assets to the Buyer shall be and hereby are forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing claims, liens, interests and encumbrances against the Buyer or its affiliates, successors, assigns, equity holders, directors, officers, employees or professionals, the Acquired Assets, or the interests of the Debtors in such Acquired Assets (other than Assumed Liabilities or Permitted Encumbrances).  Following the Closing, no holder of a claim, lien, interest, or encumbrance against the Debtors (other than Assumed Liabilities or Permitted Encumbrances) shall interfere with the Buyer's title to or use and enjoyment of the Debtors' interest in the Acquired Assets based on or related to such claim, lien, interest or encumbrance, and, except as otherwise provided in the Stalking Horse APA, the Transaction Documents, including the Exit Facilities, the Escrow Agreement, the Committee Settlement or this Order, all such claims, liens, interests, or encumbrances, if any, shall be, and hereby are transferred and will attach to the net available proceeds from the sale of the Acquired Assets in the order of their priority, with the same validity, force, and effect which they have against such Acquired Assets as of the Closing, subject to any rights, claims and defenses that the Debtors' estates and the Debtors, as applicable, may possess with respect thereto.  All persons are hereby enjoined from taking action that would interfere with or adversely affect the ability of the Debtors to transfer the Acquired Assets in accordance with the terms of the Stalking Horse APA, the Transaction Documents, including the Exit Facilities, the Escrow Agreements, the Committee Settlement and this Order.

16.     Upon assumption of the Assumed Contracts by the Debtors and assignment of same to the Buyer, the Assumed Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Order.  As of the Closing, subject to the provisions of this Order, the Buyer shall succeed to the entirety of Debtors' rights and obligations in the Assumed Contracts first arising and attributable to the time period occurring on or after the date the assignment of the Assumed Contracts becomes effective and shall have all rights thereunder.

17.     Subject to paragraph 7 of this Order, upon the entry of this Order, (a) all defaults (monetary and non-monetary) under the Assumed Contracts through the Closing shall be deemed cured and satisfied through the payment of the Cure Amounts, (b) no other amounts will be owed by the Debtors, their estates, or the Buyer with respect to amounts first arising or accruing during, or attributable or related to, the period before Closing with respect to the Assumed Contracts, and (c) any and all persons or entities shall be forever barred and estopped from asserting a claim against the Debtors, their estates, or the Buyer that any additional amounts are due or defaults exist under the Assumed Contracts that arose or accrued, or relate to or are attributable to the period before the Closing, including defaults of provisions restricting change in control or ownership interest composition or other bankruptcy-related defaults, arising under any Assumed Contract at any time on or prior to the Closing Date.  Assignment by the Debtors of any Assumed Contract to the Buyer or the Buyer Designee shall relieve the Debtors and their estates from any liability for any breach of such Assumed Contract occurring after such assignment.

18.     The creation and funding of the Escrows and the implementation of the Committee Settlement is approved pursuant to Bankruptcy Code sections 105(a) and 363(b).  The Debtors and

the other parties thereto are authorized, pursuant to Bankruptcy Code sections 105(a) and 363(b) and without further notice or relief from this Court, to enter into the Escrow Agreement, the Distribution Escrow Agreement, and the Committee Settlement, to take any and all actions that are necessary or appropriate in the exercise of their business judgment to implement the Escrow Agreement, the Distribution Escrow Agreement, and the Committee Settlement, including employing third party contractors in accordance therewith, including the applicable escrow agents, and to make or authorize the payments contemplated thereunder.  Funds deposited in accordance with the Escrow Agreement, the Distribution Escrow Agreement, and the Committee Settlement shall not constitute property of any Debtor's estate or be subject to claw back or disgorgement, and such funds (including any residual funds) may be released and applied in accordance with the terms thereof, without further order of this Court.  For the avoidance of doubt, no funds in the Professional Fees Escrow Account shall be property of the Debtors' estates, and the Professional Fee Escrow Account shall be maintained in trust solely for the benefit of the Professionals.  The Escrow Agent (as defined in the Settlement Stipulation) is acting solely as a payment agent with respect to the Direct Distribution (as defined in the Settlement Stipulation) and shall not incur any liability or be subject to any action by any person or entity arising out of or related to the Distribution Escrow Agreement or the Direct Distribution.

19.    The Stalking Horse APA has been entered into by the Buyer in good faith and the Buyer is a good faith purchaser of the Acquired Assets as that term is used in Bankruptcy Code section 363(m).  The Buyer is entitled to all of the protections afforded by Bankruptcy Code section 363(m).

20.    No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Sale Transaction.  Except as otherwise provided in the Stalking Horse APA, the Transaction Documents, the Escrow Agreement and the Committee Settlement, no obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment is due to any person in connection with the Stalking Horse APA, the other Transaction Documents, or the transactions contemplated hereby or thereby for which the Buyer is or will become liable.

21.    The consideration provided by the Buyer for the Acquired Assets under the Stalking Horse APA, including the portion of the consideration that consisted of the Credit Bid and Release, shall be deemed for all purposes to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law, and the sale of the Acquired Assets may not be avoided, or costs or damages imposed or awarded under Bankruptcy Code section 363(n) or any other provision of the Bankruptcy Code, the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, or any other similar federal or state laws.

22.    Neither the Debtors nor the Buyer engaged in any conduct that would cause or permit the Stalking Horse APA or the consummation of the Sale Transaction to be avoided, or costs or damages to be imposed, under Bankruptcy Code section 363(n) or under any other law of the United States, any state, territory, possession thereof, the District of Columbia, or any other applicable law. Accordingly, the Stalking Horse APA and the Sale Transaction shall not be avoidable under section 363(n) or chapter 5 of the Bankruptcy Code, and no party shall be entitled

to any damages or other recovery pursuant to section 363(n) of the Bankruptcy Code in respect of the Stalking Horse APA or the Sale Transaction.

23.     The Exit Facilities are being extended in good faith and for fair value and, therefore, the obligations thereunder and the liens granted therein are valid and binding and may not be avoided under the Bankruptcy Code, Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and any other applicable laws.

24.     On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of all of the Debtors' rights, title, and interest in the Acquired Assets or a bill of sale transferring good and marketable title in such Acquired Assets to the Buyer on the Closing Date pursuant to the terms of the Stalking Horse APA, free and clear of all claims, liens, interests, and encumbrances (other than Assumed Liabilities and Permitted Encumbrances).

25.     Upon the Closing, no member of the Buyer Group shall, or shall be deemed to,  (i) be the successor of or successor employer to any of the Sellers, including without limitation, with respect to any Collective Bargaining Agreements, any Benefit Plans, or any Multiemployer Plans, and the Buyer shall instead be, and be deemed to be, a new employer, including with respect to, among other things, any and all federal or state unemployment laws, including any unemployment compensation or tax laws, or any other similar federal or state laws (provided that the Buyer shall pay any employee-related liabilities to the extent included in the Assumed Employee Liabilities); (ii) have any common law successorship liability in relation to any Benefit Plan or Multiemployer Plan, including with respect to withdrawal liability or contribution obligations; (iii) have, *de facto*, or otherwise, merged or consolidated with or into Sellers; (iv) be a mere continuation or substantial

31

continuation of Sellers or the enterprise(s) of Sellers; or (v) be liable for any acts or omissions of Sellers in connection with the Collective Bargaining Agreements, the conduct of the Business, or the operation, funding, or administration of the Benefit Plans or Multiemployer Plans or arising under or related to the Acquired Assets, except as expressly provided in the Stalking Horse APA. Without limiting the generality of the foregoing, and except as otherwise provided in the Stalking Horse APA and the Committee Settlement, the parties intend and the Court hereby orders that no member of the Buyer Group shall be liable for any Encumbrance or Liability (other than Assumed Liabilities and Permitted Encumbrances) against any Seller, or any of its predecessors or affiliates, and no member of the Buyer Group shall have successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, any Collective Bargaining Agreement, the operation, funding, or administration of the Benefit Plans or Multiemployer Plans, the Acquired Assets or any Liabilities of any Seller arising or attributable to periods prior to the Closing Date.

26.     Other than the Buyer's assumption of the applicable Assumed Liabilities (including, for the avoidance of doubt, the Buyer's obligations under the Prepetition ABL Facility, the DIP ABL Facility, the Prepetition First Lien Term Loan Facility, in each case that are being amended and restated pursuant to the Exit Facilities) and the Buyer's obligations under the Stalking Horse APA, the Settlement Stipulation, and the other Transaction Documents, including the Exit Facilities, the Buyer Group and its respective affiliates, successors, assigns, members, partners, officers, directors, principals, and shareholders (or equivalent) shall have no obligations with respect to any Liabilities, including, without limitation, the Excluded Liabilities, and, upon

consummation of the Sale Transaction, the Debtors and their estates are deemed to release and forever discharge the Buyer Group and its affiliates, and their respective successors, assigns, members, partners, officers, directors, principals and shareholders (or equivalent) from any and all claims, causes of action, obligations, Liabilities, demands, losses, costs, taxes, and expenses of any kind, character, or nature whatsoever, known or unknown, fixed or contingent, relating to the sale of the Acquired Assets or assignments of the Assumed Contracts.  For the avoidance of doubt, no member of the Buyer Group shall have any liability, responsibility, obligation, or duty under or related to the Direct Distribution, other than as expressly set forth in paragraph 2(c) of the Settlement Stipulation.

27.     Upon the Closing, the Transferred Permits, including, but not limited to the Debtors' interstate motor carrier and property broker authorities, United States Department of Transportation ("DOT") numbers, and International Registration Plan accounts, vehicle registrations and license plates (all of which are set forth on Schedule 2.1(f) to the Stalking Horse APA), may be transferred to the Buyer without further consent or approval of any governmental agency or any other person.  The Debtors shall take all required steps necessary to allow for the transfer of the applicable Transferred Permits to the Buyer, including, but not limited to, executing and delivering to the Federal Motor Carrier Safety Administration and/or DOT any necessary documentation or applications (*e.g.*, a Name Change Application) to allow for the transfer of the Debtors' interstate motor carrier and property broker authority and DOT numbers to the Buyer.

28.     This Order:  (a) is and shall be effective as a determination that other than Permitted Encumbrances and Assumed Liabilities, all claims, liens, interests and encumbrances of any kind or nature whatsoever existing as to the Acquired Assets prior to the Closing have been

33

unconditionally released, discharged, and terminated, and that the conveyances described herein have been effected, including claims in connection with any tax liability and (b) is and shall be binding upon and shall authorize all entities, including, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Acquired Assets conveyed to the Buyer.  Other than Permitted Encumbrances, and liens and security interests relating to the Assumed Liabilities, all recorded claims, liens, interests, and encumbrances against the Acquired Assets from their records, official and otherwise, shall be deemed stricken.

29.     If any person or entity which has filed statements or other documents or agreements evidencing liens, interests, or encumbrances on, or claims against or interests in, the Acquired Assets shall not have delivered to the Debtors before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all claims, liens, interests or encumbrances (other than Permitted Encumbrances and liens and security interests relating to the Assumed Liabilities) which the person or entity has or may assert with respect to the Acquired Assets, the Debtors and the Buyer are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Acquired Assets.

30.     All counterparties to the Assumed Contracts shall cooperate and expeditiously execute and deliver, upon the reasonable requests of the Buyer, and shall not charge the Debtors or the Buyer for any instruments, applications, consents or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the sale of the Acquired Assets.

31.     Each and every federal, state and governmental agency or department, and any other person or entity, is hereby authorized to accept any and all documents and instruments in connection with or necessary to consummate the Sale contemplated by the Stalking Horse APA.

32.     Nothing in this Order or the Stalking Horse APA releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the owner or operator of property after the Closing Date.

33.     Without limiting the provisions of paragraph 32 above, but subject to Bankruptcy Code section 525(a), no governmental unit may revoke or suspend any right, license, trademark or other permission relating to the use of the Acquired Assets sold, transferred, or conveyed to the Buyer on account of the filing or pendency of these Chapter 11 Cases or the consummation of the sale of the Acquired Assets.

34.     Notwithstanding anything herein to the contrary, upon the payment to the applicable mortgagee under the DSJL Mortgage and Westside Bank Mortgage (each as defined in the Restructuring Term Sheet) of a cure payment in the amount of $0.00 and $33,146.88 respectively, the Buyer shall be deemed to assume on the Closing Date the DSJL Mortgage and Westside Bank Mortgage, and in each case, to have cured all existing defaults thereunder, and the liens and security interests thereunder shall attached to the same property such liens and security

35

interests encumbered prior to the Petition Date, with the same priority in interest, and such claims, liens and security interests as against the Buyer and the applicable collateral shall otherwise be unaffected by the Sale Transaction.

35.     Pursuant to this Order, the Stalking Horse APA and the other Transaction Documents, on the Closing Date, (a) the Buyer shall acquire the Acquired Actions as an Acquired Asset, and (b) the Acquired Actions shall be waived and released pursuant to the terms of the Waiver.

36.     Section 12.16 of the Stalking Horse APA is approved in its entirety and incorporated herein as if fully stated herein.  Additionally, except to the extent expressly preserved pursuant to the Stalking Horse APA, the other Transaction Documents, the Committee Settlement, and/or this Order, upon the Closing Date, (a) the Debtors, (b) the Buyer, (c) the Committee, and (d) the lenders and agents under the (i) First Lien Term Loan Facility, (ii) U.S. Revolver Facility, (iii) Canadian Sub-Facility, (iv) credit facilities under the Junior Credit Agreements, and (v) DIP Facilities (each a "Releasing Party"), to the fullest extent permissible under applicable law, mutually releases and discharges each other Releasing Party and such Releasing Parties' respective current and former affiliates, and such entities' and their current and former affiliates' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, managers, directors, equity holders, principals, members, incorporators, employees, agents, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such (collectively, in such capacity, the "Released Parties" and each a "Released Party"), from any and all claims and

causes of action, whether known or unknown, including any derivative claims that such Releasing

Party would have been legally entitled to assert (whether individually or collectively), based on or

relating to, or in any manner arising from, in whole or in part, the Debtors (including the

management, ownership, or operation thereof), the Debtors' restructuring efforts, the formulation,

preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, or any

contract, instrument, release, or other agreement or document created or entered into in connection

with the Restructuring Support Agreement, the Stalking Horse APA, the U.S. Revolver Facility,

the Canadian Sub-Facility, the DIP Facilities, the Exit Facilities, the Chapter 11 Cases, the filing

of the Chapter 11 Cases, the implementation of the Sale Transaction, the Committee Settlement,

and any other act or omission, transaction, agreement, event, or other occurrence taking place on

or before the Closing Date related or relating to the foregoing; provided, however, that this

paragraph 36 shall not (a) affect the liability of any entity that otherwise would result from any act

or omission to the extent that such act or omission is determined by a final, nonappealable order

by the Bankruptcy Court or another court with jurisdiction to have constituted fraud, gross

negligence, or willful misconduct of such entity, or (b) relieve any Released Party from any

obligations under, or otherwise affect the terms and conditions of, the Stalking Horse APA, the

other Transaction Documents, the DIP Loan Documents (as defined in the DIP Financing Orders),

the agreements and documents governing the Exit Facilities, the Committee Settlement, and/or

this Order; further provided, however, that the releases provided by the lenders and agents under

the U.S. Revolver Facility, the Canadian Sub-Facility, and the Revolver Facility (as defined in the

Final DIP Order) are conditioned upon the payment in full in cash (whether pursuant to the Exit

Revolving Facility or otherwise), by no later than the Closing Date, of all due and payable

Obligations (as defined in the Revolver DIP Agreement, which is defined in the Final DIP Order).

For the avoidance of doubt, upon (a) the Closing, including the execution of, and consummation

of the transactions contemplated by, the Exit Facilities, and (b) the payment in full in cash of the

DIP ABL Facility (whether pursuant to the Exit Revolving Facility or otherwise) by no later than

the Closing Date of all due and payable Obligations (as defined in the Revolver DIP Agreement,

which is defined in the Final DIP Order) and the amendment and restatement of the Prepetition

First Lien Term Loan Facility into the applicable Exit Facility, the liens and claims, including

superpriority claims, in respect of the Prepetition Obligations, the DIP Facilities or the Exit

Facilities shall not extend to or encumber the Cash Consideration (as defined in the Stalking Horse

APA).

      37.      To the fullest extent permissible under applicable law, except as otherwise provided

in the Stalking Horse APA, the other Transaction Documents, and/or this Order, upon the Closing

Date, none of the Released Parties shall have or incur any liability to, or be subject to any right of

action by, any holder of a claim against, or equity interest in, any of the Debtors or any other party

in interest, or any of their respective employees, representatives, financial advisors, attorneys, or

agents, acting in such capacity, or any of their successors and assigns, for any act or omission in

connection with, related to or arising out of, the Debtors' Chapter 11 Cases, the operation of the

Debtors' businesses during the Chapter 11 Cases, the investigation, formulation, preparation,

negotiation, execution, delivery, implementation, or consummation of the transactions

contemplated by the Stalking Horse APA, including, without limitation, the Sale Transaction, the

assumption and assignment of the Assumed Contracts, or any other contract, instrument, release,

agreement, settlement, or document created, modified, amended, terminated, or entered into in

connection with the Stalking Horse APA, the Committee Settlement, or any other act or omission in connection with the Debtors' Chapter 11 Cases; provided, however, that this paragraph 37 shall not (a) affect the liability of any entity that otherwise would result from any act or omission to the extent that such act or omission is determined by a final, nonappealable order by the Bankruptcy Court or another court with jurisdiction to have constituted fraud, gross negligence, or willful misconduct by such entity, or (b) relieve any Released Party from any obligations under, or otherwise affect the terms and conditions of, the Stalking Horse APA, the other Transaction Documents, the DIP Loan Documents (as defined in the DIP Financing Orders), the agreements and documents governing the Exit Facilities, the Committee Settlement, and/or this Order; provided further, however, that upon (a) the Closing, including the execution of, and consummation of the transactions contemplated by, the Exit Facilities, and (b) the payment in full in cash of the DIP ABL Facility (whether pursuant to the Exit Revolving Facility or otherwise) by no later than the Closing Date of all due and payable Obligations (as defined in the Revolver DIP Agreement, which is defined in the Final DIP Order) and the amendment and restatement of the Prepetition First Lien Term Loan Facility into the applicable Exit Facility, the liens and claims, including superpriority claims, in respect of the Prepetition Obligations, the DIP Facilities or the Exit Facilities shall not extend to or encumber the Cash Consideration (as defined in the Stalking Horse APA).

38.    To the extent this Order is inconsistent with any prior order or pleading filed in these Chapter 11 Cases, the terms of this Order shall govern.  To the extent there is any inconsistency between the terms of this Order and the terms of the Stalking Horse APA, the terms of this Order shall govern.

39.     Except as expressly provided in the Stalking Horse APA, the Committee Settlement or this Order, nothing in this Order shall be deemed to waive, release, extinguish, or estop the Debtors or their estates from asserting, or otherwise impair or diminish, any right (including, without limitation, any right of recoupment), claim, cause of action, defense, offset or counterclaim in respect of any asset that is not an Acquired Asset.

40.     All entities (other than holders of Assumed Liabilities or Permitted Encumbrances) that are presently, or on the Closing Date may be, in possession of some or all of the Acquired Assets are hereby directed to surrender possession of the Acquired Assets to the Buyer on the Closing Date.

41.     This Order shall not be modified by any chapter 11 plan of any of the Debtors confirmed in these Chapter 11 Cases.

42.     This Order, the Stalking Horse APA, and the Committee Settlement shall be binding in all respects upon all creditors and interest holders of the Debtors, all non-debtor parties to the Assumed Contracts, the Committee, all successors and assigns of the Debtors and their affiliates and subsidiaries, and any trustees, examiners, "responsible persons" or other fiduciaries appointed in the Chapter 11 Cases or upon a conversion of the Debtors' cases to cases under chapter 7 of the Bankruptcy Code, including a chapter 7 trustee, and the Stalking Horse APA, including the Committee Settlement, the Transaction Documents and the Escrow Agreement, shall not be subject to rejection or avoidance under any circumstances.  If any order under section 1112 of the Bankruptcy Code is entered, such order shall provide (in accordance with Bankruptcy Code sections 105 and 349) that this Order and the rights granted to the Buyer hereunder, and the rights and obligations of any escrow agent appointed under the Escrow Agreement or the Distribution

40

Escrow Agreement, shall remain effective and, notwithstanding such dismissal or conversion, shall remain binding on parties in interest.

43.    The failure specifically to include or make reference to any particular provisions of the Stalking Horse APA or the Committee Settlement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Stalking Horse APA and the Committee Settlement are authorized and approved in their entirety.

44.    The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order, including, without limitation, the authority to:  (a) interpret, implement and enforce the terms and provisions of this Order (including the injunctive relief provided in this Order) and the terms of the Stalking Horse APA, all amendments thereto and any waivers and consents thereunder; (b) protect the Buyer, or the Acquired Assets, from and against any of the claims, liens, interests or encumbrances (other than Assumed Liabilities and Permitted Encumbrances); (c) compel delivery of all Acquired Assets to the Buyer (other than those in the possession of the holder of an Assumed Liability or Permitted Encumbrance); (d) compel the Buyer to perform all of its obligations under the Stalking Horse APA, the Transaction Documents, and this Order; and (e) resolve any disputes arising under or related to the Stalking Horse APA, the Committee Settlement or the sale of the Acquired Assets.

45.    The Stalking Horse APA, the Committee Settlement and any related agreements, documents or other instruments may be modified, amended or supplemented through a written document signed by the parties thereto (subject to any consents required under the Exit Facilities) in accordance with the terms thereof without further order of this Court; provided, however, that

41

any such modification, amendment, or supplement is neither material nor materially changes the economic substance of the transactions contemplated hereby.

46.    Neither the Buyer nor the Debtors shall have an obligation to close the Sale Transaction until all conditions precedent in the Stalking Horse APA to each of their respective obligations to close the Sale Transaction have been met, satisfied, or waived in accordance with the terms of the Stalking Horse APA.

47.    This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding any provision in the Bankruptcy Rules to the contrary, including but not limited to Bankruptcy Rule 6004(h), the Court expressly finds there is no reason for delay in the implementation of this Order and, accordingly:  (a) the terms of this Order shall be immediately effective and enforceable upon its entry; (b) the Debtors are not subject to any stay of this Order or in the implementation, enforcement, or realization of the relief granted in this Order; and (c) the Debtors may, in their discretion and without further delay, take any action and perform any act authorized under this Order.

48.    The provisions of this Order are nonseverable and mutually dependent.

[END OF DOCUMENT]

## **Exhibit 1**

**Settlement Stipulation**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| JACK COOPER VENTURES, INC., *et al.*,[1] | ) | Case No. 19-62393 (PWB) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) |  |

## STIPULATION OF SETTLEMENT[2]

This Stipulation of Settlement (the "**Stipulation**") is made by and among (i) Jack Cooper Ventures, Inc. and certain of its affiliates (collectively, the "**Debtors**") that are debtors and debtors-in-possession in the above-referenced chapter 11 cases (the "**Chapter 11 Cases**"), (ii) the Official Committee of Unsecured Creditors appointed in these Chapter 11 Cases (collectively, the "**Committee**"), (iii) Solus Alternative Asset Management LP,

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Jack Cooper Ventures, Inc. (0805); Jack Cooper Diversified, LLC (9414); Jack Cooper Enterprises, Inc. (3001); Jack Cooper Holdings Corp. (2446); Jack Cooper Transport Company, Inc. (3030); Auto Handling Corporation (4011); CTEMS, LLC (7725); Jack Cooper Logistics, LLC (3433); Auto & Boat Relocation Services, LLC (9095); Axis Logistic Services, Inc. (2904); Jack Cooper CT Services, Inc. (3523); Jack Cooper Rail and Shuttle, Inc. (7801); Jack Cooper Investments, Inc. (6894); North American Auto Transportation Corp. (8293); Jack Cooper Transport Canada, Inc. (8666); Jack Cooper Canada GP 1 Inc. (7030); Jack Cooper Canada GP 2 Inc. (2373); Jack Cooper Canada 1 Limited Partnership (3439); and Jack Cooper Canada 2 Limited Partnership (7839). The location of the Debtors' corporate headquarters and service address is: 630 Kennesaw Due West Road NW, Kennesaw, Georgia 30152.

[2]    The form of this Stipulation of Settlement remains subject to ongoing negotiations.

on behalf of certain of its affiliates and managed funds and accounts, in its or such affiliates' capacity as a Prepetition Secured Party, DIP Secured Party, and as the Purchaser (collectively with the other Solus Entities (as defined below) "**Solus**," and, together with the Debtors and the Committee, the "**Principal Parties**"), (iv) Wells Fargo Capital Finance, LLC, in its capacity as ABL Agent and Revolver Administrative Agent, (v) Cerberus Business Finance Agency, LLC, in its capacity as Prepetition First Lien Agent and Prepetition First Lien Lender (as defined below), and (vi) Wilmington Trust National Association, in its capacity as DIP Term Administrative Agent, Prepetition 1.5 Lien Agent and Prepetition Second Lien Agent (collectively, the "**Parties**").[3]   The Parties, through their respective undersigned counsel, hereby stipulate and agree as follows:

## RECITALS

A.      The Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and commenced the Chapter 11 Cases on August 6, 2019 (the "**Petition Date**") in the United States Bankruptcy Court for the Northern District of Georgia (the "**Bankruptcy Court**").  These Chapter 11 Cases are jointly administered and have been consolidated for procedural purposes only.

B.      The Debtors continue to manage and operate their businesses and properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Cases.

C.      On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Enter Into and Perform Under the Stalking Horse Asset Purchase Agreement, (II) Approving Bidding Procedures for the Sale of the Debtors'*

---

[3]     Capitalized terms used herein but not defined herein shall have the meanings ascribed to them in the Final DIP Order (as defined herein).

*Assets, (III) Approving the Expense Reimbursement, (IV) Scheduling Hearings and Objection Deadlines With Respect to the Sale, (V) Scheduling Bid Deadlines and an Auction, (VI) Approving the Form and Manner of Notice Thereof, (VII) Approving Contract Assumption and Assignment Procedures, and (VIII) Granting Related Relief* [Docket No. 21] (the "**Sale Motion**"), seeking, among other things, the authority to sell (the "**Sale**") substantially all of their assets pursuant to a stalking horse asset purchase agreement (as amended prior to the date hereof, the "**Stalking Horse APA**") with JC Buyer Company, Inc. ("**New Jack Cooper**" or "**Purchaser**"), an affiliate of Solus, subject to higher or better offers.  Solus, New Jack Cooper and their affiliates shall be collectively referred to herein as, the "**Solus Entities**."

D.    Also, on the Petition Date, the Debtors filed the *Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to Obtain Senior and Junior Secured Superpriority Postpetition Financing, (II) Granting (A) Liens and Superpriority Administrative Expense Claims and (B) Adequate Protection to Certain Prepetition Lenders; (III) Authorizing the Use of Cash Collateral; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [Docket No. 18] (the "**DIP Motion**"), seeking, among other things, authority to enter into a junior secured superpriority multi-draw term loan credit facility in an aggregate principal amount of $15 million with Wilmington Trust, National Association, as agent under the DIP Term Loan Facility.

E.    On August 19, 2019, the United States Trustee appointed the Committee [Docket No. 142].

F.      On September 3, 2019, this Court entered the *Order (I) Authorizing the Debtors to Enter Into and Perform Under the Stalking Horse Asset Purchase Agreement, (II) Approving Bidding Procedures for the Sale of the Debtors' Assets, (III) Approving the Expense Reimbursement, (IV) Scheduling Hearings and Objection Deadlines With Respect to the Sale, (V) Scheduling Bid Deadlines and an Auction, (VI) Approving the Form and Manner of Notice Thereof, (VII) Approving Contract Assumption and Assignment Procedures, and (VII) Granting Related Relief* [Docket No. 224] (the "**Bidding Procedures Order**").

G.      The Bidding Procedures Order provided that the deadline for submitting Qualified Bids (as defined in the Bidding Procedures Order) was October 1, 2019, at 5:00 p.m. (Eastern Time) and, if more than one Qualified Bid was timely received, an auction would be conducted on October 4, 2019, at 10:00 a.m. (Eastern Time).  No other Qualified Bids were submitted and, as such, on October 1, 2019, the Debtors filed the *Notice of No Auction* [Docket No. 332] cancelling the auction, and are seeking approval of the Stalking Horse APA at the hearing to approve the Sale on October 10, 2019 at 2:30 p.m. (Eastern Time) (the "**Sale Hearing**").

H.      On September 13, 2019, the Bankruptcy Court entered the *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, and 507 (I) Authorizing the Debtors to Obtain Senior and Junior Secured Superpriority Postpetition Financing; (II) Granting (A) Liens and Superpriority Administrative Expense Claims and (B) Adequate Protection to Certain Prepetition Lenders; (III) Authorizing the Use of Cash Collateral; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief* [Docket No. 279] (the "**Final DIP Order**").  Pursuant to the Final DIP Order, the Debtors stipulated as follows:

4

i.        the Prepetition ABL Facility was secured by (a) first priority security interests in and liens on the Prepetition ABL Priority Collateral; and (b) fourth priority security interests in and lien on the Prepetition Term Loan Priority Collateral (such liens and security interests in clauses (a) and (b), the "**Prepetition ABL Liens**"); *provided* that the Prepetition ABL Canadian Sub-Facility was secured by a first priority security interest in substantially all of the assets of those Debtors organized under the laws of Canada or any province thereof.  Pursuant to the terms of the Final DIP Order, the Prepetition ABL Facility was refinanced in full by the Revolver Facility.

ii.        The Prepetition First Lien Term Loan Facility is secured by (a) first priority security interests in and liens on the Prepetition Term Loan Priority Collateral and (b) second priority security interests in and liens on the Prepetition ABL Priority Collateral (such liens and security interests in clauses (a) and (b), the "**Prepetition First Lien Term Loan Liens**").

iii.        The Prepetition 1.5 Lien Term Loan Facility is secured by (a) second priority security interests in and liens on the Prepetition Term Loan Priority Collateral and (b) third priority security interests in and liens on the Prepetition ABL Priority Collateral (such liens and security interests in clauses (a) and (b), the "**Prepetition 1.5 Lien Term Loan Liens**").

iv.        The Prepetition Second Lien Term Loan Facility is secured by (a) third priority security interests in and liens on the Prepetition Term Loan Priority Collateral and (b) fourth priority security interests in and liens on the Prepetition ABL Priority Collateral (such liens and security interests in clauses (a) and (b), the

"**Prepetition Second Lien Term Loan Liens**" and, together with the Prepetition First Lien Term Loan Liens and the Prepetition 1.5 Lien Term Loan Liens, the "**Prepetition Term Loan Liens**," and, together with the Prepetition ABL Liens, the "**Prepetition Liens**").

v.      The Prepetition Obligations owing to the Prepetition Secured Parties constitute legal, valid, and binding obligations of the Debtors and their applicable affiliates, enforceable against them in accordance with their respective terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and no portion of the Prepetition Obligations owing to the Prepetition Secured Parties is subject to avoidance, recharacterization, reduction, set-off, offset, counterclaim, cross-claim, recoupment, defenses, disallowance, impairment, recovery, subordination, or any other challenges pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity, including in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of these Cases.

I.      The Final DIP Order contemplated that the Committee may, subject to any standing requirements, commence a Challenge Proceeding, if any, with respect to the Prepetition Obligations and the Prepetition Liens by no later than (i) the earlier of (A) October 22, 2019 and (B) the date objections to the Sale are due, and (ii) any such later date as has been agreed to, in writing, by the applicable Prepetition Agent (with the consent of the applicable Prepetition Secured Parties) (such time period is referred to in the Final DIP Order as the "**Challenge Period**").

J.      On October 1, 2019, the Court entered the *Stipulation and Consent Order Extending the Challenge Period in the Final Order Pursuant to 11 U.S.C. §§ 105,361, 362, 363, 364, 503, and 507 (I) Authorizing the Debtors to Obtain Senior and Junior Secured Superpriority Postpetition Financing;(II) Granting (A) Liens and Superpriority Administrative Expense Claims and (B) Adequate Protection to Certain Prepetition Lenders; (III) Authorizing Use of Cash Collateral; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief* [Docket No. 327] (the "**Extension Stipulation**"), which extended the Challenge Period to October 10, 2019.  Pursuant to the Extension Stipulation, the Committee agreed that it would, if at all, file a motion for standing to commence a Challenge Proceeding by no later than October 4, 2019.

K.      In accordance with the Final DIP Order, the Committee undertook an investigation (the "**Committee Investigation**") into the validity, enforceability, perfection and avoidability of the Prepetition Liens and the Prepetition Obligations, among other things, and concluded that certain of the Debtors' assets were not subject to the Prepetition Liens (the "**Potential Challenge**").

L.      On October 2, 2019, the Committee served the Debtors and the Solus Entities with a draft objection to the Sale Motion (the "**Objection**"), but, as the Parties were engaged in ongoing settlement negotiations, refrained from filing the Objection.

M.      Also on October 2, 2019, the Committee served the Debtors and the Solus Entities with a draft *Motion of the Official Committee of Unsecured Creditors For Leave, Standing and Authority to Prosecute Causes of Action on Behalf of the Debtors' Estates* (the "**Standing Motion**").

N.      On October 4, 2019 at 4:00 p.m., as required by the Extension Stipulation, the Committee filed the Standing Motion [Docket No. 346] seeking standing to assert the Potential Challenge as well as certain claims pursuant to chapter 5 of the Bankruptcy Code (the "**Potential Avoidance Claims**").  On October 7, 2019, the Committee filed the *Notice of Withdrawal of Motion of the Official Committee of Unsecured Creditors for Leave, Standing and Authority to Prosecute Causes of Action on Behalf of the Debtors' Estates* [Docket No. 352].

O.      The Parties have engaged in extensive good faith, arm's length negotiations regarding the Committee Investigation, the Objection, the Potential Challenge, the Sale and the Potential Avoidance Claims, including the D&O Claims (as defined below), among other things, and have agreed to the terms hereof to resolve same and obtain the support of the Committee for the Sale.

P.      The Debtors have advised the Committee that (i) there are no estate funds available to make distributions to unsecured creditors and limited funds to reconcile claims and to continue the Chapter 11 Cases for any significant period past the Closing Date and (ii) they will seek to dismiss or convert the Chapter 11 Cases as soon as practicable.

Q.      The Debtors have advised the Committee that absent a Sale to the Purchaser, the Debtors will not be able to continue as a going concern and would be forced to liquidate, which would result in, among other things, the loss of employment for the approximately 3,000 employees of the Debtors and a significant increase in the amount of unsecured and administrative expense claims being asserted against the Debtors.

R.      The Parties desire to enter into this Stipulation to resolve any and all disputes and issues existing between the Committee, on the one hand, and the other Parties,

on the other, with respect to the Chapter 11 Cases and the Sale, including without limitation, all disputes and issues regarding the Sale, the transfer and waiver of the Acquired Actions (as defined in the Stalking Horse APA), the Potential Challenge, and the Committee Investigation (the "**Settlement**") and to seek the Court's approval of the Settlement as set forth in this Stipulation in connection with, and as an exhibit to, the Sale Order (as defined below).

**NOW, THEREFORE**, after good faith, arm's-length negotiations without collusion, in consideration of the mutual representations, warranties, agreements and covenants contained in this Stipulation and other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged by each of the Parties), the Parties hereby agree and stipulate as follows:

1.      **Challenge Investigation**.  On the terms and conditions set forth in this Stipulation, the Committee agrees to (i) support the Sale and the relief requested in the Sale Motion, including the releases provided for in the Sale Order (as defined below), and the transfer to and waiver by the Purchaser of the Acquired Actions, including the Potential Avoidance Claims and D&O Claims, (ii) withdraw the Standing Motion and refrain from filing the Objection and (iii) conclude the Committee Investigation.  Upon the Effective Date (as defined below), the Challenge Period shall be deemed to have expired or terminated without the commencement of a Challenge, and, without limiting the foregoing or any provisions of the Final DIP Order, the stipulations, admissions and releases and other provisions contained in paragraph E of the Final DIP Order with respect to the Prepetition Liens and Prepetition Obligations, among other things, shall be binding on the Committee and such other parties in interest as set forth in the Final DIP Order.  Subject to

9

the terms hereof, the Committee shall not take any action that is inconsistent with, or is likely to interfere with, the Debtors' efforts to obtain the relief requested in the Sale Motion, including entry of the Sale Order, and to effectuate the Sale.  The Debtors acknowledge and agree that the making of the Cash Payment by the Purchaser as provided below shall satisfy the Purchaser's obligations under Section 3.1(a)(iii) of the Stalking Horse APA, and the Parties otherwise agree that the Acquired Actions secure the DIP Facilities.

2.      **Creditor Distribution Escrow**.

(a)      No later than three (3) business days prior to the Closing Date, the Debtors shall use commercially reasonable efforts to provide the Committee with a list (the "**Creditor List**") of all known unsecured claims (excluding any Prepetition Obligations) that will remain unpaid as of the Closing Date (the holders thereof, the "**Subject Creditors**"), and which are not otherwise being paid or assumed in connection with the Sale;

(b)      The Creditor List shall be compiled with information contained in the Debtors' schedules (not including creditors scheduled as disputed, contingent or unliquidated), as reduced by authorized post-petition payments of all or a portion of such claims, and such other reasonably available information, including, as necessary, proofs of claim, and other claims filed pursuant to Bankruptcy Rule 3002 that are allowed;

(c)      On the Closing Date, the Purchaser shall deposit the amount of $750,000 in cash (the "**Cash Payment**") with an escrow agent (the "**Escrow Agent**")

pursuant to an escrow agreement (the "**Escrow Agreement**")[4] in form and substance reasonably acceptable to the Debtors and the Committee;

        (d)    As soon as practicable following the Closing Date, in consultation with the Committee, the Escrow Agent shall utilize the Cash Payment to make distributions to the Subject Creditors (the "**Direct Distribution**") in the manner set forth in the Escrow Agreement;

        (e)    The Escrow Agent shall act solely as a payment agent and shall incur no liability to any person or entity with respect to the Direct Distribution;

        (f)    Effective as of the Closing Date, each Prepetition Secured Party, including each Solus Entity, shall, and hereby does, waive its right to a distribution from the Direct Distribution on account of the Prepetition Obligations;

        (g)    Neither the Debtors, the Purchaser, any Solus Entity, any DIP Secured Party, the Committee or its members, the Escrow Agent, nor any Prepetition Secured Party shall have any responsibility, obligation, or duty with respect to the Direct Distribution other than as expressly set forth herein;

        (h)    The Debtors shall not be required to continue the Chapter 11 Cases beyond December 31, 2019 to allow for the completion of the foregoing process; and

        (i)    If the Direct Distribution contemplated in paragraph 2(d) is not approved by the Bankruptcy Court in connection with the Sale Order, the Cash Payment will be held in escrow pending a further determination by the Bankruptcy Court.

---

[4] The Escrow Agreement will be filed with the Bankruptcy Court prior to the Closing Date.

3. **Committee Fees and Expenses**. Notwithstanding anything in Section 5.4 of the Final DIP Order to the contrary, the reasonable and documented fees and expenses of counsel to the Committee in connection with the preparation of the Standing Motion, including the draft complaint and all other exhibits thereto, shall be considered incurred under, but subject to the limits of, the DIP Budget and paid from the proceeds of the DIP Facilities, the DIP Collateral, or Cash Collateral to the extent provided in the Final DIP Order.

4. **Trustee Fees and Expenses.** On the Closing Date, the Debtors shall pay the reasonable and documented fees and out-of-pocket expenses of U.S. Bank, National Association, the indenture trustee under that certain Fourth Supplemental Indenture, dated as of June 30, 2017, and its counsel, in an amount not to exceed $50,000.

5. **Sale Order**. The Debtors shall include this Stipulation as an exhibit to the Sale Order and seek approval of the Settlement in connection therewith. The Committee shall support the entry of the Sale Order that incorporates the Settlement and the transactions and releases contemplated thereby, including the transfer and release of the Acquired Actions, which, for the avoidance of doubt, include any and all estate claims against the Debtors' directors and officers (the "**D&O Claims**"), as contemplated by the Stalking Horse APA. Moreover, upon entry of the Sale Order incorporating this Settlement, the Committee on behalf of itself and any successor hereby covenants and agrees not to pursue any such Acquired Actions, including D&O Claims. Approval of this Stipulation and the terms contained herein is an express condition to the Committee's support for the Sale.

6. **Effectiveness**.  This Stipulation shall be effective (the "**Effective Date**") upon (a) the Bankruptcy Court's entry of an order with incorporates this Settlement (the "**Sale Order**"), in form and substance acceptable to the Debtors, the Committee and Solus, approving the Sale and this Stipulation, and (b) execution by the Parties of this Stipulation; *provided* that the form of Sale Order, which incorporates this Settlement, filed with the Bankruptcy Court contemporaneously herewith shall be deemed acceptable to the Committee.

7. **Termination**.  If the Closing of the Sale to the Purchaser does not occur by November 19, 2019 (the "**Deadline**"), unless the Parties hereto otherwise agree in writing to extend the Deadline, then this Stipulation shall terminate and be of no further force and effect, and the Challenge Period shall be deemed to be extended to the date that is ten (10) business days following the Deadline.

8. **Further Actions**.  The terms of this Stipulation shall be incorporated in any chapter 11 plan in these Chapter 11 Cases or in any order converting or dismissing these Chapter 11 Cases, and the Parties shall support certain further actions and agreements consistent with this Stipulation and the Sale Order that may be reasonably necessary to obtain entry of an order confirming a chapter 11 plan or converting or dismissing these Chapter 11 Cases.  This Stipulation shall survive the dismissal or conversion of these Chapter 11 Cases, and shall be binding upon (a) any trustee appointed, whether pursuant to a plan or following conversion to chapter 7 of the Bankruptcy Code, or (b) any other successor of the Debtors, the Committee and the other Parties hereto.

9. **Discovery**.  All pending discovery and litigation initiated by the Committee with respect to the Committee Investigation, the Objection, the Standing

Motion and the Sale Motion shall be stayed immediately, and upon the Closing Date terminated, and all matters related thereto, including document collection, review and production, depositions and related actions and proceedings directed at a Party in the Chapter 11 Cases shall be stayed immediately, and upon the Closing Date terminated. Unless required by law to be retained, the Committee shall use commercially reasonable efforts to return or destroy within a reasonable time following the Closing Date all documents and other materials furnished to the Committee by the Debtors in connection with the Committee Investigation.

10. **Immediate Effectiveness**. Notwithstanding the provisions of Bankruptcy Rule 6004(h), this Stipulation shall be effective and enforceable immediately upon approval by the Bankruptcy Court and shall be binding upon and inure to the benefit of any and all successors, permitted assigns and other representatives of the Parties, including, without limitation, any chapter 11 or chapter 7 trustee or other fiduciary hereafter appointed in these Chapter 11 Cases as a legal representative of the Debtors or their estates, as if such successor, permitted assign or other representative was an original signatory to this Stipulation.

11. **Representations**. The undersigned Parties, by and through their respective counsel, hereby represent and warrant that (a) they have full authority to execute this Stipulation; (b) they have full knowledge of, and have consented to, this Stipulation; and (c) they are fully authorized to bind themselves to all of the terms and conditions of this Stipulation. The Parties shall take such actions as may be reasonably required to obtain the Bankruptcy Court's approval of this Stipulation.

14

12.   **Governing Law; Jurisdiction**.  This Stipulation shall be governed by and shall be interpreted in accordance with the laws of the State of New York, except to the extent that the Bankruptcy Code applies, without regard to New York's rules governing conflicts of laws.  Each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court with respect to any action to enforce the terms and provisions of this Stipulation and expressly waives any right to commence any such action in any other forum.  The Bankruptcy Court shall retain jurisdiction, and each Party hereby submits to such retention of jurisdiction, to hear, resolve and determine any and all matters, claims and disputes arising from or relating to this Stipulation.  Any motion or application brought before the Bankruptcy Court to resolve a dispute arising from or related to this Stipulation shall be brought on proper notice upon the undersigned parties in accordance with the relevant Federal Rules of Bankruptcy Procedure and the Local Rules of the United States Bankruptcy Court for the Northern District of Georgia.

13.   **Counterparts**.  This Stipulation may be executed in counterparts by facsimile, email, or other similar electronic transmission, each of which shall be deemed an original as against any party whose signature appears thereupon and all of which when taken together shall constitute one document.  This Stipulation shall be deemed fully executed when one or more counterparts hereof, individually or taken together, shall bear the signature of each of the Parties.

14.   **Entire Agreement; Modifications**.  This Stipulation constitutes the entire agreement, and supersedes all prior agreements, understandings (including letters of intent or term sheets), representations and warranties, both written and oral, between the Parties with respect to the subject matter of this Stipulation.  This Stipulation may only be

modified, altered, amended or supplemented by means of a writing signed by the Principal Parties, *provided* that any amendment or modification of this Stipulation that adversely affects the rights or obligations of any other Party hereto shall also require the express written consent of such Party.

      15.    **<u>Stalking Horse APA</u>**.  Except as expressly set forth in this Stipulation, nothing contained in this Stipulation shall expand, reduce, or otherwise alter the rights and obligations of the Parties under the Stalking Horse APA, the other Transaction Documents or the Sale Order.

**IN WITNESS WHEREOF**, this Stipulation is executed as of the day and year first above written.

/s/ draft
Sarah R. Borders
Georgia Bar No. 610649
Leia Clement Shermohammed
Georgia Bar No. 972711
Britney Baker
Georgia Bar No. 625752
**KING & SPALDING LLP**
1180 Peachtree Street NE
Atlanta, Georgia 30309
Telephone: (404) 572-4600
Email: sborders@kslaw.com
Email: bbaker@kslaw.com
Email: sborders@kslaw.com

-and-

Kelley A. Cornish, Esq.
New York Bar No. 1930767
Brian S.  Hermann, Esq.
New York Bar No. 2810232
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Email:  kcornish@paulweiss.com
Email:  bhermann@paulweiss.com

*Counsel for Debtors*
*and Debtors in Possession*

/s/ draft
J. Robert Williamson
Georgia Bar No. 765214
Ashley R. Ray
Georgia Bar No. 601559
J. Hayden Kepner, Jr.
Georgia Bar No. 416616
**SCROGGINS & WILLIAMSON, P.C.**
4401 Northside Parkway, Suite 450
Atlanta, Georgia, Suite 450
Telephone: (404) 893-3880
Facsimile:  (404) 893-3886
Email:  rwillamson@swlawfirm.com
Email:  aray@swlawfirm.com
Email:  hkepner@swlawfirm.com

-and-

Michael G. Burke, Esq.
**SIDLEY AUSTIN LLP**
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
Email:  mgburke@sidley.com

-and-

Matthew A. Clemente, Esq.
**SIDLEY AUSTIN LLP**
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
Email: mclemente@sidley.com

*Counsel for the Committee*

*/s/ draft*
Erich N. Durlacher
Georgia Bar No. 235563
**BURR & FORMAN LLP**
171 Seventeenth Street, N.W.
Atlanta, Georgia 30363
Telephone: (404) 685-4313
Email: edurlacher@burr.com

-and-

Ariel A. Berrios
Julian Gurule
**BUCHALTER, P.C.**
1000 Wilshire Boulevard, Suite 1500
Los Angeles, California 90017
Telephone: (213) 891-0700
Email: aberrios@buchalter.com
Email: jgurule@buchalter.com

*Counsel for the Prepetition ABL Agent and
the Revolver Administrative Agent*

*/s/ draft*
Todd C. Meyers
Georgia Bar No. 503756
Colin M. Bernardino
Georgia Bar No. 054879
**KILPATRICK TOWNSEND &
STOCKTON LLP**
1100 Peachtree Street, NE, Suite 2800
Atlanta, Georgia 30309
Telephone: (404) 815-6500
Email: tmeyers@kilpatricktownsend.com
Email: cbernardino@kilpatricktownsend.com

-and-

Adam C. Harris
G. Scott Leonard
**SCHULTE ROTH & ZABEL LLP**
919 Third Avenue
New York, New York 10022
Telephone: (212) 756-2000
Email:adam.harris@srz.com
Email: Gregory.leonard@srz.com

*Counsel for the Prepetition
First Lien Secured Parties*

/s/ draft
Mark I. Duedall
Georgia Bar No. 231770
**BRYAN CAVE LEIGHTON PAISNER
LLP**
One Atlantic Center, 14th Floor
1201 West Peachtree Street, NW
Atlanta, Georgia 30309
Telephone: (404) 572-6600
Email: mark.duedall@bclplaw.com

-and-

Marc Kieselstein
Illinois Bar No. 6199255
Alexandra Schwarzman
Illinois Bar No. 6310133
Stephen L. Iacovo
Illinois Bar No. 6324094
Scott J. Vail
Illinois Bar No. 6324780
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Email: marc.kieselstein@kirkland.com
Email: alexandra.schwarzman@kirkland.com
Email: stephen.iacovo@kirkland.com
Email: scott.vail@kirkland.com

*Counsel for the Solus Entities*

/s/ draft
David A. Wender
Thomas P. Clinkscales
**ALSTON & BIRD LLP**
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
Email: david.wender@alston.com Email:
tom.clinkscales@alston.com

*Counsel for the DIP Term Administrative
Agent, Prepetition 1.5 Lien Agent and
Prepetition Second Lien Agent*

*** **END OF DOCUMENT** ***

Prepared and presented by:

*/s/ Sarah R. Borders* _____
Sarah R. Borders
Georgia Bar No. 610649
Leia Clement Shermohammed
Georgia Bar No. 972711
Britney Baker
Georgia Bar No. 625752
**KING & SPALDING LLP**
1180 Peachtree Street NE
Atlanta, Georgia 30309
Telephone: (404) 572-4600
Email: sborders@kslaw.com
Email: bbaker@kslaw.com

-and-

Kelley A. Cornish (admitted *pro hac vice*)
New York Bar No. 1930767
Brian S. Hermann (admitted *pro hac vice*)
New York Bar No. 2810232
**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Email: kcornish@paulweiss.com
Email: bhermann@paulweiss.com

*Counsel for the Debtors in Possession*

**Prepared and presented by:**

*/s/ Sarah R. Borders*        
Sarah R. Borders
Georgia Bar No. 625752
Leia Clement Shermohammed
Georgia Bar No. 972711
Britney Baker
Georgia Bar No. 610649
**KING & SPALDING LLP**
1180 Peachtree Street NE
Atlanta, Georgia 30309
Telephone: (404) 572-4600
Email: sborders@kslaw.com
Email: lshermohammed@kslaw.com
Email: bbaker@kslaw.com

-and-

Kelley A. Cornish (admitted *pro hac vice*)
New York Bar No. 1930767
Brian S. Hermann (admitted *pro hac vice*)
New York Bar No. 2810232
John T. Weber (admitted *pro hac vice*)
New York Bar No. 5151543
**PAUL, WEISS, RIFKIND, WHARTON &
& GARRISON LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Email: kcornish@paulweiss.com
Email: bhermann@paulweiss.com
Email: jweber@paulweiss.com

*Counsel for the Debtors in Possession*

**<u>Exhibit B</u>**

Redline

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| JACK COOPER VENTURES, INC., *et al.*,[1] | ) Case No. 19-62392 (PWB) |
| | ) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) Re Docket Nos. 21, 224 |

**ORDER (I) APPROVING THE SALE OF THE ACQUIRED ASSETS FREE AND
CLEAR OF CLAIMS, LIENS, INTERESTS AND ENCUMBRANCES; (II) APPROVING
THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF**

Upon the motion [Docket No. 21] (the "Motion")[2] of the Debtors, dated August 6, 2019,

for, among other things, entry of an order (this "Order"): (I) approving the sale of the Acquired

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Jack Cooper Ventures, Inc. (0805); Jack Cooper Diversified, LLC (9414); Jack Cooper Enterprises, Inc. (3001); Jack Cooper Holdings Corp. (2446); Jack Cooper Transport Company, Inc. (3030); Auto Handling Corporation (4011); CTEMS, LLC (7725); Jack Cooper Logistics, LLC (3433); Auto & Boat Relocation Services, LLC (9095); Axis Logistic Services, Inc. (2904); Jack Cooper CT Services, Inc. (3523); Jack Cooper Rail and Shuttle, Inc. (7801); Jack Cooper Investments, Inc. (6894); North American Auto Transportation Corp. (8293); Jack Cooper Transport Canada Inc. (8666); Jack Cooper Canada GP 1 Inc. (7030); Jack Cooper Canada GP 2 Inc. (2373); Jack Cooper Canada 1 Limited Partnership (3439); and Jack Cooper Canada 2 Limited Partnership (7839). The location of the Debtors' corporate headquarters and service address is: 630 Kennesaw Due West Road NW, Kennesaw, Georgia 30152.

[2] Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the Motion, the

Assets (the "Sale Transaction") pursuant to the Stalking Horse APA, as amended, and which for purposes of this Order shall include all exhibits, schedules and ancillary documents related thereto, including the Transaction Documents and the Escrow Agreement, free and clear of all claims, liens, interests and encumbrances (other than Assumed Liabilities and Permitted Encumbrances); (II) authorizing the assumption and assignment of certain executory contracts and unexpired leases (the "Assumed Contracts") and the assumption of the Assumed Liabilities, each as more fully described in the Stalking Horse APA; and (III) granting related relief, including as provided in the Committee Settlement (as defined below); and the Court having held a hearing on October 11, 2019 (the "Sale Hearing") to approve the Sale Transaction; and the Court having reviewed and considered the relief sought in the Motion with respect to the Sale Transaction, the declarations submitted in support of the Motion, all objections to the Motion and the Debtors' reply thereto, and the arguments of counsel made, and the testimony and evidence proffered or adduced, at the Sale Hearing; and all parties in interest having been heard or having had the opportunity to be heard regarding the Sale Transaction and the relief requested in this Order; and due and sufficient notice of the Sale Hearing and the relief sought therein having been given under the particular circumstances and in accordance with the Bidding Procedures Order; and it appearing that no other or further notice need be provided; and it appearing that the relief requested in the Motion with respect to the Sale Transaction is in the best interests of the Debtors, their estates, their creditors and other parties in interest; and upon the record of the Sale Hearing and these chapter 11 cases (the "Chapter 11 Cases"), and after due deliberation thereon, and good cause appearing therefor, it is hereby

---

Bidding Procedures Order (defined below) or the Stalking Horse APA (defined below), as applicable.

**FOUND, CONCLUDED AND DETERMINED THAT:**[3]

A.      This Court has jurisdiction over the Motion and the Sale Transaction pursuant to 28 U.S.C. §§ 157 and 1334 and may enter a final order on the Motion consistent with Article III of the United States Constitution.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.  The legal predicates for the relief requested in the Motion are Bankruptcy Code sections 105, 363, 364, 365 and 503.  Such relief is also warranted pursuant to Bankruptcy Rules 2002, 6004, 6006, 9006, 9007, and 9014.

B.      A reasonable opportunity to object or to be heard regarding the requested relief has been afforded to all interested parties and entities.  Certain parties filed objections to the Motion (each, an "Objection" and, collectively, the "Objections") as more particularly identified and described in Exhibit B to the *Debtors' Omnibus Reply ~~to Objections to the Motion~~In Support of Entry of the Order Approving the Sale of the Acquired Assets Free and Clear of Claims, Liens and Encumbrances; (II) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [Docket No. ~~—~~362].

C.      On August 22, 2019, the Debtors entered into the Stalking Horse APA subject to higher or better offers.

D.      On September 3, 2019, the Court entered an order [Docket No. 224] (the "Bidding Procedures Order"), which, among other things, (i) authorized the Debtors' entry into the

---

[3]    The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. Furthermore, any findings of fact or conclusions of law made by the Court on the record at the close of the Sale Hearing are incorporated herein pursuant to Fed. R. Bank. P. 7052.

Stalking Horse APA, (ii) approved the Bidding Procedures, (iii) approved the Expense Reimbursement, (iv) scheduled the Bid Deadline, the Auction, the Sale Objection Deadline, and the Sale Hearing, (v) approved the form and manner of notice with respect to the Sale (the "Sale Notice"), and (vi) approved the Assumption and Assignment Procedures and the form and manner of the Cure Notice in connection thereto.  In accordance with the Bidding Procedures Order, the Stalking Horse APA was deemed a Qualified Bid and the Buyer was eligible to participate in the Auction as a Qualified Bidder. The Bidding Procedures were substantively and procedurally fair to all parties and all potential bidders and afforded notice and a full, fair and reasonable opportunity for any person to make a higher or otherwise better offer to purchase the Acquired Assets.  The Debtors conducted the sale process without collusion and in accordance with the Bidding Procedures. The Debtors and their professionals adequately marketed the Acquired Assets and conducted the marketing and sale process in compliance with the Bidding Procedures and the Bidding Procedures Order. Based upon the record of these proceedings, creditors and other parties in interest and prospective purchasers were afforded a reasonable and fair opportunity to bid for the Acquired Assets. The Debtors and their professionals conducted the sale process in compliance with the Bidding Procedures Order, and afforded potential purchasers a full, fair and reasonable opportunity to make a higher or otherwise better offer for the Acquired Assets than that reflected in the Stalking Horse APA.

E.       On October [10], 2019, the Debtors, the Committee, the Buyer, Wells Fargo, and Cerberus, and Wilmington Trust National Association entered into that certain Stipulation of Settlement (the "Settlement Stipulation" and the "Committee Settlement," as applicable), a copy of which is attached hereto as **Exhibit 1**, pursuant to which the parties thereto consensually

resolved all of the Committee's issues in relation to the Challenge Period, Sale Motion, and other matters set forth therein. The effectiveness of the Committee Settlement is conditioned upon entry of this Order, and the Committee's support for the Sale Transaction is conditioned upon approval of the Committee Settlement.

F.      The Debtors have articulated good and sufficient business reasons for the Court to authorize (i) the Debtors' entry into the Stalking Horse APA and consummation of the Sale Transaction including the sale of the Acquired Assets to the Stalking Horse Bidder or any Buyer Designee (collectively, the "Buyer") pursuant to the terms of the Stalking Horse APA, (ii) the assumption and assignment of the Assumed Contracts as set forth herein and in the Stalking Horse APA, (iii) the Committee Settlement, and (iv) the assumption of the Assumed Liabilities as set forth herein and in the Stalking Horse APA.  Entry into the Stalking Horse APA and the Committee Settlement, and consummation of the Sale Transaction are sound exercises of business judgment, and such acts are in the best interests of the Debtors, their estates and creditors, and all parties in interest.

G.      The Debtors have articulated good and sufficient business reasons justifying the sale of the Acquired Assets to the Buyer.  Additionally: (i) the Debtors conducted a robust marketing process to sell the Acquired Assets and the Stalking Horse APA constitutes the highest and best offer for the Acquired Assets; (ii) the Bidding Procedures utilized were designed to yield the highest or otherwise best bids for the Acquired Assets; (iii) the Stalking Horse APA and the closing of the Sale Transaction present the best opportunity to realize the highest value for the Acquired Assets; (iv) there is risk of deterioration of the value of the Acquired Assets if the Sale Transaction is not consummated promptly; (v) the Stalking Horse APA and the sale of

the Acquired Assets to the Buyer provide greater value to the Debtors' estates than would be provided by any other presently available alternative; and (vi) based upon the Committee Settlement, the Committee supports consummation of the Sale Transaction.  Good and sufficient reasons for approval of the Stalking Horse APA and the Sale Transaction have been articulated by the Debtors.  The Debtors have demonstrated compelling circumstances and a good, sufficient and sound business purpose for the sale outside: (i) the ordinary course of business, pursuant to Bankruptcy Code section 363(b); and (ii) a plan of reorganization, in that, among other things, the immediate consummation of the Sale Transaction is necessary and appropriate to maximize the value of the Debtors' estates.  To maximize the value of the Acquired Assets and preserve the viability of the operations to which the Acquired Assets relate, it is essential that the Sale Transaction occur within the time constraints set forth in the Stalking Horse APA and the Restructuring Support Agreement.    Time is of the essence in consummating the Sale Transaction.

H.    Sound business justifications also exist for the establishment of the Professional Fees Escrow Account and the Wind-Down Escrow Account (together, the "Escrows") pursuant to the Escrow Agreement as provided in Section 4.2 of the Stalking Horse APA.  The Escrows will avoid a freefall shutdown of the Debtors' remaining estates, provide for, among other things, the payment of accrued and unpaid professional fees and expenses in accordance with the Stalking Horse APA, the implementation of the Committee Settlement, the payment of payroll, withholding taxes, and other related expenses accrued and unpaid as of the Closing Date, and provide a mechanism to assist in the orderly and responsible wind-down of the Debtors' estates.

I.      As evidenced by the affidavits of service [Docket Nos. 45, 120, 128, 164, 166, 254, 262, 311, 313 and 342] and publication [Docket No. 264] previously filed with the Court, and based on the representations of counsel at the Sale Hearing, (i) proper, timely, adequate and sufficient notice of the Motion, the Sale Hearing, the Sale Transaction, the Assumption and Assignment Procedures and the assumption and assignment of the Assumed Contracts and the applicable Cure Amounts (as defined herein) has been provided in compliance with the Bidding Procedures Order and in accordance with Bankruptcy Code sections 102(1), 363, and 365, and Bankruptcy Rules 2002, 4001, 6004, 6006, 9006, 9007 and 9014, (ii) such notice was good and sufficient, and appropriate under the particular circumstances, and (iii) no other or further notice of the Motion, the Sale Hearing, the Sale Transaction, the assumption and assignment of the Assumed Contracts or the Cure Amounts is or shall be required.  With respect to entities whose identities were not reasonably ascertained by the Debtors, publication of the Sale Notice was made in the *USA Today (National Edition)* on September 10, 2019.  Such notice was sufficient and reasonably calculated under the circumstances to reach all known and unknown holders of claims and interests and non-Debtor counterparties to executory contracts.

J.      The Debtors' marketing process with respect to the Sale afforded a full, fair and reasonable opportunity for any person or entity to make a higher or otherwise better offer.  No other person or entity or group of entities or persons submitted a Qualified Bid prior to the Bid Deadline.  Therefore, in accordance with the Bidding Procedures Order, no Auction was conducted and the Debtors determined that the Stalking Horse APA constituted the highest and best offer and selected the Stalking Horse APA as the Successful Bid.  The Debtors therefore determined in a valid and sound exercise of their business judgment, and in accordance with the

Bidding Procedures and Bid Procedures Order, that the highest and best Qualified Bid for the Acquired Assets is that of the Buyer and that the Stalking Horse APA will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. The Stalking Horse APA was negotiated and is undertaken by the Debtors and the Buyer at arm's-length, without collusion or fraud, and in good faith within the meaning of Bankruptcy Code section 363(m). The Buyer is not an "insider" of any of the Debtors as that term is defined by Bankruptcy Code section 101(31). The Buyer recognized that the Debtors were free to deal with any other party interested in acquiring the Acquired Assets, complied with the Bidding Procedures Order, and agreed to, and did, subject its bid to the competitive Bidding Procedures approved in the Bidding Procedures Order. All releases and payments to be made by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Sale Transaction, including the Committee Settlement, have been disclosed. The Buyer has not violated Bankruptcy Code section 363(n) by any action or inaction on its part. As a result of the foregoing, the Buyer is entitled to the protections of Bankruptcy Code section 363(m), including in the event this Order or any portion thereof is reversed or modified on appeal, and otherwise has proceeded in good faith in all respects in connection with these cases.

K.    Pursuant to the Bidding Procedures, applicable law, including Bankruptcy Code sections 363(b) and 363(k), and in accordance with the DIP Financing Orders, the Buyer (on behalf of the Junior Term Loan Lenders (as defined in the RSA)) was authorized to credit bid for the Acquired Assets, the obligations arising under the Junior Credit Agreements, and the DIP Term Loan Credit Agreement, as well as adequate protection obligations granted pursuant to the DIP Financing Orders, in each case, as contemplated by the Stalking Horse APA and the Bidding

Procedures Order.  Pursuant to the Stalking Horse APA, the Buyer credit bid (the "Credit Bid and Release") a portion of such obligations, with the balance of the Purchase Price being paid in cash and the assumption of liabilities.  The Credit Bid and Release, plus the assumption of the Assumed Liabilities and the cash consideration provided for under the Stalking Horse APA, was a valid and proper offer pursuant to the Bidding Procedures Order and Bankruptcy Code sections 363(b) and 363(k).  There is no cause to limit the amount of the Credit Bid and Release pursuant to section 363(k) of the Bankruptcy Code.

L.    The Acquired Assets sought to be transferred and/or assigned, as applicable, by the Debtors to the Buyer pursuant to the Stalking Horse APA are property of the Debtors' estates and title thereto is vested in the Debtors' estates.  The Debtors:  (i) have full power and authority to execute the Stalking Horse APA and all other documents contemplated thereby, (ii) have all of the power and authority necessary to consummate the transactions contemplated by the Stalking Horse APA, and (iii) have taken all corporate action necessary to authorize and approve the Stalking Horse APA, the sale of the Acquired Assets, and all other actions required to be performed by the Debtors in order to consummate the transactions contemplated in the Stalking Horse APA.  No consents or approvals, other than those already obtained or expressly provided for in the Stalking Horse APA or this Order, are required for the Debtors to consummate the Sale Transaction.

M.    The total consideration provided by the Buyer for the Acquired Assets represents the highest and best offer received by the Debtors, and the Purchase Price constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance

9

Act and any other applicable laws, and may not be avoided under Bankruptcy Code section 363(n) or any provision of chapter 5 of the Bankruptcy Code or under any other law of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law.  The Exit Facilities are being extended in good faith and for fair value and, therefore, the obligations thereunder and the liens granted therein are valid and binding and may not be avoided under the Bankruptcy Code, the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and any other applicable laws.  No other person or entity or group of persons or entities has offered to purchase the Acquired Assets for an amount that would provide greater economic value to the Debtors' estates than the Buyer.  The Debtors' determination that the Stalking Horse APA constitutes the highest and best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtors' business judgment.  The Court's approval of the Motion, the Sale Transaction, the Committee Settlement, and the Stalking Horse APA is in the best interests of the Debtors, their estates and creditors and all other parties in interest.

N.      The Buyer would not have entered into the Stalking Horse APA and would not consummate the Sale Transaction if the sale of the Acquired Assets to the Buyer were not free and clear of all claims, liens, interests and encumbrances (other than Permitted Encumbrances and Assumed Liabilities)[4] pursuant to Bankruptcy Code section 363(f) or if the Buyer would, or in the future could, be liable for any of such claims, liens, interests and encumbrances.  Unless

---

[4]     For the avoidance of doubt, "Assumed Liabilities" includes those obligations under the Prepetition ABL Facility, the DIP ABL Facility and the Prepetition First Lien Term Loan Facility, in each case that are being amended, amended and restated, supplemented or replaced by the Exit Facilities. In addition, "Permitted Encumbrances" includes the liens on and security interests in the Acquired Assets held by the agents under the Prepetition ABL Facility, the DIP ABL Facility, and the Prepetition First Lien Term Loan Facility, in each case that are continuing under the Exit Facilities.

expressly included in the Assumed Liabilities and Permitted Encumbrances, neither the Buyer

nor any of the Buyer's affiliates (including any subsidiary of Buyer, any person or entity that

could be treated as a single employer with the Buyer pursuant to Section 4001(b) the Employee

Retirement Income Security Act of 1974, as amended ("ERISA") or Section 414(b), (c), (m) or

(o) of the   Internal Revenue Code of 1986, as amended ("IRC"), Solus Alternative Asset

Management LP, any of its managed funds or accounts, any of its investors, shareholders,

owners, representatives, officers, limited or general partners, directors, or agents or affiliates

thereof (collectively, the "Buyer Group")) shall be responsible for any claims, liens, liabilities,

obligations, interests and encumbrances, including in respect of the following:  (i) any labor or

employment agreements (excluding, with respect to the Buyer, the Buyer's obligations under any

Collective Bargaining Agreement and Key Employment Agreements that are assumed by the

Buyer); (ii) any mortgages, deeds of trust and security interests; (iii) any intercompany loans and

receivables between one or more of the Sellers and any Debtor; (iv) any pension, multiemployer

plan (as such term is defined in Section 3(37) or Section 4001(a)(3) of ERISA), health or

welfare, compensation or other employee benefit plans, agreements, practices and programs,

including, without limitation, any pension plan of any of the Debtors or any multiemployer plan

to which the Debtors have at any time contributed to or had any liability or potential liability,

except, for the avoidance of doubt with respect to the Buyer, the Buyer's obligations under the

Hybrid Plan Participation Agreement that was approved by the Court upon entry of the *Order

Authorizing the Debtors to Enter Into the Pension Plan Agreement and Release* [Docket No. __];

(v) any other employee, worker's compensation, occupational disease or unemployment or

temporary disability related claim, including, without limitation, claims that might otherwise

arise under or pursuant to (a) ERISA, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the IRC and of any similar state law (collectively, "COBRA"), (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, or (k) any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors; (vi) any liabilities arising under any Environmental Laws with respect to any assets owned or operated by any of the Debtors or any corporate predecessor of any of the Debtors at any time prior to the Closing Date; (vii) any bulk sales or similar law; (viii) any tax statutes or ordinances, including, without limitation, the IRC; and (ix) any Excluded Liabilities.  There is no better available alternative to maximize the value of the Acquired Assets than the Sale Transaction with the Buyer.  The Sale Transaction contemplated by the Stalking Horse APA is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

O.    The Debtors may sell the Acquired Assets free and clear of all claims, liens, interests and encumbrances (other than Assumed Liabilities and Permitted Encumbrances) because, with respect to each creditor asserting a claim, lien, interest or encumbrance, one or more of the standards set forth in Bankruptcy Code section 363(f)(1)-(5) has been satisfied. Those holders of claims, liens, interests or encumbrances that did not object to or that withdrew their objections to the sale of the Acquired Assets or the Motion, are deemed to have consented

to the Motion and the Sale Transaction pursuant to Bankruptcy Code section 363(f)(2).  Those

holders of claims, liens, interests, or encumbrances that did object fall within one or more of the

other subsections of Bankruptcy Code section 363(f) or are adequately protected.  The Revolving

Lenders' consent to the Motion and the Sale Transaction is conditioned upon the payment in full

in cash (whether pursuant to the Exit Revolving Facility or otherwise), by no later than the

Closing Date, of all due and payable Obligations (as defined in the Revolver DIP Agreement,

which is defined in the Final DIP Order).

P.      Neither the Debtors, the Buyer, the Committee, nor the administrative agents or

lenders under the Exit Facilities engaged in any conduct that would cause or permit the Stalking

Horse APA, the other Transaction Documents, including the Exit Facilities and the Committee

Settlement, or the consummation of the Sale Transaction (including the extension of the Exit

Facilities to the Buyer) to be avoided, or costs or damages to be imposed, under Bankruptcy

Code section 363(n) or under any other law of the United States, any state, territory, possession

thereof, the District of Columbia, or any other applicable law.

Q.      The Stalking Horse APA and the consideration offered by the Buyer pursuant to

the Stalking Horse APA constitute reasonably equivalent value and fair consideration.  The

Stalking Horse APA was not entered into, and the Sale Transaction is not consummated, for the

purpose of hindering, delaying or defrauding the Debtors' creditors under the Bankruptcy Code

or under any other law of the United States, any state, territory, possession thereof, or the District

of Columbia, or any other applicable law.  Neither the Debtors, the Buyer, nor the administrative

agents or lenders under the Exit Facilities has entered into the Stalking Horse APA, the

Committee Settlement or the other Transaction Documents, including the Exit Facilities, or is

consummating the Sale Transaction for any fraudulent or otherwise improper purpose.  The Committee's support for the Sale Transaction, which was obtained by means of the Committee Settlement, is critical to both the Debtors and the Buyer.

R.      For the avoidance of doubt, following the Closing, the Acquired Assets shall be subject in all respects to the liens securing the Exit Facilities, to the extent provided by the documents governing the Exit Facilities.

S.      Upon the Closing, no member of the Buyer Group shall, or shall be deemed to, (i) be the successor of or successor employer to any of the Sellers, including without limitation, with respect to any Collective Bargaining Agreements, any Benefit Plans, or any Multiemployer Plans, and the Buyer shall instead be, and be deemed to be, a new employer, including with respect to, among other things, any and all federal or state unemployment laws, including any unemployment compensation or tax laws, or any other similar federal or state laws (provided that the Buyer shall pay any employee-related liabilities to the extent included in the Assumed Employee Liabilities); (ii) have any common law successorship liability in relation to any Benefit Plan or Multiemployer Plan, including with respect to withdrawal liability or contribution obligations; (iii) have, *de facto*, or otherwise, merged or consolidated with or into Sellers; (iv) be a mere continuation or substantial continuation of Sellers or the enterprise(s) of Sellers; or (v) be liable for any acts or omissions of Sellers in connection with the Collective Bargaining Agreements, the conduct of the Business, or the operation, funding or administration of the Benefit Plans or Multiemployer Plans or arising under or related to the Acquired Assets other than as expressly set forth in the Stalking Horse APA and the Transaction Documents.  Without limiting the generality of the foregoing, and except as otherwise provided in the Stalking Horse APA or the Committee Settlement, the parties intend

and the Court hereby finds that the Buyer Group shall not be liable for any Encumbrance or Liability (other than Assumed Liabilities and Permitted Encumbrances) against any Seller, or any of its predecessors or affiliates, and the Buyer Group shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, any Collective Bargaining Agreement, the operation, funding, or administration of the Benefit Plans or Multiemployer Plans, the Acquired Assets or any Liabilities of any Seller arising or attributable to periods prior to the Closing Date.  The Buyer would not have acquired the Acquired Assets but for the foregoing protections against potential claims based upon "successor liability," *de facto* merger, or theories of similar effect.

T.      The Debtors have proven and demonstrated that it is an exercise of their sound business judgment to assume and assign the Assumed Contracts to the Buyer in connection with the consummation of the Sale Transaction, and the assumption and assignment of the Assumed Contracts to the Buyer is in the best interests of the Debtors, their estates and creditors and all parties in interest.  The Assumed Contracts being assigned to the Buyer are an integral part of the Acquired Assets being purchased by the Buyer, and accordingly, such assumption and assignment of the Assumed Contracts is reasonable and enhances the value of the Debtors' estates.  The cure amounts required to be paid pursuant to Bankruptcy Code section 365(b), whether agreed or judicially resolved (the "Cure Amounts"), are deemed to be the entire cure obligation due and owing under the Assumed Contracts under Bankruptcy Code section 365(b). To the extent that any non-Debtor counterparty to an Assumed Contract failed to timely file an objection to the proposed Cure Amount filed with the Bankruptcy Court, the Cure Amount listed

15

in the Cure Notice shall be deemed to be the entire cure obligation due and owing under the applicable Assumed Contract.

U.      Each provision of the Assumed Contracts or applicable non-bankruptcy law that purports to prohibit, restrict or condition, or could be construed as prohibiting, restricting or conditioning, assignment of any Assumed Contracts has been satisfied or is otherwise unenforceable under Bankruptcy Code section 365.

V.      Assumption and assignment of any Assumed Contract to the Buyer pursuant to this Order and the Stalking Horse APA and full payment of any applicable Cure Amount shall result in the full release and satisfaction of any and all cures, claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting change in control or ownership interest composition or other bankruptcy-related defaults, arising under any Assumed Contract at any time prior to the Closing Date, and shall relieve the Debtors and their estates from any liability for any breach of such Assumed Contract occurring after such assignment.

W.      No default exists under any of the Assumed Contracts to which General Motors LLC and/or General Motors Holdings LLC (collectively, "GM", and, such contracts, the "GM Contracts") is a party, and therefore, the Debtors are not required to satisfy the requirements of section 365(b)(1) of the Bankruptcy Code.

X.      The Buyer's assumption of any Assumed Contracts to which GM is not a party, including the Agreement on Purchased Transportation between Jack Cooper Transport and Teamsters National Automobile Transporters Industry Negotiating Committee, shall not modify or change any right of GM, or the obligations of either GM or the Buyer under the GM Contracts.

Y.    Among the GM Contracts is the Master Contract for Vehicle Haulaway Transportation Services and the Master Contract for Yard Management Services, each dated March 28, 2019 and between Debtor Jack Cooper Transport Company, Inc. and General Motors Holdings, LLC (the "Haulaway and Yard Management Contracts"). In addition to and notwithstanding anything to the contrary herein, and consistent with Section 365 of the Bankruptcy Code but restated here for the sake of clarity, the Buyer shall assume responsibility for the Debtors' obligations under the Haulaway and Yard Management Contracts for unknown, unliquidated or pending amounts arising under "Section 7. Cargo Loss and Damage" of the Haulaway and Yard Management Contracts, that may have been incurred by the Debtors pre-Closing in the ordinary course, but which unknown, unliquidated or pending amounts only become known, liquidated and/or payable under Section 7 of the Haulaway Contract post-Closing, if any.

Z.    The Buyer has demonstrated adequate assurance of future performance of all Assumed Contracts, including the GM Contracts, within the meaning of Bankruptcy Code section 365.

AA.    Upon the assignment to the Buyer and the payment of the relevant Cure Amount (if applicable), (i) each Assumed Contract shall be deemed valid and binding and in full force and effect in accordance with its terms, and all defaults thereunder, if any, shall be deemed cured, subject to the provisions of this Order; and (ii) the Buyer shall assume all obligations under each Assumed Contract.

BB.    An injunction against creditors and third parties pursuing claims against, and liens, interests and encumbrances on, the Acquired Assets is necessary to induce the Buyer to

17

close the Sale Transaction, and the issuance of such injunctive relief is therefore necessary to avoid irreparable injury to the Debtors' estates and will benefit the Debtors' creditors.

CC.     The Sale Transaction does not constitute a *sub rosa* chapter 11 plan.  The Sale Transaction neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates a Chapter 11 plan for any of the Debtors.

DD.     This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds that there is no just reason for delay in the implementation of this Order, and, sufficient cause having been shown, waives any such stay, and expressly directs entry of judgment as set forth herein. The Debtors have demonstrated compelling circumstances and a good, sufficient and sound business purpose and justification for the immediate approval and consummation of the Sale Transaction as contemplated by the Stalking Horse APA and the Committee Settlement. The Buyer, being a good faith purchaser under section 363(m) of the Bankruptcy Code, may close the Sale Transaction contemplated by the Stalking Horse APA at any time after entry of this Order.

EE.     The relief granted herein is in the best interests of the Debtors, their estates and creditors, and other parties in interest.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:**

1.     The Motion is **GRANTED**, to the extent set forth herein.

2.     Any Objection to the Motion, or any other relief granted in this Order, to the extent not resolved, adjourned for hearing on a later date, waived or withdrawn or previously overruled, and all reservations of rights included therein, is hereby **OVERRULED** and **DENIED** on the merits.

3.     The Bidding Procedures utilized by the Debtors with respect to the Sale Transaction are hereby ratified and were appropriate under the circumstances in order to maximize the value obtained from the Sale Transaction for the benefit of the estates.

4.     Pursuant to Bankruptcy Code sections 105, 363, 364, 365 and 503 and the Stalking Horse APA, the Credit Bid and Release, the Sale Transaction, and the Committee Settlement are hereby approved and the Debtors are authorized to enter into and perform under the Stalking Horse APA, the Committee Settlement and the other Transaction Documents. Pursuant to Bankruptcy Code sections 105, 363, 364, 365 and 503, each of the Debtors and the Buyer are hereby authorized and directed to take any and all actions necessary or appropriate to: (i) consummate the Sale Transaction and the Closing in accordance with the Motion, the Stalking Horse APA, and this Order; (ii) assume and assign the Assumed Contracts; (iii) provide for the assumption of the Assumed Liabilities; (iv) perform, consummate, implement and close fully the Stalking Horse APA together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Stalking Horse APA; (v) perform, consummate, and implement the Committee Settlement and the Settlement Stipulation, as applicable; (vi) establish and fund the Escrows; and (vii) enter into the Exit Facilities on the Closing Date.  The Debtors and each other party to the Transaction Documents, including the Escrow Agreement (as defined in the Stalking Horse APA) and the Committee Settlement, including the Escrow Agreement (as defined in the Settlement Stipulation) (the "Distribution Escrow Agreement") are hereby authorized and directed to perform each of their covenants and undertakings as provided in the Stalking Horse APA and the Transaction Documents, including the Escrow Agreement and, the Committee Settlement, and the Distribution Escrow Agreement,

prior to or after the Closing Date without further order of the Court. The Buyer and the Debtors shall have no obligation to close the Sale Transaction except as is contemplated and provided for in the Stalking Horse APA.

5.     Pursuant to Bankruptcy Code section 365(f), notwithstanding any provision of any Assumed Contract or applicable non-bankruptcy law that prohibits, restricts or conditions the assignment of the Assumed Contracts, the Debtors are authorized to assume the Assumed Contracts and to assign the Assumed Contracts to the Buyer or to any Buyer Designee, which assignment shall take place on and be effective as of the Closing or as otherwise provided by order of this Court. There shall be no accelerations, assignment fees, increases, or any other fees charged to the Buyer or the Debtors as a result of the assumption and assignment of the Assumed Contracts.

6.     The Buyer shall have assumed the Assumed Contracts (including the Key Employment Agreements), and pursuant to section 365(f) of the Bankruptcy Code, the assignment by the Debtors of such Assumed Contracts shall not be a default thereunder. After the payment of the relevant Cure Amount (if applicable), neither the Debtors, their bankruptcy estates nor the Buyer shall have any further liabilities to the non-Debtor counterparties to the Assumed Contracts, other than the Buyer's obligations under the Assumed Contracts that accrue or become due and payable on or after the Closing Date.

7.     The Debtors' assumption of the Assumed Contracts is subject to the consummation of the Sale. To the extent that an objection by a counterparty to any Assumed Contract, including all objections related to Cure Amounts, is not resolved prior to the Closing Date, the Debtors, with the consent of the Buyer and in accordance with the Stalking Horse

20

APA, may elect to: (i) not assume and assign to the Buyer the Assumed Contract; (ii) postpone the assumption of such Assumed Contract until the resolution of such objection; or (iii) reserve the disputed portion of the Cure Amount and assume the Assumed Contract on the Closing Date. So long as the claimed Cure Amount is held in reserve, and there are no other unresolved objections to the assumption and assignment of the applicable Assumed Contract, the Debtors can, without further delay, assume and assign the Assumed Contract that is the subject of the objection. Under such circumstances, the respective objecting counterparty's recourse would be limited to the funds held in reserve.

8.    Notwithstanding anything to the contrary in the Motion, any Notices related thereto, or this Order, the Cigna Employee Benefits Agreements (as defined in the *Objection of Cigna Entities to Notice to Contract Parties to Potentially Assumed Executory Contracts and Unexpired Leases* [Docket No. 337] ("Cigna Objection")) shall be assumed and assigned to the Buyer as of the Closing Date; provided, however, that: (i) any unpaid obligations to Cigna due and accruing under the Cigna Employee Benefits Agreements as of the Closing Date shall pass through to the Buyer and survive assumption and assignment so that nothing in this Order or 11 U.S.C. § 365 shall affect the obligations accruing under the Cigna Employee Benefits Agreements Contracts prior to the Closing Date; and (ii) prior to the Closing Date, the Buyer shall provide Cigna with an executed form W-9 for the Buyer, and contact information for a Buyer representative to whom Employee Benefits Agreement questions can be directed.

9.    Notwithstanding anything to the contrary in the Motion, any Notices related thereto, or this Order, the Leases (as defined in the *Protective Objection of Stonebriar Commercial Finance LLC to Notice to Contract Parties to Potentially Assumed Executory*

*Contracts and Unexpired Leases* [Docket No. 335] ("Stonebriar Objection")) shall be assumed and assigned to the Buyer as of the Closing Date; provided, however, that: (i) any unpaid obligations due under the Leases on and after November 1, 2019, shall pass through to the Buyer and survive assumption and assignment so that nothing in this Order or 11 U.S.C. § 365 shall affect the obligations accruing under the Leases.

10.     Notwithstanding anything in this Order or the Stalking Horse APA to the contrary, with respect to certain commercial automobile liability, general liability and workers' compensation insurance programs (collectively, the "Programs") of the Debtors with National Interstate Insurance Company and its affiliates, including National Interstate Insurance Company of Hawaii, Inc., Triumphe Casualty Company, Vanliner Insurance Company, Hudson Indemnity, Ltd. and American Money Management Corporation (collectively, "NIIC"), the executory contracts related thereto, as are identified and agreed among the Debtors, Buyer and NIIC at or prior to Closing, shall be assumed by the Debtors and assigned to the Buyer with such amendments and modifications and/or commutation as may be mutually agreed among the Debtors, Buyer and NIIC at or prior to Closing; provided, that to the extent the parties are unable to mutually agree on such amendments and modifications and/or commutation, the Debtors and Buyer reserve the right to classify the Programs, and executory contracts related thereto, as Excluded Contracts at any time on or prior to the Closing Date.  In addition, for avoidance of doubt, the terms of this Sale Order and the Stalking Horse APA shall, subject to any mutually agreed amendments and modifications and/or commutation to the contracts related to the Programs, not alter, modify, affect or otherwise impair NIIC's rights and interests in the cash or other collateral maintained by NIIC related to the Programs, and such cash or other collateral

remains subject to NIIC's rights under the contracts and applicable law that governs the Programs.  Regardless of whether or not the contracts related to the Programs are Assumed Contracts, the reversionary interests of the Debtors to the cash or other collateral securing or otherwise relating to the Programs shall transfer to Buyer subject to the terms and conditions of the contracts and agreements related to the Programs, as may be amended.

11.    Notwithstanding anything in this Order or the Stalking Horse APA to the contrary, all of the issued surety bonds (the "Bonds") referenced in the *Limited Objection of the Surety to the Stalking Horse APA* [Docket No. 317] (the "Surety Objection") shall be assumed by the Buyer, on the conditions that: (a) prior to the Closing, the Buyer and Surety (as defined in the Surety Objection) shall execute a general indemnity agreement, acceptable to the Surety and the Buyer (the "Indemnity Agreement"), regarding all of the assumed Bonds; and (b) the Buyer shall provide the Surety with a replacement irrevocable letter of credit issued by Wells Fargo, in its capacity as letter of credit issuer under the Exit Revolving Facility, in the amount of $250,000 in favor of the Surety to secure the Bonds and Buyer's obligations under the Indemnity Agreement (the "New L/C"), after which the Surety shall execute appropriate documents with the Debtors and Wells Fargo to effect a release and cancellation of that certain irrevocable letter of credit issued by Wells ~~Forgo~~Fargo, No. IS009842U (as amended), in the amount of $250,000, obtained by one or more of the Debtors in favor of the Surety to collateralize the Bonds prior to the Petition Date.  The issuance of the New L/C shall comply in all respects with the terms and conditions of the Exit Revolving Facility.  As part of the assumption of the Bonds, the Cure Amount shall be an amount equal to the Surety's reasonable and documented legal fees and costs

in an amount not to exceed $10,000, to be paid either at the Closing, or thereafter by a draw on the New L/C.

12.    Upon the Closing:   (a) the Debtors are hereby authorized and directed to consummate, and shall be deemed for all purposes to have consummated, the sale, transfer and assignment of all of the Debtors' rights, title and interest in the Acquired Assets (which for the avoidance of doubt, and subject to paragraphs 35 through 37 hereof, includes any affirmative claims, demands, remedies, rights and/or causes of action against any third-party) to the Buyer free and clear of all claims, liens, interests, and encumbrances (other than the Assumed Liabilities and Permitted Encumbrances) and (b) except as otherwise expressly provided in the Stalking Horse APA, all Encumbrances and Liabilities (other than the Assumed Liabilities and the Permitted Encumbrances) shall not be enforceable as against any member of the Buyer Group or the Acquired Assets.   Unless otherwise expressly included in the Assumed Liabilities and Permitted Encumbrances, or as otherwise expressly provided by this Order, no member of the Buyer Group shall be responsible for any claims, liens, liabilities, obligations, interests or encumbrances, including in respect of the following: (i) any labor or employment agreements (excluding, with respect to the Buyer, the Buyer's obligations for any Collective Bargaining Agreement or Key Employment Agreement that is assumed by the Buyer); (ii) any mortgages, deeds of trust and security interests; (iii) any intercompany loans and receivables between one or more of the Sellers and any Debtor; (iv) any pension, multiemployer plan (as such term is defined in Section 3(37) or Section 4001(a)(3) of ERISA), health or welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of any of the Debtors or any multiemployer plan to which the Debtors have at

any time contributed to or had any liability or potential liability, except, for the avoidance of doubt, with respect to the Buyer, the Buyer's obligations under the Hybrid Plan Participation Agreement; (v) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) ERISA, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of 1990, (h) COBRA, (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, or (k) any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors; (vi) any liabilities arising under any Environmental Laws with respect to any assets owned or operated by any of the Debtors or any corporate predecessor of any of the Debtors at any time prior to the Closing Date; (vii) any bulk sales or similar law; (viii) any tax statutes or ordinances, including, without limitation, the IRC, as amended; and (ix) any Excluded Liabilities.  A certified copy of this Order may be filed with the appropriate clerk and/or recorder to act to cancel any such lien, claim, interest or encumbrance of record.

13.     The transfer to the Buyer of the Debtors' rights, title, and interest in the Acquired Assets pursuant to the Stalking Horse APA shall be, and hereby is deemed to be, a legal, valid and effective transfer of the Debtors' rights, title, and interest in the Acquired Assets, and vests with or will vest in the Buyer all rights, title, and interest of the Debtors in the Acquired Assets, free and clear of all claims, liens, interests, and encumbrances of any kind or nature whatsoever

(other than the Permitted Encumbrances and the Assumed Liabilities), with any such claims, liens, interests, and encumbrances attaching to the net available proceeds with the same validity, extent, and priority as immediately prior to the sale of the Acquired Assets, subject to the provisions of the Stalking Horse APA and this Order, and any rights, claims, and defenses of the Debtors and other parties in interest.  For the avoidance of doubt, the Acquired Actions shall include all of the Debtors' claims and causes of action arising under Chapter 5 of the Bankruptcy Code.

14.     None of the Buyer or its affiliates, successors, assigns, equity holders, officers, directors,  employees or professionals shall have or incur any liability to, or be subject to any action by any of the Debtors or any of their estates, predecessors, successors, or assigns, arising out of the negotiation, investigation, preparation, execution, or delivery of the Stalking Horse APA and the entry into and consummation of the sale of the Acquired Assets, except as expressly provided in the Stalking Horse APA, the Committee Settlement and this Order.

15.     Except as expressly provided in the Stalking Horse APA, the other Transaction Documents, including the Exit Facilities and the Committee Settlement, or by this Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, vendors, suppliers, employees, trade creditors, litigation claimants, and other persons, holding claims, liens, interests, or encumbrances of any kind or nature whatsoever against or in the Debtors or the Debtors' interests in the Acquired Assets (whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated, or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of these ~~chapter~~Chapter 11

cases,Cases, whether imposed by agreement, understanding, law, equity, or otherwise),

including, without limitation, the non-Debtor party or parties to each Assumed Contract, arising

under or out of, in connection with, or in any way relating to, the Acquired Assets or the transfer

of the Debtors' interests in the Acquired Assets to the Buyer shall be and hereby are forever

barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing

claims, liens, interests and encumbrances against the Buyer or its affiliates, successors, assigns,

equity holders, directors, officers, employees or professionals, the Acquired Assets, or the

interests of the Debtors in such Acquired Assets (other than Assumed Liabilities or Permitted

Encumbrances).  Following the Closing, no holder of a claim, lien, interest, or encumbrance

against the Debtors (other than Assumed Liabilities or Permitted Encumbrances) shall interfere

with the Buyer's title to or use and enjoyment of the Debtors' interest in the Acquired Assets

based on or related to such claim, lien, interest or encumbrance, and, except as otherwise

provided in the Stalking Horse APA, the Transaction Documents, including the Exit Facilities,

the Escrow Agreement, the Committee Settlement or this Order, all such claims, liens, interests,

or encumbrances, if any, shall be, and hereby are transferred and will attach to the net available

proceeds from the sale of the Acquired Assets in the order of their priority, with the same

validity, force, and effect which they have against such Acquired Assets as of the Closing,

subject to any rights, claims and defenses that the Debtors' estates and the Debtors, as applicable,

may possess with respect thereto.  All persons are hereby enjoined from taking action that would

interfere with or adversely affect the ability of the Debtors to transfer the Acquired Assets in

accordance with the terms of the Stalking Horse APA, the Transaction Documents, including the

Exit Facilities, the Escrow Agreements, the Committee Settlement and this Order.

16.　　Upon assumption of the Assumed Contracts by the Debtors and assignment of same to the Buyer, the Assumed Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Order.  As of the Closing, subject to the provisions of this Order, the Buyer shall succeed to the entirety of Debtors' rights and obligations in the Assumed Contracts first arising and attributable to the time period occurring on or after the date the assignment of the Assumed Contracts becomes effective and shall have all rights thereunder.

17.　　Subject to paragraph 7 of this Order, upon the entry of this Order, (a) all defaults (monetary and non-monetary) under the Assumed Contracts through the Closing shall be deemed cured and satisfied through the payment of the Cure Amounts, (b) no other amounts will be owed by the Debtors, their estates, or the Buyer with respect to amounts first arising or accruing during, or attributable or related to, the period before Closing with respect to the Assumed Contracts, and (c) any and all persons or entities shall be forever barred and estopped from asserting a claim against the Debtors, their estates, or the Buyer that any additional amounts are due or defaults exist under the Assumed Contracts that arose or accrued, or relate to or are attributable to the period before the Closing, including defaults of provisions restricting change in control or ownership interest composition or other bankruptcy-related defaults, arising under any Assumed Contract at any time on or prior to the Closing Date.  Assignment by the Debtors of any Assumed Contract to the Buyer or the Buyer Designee shall relieve the Debtors and their estates from any liability for any breach of such Assumed Contract occurring after such assignment.

18.　　The creation and funding of the Escrows and the implementation of the Committee Settlement is approved pursuant to Bankruptcy Code sections 105(a) and 363(b).

The Debtors and the other parties thereto are authorized, pursuant to Bankruptcy Code sections 105(a) and 363(b) and without further notice or relief from this Court, to enter into the Escrow Agreement, the Distribution Escrow Agreement, and the Committee Settlement, to take any and all actions that are necessary or appropriate in the exercise of their business judgment to implement the Escrow Agreement, the Distribution Escrow Agreement, and the Committee Settlement, including employing third party contractors in accordance therewith, including the applicable escrow agents, and to make or authorize the payments contemplated thereunder. Funds deposited in accordance with the Escrow Agreement, the Distribution Escrow Agreement, and the Committee Settlement shall not constitute property of any Debtor's estate or be subject to claw back or disgorgement, and such funds (including any residual funds) may be released and applied in accordance with the terms thereof, without further order of this Court.   For the avoidance of doubt, no funds in the Professional Fees Escrow Account shall be property of the Debtors' estates, and the Professional Fee Escrow Account shall be maintained in trust solely for the benefit of the Professionals.  The Escrow Agent (as defined in the Settlement Stipulation) is acting solely as a payment agent with respect to the Direct Distribution (as defined in the Settlement Stipulation) and shall not incur any liability or be subject to any action by any person or entity arising out of or related to the Distribution Escrow Agreement or the Direct Distribution.

19.     The Stalking Horse APA has been entered into by the Buyer in good faith and the Buyer is a good faith purchaser of the Acquired Assets as that term is used in Bankruptcy Code section 363(m).   The Buyer is entitled to all of the protections afforded by Bankruptcy Code section 363(m).

20.     No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Sale Transaction.  Except as otherwise provided in the Stalking Horse APA, the Transaction Documents, the Escrow Agreement and the Committee Settlement, no obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment is due to any person in connection with the Stalking Horse APA, the other Transaction Documents, or the transactions contemplated hereby or thereby for which the Buyer is or will become liable.

21.     The consideration provided by the Buyer for the Acquired Assets under the Stalking Horse APA, including the portion of the consideration that consisted of the Credit Bid and Release, shall be deemed for all purposes to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law, and the sale of the Acquired Assets may not be avoided, or costs or damages imposed or awarded under Bankruptcy Code section 363(n) or any other provision of the Bankruptcy Code, the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, or any other similar federal or state laws.

22.     Neither the Debtors nor the Buyer engaged in any conduct that would cause or permit the Stalking Horse APA or the consummation of the Sale Transaction to be avoided, or costs or damages to be imposed, under Bankruptcy Code section 363(n) or under any other law of the United States, any state, territory, possession thereof, the District of Columbia, or any other applicable law. Accordingly, the Stalking Horse APA and the Sale Transaction shall not be avoidable under section 363(n) or chapter 5 of the Bankruptcy Code, and no party shall be

entitled to any damages or other recovery pursuant to section 363(n) of the Bankruptcy Code in respect of the Stalking Horse APA or the Sale Transaction.

23.     The Exit Facilities are being extended in good faith and for fair value and, therefore, the obligations thereunder and the liens granted therein are valid and binding and may not be avoided under the Bankruptcy Code, Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and any other applicable laws.

24.     On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of all of the Debtors' rights, title, and interest in the Acquired Assets or a bill of sale transferring good and marketable title in such Acquired Assets to the Buyer on the Closing Date pursuant to the terms of the Stalking Horse APA, free and clear of all claims, liens, interests, and encumbrances (other than Assumed Liabilities and Permitted Encumbrances).

25.     Upon the Closing, no member of the Buyer Group shall, or shall be deemed to, (i) be the successor of or successor employer to any of the Sellers, including without limitation, with respect to any Collective Bargaining Agreements, any Benefit Plans, or any Multiemployer Plans, and the Buyer shall instead be, and be deemed to be, a new employer, including with respect to, among other things, any and all federal or state unemployment laws, including any unemployment compensation or tax laws, or any other similar federal or state laws (provided that the Buyer shall pay any employee-related liabilities to the extent included in the Assumed Employee Liabilities); (ii) have any common law successorship liability in relation to any Benefit Plan or Multiemployer Plan, including with respect to withdrawal liability or contribution

obligations; (iii) have, *de facto*, or otherwise, merged or consolidated with or into Sellers; (iv) be a mere continuation or substantial continuation of Sellers or the enterprise(s) of Sellers; or (v) be liable for any acts or omissions of Sellers in connection with the Collective Bargaining Agreements, the conduct of the Business, or the operation, funding, or administration of the Benefit Plans or Multiemployer Plans or arising under or related to the Acquired Assets, except as expressly provided in the Stalking Horse APA. Without limiting the generality of the foregoing, and except as otherwise provided in the Stalking Horse APA and the Committee Settlement, the parties intend and the Court hereby orders that no member of the Buyer Group shall be liable for any Encumbrance or Liability (other than Assumed Liabilities and Permitted Encumbrances) against any Seller, or any of its predecessors or affiliates, and no member of the Buyer Group shall have successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, any Collective Bargaining Agreement, the operation, funding, or administration of the Benefit Plans or Multiemployer Plans, the Acquired Assets or any Liabilities of any Seller arising or attributable to periods prior to the Closing Date.

26.     Other than the Buyer's assumption of the applicable Assumed Liabilities (including, for the avoidance of doubt, the Buyer's obligations under the Prepetition ABL Facility, the DIP ABL Facility, the Prepetition First Lien Term Loan Facility, in each case that are being amended and restated pursuant to the Exit Facilities) and the Buyer's obligations under the Stalking Horse APA, the Settlement Stipulation, and the other Transaction Documents, including the Exit Facilities, the Buyer Group and its respective affiliates, successors, assigns, members, partners, officers, directors, principals, and shareholders (or equivalent) shall have no

obligations with respect to any Liabilities, including, without limitation, the Excluded Liabilities, and, upon consummation of the Sale Transaction, the Debtors and their estates are deemed to release and forever discharge the Buyer Group and its affiliates, and their respective successors, assigns, members, partners, officers, directors, principals and shareholders (or equivalent) from any and all claims, causes of action, obligations, Liabilities, demands, losses, costs, taxes, and expenses of any kind, character, or nature whatsoever, known or unknown, fixed or contingent, relating to the sale of the Acquired Assets or assignments of the Assumed Contracts.  For the avoidance of doubt, no member of the Buyer Group shall have any liability, responsibility, obligation, or duty under or related to the ~~Creditor~~Direct Distribution ~~Trust or the CDTA~~, other than as expressly set forth in ~~paragraphs~~paragraph 2 ~~and 3(b)~~ (c) of the Settlement Stipulation.

27.    Upon the Closing, the Transferred Permits, including, but not limited to the Debtors' interstate motor carrier and property broker authorities, United States Department of Transportation ("DOT") numbers, and International Registration Plan accounts, vehicle registrations and license plates (all of which are set forth on Schedule 2.1(f) to the Stalking Horse APA), may be transferred to the Buyer without further consent or approval of any governmental agency or any other person.  The Debtors shall take all required steps necessary to allow for the transfer of the applicable Transferred Permits to the Buyer, including, but not limited to, executing and delivering to the Federal Motor Carrier Safety Administration and/or DOT any necessary documentation or applications (*e.g.*, a Name Change Application) to allow for the transfer of the Debtors' interstate motor carrier and property broker authority and DOT numbers to the Buyer.

28.    This Order:  (a) is and shall be effective as a determination that other than Permitted Encumbrances and Assumed Liabilities, all claims, liens, interests and encumbrances of any kind or nature whatsoever existing as to the Acquired Assets prior to the Closing have been unconditionally released, discharged, and terminated, and that the conveyances described herein have been effected, including claims in connection with any tax liability and (b) is and shall be binding upon and shall authorize all entities, including, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Acquired Assets conveyed to the Buyer.  Other than Permitted Encumbrances, and liens and security interests relating to the Assumed Liabilities, all recorded claims, liens, interests, and encumbrances against the Acquired Assets from their records, official and otherwise, shall be deemed stricken.

29.    If any person or entity which has filed statements or other documents or agreements evidencing liens, interests, or encumbrances on, or claims against or interests in, the Acquired Assets shall not have delivered to the Debtors before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all claims, liens, interests or encumbrances (other than Permitted Encumbrances and liens and security interests relating to the Assumed Liabilities) which the

person or entity has or may assert with respect to the Acquired Assets, the Debtors and the Buyer are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Acquired Assets.

30.    All counterparties to the Assumed Contracts shall cooperate and expeditiously execute and deliver, upon the reasonable requests of the Buyer, and shall not charge the Debtors or the Buyer for any instruments, applications, consents or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the sale of the Acquired Assets.

31.    Each and every federal, state and governmental agency or department, and any other person or entity, is hereby authorized to accept any and all documents and instruments in connection with or necessary to consummate the Sale contemplated by the Stalking Horse APA.

32.    Nothing in this Order or the Stalking Horse APA releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the owner or operator of property after the Closing Date.

33.    Without limiting the provisions of paragraph 32 above, but subject to Bankruptcy Code section 525(a), no governmental unit may revoke or suspend any right, license, trademark or other permission relating to the use of the Acquired Assets sold, transferred, or conveyed to the Buyer on account of the filing or pendency of these ~~chapter~~Chapter 11 ~~cases~~Cases or the consummation of the sale of the Acquired Assets.

34.    Notwithstanding anything herein to the contrary, upon the payment to the applicable mortgagee under the DSJL Mortgage and Westside Bank Mortgage (each as defined in the Restructuring Term Sheet) of a cure payment in the amount of $~~[    ] and $[    ]~~0.00 and

$33,146.88 respectively, the Buyer shall be deemed to assume on the Closing Date the DSJL Mortgage and Westside Bank Mortgage, and in each case, to have cured all existing defaults thereunder, and the liens and security interests thereunder shall attached to the same property such liens and security interests encumbered prior to the Petition Date, with the same priority in interest, and such claims, liens and security interests as against the Buyer and the applicable collateral shall otherwise be unaffected by the Sale Transaction.

35.    Pursuant to this Order, the Stalking Horse APA and the other Transaction Documents, on the Closing Date, (a) the Buyer shall acquire the Acquired Actions as an Acquired Asset, and (b) the Acquired Actions shall be waived and released pursuant to the terms of the Waiver.

36.    Section 12.16 of the Stalking Horse APA is approved in its entirety and incorporated herein as if fully stated herein.   Additionally, except to the extent expressly preserved pursuant to the Stalking Horse APA, the other Transaction Documents, the Committee Settlement, and/or this Order, upon the Closing Date, (a) the Debtors, (b) the Buyer, (c) the Committee, and (d) the lenders and agents under the (i) First Lien Term Loan Facility, (ii) U.S. Revolver Facility, (iii) Canadian Sub-Facility, (iv) credit facilities under the Junior Credit Agreements, and (v) DIP Facilities (each a "Releasing Party"), to the fullest extent permissible under applicable law, mutually releases and discharges each other Releasing Party and such Releasing Parties' respective current and former affiliates, and such entities' and their current and former affiliates' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, managers, directors, equity holders,

principals, members, incorporators, employees, agents, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such (collectively, in such capacity, the "Released Parties" and each a "Released Party"), from any and all claims and causes of action, whether known or unknown, including any derivative claims that such Releasing Party would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the Debtors' restructuring efforts, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Stalking Horse APA, the U.S. Revolver Facility, the Canadian Sub-Facility, the DIP Facilities, the Exit Facilities, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the implementation of the Sale Transaction, the Committee Settlement, and any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Closing Date related or relating to the foregoing; provided, however, that this paragraph 36 shall not (a) affect the liability of any entity that otherwise would result from any act or omission to the extent that such act or omission is determined by a final, nonappealable order by the Bankruptcy Court or another court with jurisdiction to have constituted fraud, gross negligence, or willful misconduct of such entity, or (b) relieve any Released Party from any obligations under, or otherwise affect the terms and conditions of, the Stalking Horse APA, the other Transaction Documents, the DIP Loan Documents (as defined in the DIP Financing Orders), the agreements and documents governing the Exit Facilities, the Committee Settlement, and/or this Order; further provided, however, that

the releases provided by the lenders and agents under the U.S. Revolver Facility, the Canadian Sub-Facility, and the Revolver Facility (as defined in the Final DIP Order) are conditioned upon the payment in full in cash (whether pursuant to the Exit Revolving Facility or otherwise), by no later than the Closing Date, of all due and payable Obligations (as defined in the Revolver DIP Agreement, which is defined in the Final DIP Order).  For the avoidance of doubt, upon (a) the Closing, including the execution of, and consummation of the transactions contemplated by, the Exit Facilities, and (b) ~~and~~ the payment in full in cash of the DIP ABL Facility (whether pursuant to the Exit Revolving Facility or otherwise) by no later than the Closing Date of all due and payable Obligations (as defined in the Revolver DIP Agreement, which is defined in the Final DIP Order) and the amendment and restatement of the Prepetition First Lien Term Loan Facility into the applicable Exit Facility, the liens and claims, including superpriority claims, in respect of the Prepetition Obligations, the DIP Facilities or the Exit Facilities shall not extend to or encumber the Cash Consideration (as defined in the Stalking Horse APA).

37.     To the fullest extent permissible under applicable law, except as otherwise provided in the Stalking Horse APA, the other Transaction Documents, and/or this Order, upon the Closing Date, none of the Released Parties shall have or incur any liability to, or be subject to any right of action by, any holder of a claim against, or equity interest in, any of the Debtors or any other party in interest, or any of their respective employees, representatives, financial advisors, attorneys, or agents, acting in such capacity, or any of their successors and assigns, for any act or omission in connection with, related to or arising out of, the Debtors' ~~chapter~~Chapter 11 ~~cases~~Cases, the operation of the Debtors' businesses during the ~~chapter~~Chapter 11 ~~cases~~Cases, the investigation, formulation, preparation, negotiation, execution, delivery,

implementation, or consummation of the transactions contemplated by the Stalking Horse APA, including, without limitation, the Sale Transaction, the assumption and assignment of the Assumed Contracts, or any other contract, instrument, release, agreement, settlement, or document created, modified, amended, terminated, or entered into in connection with the Stalking Horse APA, the Committee Settlement, or any other act or omission in connection with the Debtors' ~~chapter~~Chapter 11 ~~cases~~Cases; provided, however, that this paragraph 37 shall not (a) affect the liability of any entity that otherwise would result from any act or omission to the extent that such act or omission is determined by a final, nonappealable order by the Bankruptcy Court or another court with jurisdiction to have constituted fraud, gross negligence, or willful misconduct by such entity, or (b) relieve any Released Party from any obligations under, or otherwise affect the terms and conditions of, the Stalking Horse APA, the other Transaction Documents, the DIP Loan Documents (as defined in the DIP Financing Orders), the agreements and documents governing the Exit Facilities, the Committee Settlement, and/or this Order; provided further, however, that upon (a) the Closing, including the execution of, and consummation of the transactions contemplated by, the Exit Facilities, and (b) ~~and~~ the payment in full in cash of the DIP ABL Facility (whether pursuant to the Exit Revolving Facility or otherwise) by no later than the Closing Date of all due and payable Obligations (as defined in the Revolver DIP Agreement, which is defined in the Final DIP Order) and the amendment and restatement of the Prepetition First Lien Term Loan Facility into the applicable Exit Facility, the liens and claims, including superpriority claims, in respect of the Prepetition Obligations, the DIP Facilities or the Exit Facilities shall not extend to or encumber the Cash Consideration (as defined in the Stalking Horse APA).

38.     To the extent this Order is inconsistent with any prior order or pleading filed in these ~~chapter~~Chapter 11 ~~cases~~Cases, the terms of this Order shall govern.  To the extent there is any inconsistency between the terms of this Order and the terms of the Stalking Horse APA, the terms of this Order shall govern.

39.     Except as expressly provided in the Stalking Horse APA, the Committee Settlement or this Order, nothing in this Order shall be deemed to waive, release, extinguish, or estop the Debtors or their estates from asserting, or otherwise impair or diminish, any right (including, without limitation, any right of recoupment), claim, cause of action, defense, offset or counterclaim in respect of any asset that is not an Acquired Asset.

40.     All entities (other than holders of Assumed Liabilities or Permitted Encumbrances) that are presently, or on the Closing Date may be, in possession of some or all of the Acquired Assets are hereby directed to surrender possession of the Acquired Assets to the Buyer on the Closing Date.

41.     This Order shall not be modified by any chapter 11 plan of any of the Debtors confirmed in these ~~chapter~~Chapter 11 ~~cases~~Cases.

42.     This Order ~~and,~~ the Stalking Horse APA, and the Committee Settlement shall be binding in all respects upon all creditors and interest holders of the Debtors, all non-debtor parties to the Assumed Contracts, the Committee, all successors and assigns of the Debtors and their affiliates and subsidiaries, and any trustees, examiners, "responsible persons" or other fiduciaries appointed in the ~~chapter~~Chapter 11 ~~cases~~Cases or upon a conversion of the Debtors' cases to cases under chapter 7 of the Bankruptcy Code, including a chapter 7 trustee, and the Stalking Horse APA, including the Committee Settlement, the Transaction Documents and the

Escrow Agreement, shall not be subject to rejection or avoidance under any circumstances.  If

any order under section 1112 of the Bankruptcy Code is entered, such order shall provide (in

accordance with Bankruptcy Code sections 105 and 349) that this Order and the rights granted to

the Buyer hereunder, and the rights and obligations of any escrow agent appointed under the

Escrow Agreement or the Distribution Escrow Agreement, shall remain effective and,

notwithstanding such dismissal or conversion, shall remain binding on parties in interest.

43.    The failure specifically to include or make reference to any particular provisions

of the Stalking Horse APA or the Committee Settlement in this Order shall not diminish or

impair the effectiveness of such provision, it being the intent of the Court that the Stalking Horse

APA and the Committee Settlement are authorized and approved in their entirety.

44.    The Court retains jurisdiction with respect to all matters arising from or related to

the implementation of this Order, including, without limitation, the authority to:  (a) interpret,

implement and enforce the terms and provisions of this Order (including the injunctive relief

provided in this Order) and the terms of the Stalking Horse APA, all amendments thereto and

any waivers and consents thereunder; (b) protect the Buyer, or the Acquired Assets, from and

against any of the claims, liens, interests or encumbrances (other than Assumed Liabilities and

Permitted Encumbrances); (c) compel delivery of all Acquired Assets to the Buyer (other than

those in the possession of the holder of an Assumed Liability or Permitted Encumbrance); (d)

compel the Buyer to perform all of its obligations under the Stalking Horse APA, the Transaction

Documents, and this Order; and (e) resolve any disputes arising under or related to the Stalking

Horse APA, the Committee Settlement or the sale of the Acquired Assets.

41

45.    The Stalking Horse APA, the Committee Settlement and any related agreements, documents or other instruments may be modified, amended or supplemented through a written document signed by the parties thereto (subject to any consents required under the Exit Facilities) in accordance with the terms thereof without further order of this Court; provided, however, that any such modification, amendment, or supplement is neither material nor materially changes the economic substance of the transactions contemplated hereby.

46.    Neither the Buyer nor the Debtors shall have an obligation to close the Sale Transaction until all conditions precedent in the Stalking Horse APA to each of their respective obligations to close the Sale Transaction have been met, satisfied, or waived in accordance with the terms of the Stalking Horse APA.

47.    This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding any provision in the Bankruptcy Rules to the contrary, including but not limited to Bankruptcy Rule 6004(h), the Court expressly finds there is no reason for delay in the implementation of this Order and, accordingly:  (a) the terms of this Order shall be immediately effective and enforceable upon its entry; (b) the Debtors are not subject to any stay of this Order or in the implementation, enforcement, or realization of the relief granted in this Order; and (c) the Debtors may, in their discretion and without further delay, take any action and perform any act authorized under this Order.

48.    The provisions of this Order are nonseverable and mutually dependent.

[END OF DOCUMENT]

## <u>Exhibit 1</u>

**Settlement Stipulation**

**Prepared and presented by:**

*/s/ Sarah R. Borders*
Sarah R. Borders
Georgia Bar No. 625752
Leia Clement Shermohammed
Georgia Bar No. 972711
Britney Baker
Georgia Bar No. 610649
**KING & SPALDING LLP**
1180 Peachtree Street NE
Atlanta, Georgia 30309
Telephone: (404) 572-4600
Email: sborders@kslaw.com
Email: lshermohammed@kslaw.com
Email: bbaker@kslaw.com

-and-

Kelley A. Cornish (admitted *pro hac vice*)
New York Bar No. 1930767
Brian S. Hermann (admitted *pro hac vice*)
New York Bar No. 2810232
John T. Weber (admitted *pro hac vice*)
New York Bar No. 5151543
**PAUL, WEISS, RIFKIND, WHARTON &
& GARRISON LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Email: kcornish@paulweiss.com
Email: bhermann@paulweiss.com
Email: jweber@paulweiss.com

*Counsel for the Debtors in Possession*