**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| JACK COOPER VENTURES, INC., *et al.*,[1] | ) | Case No. 19-62393 (PWB) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**DEBTORS' EMERGENCY MOTION FOR AN ORDER (I) DISMISSING
THE DEBTORS' CHAPTER 11 CASES, (II) REJECTING REMAINING EXECUTORY
CONTRACTS AND UNEXPIRED LEASES, (III) RESCINDING THE BAR DATE
ORDER AND (IV) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

hereby submit this motion (the "Motion")[2] for entry of an order, substantially in the form attached

hereto as Exhibit A (the "Proposed Order"), pursuant to sections 105(a), 305(a), 349, 363, 365,

554 and 1112(b) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 1017(a)

and 6007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), dismissing the

Debtors' chapter 11 cases (the "Chapter 11 Cases"), rejecting remaining executory contracts and

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Jack Cooper Ventures, Inc. (0805); Jack Cooper Diversified, LLC (9414); Jack Cooper Enterprises, Inc. (3001); Jack Cooper Holdings Corp. (2446); Jack Cooper Transport Company, Inc. (3030); Auto Handling Corporation (4011); CTEMS, LLC (7725); Jack Cooper Logistics, LLC (3433); Auto & Boat Relocation Services, LLC (9095); Axis Logistic Services, Inc. (2904); Jack Cooper CT Services, Inc. (3523); Jack Cooper Rail and Shuttle, Inc. (7801); Jack Cooper Investments, Inc. (6894); North American Auto Transportation Corp. (8293); Jack Cooper Transport Canada Inc. (8733); Jack Cooper Canada GP 1 Inc. (8087); Jack Cooper Canada GP 2 Inc. (8089); Jack Cooper Canada 1 Limited Partnership (8084); and Jack Cooper Canada 2 Limited Partnership (8086). The location of the Debtors' corporate headquarters and service address is: 630 Kennesaw Due West Road NW, Kennesaw, Georgia 30152.

[2]  Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the Sale Order (as defined below).

35426009.v28

unexpired leases, rescinding the Bar Date Order, authorizing the retention of Compass Advisory Partners, LLC to effectuate the orderly wind-down of the Debtors' estates in accordance with the Wind-Down Budget, amending the case caption to reflect the Debtors' new names, setting a hearing on the Final Fee Applications and granting related relief.  The Debtors respectfully state as follows in support of this Motion:

## PRELIMINARY STATEMENT

1.      The Debtors commenced these Chapter 11 Cases with the objective of maximizing value for all of the Debtors' stakeholders by selling substantially all of their assets on a going concern basis.  In furtherance thereof, on the Petition Date, the Debtors filed the Sale Motion and continued marketing their assets in an effort to preserve the Debtors' business as a going concern, save thousands of jobs, and maintain a business upon which hundreds of vendors could continue to depend.

2.      The sale (the "Sale") of substantially all of the Debtors' assets to the Buyer (as defined below) was approved by this Court on October 11, 2019 and closed on November 4, 2019 with an effective closing date of November 2, 2019 (the "Closing Date").

3.      Consequently, no meaningful assets remain in the Debtors' estates for the Debtors to monetize or distribute to creditors.  Accordingly, the Debtors have determined that dismissal is the most effective way to conclude these Chapter 11 Cases.  The Debtors believe that dismissal is warranted because it will (a) allow for a prompt and orderly conclusion to these Chapter 11 Cases, (b) avoid the unnecessary accrual of additional administrative expenses, including any expenses associated with a conversion of these cases to chapter 7, (c) provide for a limited wind-down

framework, and (d) otherwise be in the best interests of the Debtors, their estates, and their creditors.

4.        Accordingly, by this Motion, the Debtors seek the dismissal of these Chapter 11 Cases and certain related relief.

## JURISDICTION

5.        The United States Bankruptcy Court for the Northern District of Georgia has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

6.        Venue of this proceeding is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

7.        The statutory predicates for the relief sought herein are sections 105(a), 305(a), 349, 363, 365, 554 and 1112(b) of the Bankruptcy Code and Bankruptcy Rules 1017(a) and 6007.

## BACKGROUND

A.        **General Background**

8.        On August 6, 2019 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Prior to the Closing Date, the Debtors operated their businesses and managed their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On August 8, 2019, the Court entered an order [Docket No. 57] authorizing the joint administration and procedural consolidation of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).  No entity has requested the appointment of a trustee or examiner in these Chapter 11 Cases.  On August 19, 2019, the United States Trustee for the Northern District of Georgia (the "U.S. Trustee") appointed the Official Committee of

Unsecured Creditors (the "Creditors' Committee"). *See Appointment and Notice of Appointment of Committee of Creditors Holding Unsecured Claims* [Docket No. 142].

9.     Additional information regarding the Debtors, including their prior business operations, corporate and capital structure, and the events leading to the Petition Date is set forth in the *Declaration of Greg May, Chief Financial Officer of the Debtors, in Support of First Day Motions* (the "First Day Declaration") [Docket No. 19].

10.     On September 13, 2019, the Bankruptcy Court entered the *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, and 507 (I) Authorizing the Debtors to Obtain Senior and Junior Secured Superpriority Postpetition Financing; (II) Granting (A) Liens and Superpriority Administrative Expense Claims and (B) Adequate Protection to Certain Prepetition Lenders; (III) Authorizing the Use of Cash Collateral; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief* (the "Final DIP Order") [Docket No. 279].

**B.     The Sale Process**

11.     On August 22, 2019, the Debtors entered into that certain Asset Purchase Agreement with JC Buyer Company, Inc. ("Buyer") [Docket No. 157] (as amended, the "Stalking Horse APA"), subject to higher or better offers.

12.     By order dated October 11, 2019 [Docket No. 377] (the "Sale Order"), the Court approved the Sale to the Buyer of substantially all of the Debtors' assets pursuant to the Stalking Horse APA.  The Sale closed on November 4, 2019 with an effective closing date of November 2, 2019.  Pursuant to the Sale Order and the Stalking Horse APA, the Debtors have assumed and assigned the Assumed Contracts (as defined in the Stalking Horse APA) to the Buyer.  By this

Motion, the Debtors seek to reject all contracts not assumed by the Buyer *nunc pro tunc* as of the Closing Date.

13.    The assets acquired by the Buyer included any and all causes of action belonging to the Debtors and their estates, including Avoidance Actions (as defined in the Stalking Horse APA).  On the Closing Date, the Buyer released and waived the Avoidance Actions and other causes of action that may exist against various third parties.  As a result, there are no estate claims to investigate and/or prosecute, and the Debtors have no remaining material assets.

**C.    Transition Services Agreement and Wind-Down Budget**

14.    As contemplated by the Stalking Horse APA, the Debtors and Buyer agreed to a budget (the "Wind-Down Budget") solely for wind-down and other post-closing expenses as set forth therein in an aggregate amount of $250,000 (the "Wind-Down Amount").  *See* Stalking Horse APA, § 8.12.  The Creditors Committee is entitled to $35,000 for wind-down fees and expenses under the Wind-Down Budget.  A copy of the Wind-Down Budget is attached hereto as Exhibit B.

15.    The Debtors and Buyer also negotiated a Transition Services Agreement (the "TSA"), pursuant to which the Buyer will perform certain wind-down services for the benefit of the Debtors, including delivery of monthly operating reports for the U.S. Trustee, preparation of state and federal tax returns, transfers of benefit and insurances plans, and other related wind-down actions as set forth in the TSA.[3]  A copy of the TSA is attached hereto as Exhibit C.

---

[3]    The summaries set forth herein are qualified in their entirety by reference to the applicable definitive document(s). For the avoidance of doubt, to the extent there is a conflict or any inconsistency between any summary set forth herein and the terms of a definitive document, the terms of the definitive document shall control in all respects.

**D.**     **Appointment of An Authorized Officer**

16.     On the Closing Date, the existing officers and all but one director resigned from the Debtors.  The Debtors have engaged Compass Advisory Partners, LLC ("Compass") to provide administrative oversight and coordination of the Debtors' wind-down activities.  A form of the engagement letter with Compass is attached hereto as Exhibit D (the "Engagement Letter") and includes the retention of John W. Teitz, a Managing Director at Compass, to act as the authorized officer of the Debtors as of the Closing Date. The Wind-Down Amount will be available to Compass to fund the wind-down in accordance with the Wind-Down Budget.

17.     Mr. Teitz is an experienced turnaround executive who specializes in providing hands-on financial oversight and day-to-day management support to a variety of entities.  Mr. Teitz received his Bachelor of Science Degree from Georgetown University and his Master of Business Administration from the University of Pittsburgh, and is a Certified Public Accountant.  For over 30 years, Mr. Teitz has worked effectively with boards of directors, senior management teams, lenders, and investors in situations similar to the Debtors' situation.

18.     Pursuant to the Engagement Letter, Compass shall be authorized to provide administrative oversight and coordination of wind-down activities as set forth in the Engagement Letter, and to utilize the Wind-Down Amount in accordance with the Wind-Down Budget.

19.     In accordance with the Engagement Letter, the Debtors will pay Compass (i) a base fee of $5,000 per month payable on the first of each month ("Base Fee"), for up to 10 hours per month; (ii) in addition to the Base Fee, payment of professional fees at a rate of $300.00 per hour for all hours in excess of 10 hours per month incurred to complete the work contemplated therein and (iii) reimbursement of all reasonable and customary out-of-pocket expenses incurred on behalf

7

of the Debtors.  Upon the commencement of Compass's retention, as of the Closing Date, the Debtors will pay an initial retainer of $60,000 to Compass.  The Debtors do not anticipate that the fees incurred by Compass will exceed the amount of the initial retainer.

20.     As of the Closing Date, Gerry Czarnecki remains as the sole director of each of the Debtors.

21.     By this Motion, the Debtors request that (i) the Court authorize the retention of Compass and John W. Teitz, in each case *nunc pro tunc* to the commencement of their engagement on November 4, 2019, to provide the above-described necessary services to effectuate the orderly wind-down of the Debtors' affairs in accordance with the Engagement Letter, the TSA, and the Wind-Down Budget, and (ii) no further Court approval shall be necessary to pay any amounts owed to Compass from time to time in accordance therewith or for Compass to utilize the Wind-Down Amount as described above.

**E.     U.S. Trustee Fees**

22.     The Buyer agreed to fund any unpaid fees required to be paid to the U.S. Trustee under section 1930 of title 28 of the United States Code (the "U.S. Trustee Fees"), as and when due after the Closing Date.

**F.     Professional Fees**

23.     On the Closing Date, the Buyer delivered to the designated Escrow Agent an amount equal to the estimate of all accrued and unpaid fees and expenses incurred on or prior to November 4, 2019 (regardless of whether such fees and expenses have been approved by the Bankruptcy Court as of November 4, 2019) by any professional retained by the Sellers and the Official Committee of Unsecured Creditors (the "Professional Fees Amount"), which amount was

8

deposited into a Professional Fees Escrow Account, and shall be held and distributed in each case in accordance with the Professional Fee Escrow Agreement, a copy of which is attached hereto as Exhibit E.

24.    All professionals retained in these Chapter 11 Cases by the Debtors or the Creditors' Committee required to file final requests for allowance and payment of all fees and expenses incurred during these Chapter 11 Cases (the "Final Fee Applications") through November 4, 2019 will file such Applications in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Complex Case Procedures of the United States Bankruptcy Court for the Northern District of Georgia, which requests shall be heard at a final fee hearing (the "Final Fee Hearing") to be set by the Court prior to the Dismissal Effective Date (as defined below).  As applicable, the professional fees approved by the Court at the Final Fee Hearing will be paid from the Professional Fees Escrow Account.  With respect to the period after the Closing Date and before the Dismissal Effective Date, as provided therein professional fees will be payable from the Wind-Down Amount as set forth in the Wind-Down Budget without further Court approval being necessary.

**G.    Rejection of Contracts**

25.    Prior to the Closing Date, the Buyer designated the Assumed Contracts.  All of the Sellers' executory contracts and unexpired leases that were not designated as Assumed Contracts were not assumed by the Buyer on the Closing Date under the terms of the Stalking Horse APA.

26.    Accordingly, by this Motion, the Debtors seek to reject all executory contracts and unexpired leases that were not assumed by the Buyer, with such rejection to be effective upon entry of the Proposed Order *nunc pro tunc* to the Closing Date.

**H.**     **Rescission of the Bar Date Order**

27.     As the Debtors are seeking to dismiss the Chapter 11 Cases and, as a result, the Debtors will not be undertaking a claims allowance process, no creditor, including any counterparty to an executory contract or lease that has been rejected pursuant to the Motion, shall be required to file a proof of claim by the Claims Bar Date, Rejection Damages Bar Date or Governmental Bar Date as set forth in the Bar Date Order entered by the Court on September 19, 2019 [Docket No. 297], and the Debtors request that the Bar Date Order be deemed rescinded.

**I.**     **Case Caption and Debtors' Name Changes**

28.     Pursuant to Section 8.8 of the Stalking Horse APA, the Debtors were required to change their names post-closing.  Moreover, the Sale Order authorizes the Debtors to "take any action and perform any act authorized under this Order," which includes the Debtors performing their obligations under the Stalking Horse APA.  Sale Order, ¶ [47].

29.     Pursuant to the authority granted in the Sale Order, the Debtors have filed, or will soon file, the necessary paperwork with the secretaries of state (and any other relevant agencies in the U.S. and Canada) in the Debtors' respective states or provinces of incorporation to accomplish the required name changes from a corporate perspective.  The changes to each of the Debtors' respective corporate names are as follows:

| Case No. | Old Entity Name | New Entity Name |
|----------|-----------------|-----------------|
| 19-62411 | Jack Cooper Investments, Inc. | Legacy JCI, Inc. |
| 19-62393 | Jack Cooper Ventures, Inc. | Legacy JCV, Inc. |
| 19-62409 | Jack Cooper Enterprises, Inc. | Legacy JCEI, Inc. |
| 19-62410 | Jack Cooper Holdings Corp. | Legacy JCHC Corp. |
| 19-62407 | Jack Cooper Diversified, LLC | Legacy JCD, LLC |
| 19-62416 | Jack Cooper Transport Company, Inc. | Legacy JCTC, Inc. |
| 19-62412 | Jack Cooper Logistics, LLC | Legacy JCL, LLC |
| 19-62398 | Auto Handling Corporation | Legacy AHC Corporation |
| 19-62399 | Axis Logistic Services, Inc. | Legacy ALS, Inc. |

| 19-62406 | Jack Cooper CT Services, Inc. | Legacy JCCTS, Inc. |
| 19-62413 | Jack Cooper Rail and Shuttle, Inc. | Legacy JCRS, Inc. |
| 19-62417 | North American Auto Transportation Corp. | Legacy CTAAN Corp. |
| 19-62400 | CTEMS, LLC | Legacy SMETC, LLC |
| 19-62396 | Auto & Boat Relocation Services LLC | Legacy SRBA LLC |
| 19-62415 | Jack Cooper Transport Canada Inc. | Legacy JCTCAN Inc. |
| 19-62402 | Jack Cooper Canada 1 Limited Partnership | Legacy JCCAN1 Limited Partnership |
| 19-62403 | Jack Cooper Canada 2 Limited Partnership | Legacy JCCAN2 Limited Partnership |
| 19-62404 | Jack Cooper Canada GP 1 Inc. | Legacy JCCANGP1 Inc. |
| 19-62405 | Jack Cooper Canada GP 2 Inc. | Legacy JCCANGP2 Inc. |

30. Accordingly, the Debtors request that (i) the case caption used in each of these Chapter 11 Cases be amended to reflect the changes of the Debtors' corporate names, and (ii) the Court authorize and direct the Clerk of the United States Bankruptcy Court for the Northern District of Georgia (the "Clerk of Court") and other parties in interest to take actions that are necessary to update the ECF filing system and their respective records to reflect such name changes.

**J.     Effective Dismissal Date**

31. Subject to Court approval of this Motion, the Debtors and the Buyer, in consultation with the Creditors' Committee, shall determine the date on which the dismissal of these Chapter 11 Cases will be effective, provided that, other than to the extent necessary to accommodate the Court's schedule, in no event shall such dismissal date occur after December 6, 2019 (the "Dismissal Effective Date"). The Debtors shall file a notice on the docket that sets forth the Dismissal Effective Date, and upon the occurrence of such date, the Debtors request that these Chapter 11 Cases be dismissed and closed.

11

32.     Effective immediately upon the Dismissal Effective Date (or such earlier date as the Creditors' Committee may elect in its discretion), the Creditors' Committee will dissolve and the members thereof will be released and discharged from all rights and duties arising from or related to the Chapter 11 Cases.

## RELIEF REQUESTED

33.     By this Motion, the Debtors request entry of the Proposed Order, pursuant to sections 105(a), 305(a), 349, 363, 365, 554 and 1112(b) of the Bankruptcy Code and Rule 1017(a) and 6007 of the Bankruptcy Rules, dismissing the Debtors' Chapter 11 Cases; rejecting remaining executory contracts and unexpired leases and granting related relief.

## BASIS FOR RELIEF

**A.      This Court Should Dismiss these Cases if the Elements for "Cause" Are Shown Under Section 1112(b)(4) of the Bankruptcy Code.**

34.     Pursuant to section 1112(b)(1) of the Bankruptcy Code, absent unusual circumstances, a court shall dismiss a bankruptcy case "for cause." Section 1112(b)(1) states, in pertinent part:

> on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause . . . .

11 U.S.C. § 1112(b)(1).  The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 changed the statutory language with respect to conversion and dismissal from permissive to mandatory.[4]  *See* H.R. Rep. 109-31 (I), 2005 U.S.C.C.A.N. 88, 94 (stating that the Act "mandate[s]

---

[4]     Prior to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, a bankruptcy court had wide discretion to use its equitable powers to dispose of a debtor's case but was not mandated to dismiss a case if cause were shown.  H.R.Rep. No. 595, 95th Cong., 1st Sess. 405 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 117

that the court convert or dismiss a chapter 11 case, whichever is in the best interests of creditors and the estate, if the movant establishes cause, absent unusual circumstances."); *see also In re Gateway Access Solutions, Inc.*, 374 B.R. 556 (Bankr. M.D. Pa. 2007) (stating that the amendments to section 1112 limit the court's discretion to refuse to dismiss or convert a chapter 11 case upon a finding of cause); *accord In re TCR of Denver, LLC*, 338 B.R. 494, 498 (Bankr. D. Colo. 2006) ("Congress has purposefully limited the role of this Court in deciding issues of conversion or dismissal such that this Court has no choice, and no discretion in that it 'shall' dismiss or convert a case under Chapter 11 if the elements for 'cause' are shown under 11 U.S.C. § 1112(b)(4).") (emphasis added).

35.     The amendments to section 1112 thus limit the Court's discretion to refuse to dismiss or convert a chapter 11 case upon a finding of cause.  *In re 3 Ram, Inc.*, 343 B.R. 113, 119 (Bankr. E.D.Pa. 2006) ("Under new § 1112 when cause is found, the court shall dismiss or convert unless special circumstances exist that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate."); *see also In re Broad Creek Edgewater, LP*, 371 B.R. 752, 759 (Bankr. D. S.C. 2007).

36.     For reasons more fully explained below, the Debtors submit that this Court should dismiss these Chapter 11 Cases because cause exists, and dismissal is in the best interests of the Debtors, their estates, and their creditors.

---

(1978), *reprinted in* 1978 U.S.C.C.A.N. 5787; *see also Small Business Admin. v. Preferred Door Co. (In re Preferred Door Co.)*, 990 F.2d 547, 549 (10th Cir. 1993) (a court has broad discretion to dismiss a bankruptcy case); *In re Sullivan Cent. Plaza I, Ltd.*, 935 F.2d 723, 728 (5th Cir. 1991) (determination of whether cause exists under § 1112(b) "rests in the sound discretion" of the bankruptcy court); *In re Koerner*, 800 F.2d 1358, 1367 & n.7 (5th Cir. 1986) (bankruptcy court is afforded "wide discretion" under section 1112(b)).

**B.**    **Cause Exists to Dismiss the Debtors' Bankruptcy Cases Because the Debtors Ceased Business Operations, Have No Remaining Assets Available for Distribution to Creditors, and Are Unable to Confirm a Chapter 11 Plan.**

37.    Section 1112(b)(4) of the Bankruptcy Code provides a non-exhaustive list of 16 grounds for dismissal.  11 U.S.C. § 1112(b)(4)(A)-(P).  *See In re Gateway Access Solutions*, 374 B.R. at 561 ("Generally, such lists are viewed as illustrative rather than exhaustive, and the Court should 'consider other factors as they arise.'") (quoting *In re Brown*, 951 F.2d 564, 572 (3d Cir. 1991)); *In re 3 Ram, Inc.*, 343 B.R. at 117 ("While the enumerated examples of 'cause' to convert or dismiss a chapter 11 case now listed in § 1112(b)(4) have changed under BAPCPA, the fact that they are illustrative, not exhaustive has not."); *accord In re Frieouf*, 938 F.2d 1099, 1102 (10th Cir. 1991) (stating that section 1112(b)'s list is nonexhaustive).[5]  One such ground is where a party-in-interest shows that there is a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation."  11 U.S.C. § 1112(b)(4)(A).

38.    To satisfy this standard, a debtor must establish that: (i) there has been a diminution of value of the estate; and (ii) the debtor does not have a "reasonable likelihood of rehabilitation." *See, e.g., In re Citi-Toledo Partner*s, 170 B.R. 602, 606 (Bankr. N.D. Ohio 1994) ("Section 1112(b)(1) contemplates a 'two-fold' inquiry into whether there has been a 'continuing diminution of the estate and absence of a reasonable likelihood of rehabilitation,'") (citing *In re Photo Promotion Associates, Inc.*, 47 B.R. 454, 458 (Bankr. S.D.N.Y. 1985); *Clarkson v. Cooke Sales And Service Co. (In re Clarkson)*, 767 F.2d 417, 420 (8th Cir. 1985) (dismissal warranted where

---

5    In *In re TCR of Denver*, the court recognized the apparent typographical error in § 1112(b)(4) of the Bankruptcy Code.  The sixteen illustrative examples of "cause" set forth in that section are linked by the word "and" after subsection (O).  Accordingly, strict construction of the statute would require that a debtor establish all of the items constituting "cause" before a case can be dismissed by the court.  The TCR court held that Congress could not have intended to require a "perfect storm" of all sixteen circumstances listed before a case be converted or dismissed.  *See In re TCR of Denver*, 338 B.R. at 498.

"the absence of financial data and certain sources of income for the [debtors] indicate[d] the absence of a reasonable likelihood of rehabilitation"); *A. Illum Hansen, Inc. v. Tiana Queen Motel, Inc. (In re Tiana Queen Motel, Inc.)*, 749 F.2d 146 (2d Cir. 1984) (conversion under section 1112(b)(1), (2) and (3) warranted in light of Debtor's "failure . . . to demonstrate that their prospects for prompt rehabilitation were based upon anything more substantial than [their] boundless confidence" in the 15 months after the filing of a chapter 11 petition); *see also In re Wright Air Lines, Inc.*, 51 B.R. 96, 99 (Bankr. N.D. Ohio 1985) (stating that "[r]ehabilitation as used in 11 U.S.C. Section 1112(b)(1) means 'to put back in good condition; re-establish on a firm, sound basis'") (citation omitted).

39.     Here, the Debtors easily satisfy the two-fold inquiry.  First, the Debtors sold virtually all of their assets in connection with the Sale and no longer conduct any business.  At the same time, administrative claims, such as professional fees and U.S. Trustee Fees, continue to accrue each day these Chapter 11 Cases remain open.  Second, it is impossible for the Debtors to rehabilitate their business since there is no business to reorganize.  Pursuant to the Stalking Horse APA and the Sale Order, the Debtors transferred all of their operating assets, together with the Avoidance Actions, to the Buyer on the Closing Date.

40.     Moreover, while no longer an enumerated ground under amended section 1112 of the Bankruptcy Code, dismissal of a chapter 11 case is appropriate where the court finds that a feasible plan is not possible.  *In re 3 Ram*, 343 B.R. at 117-18.  If a chapter 11 debtor cannot achieve a reorganization within the statutory requirements of the Bankruptcy Code, then there is no point in expending estate assets on administrative expenses.  *Id.* at 118 (citing, *inter alia*, *In re Brown*, 951 F.2d at 572).

41.    Here, the Debtors are unable to confirm a chapter 11 plan because the Debtors no longer have any operations and have no funds or assets to make any further distributions to creditors and satisfy the statutory requirements in respect of such a plan.  Thus, there is no point in incurring additional administrative expenses when the Debtors are unable to consummate a plan.

42.    In sum, the Debtors have met their burden and these Chapter 11 Cases should be dismissed under section 1112(b)(4) of the Bankruptcy Code due to the substantial or continuing loss to, or diminution of, the Debtors' estates, the absence of a reasonable likelihood of rehabilitation, and the fact that a chapter 11 plan is not feasible under the circumstances of these Chapter 11 Cases.

**C.    Dismissal Is in the Best Interests of the Debtors' Creditors and Estates.**

43.    Once a court determines that cause exists to dismiss a debtor's chapter 11 case, the court must evaluate whether dismissal is in the best interests of the debtor's creditors and of the estate.  *See, e.g., Rollex Corp. v. Associated Materials (In re Superior Siding & Window)*, 14 F.3d 240, 242 (4th Cir. 1994) ("Once 'cause' is established, a court is required to consider this second question of whether to dismiss or convert.").  A variety of factors demonstrate that it is in the best interest of the Debtors' estates and their creditors to dismiss these Chapter 11 Cases.

44.    First, a dismissal of a chapter 11 bankruptcy case meets the best interests of creditors test where a debtor has nothing to reorganize, and the debtor's assets are fixed and liquidated.  *See Camden Ordinance Mfg. Co. of Ark., Inc. v. Unites States Trustee (In re Camden Ordnance Mfg. Co. of Ark., Inc.)*, 245 B.R. 794, 799 (E.D. Pa. 2000) (reorganization to salvage business which ceased business was infeasible); *In re Brogdon Inv. Co.*, 22 B.R. 546, 549 (Bankr.

16

N.D. Ga. 1982) (court dismissed chapter 11 case in part where there was "simply nothing to reorganize" and no reason to continue the reorganization).

45.     As explained above, the Debtors have nothing left to reorganize.  Virtually all of the operating assets of the Debtors' estates were transferred to the Buyer in the Sale.  Thus, it is in the best interests of the creditors to dismiss these Chapter 11 Cases because the Debtors' operations no longer exist, no funds are available to finance a chapter 11 plan, and no assets are available for distribution.

46.     Second, the best interests of creditors test is also met where an interested party, other than the debtor, feels that dismissal is a proper disposition of the case.  *See Camden Ordinance*, 245 B.R. at 798; *In re Mazzocone*, 183 B.R. 402, 414 (Bankr. ED. Pa. 1995) (Factors weighed more heavily in favor of dismissal of chapter 11 case rather than conversion to chapter 7, where debtor and United States Trustee both favored dismissal).  Here, the Creditors' Committee supports the relief requested herein and has agreed not to require the Debtors to continue these Chapter 11 Cases beyond the Dismissal Effective Date.

47.     Third, the best interests of creditors test is met where a debtor demonstrates the ability to oversee its own liquidation.  *See Camden Ordinance*, 245 B.R. at 798; *Mazzocone,* 183 B.R. at 412 ("Only when a Chapter 11 debtor has no intention or ability to . . . perform its own liquidation ... should a debtor be permitted to remain in bankruptcy.").  Here, the Debtors conducted the sale of substantially all of their assets, which maximized the value of those assets and liquidated them in an orderly fashion.  As recognized by this Court, the Sale was the product of hard-fought negotiations between the Debtors, the Creditors' Committee, and the Buyer.  Subject to this Court's approval, as further described above, the Debtors will retain an advisor to

17

assist in the wind-down, subject to the Wind-Down Budget. There is nothing further for the Debtors to pursue in these Chapter 11 Cases.

48. Fourth, and finally, dismissal of these Chapter 11 Cases will maximize the value of the Debtors' estates because the alternative—conversion to a chapter 7 liquidation and appointment of a trustee—is unnecessary and could impose significant additional administrative costs upon the Debtors' estates.

49. Thus, in balancing the equities of the Debtors' Chapter 11 Cases, it is clear that it is in the best interest of the Debtors' estates and their creditors to dismiss these Chapter 11 Cases.

50. Bankruptcy courts have dismissed cases pursuant to section 1112(b) under similar circumstances where the debtor lacks sufficient funds to confirm a chapter 11 plan. *See, e.g.*, *In re F &H Acquisition Corp., et al.*, Case No 13-13220 (KG) (Bankr. D. Del. Aug. 25, 2016) (dismissing cases pursuant to sections 349 and 1112(b)) [Docket No. 1132]; *In re ICL Holding Company, Inc*., Case No. 12 13319 (KG) (Bankr. D. Del. Jan. 24, 2014) (dismissing case pursuant to sections 1112(b) and 305(a)) [Docket No. 1137]; *In re Coach Am Group Holdings Corp.*, Case No. 12-10010 (KG) (Bankr. D. Del. May 31, 2013) [Docket No. 1568].

51. Granting the relief requested simply furthers the Bankruptcy Code's goal of efficient administration of the Debtors' bankruptcy estates, eliminates the accrual of administrative expense obligations, and brings closure to these Chapter 11 Cases in a timely manner.

**D.** **Dismissal of these Chapter 11 Cases Is Warranted Under Section 305(a) of the Bankruptcy Code.**

52. Alternatively, cause exists to dismiss these Chapter 11 Cases pursuant to section 305(a) of the Bankruptcy Code, which provides that:

> (a) The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if—
>
> (1) the interests of creditors and the debtor would be better served by such dismissal or suspension;

11 U.S.C. § 305(a).

53.     Dismissal under section 305(a) is determined on a case-by-case basis and rests in the sound discretion of the bankruptcy court. *In re Sky Group Intern, Inc*., 108 B.R. 86, 91 (Bankr. W.D. Pa. 1989). Many factors are considered when determining the best interests of creditors and the debtor, including (i) the economy and efficiency of administration, (ii) whether federal proceedings are necessary to reach a just and equitable solution, (iii) whether there is an alternative means of achieving an equitable distribution of assets and (iv) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case. *AMC Investors*, 406 B.R. at 488.

54.     As described above, cause exists for dismissal. The Debtors sold substantially all of their assets, are unable to confirm a chapter 11 plan, and have no remaining valuable assets or funds available for distribution to general unsecured creditors. Conversion to chapter 7 would impose additional administrative costs with no corresponding benefit to the Debtors' creditors or their estates. Dismissal of these Chapter 11 Cases as set forth in this Motion, among other things, provides the most efficient, cost-effective method of effectuating the wind-down of the Debtors' estates.

55.     Accordingly, the Debtors submit that the relief requested herein is necessary, prudent and in the best interests of the Debtors' estates and creditors, and should therefore be granted.

19

**E.**     **The Court Should Approve the Rejection of All Remaining Executory Contracts and Unexpired Leases**

56.     All of the Sellers' executory contracts and unexpired leases that were not designated as Assumed Contracts were not assumed by the Buyer on the Closing Date under the terms of the Stalking Horse APA.  Accordingly, the Debtors seek to reject all executory contracts and unexpired leases that were not assumed by the Buyer, with such rejection to be effective upon entry of the Proposed Order *nunc pro tunc* to the Closing Date.

**F.**     **The Bar Date Order Should Be Rescinded.**

57.     As it would be inequitable to require creditors to file proofs of claim when there are no funds or assets to make distributions to creditors and the Chapter 11 Cases are being dismissed, the Debtors request that the Court rescind the Bar Date Order.

**G.**     **The Court Should Authorize the Debtors' Retention of Compass and the Appointment of John W. Teitz as the Debtors' Authorized Representative**

58.     On the Closing Date, the existing officers and all but one director resigned from the Debtors.  The Debtors have engaged Compass Advisory Partners, LLC ("Compass") to provide administrative oversight and coordination of the Debtors' wind-down activities.  Accordingly, by this Motion, the Debtors request that (i) the Court authorize the retention of Compass and John W. Teitz, in each case *nunc pro tunc* to the commencement of their engagement on November 4, 2019, to provide the above-described necessary services to effectuate the orderly wind-down of the Debtors' affairs in accordance with the Engagement Letter, the TSA, and the Wind-Down Budget, and (ii) no further Court approval shall be necessary to pay any amounts owed to Compass from time to time in accordance therewith or for Compass to utilize the Wind-Down Amount as described above.

**H.**     **The Court Should Amend the Case Caption to Reflect the Debtors' New Names**

59.     The Debtors submit that the amendment to the case caption is necessary and appropriate as the Debtors have sold substantially all of their assets to the Buyer and are required to change their corporate names pursuant to the Stalking Horse APA.  Further, the Debtors submit that the relief requested herein is routinely approved by courts in situations similar to those present here.  *See e.g.*, *In re Natrol, Inc.*, Case No. 14-11446 (BLS) (Bankr. D. Del. Nov. 24, 2014); *In re Constar Inter. Holdings LLC*, Case No. 13-13281 (CSS) (Bankr. D. Del. March 19, 2014); *In re Vertis Holdings, Inc.*, Case No. 12-12821 (CSS) (Bankr. D. Del. May 1, 2013); *In re Leiner Health Prods., Inc*., Case No. 08-10446 (KJC) (Bankr. D. Del. Aug. 19, 2008); *In re TSIC, Inc.*, Case No. 08-10322 (KG) (Bankr. D. Del. July 17, 2008); and *In re Tweeter Home Entm't Group, Inc.*, Case No. 07-10787 (PJW) (Bankr. D. Del. Feb. 5, 2008).

**I.**     **The Court Should Set a Hearing on Final Fee Applications**

60.     All professionals retained in these Chapter 11 Cases by the Debtors or the Creditors' Committee required to file Final Fee Applications through November 4, 2019 will file such Applications in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Complex Case Procedures of the United States Bankruptcy Court for the Northern District of Georgia.  Accordingly, the Debtors request that the Court set the Final Fee Hearing prior to the Dismissal Effective Date.

### NOTICE

61.     The Debtors have provided notice of this Motion to:  (a) the U.S. Trustee; (b) the Debtors' thirty (30) largest unsecured creditors; (c) counsel to the Creditors' Committee; (d) counsel to the Prepetition Secured Parties; (e) counsel to the administrative agents for the Debtors'

prepetition credit facilities; (f) counsel to the administrative agents for the Debtors' debtor-in-possession financing facilities; (g) the United States Securities and Exchange Commission; (h) the Internal Revenue Service; (i) the Georgia Department of Revenue; (j) the Attorney General for the State of Georgia; (k) the United States Attorney for the Northern District of Georgia; (l) the state attorneys general for states in which the Debtors conduct business; (m) the Pension Benefit Guaranty Corporation; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

## **NO PRIOR REQUEST**

62.    No prior request for the relief sought in the Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request entry of the Proposed Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and such other relief as is just and proper.

[*Remainder of Page Intentionally Left Blank*.]

Dated: November 6, 2019
        Atlanta, Georgia

/s/ Sarah R. Borders

Sarah R. Borders
Georgia Bar No. 610649
Leia Clement Shermohammed
Georgia Bar No. 972711
Britney Baker
Georgia Bar No. 625752
KING & SPALDING LLP
1180 Peachtree Street NE
Atlanta, Georgia 30309
Telephone: (404) 572-4600
Email: sborders@kslaw.com
Email: lshermohammed@kslaw.com
Email: bbaker@kslaw.com

-and-

Kelley A. Cornish (admitted *pro hac vice*)
New York Bar No. 1930767
Brian S. Hermann (admitted *pro hac vice*)
New York Bar No. 2810232
**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Email: kcornish@paulweiss.com
Email: bhermann@paulweiss.com

*Counsel for the Debtors in Possession*

## Exhibit A

Proposed Order

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| JACK COOPER VENTURES, INC., *et al.*,[1] | ) | Case No. 19-62393 (PWB) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**ORDER (I) DISMISSING THE DEBTORS'**
**CHAPTER 11 CASES, (II) REJECTING REMAINING EXECUTORY CONTRACTS**
**AND UNEXPIRED LEASES, (III) RESCINDING THE BAR DATE ORDER, AND**
**(IV) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "Motion")[2] of the Debtors for entry of an order,

pursuant to sections 105(a), 305(a), 349, 363, 365, 554 and 1112(b) of title 11 of the United States

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Jack Cooper Ventures, Inc. (0805); Jack Cooper Diversified, LLC (9414); Jack Cooper Enterprises, Inc. (3001); Jack Cooper Holdings Corp. (2446); Jack Cooper Transport Company, Inc. (3030); Auto Handling Corporation (4011); CTEMS, LLC (7725); Jack Cooper Logistics, LLC (3433); Auto & Boat Relocation Services, LLC (9095); Axis Logistic Services, Inc. (2904); Jack Cooper CT Services, Inc. (3523); Jack Cooper Rail and Shuttle, Inc. (7801); Jack Cooper Investments, Inc. (6894); North American Auto Transportation Corp. (8293); Jack Cooper Transport Canada Inc. (8733); Jack Cooper Canada GP 1 Inc. (8087); Jack Cooper Canada GP 2 Inc. (8089); Jack Cooper Canada 1 Limited Partnership (8084); and Jack Cooper Canada 2 Limited Partnership (8086). The location of the Debtors' corporate headquarters and service address is: 630 Kennesaw Due West Road NW, Kennesaw, Georgia 30152.

[2]  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

2

Code(the "Bankruptcy Code") and Rules 1017(a) and 6007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), dismissing these Chapter 11 Cases, rejecting remaining executory contracts and unexpired leases, rescinding the Bar Date Order, authorizing the retention of Compass Advisory Partners, LLC to effectuate the orderly wind-down of the Debtors' estates in accordance with the Wind-Down Budget, amending the case caption to reflect the Debtors' new names,  setting a hearing on the Final Fee Applications and granting related relief; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a) and (b) and 1334(b); and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b)(2) in which the Court may enter a final order; and venue being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and notice of the Motion being sufficient; and the Court having conducted a hearing on the Motion at which time all parties in interest were given an opportunity to be heard; and any objections filed with respect to the Motion having been withdrawn or overruled by the Court or resolved by the terms of this Order; and after due deliberation and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Motion is granted as set forth herein.

2.      The Debtors' Chapter 11 Cases shall be dismissed, effective as of a date to be agreed to by the Debtors and the Buyer, in consultation with the Creditors' Committee, but no later than December 6, 2019 (the "Dismissal Effective Date").  The Debtors shall file a notice on the docket that sets forth the Dismissal Effective Date, which notice shall be sufficient notice of such date.

3.      All contracts not assumed by the Buyer shall be deemed rejected *nunc pro tunc* as of the Closing Date.

3

4.      The Bar Date Order entered by the Court on September 19, 2019 [Docket No. 297] is hereby rescinded.

5.      The Debtors are authorized to retain Compass Advisory Partners, LLC and appoint John W. Teitz as an authorized representative, in each case *nunc pro tunc* to November 4, 2019, to effectuate the orderly wind-down of the Debtors' estates on the terms described in the Motion and the Engagement Letter.  Payments to Compass Advisory Services in accordance with the Engagement Letter are approved and no further Court approval shall be necessary.

6.      Effective as of the date hereof, the new caption of the jointly administered Chapter 11 Cases shall read as follows:

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Legacy JCV, Inc., *et al.*, | Case No. 19-62393 (PWB) |
| Debtors. | (Jointly Administered) |

FN1: The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Legacy JCV, Inc. (0805); Legacy JCD, LLC (9414); Legacy JCEI, Inc. (3001); Legacy JCHC Corp. (2446); Legacy JCTC, Inc. (3030); Legacy AHC Corporation (4011); Legacy SMETC, LLC (7725); Legacy JCL, LLC (3433); Legacy SRBA LLC (9095); Legacy ALS, Inc. (2904); Legacy JCCTS, Inc. (3523); Legacy JCRS, Inc. (7801); Legacy JCI, Inc. (6894); Legacy CTAAN Corp. (8293); Legacy JCTCAN Inc. (8733); Legacy JCCANGP1 Inc. (8087); Legacy JCCANGP2 Inc. (8089); Jack Cooper Canada 1 Limited Partnership (8084); and Legacy JCCAN2 Limited Partnership (8086) The location of the Debtors' corporate headquarters and service address is: 630 Kennesaw Due West Road NW, Kennesaw, Georgia 30152.

7.      The Clerk of the Court is authorized and directed to take actions that are necessary to update the ECF filing system and their respective records to reflect the name changes.  The changes to each of the Debtors' respective corporate names are as follows:

| Case No. | Old Entity Name | New Entity Name |
|---|---|---|
| 19-62411 | Jack Cooper Investments, Inc. | Legacy JCI, Inc. |
| 19-62393 | Jack Cooper Ventures, Inc. | Legacy JCV, Inc. |
| 19-62409 | Jack Cooper Enterprises, Inc. | Legacy JCEI, Inc. |
| 19-62410 | Jack Cooper Holdings Corp. | Legacy JCHC Corp. |
| 19-62407 | Jack Cooper Diversified, LLC | Legacy JCD, LLC |
| 19-62416 | Jack Cooper Transport Company, Inc. | Legacy JCTC, Inc. |
| 19-62412 | Jack Cooper Logistics, LLC | Legacy JCL, LLC |
| 19-62398 | Auto Handling Corporation | Legacy AHC Corporation |
| 19-62399 | Axis Logistic Services, Inc. | Legacy ALS, Inc. |
| 19-62406 | Jack Cooper CT Services, Inc. | Legacy JCCTS, Inc. |
| 19-62413 | Jack Cooper Rail and Shuttle, Inc. | Legacy JCRS, Inc. |
| 19-62417 | North American Auto Transportation Corp. | Legacy CTAAN Corp. |
| 19-62400 | CTEMS, LLC | Legacy SMETC, LLC |
| 19-62396 | Auto & Boat Relocation Services LLC | Legacy SRBA LLC |
| 19-62415 | Jack Cooper Transport Canada Inc. | Legacy JCTCAN Inc. |
| 19-62402 | Jack Cooper Canada 1 Limited Partnership | Legacy JCCAN1 Limited Partnership |
| 19-62403 | Jack Cooper Canada 2 Limited Partnership | Legacy JCCAN2 Limited Partnership |
| 19-62404 | Jack Cooper Canada GP 1 Inc. | Legacy JCCANGP1 Inc. |
| 19-62405 | Jack Cooper Canada GP 2 Inc. | Legacy JCCANGP2 Inc. |

8.      A final omnibus fee hearing will be held in these Chapter 11 Cases on ____, 2019 at __:__ _.m. (prevailing Eastern time) (the "Final Fee Hearing").  Not later than twenty-one (21) days prior to the Final Fee Hearing, all professionals retained in these Chapter 11 Cases required to do so shall file final requests (the "Final Fee Applications") for allowance and payment of all fees and expenses incurred during these Chapter 11 Cases through the Closing Date in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Complex Case Procedures of the United States Bankruptcy Court for the Northern District of Georgia so as to be heard at the Final Fee Hearing. Any objections to the Final Fee Applications shall be filed and served on counsel for the Debtors by __:__ _.m. (prevailing Eastern Time) on ____, 2019.

9.      Any post-closing fees and expenses may be paid by the authorized representative of the Debtors in accordance with the Wind-Down Budget and without further Court approval.

10.     Notwithstanding section 349 of the Bankruptcy Code, all orders of this Court entered in these Chapter 11 Cases on or before the Dismissal Effective Date (including, but not limited to, the Final DIP Order and the Sale Order) shall remain in full force and effect and shall survive the dismissal of these Chapter 11 Cases.

11.     The Buyer shall pay all outstanding U.S. Trustee Fees pursuant to 28 U.S.C. § 1930 when they become due.

12.     Notwithstanding the dismissal of these Chapter 11 Cases, this Court shall retain jurisdiction with respect to any matters, claims, rights or disputes arising from or relating to the implementation of this or any other Order of this Court entered in these Chapter 11 Cases.

13.     As soon as reasonably practicable after the Dismissal Effective Date, without the need for further action on the part of this Court and without the need for further corporate action or action of the boards of directors of the Debtors, to the extent not previously dissolved, the Debtors shall be entitled to seek dissolution pursuant to applicable state law, and the Debtors shall not be required to pay any taxes or fees in order to cause such dissolution.  The Debtors are authorized to execute and file on their behalf all documents necessary and proper to effectuate and consummate their dissolution in accordance with the laws of the states in which they are formed.

14.     Effective immediately upon the Dismissal Effective Date, the Creditors' Committee shall dissolve and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases.

15.     The Debtors are hereby authorized and empowered to take any and all steps necessary and appropriate to effectuate the terms of this Order.

16.     To the extent applicable, Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure are waived and this Order shall be effective and enforceable immediately upon entry.

END OF DOCUMENT

Prepared and presented by:

*/s/ Sarah R. Borders*
Sarah R. Borders
Georgia Bar No. 610649
Leia Clement Shermohammed
Georgia Bar No. 972711
Britney Baker
Georgia Bar No. 625752
KING & SPALDING LLP
1180 Peachtree Street NE
Atlanta, Georgia 30309
Telephone: (404) 572-4600
Email: sborders@kslaw.com
Email: lshermohammed@kslaw.com
Email: bbaker@kslaw.com

-and-

Kelley A. Cornish (admitted *pro hac vice*)
New York Bar No. 1930767
Brian S. Hermann (admitted *pro hac vice*)
New York Bar No. 2810232
**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Email: kcornish@paulweiss.com
Email: bhermann@paulweiss.com

*Counsel for the Debtors in Possession*

**<u>Exhibit B</u>**

Wind-Down Budget

**Jack Cooper Ventures, Inc.**

**Wind-Down Budget**

**Global Notes:**

--    Assumed transaction Closing Date:             11/4/2019

--    The wind-down budget reflects a budget for the entire wind-down period.

--    Budget includes activity post-sale closing through the wind-down.  It does not include any flow of funds items related to the sale closure, including accrued payroll, accrued benefits, open A/P, accrued sales taxes, D&O insurance, professional fees, including investment banking fees, payable upon or accrued through the closing.

--    Budget is an expense budget only, and does not include proceeds from the sale or liquidation of misc. assets, if any, during the wind-down period.

--    Budget excludes items that are handled under the TSA previously agreed with the Buyer .

--    Retainer and expenses (total $70k) to Compass is being paid at closing and not included in the wind-down budget

--    This budget assumes that the Buyer will pay post closing Prime Clerk fees up to a maximum of $50k, with any overage coming out of the winddown budget.

| Wind-Down Expenses | | Amount |
|---|---|---|
| UCC Advisors | $ | 35,000 |
| Debtor Professionals and Other Wind-Down Expenses | | 215,000 |
| **Total Wind-Down Expenses** | **$** | **250,000** |

**<u>Exhibit C</u>**

Transition Services Agreement

EXECUTION VERSION

### TRANSITION SERVICES AGREEMENT

This **TRANSITION SERVICES AGREEMENT** (this "Agreement"), dated as of November 2, 2019 (the "Closing Date"), is made and entered into by and among JC Buyer Company, Inc., a Delaware corporation (the "Buyer"), Jack Cooper Investments, Inc., a Delaware corporation (the "Company"), and the Additional Sellers party hereto (together with the Company, the "Sellers"), and solely as to Section 5, Wells Fargo Bank, National Association ("ABL Agent"). The Buyer and the Sellers may be referred to herein collectively as the "Parties" and each individually as a "Party". All capitalized words and terms used herein and not otherwise defined have the meanings ascribed to them in the Purchase Agreement (as hereinafter defined).

### RECITALS

**WHEREAS**, the Buyer and the Sellers have entered into that certain Asset Purchase Agreement, dated as of August 22, 2019 (as amended, the "Purchase Agreement"), pursuant to which, on the Closing Date, the Sellers have agreed to sell to the Buyer all of the Acquired Assets and assign to the Buyer all of the Assumed Liabilities, and the Buyer has agreed to purchase from the Sellers all of the Acquired Assets and assume from the Sellers all of the Assumed Liabilities; and

**WHEREAS**, in order to provide for an efficient and orderly transition of ownership and management of Acquired Assets and Assumed Liabilities from the Sellers to the Buyer and certain of its Affiliates and the wind-down of the Sellers' operations, the Parties have agreed that each Party will provide to the other Party certain transition services (in each case, the Party providing such transition services, the "Provider", and the recipient of such transition services, the "Recipient") on the terms and conditions set forth herein.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

**Section 1.      Description of Services**.  Subject to the terms and provisions of this Agreement, the Buyer shall provide (or shall cause its subcontractors or Affiliates to provide) to the Sellers those services described on Annex A hereto (the "Buyer Services"), and the Sellers shall perform (or cause their subcontractors or Affiliates to perform) the obligations set forth in Section 5 (the "Seller Services", and together with the Buyer Services, the "Services").

**Section 2.      Term**.  Subject to Section 6, the Provider's obligation to perform the Services covered by this Agreement shall commence on the Closing Date and terminate on the date that is one hundred eighty (180) days after the Closing Date (the "Termination Date") or, with respect to a specific Service, such other earlier time set forth on Annex A hereto, other than as may be mutually agreed in writing.  Notwithstanding anything herein to the contrary, the Parties' respective rights and obligations under Section 4, Section 6, Section 7(b) and Section 10 through Section 18 shall survive the Termination Date.

**Section 3.      Standard and Performance; Access**.

(a)      Each Provider will use commercially reasonable efforts in the performance of its obligations under this Agreement.

(b)      Each Provider may use subcontractors or Affiliates to provide some or all of the Services (including, without limitation, service providers and vendors under agreement with such Provider or its Affiliates).  If a Provider delegates any of its responsibilities under this Agreement

to any of its Affiliates or uses subcontractors in the performance thereof, then the Provider shall remain fully responsible for the actions and performance of such Affiliate or subcontractor.

(c)    In order to enable the provision of the Services by the Parties, each Recipient agrees that it shall provide to each Provider (including each such Provider's Affiliates and their respective employees or subcontractors to the extent such Affiliates, employees or subcontractors are providing the Services) reasonable access to such Recipient's facilities, assets and books and records, in each case, solely to the extent necessary for such Provider to fulfill its obligations under this Agreement.

**Section 4.    Consideration and Reimbursement of Expenses**.  The Buyer shall (a) pay directly or (b) reimburse the Sellers and their Affiliates for any reasonable out-of-pocket and documented expenses actually incurred by the Sellers or any of their Affiliates in connection with providing the Seller Services within fifteen (15) days of being provided supporting documentation therefor.  Other than as set forth in the preceding sentence, there will be no consideration paid by either Party for the Services.

**Section 5.    Seller Bank Accounts**.  The Sellers have agreed for a period commencing on the Closing Date and continuing for sixty (60) days thereafter, or such longer period as may be agreed to by the Parties (the "Cash Management Transition Period"), to act as a collection and disbursement agent for the Buyer or an Affiliate thereof at the Buyer's direction.  During the Cash Management Transition Period, to the extent that customers or other persons remit monies (the "Collections") to the Sellers' bank accounts identified on Schedule 5.18 of the Purchase Agreement, excluding any accounts held by Jack Cooper Transport Canada Inc. or any other Canadian Subsidiary of the Company (the "Bank Accounts"), which monies all parties hereto agree belong to the Buyer, the Sellers shall receive such funds in trust for the Buyer and allow such Collections to be swept on a daily basis (the "Daily Sweep") to a deposit account designated by the ABL Agent (the "ABL Designated Account"); provided, that Sellers shall be permitted to retain a disbursement account for the purpose of receiving and paying wind-down amounts, and Buyer agrees to provide Sellers with treasury related services in connection therewith.  Such Daily Sweep shall be in the same manner and frequency as the daily sweep in existence in respect of that certain Senior Superpriority Debtor-in-Possession Credit Agreement, dated as of August 8, 2019, by and among Jack Cooper Ventures, Inc. and certain of its subsidiaries, the lenders party thereto, and Wells Fargo Capital Finance, LLC, a Delaware limited liability company, as administrative agent for the lenders party thereto and the related loan documents.  All Collections deposited in the ABL Designated Account shall be applied to the Obligations (as defined in the ABL Credit Agreement) pursuant to the terms of that certain Credit Agreement of even date herewith (as amended, restated, supplemented, or otherwise modified from time to time, the "ABL Credit Agreement") by and among JC INTERMEDIATE HOLDINGS, INC., a Delaware corporation ("Parent"), JC BUYER COMPANY, INC., a Delaware corporation, which within five Business Days after the Closing Date shall change its name to Jack Cooper Investments, Inc. ("JCI"), the Domestic Subsidiaries of JCI identified on the signature pages hereof (such Domestic Subsidiaries, together with JCI, are referred to hereinafter each individually as a "Domestic Borrower", and individually and collectively, jointly and severally, as the "Domestic Borrowers"), JACK COOPER CANADA 1 INC., a British Columbia corporation ("JCC 1"), JACK COOPER CANADA 2 INC., a British Columbia corporation ("JCC 2"), and the other Canadian Subsidiaries of Parent identified on the signature pages thereof (JCC 1, JCC2 and such Canadian Subsidiaries are referred to hereinafter each individually as a "Canadian Borrower", and individually and collectively, jointly and severally, as the "Canadian Borrowers") (the Domestic Borrowers and the Canadian Borrowers are referred to hereinafter each individually as a "Borrower", and individually and collectively, as the "Borrowers"), the lenders party thereto as "Lenders" (such Lenders, together with their respective successors and assigns in

2

such capacity, each, individually, a "<u>Lender</u>" and, collectively, the "<u>Lenders</u>"), and Wells Fargo Bank, National Association, as agent for the Lenders (in such capacity, the "<u>ABL Agent</u>").  At the end of the Cash Management Transition Period, the Buyer shall provide to the Sellers a reconciliation of all Collections and disbursements from the account from the Closing Date to the termination of the Cash Management Transition Period.  The Buyer and the Sellers may extend the Cash Management Transition Period upon written agreement of the Company and the Buyer.  No amendments or other modifications to this section shall be made without the prior written consent of ABL Agent.

       **Section 6.**     **Early Termination of Services**.  At any time, and from time to time, the Recipient may, upon at least fifteen (15) days' prior written notice to the Provider, specify any component of the Services (a "<u>Component</u>") the Recipient no longer requires (a "<u>Cut-Off Notice</u>").  The Buyer's obligation to reimburse the Sellers for the out of pocket expenses incurred in connection with the Seller Services already performed shall survive any termination of such Seller Services or this Agreement.

       **Section 7.**     **Independent Contractor**.

       (a)     In the performance of its obligation to the Recipient hereunder, each Provider shall be an independent contractor.  Nothing contained herein shall be deemed or construed as creating the relationship of principal and agent, partnership, joint employers or joint venture between the Parties.

       (b)     <u>Authorized Representative</u>. Each of the Canadian Sellers hereby appoints any director or officer of Jack Cooper Canada 1 Inc. or Jack Cooper Canada 2 Inc. as its authorized representative from and after the Closing (each, an "<u>Authorized Representative</u>") for the purposes of this Agreement. Each Authorized Representative is authorized and directed, for and on behalf of the applicable Canadian Sellers, to take such actions and execute and deliver such documents as may be necessary or desirable for the completion of (i) the wind-down of the Canadian Sellers, including the wind-down or transfer of any of the Canadian Sellers' benefit plans, as applicable, and (ii) the Buyer Services to be performed for the benefit of the Canadian Sellers under this Agreement; <u>provided</u>, that in taking such actions and executing and delivering such documents in connection with the foregoing, each Authorized Representative will remain an independent contractor with respect to each Canadian Seller but will be indemnified by the Canadian Sellers, as applicable, in the same manner and to the full extent as such Canadian Seller indemnifies its own employees.

       **Section 8.**     **Force Majeure**.  The Provider shall not be in default of its obligations hereunder for any delays or failure in its performance hereunder resulting from any cause or circumstance beyond the Provider's reasonable control and without its fault or negligence, including, without limitation acts of civil or military authority, embargoes, war, terrorism, riots, fires, explosions, earthquakes, floods, acts of God, or strikes, lock outs or similar labor problems (each, a "<u>Force Majeure Event</u>").  If any such Force Majeure Event prevents the Provider from providing any of the Services, the Provider shall cooperate with the Recipient in obtaining an alternative source for the affected Services, and the Parties' obligations hereunder shall be postponed with respect to such Services during the period of such Force Majeure Event.  Each Party will promptly notify the other in writing upon learning of the occurrence of any Force Majeure Event.  Upon cessation of such Force Majeure Event, the Parties shall resume their performance of their respective obligations with respect to the affected Services.

       **Section 9.**     **Termination**.

       (a)     This Agreement shall terminate on the Termination Date but may be terminated

earlier:

    (i)        upon the mutual written agreement of the Parties;

    (ii)        by the Sellers for material breach of any of the terms hereof by the Buyer if the breach is not cured within fifteen (15) days after written notice of such breach is delivered to the Buyer;

    (iii)        by the Buyer for material breach of any of the terms hereof by the Sellers if the breach is not cured within fifteen (15) days after written notice of such breach is delivered to the Sellers;

    (iv)        by the Sellers for any reimbursement default by the Buyer hereunder if such default is not cured within ten (10) days after written notice is delivered to the Buyer; or

    (v)        all Components of the Services have been terminated via a Cut-Off Notice.

    (b)        The termination of this Agreement shall be without prejudice to any rights and obligations of the Parties that have vested prior to the effective date of such termination.

**Section 10.      Limitation on Liability; Specific Performance**.

    (a)        Absent gross negligence, actual fraud, willful misconduct or willful breach on the part of the Buyer, the Buyer and its Affiliates will have no liability to the Sellers related to this Agreement, and neither a breach of or default under this Agreement by the Buyer, nor the provision of the Buyer Services by the Buyer shall give rise to any obligation to indemnify the Sellers or any other liability whatsoever hereunder.  Absent gross negligence, actual fraud or willful misconduct on the part of the Buyer, the Buyer will not be liable for the quality of goods or services purchased from third parties on behalf of the Sellers in accordance with the terms of this Agreement.  In no event will the Buyer be liable to the Sellers for any special, incidental or consequential damages of any kind or nature, regardless of the form of action through which such damages are sought.  In no event will the Buyer be liable to the Sellers for lost profits resulting from an alleged breach of this Agreement, even if under applicable Legal Requirement, such lost damages would not be considered consequential or special damages.

    (b)        Absent gross negligence, actual fraud, willful misconduct or willful breach on the part of the Sellers, the Sellers will have no liability to the Buyer related to this Agreement, and neither a breach of or default under this Agreement by the Sellers, nor the provision of the Seller Services by the Sellers shall give rise to any obligation to indemnify Buyer or any other liability whatsoever hereunder; provided, nothing in this Section 10(b) shall limit the Buyer's ability to seek specific performance of the Seller Services pursuant to Section 10(c).

    (c)        The Parties shall have the right to seek specific performance of the Services contemplated by this Agreement, in addition to any and all other rights and remedies at law or in equity, and all such rights and remedies shall be cumulative. The Parties agree that the remedies at law, including monetary damages, may be inadequate compensation for any losses arising out of or relating to the Services, and that any defense in any action for specific performance that a

4

remedy at law would be adequate is waived.

(d)      Disclaimer.  The Parties specifically acknowledge that (i) neither Party is in the business of providing services to third parties of the kind provided under this Agreement and (ii) neither Party nor any of its respective Affiliates, their respective employees or third party service providers hold themselves out as experts in providing such services. Except as expressly set forth herein, neither Party nor any of its respective Affiliates, their respective employees or third party service providers makes any representation of any kind as to the quality of the Services to be provided hereunder.  The Parties agree that all Services shall be provided without any warranty of any kind whatsoever, whether express or implied, and all such warranties are expressly disclaimed to the fullest extent permitted by applicable Legal Requirement.

(e)      For the avoidance of doubt, the performance by the Buyer (or its subcontractors or Affiliates) of the Buyer Services hereunder shall in no way alter the liabilities or obligations of the Buyer under the Purchase Agreement or result in the assumption of any additional Assumed Liabilities.

**Section 11.      Confidentiality**.

(a)      During the term of this Agreement and thereafter, the Parties shall, and shall instruct their respective directors, officers, employees, agents and representatives (collectively, "Representatives") to, maintain in confidence and not disclose the other Party's financial, technical, sales, marketing, development, personnel, and other information, records, or data, including, without limitation, customer lists, supplier lists, trade secrets, designs, product formulations, product specifications or any other proprietary or confidential information, however recorded or preserved, whether written or oral, in each case obtained in connection with the provision of Services under this Agreement (any such information, "Confidential Information"). Each Party shall use the same degree of care, but no less than reasonable care, to protect the other Party's Confidential Information as it uses to protect its own Confidential Information of like nature. Unless otherwise authorized in any other agreement between the parties, any Party receiving any Confidential Information of the other Party (the "Receiving Party") may use Confidential Information only for the purposes of fulfilling its obligations under this Agreement (the "Permitted Purpose").  Any Receiving Party may disclose such Confidential Information only to its Representatives who have a need to know such information for the Permitted Purpose and who have been advised of the terms of this Section 11; provided, however, that any Receiving Party may disclose such Confidential Information to the extent such Confidential Information is required to be disclosed under any Legal Requirement, and in the latter case the Receiving Party shall promptly notify, to the extent possible, the disclosing party (the "Disclosing Party"), and take reasonable steps at the Disclosing Party's expense to assist in contesting such Legal Requirement or in protecting the Disclosing Party's rights prior to disclosure, and in which case the Receiving Party shall only disclose such Confidential Information that it is legally bound to disclose under such Legal Requirement.

(b)      Notwithstanding the foregoing, "Confidential Information" shall not include any information that the Receiving Party can demonstrate: (i) was generally available to the public or publicly known at the time of disclosure to it, or has become publicly known through no act of the Receiving Party or its Representatives in breach of this Section 11; (ii) was rightfully received from a third party without a duty of confidentiality; (iii) was developed by it independently without any reliance on the Confidential Information; or (iv) was already in the possession of the

5

Receiving Party prior to its disclosure by the Disclosing Party.

(c)    Upon demand by the Disclosing Party at any time, or upon expiration or termination of this Agreement with respect to any Service, the Receiving Party agrees promptly to return or destroy, at the Receiving Party's option, all Confidential Information; provided that the Receiving Party shall not be required to destroy Confidential Information to the extent that such Confidential Information is electronically stored in back-up, media. If such Confidential Information is destroyed, an authorized officer of the Receiving Party shall certify to such destruction in writing.

**Section 12.    Binding Effect; Assignment**.  This Agreement shall be binding upon, and inure to the benefit of, the Parties and their respective successors and permitted assigns in accordance with this Section 12.  No assignment of this Agreement or of any rights or obligations hereunder may be made by either Party (by operation of law or otherwise) without the prior written consent of the other Party.  Any attempted assignment without the required consent shall be void.

**Section 13.    Notices and Invoices**.  All notices and other communications (other than invoices) required or permitted to be given or delivered hereunder shall be given in accordance with Section 12.4 of the Purchase Agreement.

**Section 14.    Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver**.  Section 12.10 of the Purchase Agreement (as in effect on the Closing Date) is incorporated herein by reference, *mutatis mutandis*.

**Section 15.    Entire Agreement; Amendment; Waiver**.  This Agreement (including Annex A hereto), the Purchase Agreement (including the Disclosure Schedules and the Exhibits thereto), the Sale Order, and the other Transaction Documents supersede all prior agreements, negotiations and discussions, whether written or oral, between the Buyer, on the one hand, and the Sellers, on the other hand, with respect to the subject matter hereof and constitute a complete and exclusive statement of the terms of the agreements between the Buyer, on the one hand, and the Sellers, on the other hand, with respect thereto. This Agreement may be amended or supplemented at any time only by written instrument duly executed by each Party hereto.  Any of the terms or conditions of this Agreement may be waived at any time by the Party entitled to the benefit thereof but only by a written instrument signed by the Party waiving such terms or conditions.  The waiver of any provision shall be effective only in the specific instance and for the particular purpose for which it was given.  No failure to exercise, and no delay in exercising, any right or power hereunder shall operate as a waiver thereof.

**Section 16.    No Third Party Beneficiaries**.  This Agreement is for the sole benefit of the Parties and their permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind.

**Section 17.    Counterparts**.  This Agreement may be executed in counterparts each of which shall be deemed an original and all of which together shall constitute one and the same agreement. Executed signatures to this Agreement may be delivered by any standard electronic means and any such electronically delivered signatures shall be construed as manually executed signatures.

**Section 18.    Severability**.  Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Legal Requirement, but if any provision or portion of any provision of this Agreement is held to be invalid,

6

illegal or unenforceable in any respect under any applicable Legal Requirement or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or portion of any provision in such jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision or portion of any provision had never been contained herein.

*[Signature Pages Follow]*

7

**IN WITNESS WHEREOF**, the Parties have entered into this Agreement as of the date set forth above.

**JC BUYER COMPANY, INC.**

By: _____

Name: Tom Higbie

Title: Vice-President

**JACK COOPER INVESTMENTS, INC.**

By: _____
Name: T. Michael Riggs
Title: Chief Executive Officer, President, Treasurer and
Assistant Secretary

**AUTO & BOAT RELOCATION SERVICES LLC**

By: _____
Name: T. Michael Riggs
Title: Chief Executive Officer, Treasurer and Assistant
Secretary

**AUTO HANDLING CORPORATION**

By: _____
Name: T. Michael Riggs
Title:  Chief Executive Officer, President, Treasurer and
Assistant Secretary

**AXIS LOGISTIC SERVICES, INC.**

By: _____
Name: T. Michael Riggs
Title: Chief Executive Officer, Treasurer and Assistant
Secretary

**CTEMS, LLC**

By: _____
Name: T. Michael Riggs
Title: Chief Executive Officer, Treasurer and Assistant
Secretary

*Signature Page to Transition Services Agreement*

**JACK COOPER CANADA 1 LIMITED
PARTNERSHIP**

By: _____
Name: T. Michael Riggs
Title: Chief Executive Officer

**JACK COOPER CANADA 2 LIMITED
PARTNERSHIP**

By: _____
Name: T. Michael Riggs
Title: Chief Executive Officer

**JACK COOPER CANADA GP 1 INC.**

By: _____
Name: T. Michael Riggs
Title: Chief Executive Officer

**JACK COOPER CANADA GP 2 INC.**

By: _____
Name: T. Michael Riggs
Title: Chief Executive Officer

**JACK COOPER CT SERVICES, INC.**

By: _____
Name: T. Michael Riggs
Title: Chief Executive Officer, Treasurer and Assistant
Secretary

*Signature Page to Transition Services Agreement*

**JACK COOPER DIVERSIFIED, LLC**

By: _____
Name: T. Michael Riggs
Title: Chief Executive Officer, Treasurer and Assistant
Secretary

**JACK COOPER ENTERPRISES, INC.**

By: _____
Name: T. Michael Riggs
Title: Chief Executive Officer, President, Treasurer and
Assistant Secretary

**JACK COOPER HOLDINGS CORP.**

By: _____
Name: T. Michael Riggs
Title: Chief Executive Officer, President, Treasurer and
Assistant Secretary

**JACK COOPER LOGISTICS, LLC**

By: _____
Name: T. Michael Riggs
Title: Chief Executive Officer, Treasurer and Assistant
Secretary

**JACK COOPER RAIL AND SHUTTLE, INC.**

By: _____
Name: T. Michael Riggs
Title: Chief Executive Officer, Treasurer and Assistant
Secretary

*Signature Page to Transition Services Agreement*

**JACK COOPER TRANSPORT CANADA INC.**

By: _____

Name: T. Michael Riggs

Title: Chief Executive Officer, Treasurer and Assistant
Secretary

**JACK COOPER TRANSPORT COMPANY, INC.**

By: _____

Name: T. Michael Riggs

Title: Chief Executive Officer, Treasurer and Assistant
Secretary

**JACK COOPER VENTURES, INC.**

By: _____

Name: T. Michael Riggs

Title: Chief Executive Officer, President, Treasurer and
Assistant Secretary

**NORTH AMERICAN AUTO TRANSPORTATION
CORP**

By: _____

Name: T. Michael Riggs

Title: Chief Executive Officer, Treasurer and Assistant
Secretary

*Signature Page to Transition Services Agreement*

**WELLS FARGO BANK NATIONAL
ASSOCIATION,**
a national banking association

By: _____
Name: David Wiśniewski
Title: Vice President

*Signature Page to Transition Services Agreement*

**Annex A**

This <u>Annex A</u> describes the Buyer Services referenced in the Transition Services Agreement.

| Service | Description | Termination Date |
|---|---|---|
| **US Trustee Reporting** | Buyer to prepare monthly reports to US Trustee. | Through dismissal of the Sellers' bankruptcy cases |
| **Provide Final W-2s and 1099s to all Seller Employees and Contractors** | Buyer to prepare and deliver, in consultation with and at the Sellers' direction, final W-2s and 1099s for each of Sellers' employees and independent contractors located in the United States that are first due after the Closing Date; <u>provided</u> that nothing shall require the Buyer or any of its Affiliates to pay any amounts owed thereunder or have any liability with respect thereto (other than such amounts or liabilities related to Assumed Liabilities). | Earlier of (i) completion and (ii) the Termination Date |
| **Provide Final T4s (or T4As, as applicable), Records of Employment (ROEs) or equivalent Canadian tax forms** | Buyer to prepare and deliver, in consultation with and at the Sellers' direction, final T4s, (or T4As, as applicable), Records of Employment (ROEs) or equivalent tax forms or filings for each of Canadian Sellers' employees and independent contractors, as required and that are first due after the Closing Date; <u>provided</u> that nothing shall require the Buyer or any of its Affiliates to pay any amounts owed thereunder or have any liability with respect thereto (other than such amounts or liabilities related to Assumed Liabilities). | Earlier of (i) completion and (ii) the Termination Date |
| **Final U.S. Payroll, including Tax Withholding and Returns (including Sales Tax Returns)** | Buyer to prepare, in consultation with and at the Sellers' direction, the Sellers' final payroll in respect of the Sellers' employees and independent contractors based in the United States, including tax withholding and tax returns (including sales tax returns) that are first due after the Closing Date; <u>provided</u> that nothing shall require the Buyer or any of its Affiliates to pay any amounts owed thereunder or have any liability with respect thereto (other than such amounts or liabilities related to Assumed Liabilities). | Earlier of (i) completion and (ii) the Termination Date |
| **Final Canadian Payroll, including Tax Withholding, Sales Tax and Returns** | Buyer to prepare, in consultation with and at the Sellers' direction, the Canadian Sellers' final payroll in respect of the Canadian Sellers' employees and independent contractors, including withholding and remitting for and on behalf of the Canadian Sellers all withholdings and deductions, and remitting for and on behalf of the Canadian Sellers all sales taxes and tax returns that are first due after the Closing Date, and Buyer will close the Canadian Sellers' workers' compensation accounts with applicable Canadian governmental authorities; <u>provided</u> that nothing shall require the Buyer or any of its Affiliates to pay any amounts owed thereunder or have any liability with respect thereto | Earlier of (i) completion and (ii) the Termination Date |

| Service | Description | Termination Date |
|---|---|---|
| | (other than such amounts or liabilities related to Assumed Liabilities). | |
| **Canadian Employees** | Sellers will permit the transferred employees located in Canada to continue to be paid through ADP under the applicable Sellers' tax identification numbers, with payments to be funded by Buyer, except Sellers will hold all tax remittances in connection therewith, and such tax remittances will be remitted by the Buyer following completion of the transition of the Buyer Employees to the Buyer's tax identification numbers. | Once fully transitioned to Buyer tax identification numbers |
| **Preparation of Federal and State Tax Returns** | Buyer to prepare, in consultation with the Sellers, the final state and federal income tax returns for the Sellers (other than the Canadian Sellers) for the tax year ended December 31, 2019 and, if necessary, the tax year ended December 31, 2020, in the United States; provided that nothing shall require the Buyer or any of its Affiliates to pay any amounts owed thereunder or have any liability with respect thereto. | Earlier of (i) completion and (ii) the Termination Date |
| **Wind-Down of Specified Foreign Subsidiaries** | Buyer will provide all such assistance as the Sellers or their Representatives may reasonably request in connection with the winding down of the Specified Foreign Subsidiaries in compliance with all applicable laws and regulations. The costs of such wind-down activities will be paid by the applicable Specified Foreign Subsidiary using the available cash held by it.  To the extent such wind-down expenses exceed the available cash held by the applicable Specified Foreign Subsidiaries in each jurisdiction (other than the Specified Foreign Subsidiary in the Netherlands), the Buyer will have no obligation to pay any amounts in excess of such available cash. | Earlier of (i) completion and (ii) the Termination Date |
| **General Support** | For the avoidance of doubt, Buyer will provide de minimis services necessary for the performance of the foregoing Buyer Services, including but not limited to document storage and retention services, accounting services, preparation of reports, legal support, use of personnel, use of software and information technology, in each case, that do not require any out of pocket expenses.  The Buyer acknowledges that the Sellers will require the Buyer's employees to provide the Seller Services and will provide reasonable accommodation therefor. | Until Termination Date |

## **Exhibit D**

Engagement Letter

Page 1

 **COMPASS ADVISORY PARTNERS, LLC**
MANAGEMENT CONSULTING | INVESTMENT BANKING
WWW.COMPASSADVISORYPARTNERS.COM

| | |
|---|---|
| **306 FOURTH AVENUE - SUITE 701** | **Nicholas W.Arrington** |
| **PITTSBURGH, PENNSYLVANIA 15222** | **412.654.6543** |

November 1, 2019

Mr. Greg May, Chief Financial Officer
Jack Cooper Ventures, Inc.
630 Kennesaw Due West Road
NW Kennesaw, GA 30152

Dear Mr. May:

As requested, this letter agreement ("**Agreement**") is by and between Jack Cooper Ventures, Inc., a U.S. Debtor, by itself and on behalf of its U.S. Debtor affiliates (the "**Client**" or "**Debtors**") and Compass Advisory Partners, LLC ("**Compass**") with an address at 306 Fourth Avenue, Suite 701, Pittsburgh, PA 15222.

**WHEREAS**, the Client (a major employer of Teamster drivers for its auto transport business in the U.S. and Canada) filed Chapter 11 bankruptcy petitions in the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division ("**Bankruptcy Court**") as of August 6, 2019 and their respective bankruptcy cases are being jointly administered under Case Number 19-62393 (collectively the "**Bankruptcy Case**");

**WHEREAS**, the Debtors expect to operate their various businesses as debtors-in-possession through the Closing Date, as defined in that certain Asset Purchase Agreement, dated as of August 22, 2019 (as amended, "**Purchase Agreement**"), and then complete a court-approved 363 sale whereby most of the Debtors' assets, contracts and certain obligations of the Debtors will be transferred to JC Buyer Company, Inc. ("**Buyer**");

**WHEREAS**, pursuant to the court-approved sale order ("**Sale Order**"), as of the Closing Date, the Debtor's management team and employees will begin to work for Buyer;

**WHEREAS**, following the Closing Date, the Debtors will seek entry by the Bankruptcy Court of an Order pursuant to Section 349 and 1112(b) of the Bankruptcy Code and Bankruptcy Rule 1017 authorizing the dismissal of the Bankruptcy Case upon occurrence of certain conditions (the "**Dismissal Order**");

**WHEREAS**, following the Closing Date, the Client intends to wind-down its remaining operations as contemplated by and subject to the Dismissal Order, the Transition Services Agreement ("**Transition Services Agreement**") and the Wind-Down Amount (as defined below) (collectively, the "**Wind-Down Activities**");

Page 2

**WHEREAS**, the Client will have a need for an agent to provide administrative oversight and coordination of its Wind-Down Activities and to execute corporate and other documents in connection therewith; and

**WHEREAS**, the Client desires to engage Compass to provide such aforementioned services and to retain John W. Teitz as an authorized representative of the Client for the primary purpose of executing documents on behalf of the Client in connection with the Wind-Down Activities and to sign the final tax returns on behalf of the Client, with such federal and state tax returns to be prepared by a nationally recognized accounting firm selected by the Buyer (or other accounting firm reasonably acceptable to the Compass), with the costs of the preparation thereof being borne by the Buyer as contemplated by the Transition Services Agreement.

**NOW, THEREFORE**, in consideration of the mutual promises herein contained, the parties hereto, intending to be legally bound hereby, agree as follows:

## SCOPE OF WORK - OVERVIEW

Compass will provide the following administrative oversight and other services, if needed, to the Client following the Closing Date:

a. Provide administrative oversight and coordination of Wind-Down Activities including, but not limited to, negotiations with various third parties, execution of certain documents (i.e., tax returns) and payment of professionals and other amounts, subject to the Wind-Down Amount, with support by the Buyer as set forth in the Transition Services Agreement.

b. Provide administrative oversight and coordination, on an as-needed basis, relating to the orderly wind-down or transition of employees, employee benefit programs, pension plans and 401-K plans as contemplated by the Purchase Agreement, with support by the Buyer as set forth in the Transition Services Agreement.

c. Provide administrative oversight and coordination relating to various litigation strategies and negotiations in conjunction with legal counsel, as needed.

d. Provide administrative oversight and coordination relating to communications and negotiations with third parties including federal and state regulatory agencies and others, as needed.

e. Provide administrative oversight and coordination relating to completion and filing of Client's tax returns in conjunction with tax and legal professionals.

f. Provide assessment and periodic status reports to the Buyer relating to the Wind-Down Activities and the Wind-Down Amount.

g. Client retains complete and sole responsibility for payment of all taxes and related obligations that become due during the term of this Agreement.

**Upon commencement of this engagement, the Client shall add Compass, Mr. Teitz and Mr. Arrington as named insureds under the Client's D&O policies.**

Page 3

## PROJECT TEAM

Our team for this project will include Mr. John W. (Jack) Teitz and Mr. Nick Arrington ("**Compass Agents**"). Mr. Teitz will be the person in charge and will be responsible for the day-to-day activities for this project. The term of this Agreement, and the Compass Agents' employment hereunder, are at will and may be terminated by the Client at any time for any reason upon written notice to you.

## PROFESSIONAL FEES & RETAINER

In consideration for Compass providing its services, the Client shall pay Compass (i) a base fee of $5,000 per month payable on the first business day of each month ("**Base Fee**"), for up to 10 hours per month; (ii) in addition to the Base Fee, payment of professional fees at a rate of $300.00 per hour for all hours in excess of 10 hours per month incurred to complete the work contemplated hereby and (iii) reimbursement of all reasonable and customary out-of-pocket expenses incurred on behalf of the Client.

The term of this Agreement shall run from November 1, 2019 through April 30, 2020 unless earlier terminated by either party.

The Base Fee for our professional services will be earned and payable on the 1st day of each month. All payments for any additional fees and project-related expenses are due upon receipt of our monthly invoices and paid in accordance with the procedures set forth under "Expenses" below.

Upon commencement of this project, Client agrees to pay an initial retainer of $60,000 to Compass (the "**Initial Retainer**"), and the Client agrees to replenish this retainer anytime the retainer balance drops below $10,000. To the extent that the Initial Retainer is not fully earned at the termination of this Agreement, the balance will be paid promptly by Compass to Buyer.

## EXPENSES

Reimbursable expenses include reasonable and customary out-of-pocket expenses incurred on this engagement including without limitation costs for travel and travel-related expenses, overnight delivery services and reimbursement of outside legal services, as needed.

The initial reimbursement request for project expenses will include an amount of $10,000 for legal services incurred on our behalf prior to commencement of this project (the "**Expense Payment**"). Compass will satisfy the Base Fee, hourly fees and expense reimbursement claims from the Initial Retainer until it is exhausted (subject to the replenishment rights set forth above); thereafter, sll amounts payable in connection herewith (and any retainer replenishment requests) shall be paid solely from the Wind-Down Amount of $250,000 (the "**Wind-Down Amount**"). The Wind-Down Amount shall be delivered to Compass on the Closing Date and utilized by Compass to pay fees, expenses and other amounts in connection with the Wind-Down Activities. The Client (and if requested of Client, the Buyer) shall be entitled to receive updates and reasonable supporting information regarding payments made from the Wind-Down Amount, and the balance of the Wind-Down Amount shall be returned by Compass or Client to Buyer promptly following the termination of this Agreement.

**No Compass fees or expenses shall be subject to Bankruptcy Court approval.**

Page 4

## ADDITIONAL TERMS AND CONDITIONS

The Client acknowledges and agrees that Compass has been retained solely to provide the administrative oversight and coordination activities set forth in this Agreement. At all times Compass shall act solely as an independent contractor. To the extent that additional authority is granted to Compass, all such actions will be undertaken upon advice of legal counsel.

**Dispute Resolution:** Any controversy, dispute, or claim between the parties relating to this Agreement shall be resolved pursuant to applicable law.

**Authority:** Subject to approval of the Bankruptcy Court, the Client has the power and authority to make and carry out the terms of this Agreement, and has taken all necessary action to authorize the execution, delivery and performance of this Agreement. This Agreement is the legally binding obligation of the Client, enforceable in accordance with its terms.  This Agreement constitutes the sole and exclusive agreement between the parties hereto and supersedes all prior agreements, representations, and understandings of the parties. No modification of this Agreement shall be binding unless agreed to in writing by the parties.

**Standard of Care and Warranty Disclaimer:** Compass performs its services in accordance with standards of skill and care generally observed by "turnaround" consultants of recognized national standing in the United States. If Compass fails to meet such standards, the sole remedy of Client shall be to terminate this Agreement and recover any direct damages Client may prove. Neither Compass nor any of its directors, shareholders, officers, employees, consultants or other agents (collectively with Compass and the Compass Agents, the "**Compass Parties**") shall be liable for any lost or loss of profits, any indirect, incidental or consequential damages, or any claim, loss or expense for which indemnification would be available under this Agreement.  In performing its services under this Agreement, Compass is not assuming any responsibility for the Client's decision to pursue or not to pursue any business strategy or to effect or not to effect any transaction, nor shall Compass be responsible for providing any tax, legal or other specialist advice. Compass makes no representations or warranties, express or implied, concerning the value of its services or the results that may be obtained therefrom.  Compass' engagement under this Agreement **shall not** constitute an audit, review, compilation or any other type of financial statement reporting or consulting engagement that is subject to the rules of the AICPA or other state and national professional bodies.

**Limitation of Liability and Indemnity:** Compass' sole obligation under this Agreement is to the Client, and any advice (written or oral) given by Compass to the Client in connection with Compass' engagement under this Agreement is solely for use and benefit of the Client.  In no event, regardless of the legal theory advanced, shall any  Compass Party be (i) responsible other than for gross negligence, willful misconduct, bad faith or knowing violation of law or (ii) liable to any third party (other than to the extent expressly provided herein). The obligations of Compass are solely corporate obligations, and no Compass Party shall have any personal liability whatsoever to any person, nor will any such claim be asserted by the Client, whether on its own behalf or on behalf of any other person.

In addition, the Client shall indemnify, defend and hold harmless the Compass Parties against any and all  claims,  costs,  demands,  damages,  assessments,  actions,  suits  or  other  proceedings,  liabilities, judgments, penalties, fines or amounts paid in settlement, expenses, and attorney's fees (whether incurred at the trial or appellate level, in an arbitration, any adversary proceeding, contested matter or

Page 5

application, or otherwise notwithstanding any limitation set forth above arising out of, connected with or related to the services performed under this Agreement, whether or not such claims are attributable in whole or in part to negligence by Compass, other than claims that are finally determined by judgment or in binding arbitration to have resulted from acts or omissions by Compass that involve gross negligence, willful misconduct (including bad faith and self-dealing) or a knowing violation of law. Compass shall give prompt written notice to the Client of any claim for which indemnification is sought; provided, however, that Client's obligations hereunder shall not be affected by any failure or delay by Compass to give such notice, except to the extent that the rights and remedies of Client shall have been materially prejudiced as a result of such failure or delay. The Client shall pay all costs and expenses, including reasonable attorneys' fees, incurred by Compass to enforce its rights under this Agreement. The Client agrees that, without Compass' prior written consent, it will not agree to the entry of any judgment in any pending or threatened claim, action, or proceeding or investigation in respect of which indemnification or contribution could be sought hereunder (whether or not Compass or any other Compass Party is an actual or potential party to such claim, action or proceeding or investigation), unless such settlement, compromise or consent includes an unconditional release of each Compass Party from all liability arising out of such claim, action proceeding or investigation.

If for any reason the foregoing indemnification is determined to be unavailable to any Compass Party or insufficient to fully indemnify any such person, then the Client will contribute to the amount paid or payable by such person as a result of any such claims in such proportion as is appropriate to reflect both the relative benefit and the relative fault of the Client on the one hand, and the Compass Parties on the other hand, and any other relevant equitable considerations in connection with the matters as to which such claims relate**; provided, however, that in no event shall the amount to be contributed by all Compass Parties in the aggregate exceed fifty percent (50%) of the amount of compensation actually paid to Compass for this project.**

Notwithstanding anything to the contrary in this Agreement, the Client shall have no obligation under these indemnification provisions to indemnify any person, or provide contribution or reimbursement to any person, for any claim or expense under these indemnification provisions to the extent that it is either: (i) judicially determined (the determination having become final) by the applicable court of law to have arisen from that person's gross negligence or willful misconduct (including bad faith and self-dealing); or
(ii) settled prior to a judicial determination regarding the availability of indemnity, contribution or reimbursement under the terms of this Agreement.

**Jurisdiction; Applicable Law:** This Agreement shall be interpreted under and governed by the laws of the Commonwealth of Pennsylvania. Any dispute under this Agreement must be commenced in a court of competent jurisdiction located in Allegheny County, Pennsylvania.

**Limitation of Authority:** The relationship between the Client and Compass created, with respect to Compass, is one of independent contractor.

**Period of Service and Termination:** Either party may terminate this Agreement by providing written notice to that effect to the other party. Upon any termination of this Agreement, Compass will be entitled to payment of all fees and reimbursement of all out-of-pocket expenses earned or incurred through the date of termination.  For the avoidance of doubt, upon termination of this Agreement, Client is obligated to pay only fees and expenses incurred by or payable to Compass hereunder through the date of

Page 6

termination. All unearned portions of the Initial Retainer and the Expense Payment will be paid by Compass to Buyer promptly following termination.

**Successors and Assigns:** This Agreement shall be binding on the parties and their respective successors and assigns, but neither party may assign any benefit or delegate any duty under this Agreement, voluntarily or by operation of law, without the written consent of the other party. This Agreement constitutes the parties' entire agreement with respect to its subject matter and is intended to supersede all prior negotiations, discussions and agreements and fully to integrate the parties' agreement. This Agreement may be executed by facsimile and in any number of counterparts, each of which shall constitute an original and all of which shall constitute one agreement. The Buyer shall be a third party beneficiary of this Agreement.

After reviewing this Agreement, please confirm that the foregoing is in accordance with your understanding by signing and returning this letter, whereupon it shall be our binding Agreement.

Please call Jack Teitz if you have any questions related to this Agreement (412-855-7625).

Sincerely,

Compass Advisory Partners, LLC

*N. Arrington*

Nicholas W. Arrington, Managing Member

**********************************************************************************

Agreed and accepted this 1st day of November 2019

JACK COOPER VENTURES, INC.

By: _____

Name: T. Michael Riggs

Title: Chief Executive Officer,

President, Treasurer and Assistant

Secretary

**<u>Exhibit E</u>**

Professional Fee Escrow Agreement

EXECUTION VERSION

## ESCROW AGREEMENT

 THIS ESCROW AGREEMENT (this "Escrow Agreement") is entered into and effective this 2nd day of November, 2019, by and among JC Buyer Company, Inc., a Delaware corporation (the "Buyer"), Jack Cooper Investments, Inc., a Delaware corporation (the "Company" and, together with the Buyer, the "Parties", and each individually, a "Party") and SunTrust Bank, a Georgia banking corporation, as escrow agent ("Escrow Agent").

WHEREAS, the Parties have entered into that certain Asset Purchase Agreement, dated as of August 22, 2019 (as amended, the "Purchase Agreement"; capitalized terms used but not otherwise defined herein have the meanings set forth in the Purchase Agreement);

WHEREAS, the Parties have agreed to establish, pursuant to and in accordance with the terms and conditions of the Purchase Agreement, a professional fees escrow fund (the "Professional Fees Escrow Fund" or the "Escrow Fund"), providing for the delivery on the date hereof by Buyer to the Escrow Agent of a sum of $_____;

WHEREAS, the Parties desire for the Escrow Agent to open (i) a professional fees escrow account (the "Professional Fees Escrow Account" or the "Escrow Account") into which Buyer will deposit the Escrow Fund, to be held, disbursed and invested by the Escrow Agent in accordance with this Escrow Agreement; and

WHEREAS, the Parties acknowledge that the Escrow Agent is not a party to, and has no duties or obligations under, the Purchase Agreement, that all references in this Escrow Agreement to the Purchase Agreement are for convenience only, and that the Escrow Agent shall have no implied duties beyond the express duties set forth in this Escrow Agreement.

NOW, THEREFORE, in consideration of the premises herein, the Parties and the Escrow Agent agree as follows:

**I.      Terms and Conditions**

1.1.    **Appointment of the Escrow Agent.** The Parties hereby appoint the Escrow Agent as their escrow agent for the purposes set forth herein, and the Escrow Agent hereby accepts such appointment under the terms and conditions set forth herein.

1.2    **Deposit of the Escrow Fund.**  Buyer shall remit the Escrow Fund to the Escrow Agent, using the wire instructions below, to be held by the Escrow Agent in the Escrow Account and invested and disbursed as provided in this Escrow Agreement.

> SunTrust Bank
> ABA: 061000104
> Account: 9443001321
> Account Name: Escrow Services
> Reference: JC Buyer / Jack Cooper Investments Escrow Fund
> Attention: Matt Ward

1.3.    **Purpose of Escrow Fund.**  The Escrow Fund shall serve as a source of payment for the Professional Fees Amount (as defined in the Purchase Agreement) as provided herein, as contemplated by the Purchase Agreement.

1.4.    **Disbursements of the Professional Fees Escrow Fund.**

The Professional Fees Escrow Fund shall initially be allocated among those Professionals as set forth on Schedule A hereto.  The amount allocated to each such Professional on Schedule A is referred to herein as such Professional's "Allocated Professional Payment", the total of which will be equal to the Professional Fees Amount.

Within two (2) Business Days (as defined below) after the Escrow Agent's receipt of (a) written instructions signed by an authorized representative of the Buyer set forth on the Buyer's Certificate of Incumbency provided to the Escrow Agent pursuant to Section 4.13 and signed by an authorized representative of the applicable Professional(s) listed on Schedule A set forth on such Professional Certificates of Incumbency (as defined below) provided to the Escrow Agent pursuant to Section 4.13 ("Joint Written Instructions"), directing that payment be made to the applicable Professional(s) out of the Professional Fees Escrow Fund, or (b) an order ("Order") entered by the United States Bankruptcy Court for the Northern District of Georgia Atlanta Division (the "Bankruptcy Court") authorizing the payment to such Professional of fees in the amounts set forth in such Order (each such amount, after taking into account any payments previously received by such Professional on account thereof on an interim basis, a "Final Professional Payment"), the Escrow Agent shall disburse funds from the Professional Fees Escrow Account as follows: (i) to each Professional whose Final Professional Payment is less than or equal to such Professional's Allocated Professional Payment on **Schedule A** hereto, the full amount of such Final Professional Payment (and the balance, if any, of such Professional's Allocated Professional Payment will remain in the Professional Fees Escrow Account), and (ii) to each Professional whose Final Professional Payment is greater than such Professional's Allocated Professional Payment on **Schedule A** hereto, the amount of such Professional's Allocated Professional Payment.

Following the Escrow Agent's disbursement of payments to each Professional listed on **Schedule A** hereto, the Escrow Agent shall disburse the remaining Professional Fees Escrow Funds (the "Excess Funds"), if any, as follows: (a) first, the Excess Funds will be divided on a pro rata basis among any Professionals approved to receive Final Professional Payments in excess of their Allocated Professional Payments on **Schedule A** (provided, in no event will any Professional receive a payment in excess of the Final Professional Payment approved for such Professional in the applicable Order), and (b) second, if any Professional Fees Escrow Funds remain in the Professional Fees Escrow Account following all disbursements in accordance with clause (a), the balance of the Professional Fees Escrow Funds will be disbursed to the Buyer in accordance with Section 1.5.

For purposes of this Escrow Agreement, "Business Day" shall mean any day other than a Saturday, Sunday or any other day on which the Escrow Agent is authorized or required by law or executive order to remain closed. All payments under this Section 1.4 will be made by wire transfer of immediately available funds to the account or accounts for each Professional set forth on such Professional's Certificate of Incumbency.

1.5. **Final Release.** Promptly, and in any event within five (5) Business Days following the date on which all payments have been made to the Professionals set forth on **Schedule A** hereto out of the Professional Fees Escrow Account in accordance with Section 1.4 (such date, the "Release Date"), the duly authorized representative of the Buyer set forth on the Buyer's Certificate of Incumbency provided to the Escrow Agent pursuant to Section 4.13 will deliver to the Escrow Agent written instructions, signed by a duly authorized representatives of the Buyer ("Final Release Instructions"), directing the Escrow Agent to disburse to Buyer from the applicable Escrow Account the balance of the applicable Escrow Fund, if greater than zero. The Escrow Agent will disburse such amount within two (2) Business Days following its receipt of such Final Release Instructions in accordance with the payment instructions set forth therein.

1.6 **Reliance by the Escrow Agent**. The Escrow Agent will be entitled to rely conclusively upon any Joint Written Instructions, Final Release Instructions or Order, as applicable delivered in accordance with this Sections 1.4 and 1.5 and will be fully protected and will incur no liability hereunder with respect to any disbursement made in compliance herewith and with any such Joint Written Instruction, Final Release Instructions or Order, as applicable, received by the Escrow Agent other than in the case of the Escrow Agent's fraud, willful misconduct or gross negligence as determined by a court of competent jurisdiction. Without in any way limiting the foregoing, the Escrow Agent shall be entitled to assume conclusively and without inquiry that the recipients of disbursements set forth for in any such Joint Written Instructions, Final Release Instructions or Order, as applicable, is entitled to disbursement in the amount set forth therein.

## II.    Provisions as to Escrow Agent

2.1.    This Escrow Agreement expressly and exclusively sets forth the duties of the Escrow Agent with respect to any and all matters pertinent hereto, which duties shall be deemed purely ministerial in nature, and no implied duties or obligations shall be read into this Escrow Agreement against the Escrow Agent.  The Escrow Agent shall in no event be deemed to be a fiduciary to any Party or any other person or entity under this Escrow Agreement.  The permissive rights of the Escrow Agent to do things enumerated in this Escrow Agreement shall not be construed as duties. In performing its duties under this Escrow Agreement, or upon the claimed failure to perform its duties, the Escrow Agent shall not be liable for any damages, losses or expenses other than damages, losses or expenses which have been finally adjudicated by a court of competent jurisdiction to have directly resulted from the Escrow Agent's fraud, willful misconduct or gross negligence.  In no event shall the Escrow Agent be liable for incidental, indirect, special, consequential or punitive damages of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.  The Escrow Agent shall not be responsible or liable for the failure of any Party to take any action in accordance with this Escrow Agreement.  Any wire transfers of funds made by the Escrow Agent pursuant to this Escrow Agreement will be made subject to and in accordance with the Escrow Agent's usual and ordinary wire transfer procedures in effect from time to time.  The Escrow Agent shall have no liability with respect to the transfer or distribution of any funds effected by the Escrow Agent pursuant to wiring or transfer instructions provided to the Escrow Agent in accordance with the provisions of this Escrow Agreement.  The Escrow Agent shall not be obligated to take any legal action or to commence any proceedings in connection with this Escrow Agreement or any property held hereunder or to appear in, prosecute or defend in any such legal action or proceedings.

2.2.    The Parties acknowledge and agree that the Escrow Agent acts hereunder as a depository only, and is not responsible or liable in any manner whatsoever for the sufficiency, correctness, genuineness or validity of the subject matter of this Escrow Agreement or any part thereof, or of any person executing or depositing such subject matter.  No provision of this Escrow Agreement shall require the Escrow Agent to risk or advance its own funds or otherwise incur any financial liability or potential financial liability in the performance of its duties or the exercise of its rights under this Escrow Agreement.

2.3.    This Escrow Agreement constitutes the entire agreement between the Escrow Agent and the Parties  in connection with the subject matter of this Escrow Agreement, and no other agreement entered into between the Parties, or any of them, including, without limitation, the Purchase Agreement, shall be considered as adopted or binding, in whole or in part, upon the Escrow Agent notwithstanding that any such other agreement may be deposited with the Escrow Agent or the Escrow Agent may have knowledge thereof.

2.4.    The Escrow Agent shall in no way be responsible for nor shall it be its duty to notify any Party or any other person or entity interested in this Escrow Agreement of any payment required or maturity occurring under this Escrow Agreement or under the terms of any instrument deposited herewith unless such notice is explicitly provided for in this Escrow Agreement.

2.5.    The Escrow Agent shall be protected in acting upon any written instruction, notice, request, waiver, consent, certificate, receipt, authorization, power of attorney or other paper or document which the Escrow Agent in good faith believes to be genuine and what it purports to be, including, but not limited to, items directing investment or non-investment of funds, items requesting or authorizing release, disbursement or retainage of the subject matter of this Escrow Agreement and items amending the terms of this Escrow Agreement.  The Escrow Agent shall be under no duty or obligation to inquire into or investigate the validity, accuracy or content of any such notice, request, waiver, consent, certificate, receipt, authorization, power of attorney or other paper or document.  The Escrow Agent shall have no duty or obligation to make any formulaic calculations of any kind hereunder.

2.6.    The Escrow Agent may execute any of its powers and perform any of its duties hereunder directly or through affiliates or agents.  The Escrow Agent shall be entitled to seek the advice of legal counsel with respect to any matter arising under this Escrow Agreement and the Escrow Agent shall have no liability and shall be fully protected with respect to any action taken or omitted pursuant to the advice of such legal counsel.  The Parties shall be jointly and severally liable for and shall promptly

pay upon demand by the Escrow Agent the reasonable and documented fees and expenses of any such legal counsel.

2.7.    In the event of any disagreement between any of the Parties, or between any of them and any other person or entity, resulting in adverse claims or demands being made in connection with the matters covered by this Escrow Agreement, or in the event that the Escrow Agent, in good faith, is in doubt as to what action it should take hereunder, the Escrow Agent may, at its option, refuse to comply with any claims or demands on it, or refuse to take any other action hereunder, so long as such disagreement continues or such doubt exists, and in any such event, the Escrow Agent shall not be or become liable in any way or to any Party or other person or entity for its failure or refusal to act, and the Escrow Agent shall be entitled to continue to refrain from acting until (i) the rights of the Parties and all other interested persons and entities shall have been fully and finally adjudicated by a court of competent jurisdiction, or (ii) all differences shall have been settled and all doubt resolved by agreement among all of the Parties and all other interested persons and entities, and the Escrow Agent shall have been notified thereof in writing signed by the Parties and all such persons and entities.  Notwithstanding the preceding, the Escrow Agent may in its discretion obey the order, judgment, decree or levy of any court, whether with or without jurisdiction, or of an agency of the United States or any political subdivision thereof, or of any agency of any State of the United States or of any political subdivision thereof, and the Escrow Agent is hereby authorized in its sole discretion to comply with and obey any such orders, judgments, decrees or levies.  The rights of the Escrow Agent under this sub-paragraph are cumulative of all other rights which it may have by law or otherwise.

In the event of any disagreement or doubt, as described above, the Escrow Agent shall have the right, in addition to the rights described above and at the election of the Escrow Agent, to tender into the registry or custody of any court having jurisdiction, all funds and property held under this Escrow Agreement, and the Escrow Agent shall have the right to take such other legal action as may be appropriate or necessary, in the sole discretion of the Escrow Agent.  Upon such tender, the Parties agree that the Escrow Agent shall be discharged from all further duties under this Escrow Agreement; provided, however, that any such action of the Escrow Agent shall not deprive the Escrow Agent of its compensation and right to reimbursement of expenses hereunder arising prior to such action and discharge of the Escrow Agent of its duties hereunder.

2.8.    The Parties jointly and severally agree to indemnify, defend and hold harmless the Escrow Agent and each of the Escrow Agent's officers, directors, agents and employees (the "Indemnified Parties") from and against any and all reasonable and documented out-of-pocket losses, liabilities, claims made by any Party or any other person or entity, damages, expenses and costs (including, without limitation, reasonable and documented out-of-pocket attorneys' fees and expenses) of every nature whatsoever (collectively, "Losses") which any such Indemnified Party may incur and which arise directly or indirectly from this Escrow Agreement or which arise directly or indirectly by virtue of the Escrow Agent's undertaking to serve as Escrow Agent hereunder; provided, however, that no Indemnified Party shall be entitled to indemnity with respect to Losses that have been finally adjudicated by a court of competent jurisdiction to have been directly caused by such Indemnified Party's fraud, gross negligence or willful misconduct.  The provisions of this section shall survive the termination of this Escrow Agreement and any resignation or removal of the Escrow Agent.

2.9.    Any entity into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any entity to which all or substantially all the escrow business of the Escrow Agent may be transferred, shall be the Escrow Agent under this Escrow Agreement without further act.

2.10. The Escrow Agent may resign at any time from its obligations under this Escrow Agreement by providing written notice to the Parties.  Such resignation shall be effective on the date set forth in such written notice, which shall be no earlier than thirty (30) days after such written notice has been furnished.  In such event, the Parties shall promptly appoint a successor escrow agent.  In the event no successor escrow agent has been appointed on or prior to the date such resignation is to become effective, the Escrow Agent shall be entitled to tender into the custody of any court of competent jurisdiction all funds and other property then held by the Escrow Agent hereunder and the Escrow Agent shall thereupon be relieved of all further duties and obligations under this Escrow Agreement; provided, however, that any such action of the Escrow Agent shall not deprive the Escrow Agent of its compensation and right to reimbursement of expenses hereunder arising prior to such action and

4

discharge of the Escrow Agent of its duties hereunder.  The Escrow Agent shall have no responsibility for the appointment of a successor escrow agent hereunder.

2.11 The Escrow Agent and any director, officer or employee of the Escrow Agent may become financially interested in any transaction in which any of the Parties may be interested and may contract with and lend money to any Party and otherwise act as fully and freely as though it were not escrow agent under this Escrow Agreement.  Nothing herein shall preclude the Escrow Agent from acting in any other capacity for any Party.

### III.    Compensation of Escrow Agent

3.1.    The Buyer agrees to pay to the Escrow Agent compensation, and to reimburse the Escrow Agent for costs and expenses, all in accordance with the provisions of **Exhibit B** hereto, which is incorporated herein by reference and made a part hereof.  The fees agreed upon for the services rendered hereunder are intended as full compensation for the Escrow Agent's services as contemplated by this Escrow Agreement; provided, however, that in the event that the conditions for the disbursement of funds are not fulfilled, or the Escrow Agent renders any service not contemplated in this Escrow Agreement, or there is any assignment of interest in the subject matter of this Escrow Agreement or any material modification hereof, or if any dispute or controversy arises hereunder, or the Escrow Agent is made a party to any litigation pertaining to this Escrow Agreement or the subject matter hereof, then the Buyer agrees to compensate the Escrow Agent for such extraordinary services and reimburse the Escrow Agent for all costs and expenses, including reasonable and documented out-of-pocket attorneys' fees and expenses, occasioned by any such event.  In the event the Escrow Agent is authorized to make a distribution of funds to any Party (or at the direction of any Party) pursuant to the terms of this Escrow Agreement, and fees or expenses are then due and payable to the Escrow Agent pursuant to the terms of this Escrow Agreement (including, without limitation, amounts owed under this Section 3.1 and Section 2.8) by the Party receiving or directing such distribution, the Escrow Agent is authorized to offset and deduct such amounts due and payable to it from such distribution.  The Escrow Agent shall have and is hereby granted the right to set off and deduct any unpaid fees, non-reimbursed expenses and unsatisfied indemnification rights from the Escrow Funds (and the earnings and interest accrued thereon).  The provisions of this section shall survive the termination of this Escrow Agreement and any resignation or removal of the Escrow Agent.

### IV.    Miscellaneous

4.1.    The Escrow Agent shall make no disbursement, investment or other use of funds until and unless it has collected funds.  The Escrow Agent shall not be liable for collection items until the proceeds of the same in actual cash have been received or the Federal Reserve has given the Escrow Agent credit for the funds.

4.2.    The Escrow Agent shall invest all funds held pursuant to this Escrow Agreement in the SunTrust Deposit Option 100.  The investments in the SunTrust Deposit Option 100 are insured, subject to the applicable rules and regulations of the Federal Deposit Insurance Corporation (the "FDIC"), in the standard FDIC insurance amount of $250,000, including principal and accrued interest, and are not secured.  The SunTrust Deposit Option 100 is more fully described in materials which have been furnished to the Parties by the Escrow Agent, and the Parties acknowledge receipt of such materials from the Escrow Agent.  Instructions to make any other investment must be in writing and signed by each of the Parties.  The Parties recognize and agree that the Escrow Agent will not provide supervision, recommendations or advice relating to the investment of moneys held hereunder or the purchase, sale, retention or other disposition of any investment, and the Escrow Agent shall not be liable to any Party or any other person or entity for any loss incurred in connection with any such investment.  The Escrow Agent is hereby authorized to execute purchases and sales of investments through the facilities of its own trading or capital markets operations or those of any affiliated entity.  The Escrow Agent or any of its affiliates may receive compensation with respect to any investment directed hereunder including without limitation charging any applicable agency fee in connection with each transaction.  The Escrow Agent shall use its best efforts to invest funds on a timely basis upon receipt of such funds; provided, however, that the Escrow Agent shall in no event be liable for compensation to any Party or other person or entity related to funds which are held un-invested or funds which are not invested timely.  The Escrow Agent is authorized and directed to sell

or redeem any investments as it deems necessary to make any payments or distributions required under this Escrow Agreement.  Any investment earnings and income on the Escrow Funds shall become part of the Escrow Funds and shall be disbursed in accordance with this Escrow Agreement.

4.3    The Escrow Agent shall provide monthly reports of transactions and holdings to the Parties as of the end of each month, at the addresses provided by the Parties in Section 4.5.

4.4    The Parties agree that, for income tax reporting purposes, all interest and income from the investment of the Escrow Funds shall be reported as having been earned by Buyer as of the end of each calendar year whether or not such income was disbursed during such calendar year and to the extent required by the Internal Revenue Service.  Buyer shall be entitled to, and the Escrow Agent shall make to Buyer, quarterly distributions (and a final distribution immediately prior to the final disbursement of Escrow Funds) from the Escrow Funds equal to forty percent (40%) of the amount of taxable income allocable to Buyer pursuant to Section 4.4 of this Escrow Agreement during such calendar quarter (or other period) on or before the fifth (5th) day after the end of each calendar quarter (or other period).  The Escrow Agent shall be deemed the payor of interest or other income paid up upon investment of the Escrow Funds for purposes of performing tax reporting. The Escrow Agent shall, for each tax year (or portion thereof) for which the Escrow Property is held by it, timely report the interest and other income from investment of the Escrow Property to the Internal Revenue Service and Buyer on IRS Form 1099 (and other appropriate form).

On or before the execution and delivery of this Escrow Agreement, each of the Parties shall provide to the Escrow Agent a correct, duly completed, dated and executed current United States Internal Revenue Service Form W-9 or Form W-8, whichever is appropriate or any successor forms thereto, in a form and substance reasonably satisfactory to the Escrow Agent including appropriate supporting documentation and/or any other form, document, and/or certificate required or reasonably requested by the Escrow Agent to validate the form provided.  The Escrow Agent shall withhold any taxes required to be withheld by the Escrow Agent by applicable law, and shall remit such taxes to the appropriate governmental authorities.  .  With respect to the preparation, delivery and filing of such required tax information reporting forms and all matters pertaining to the reporting of earnings on funds held under this Escrow Agreement, the Escrow Agent shall be entitled to request and receive written instructions from Buyer and the Escrow Agent shall be entitled to rely conclusively and without further inquiry on such written instructions.  The Buyer agrees to indemnify, defend and hold the Escrow Agent harmless from and against any tax, late payment, interest, penalty or other cost or expense that may be assessed against the Escrow Agent on or with respect to the Escrow Funds or any earnings or interest thereon unless such tax, late payment, interest, penalty or other cost or expense was finally adjudicated by a court of competent jurisdiction to have been directly caused by the gross negligence of willful misconduct of the Escrow Agent.  The indemnification provided in this section shall survive the resignation or removal of the Escrow Agent and the termination of this Escrow Agreement.

4.5.    Any notice, request for consent, report, or any other communication required or permitted in this Escrow Agreement shall be in writing and shall be deemed to have been given when delivered (i) personally, (ii) by facsimile transmission with written confirmation of receipt, (iii) by electronic mail to the e-mail address given below, and written confirmation of receipt is obtained promptly after completion of the transmission, (iv) by overnight delivery with a reputable national overnight delivery service, or (v) by United States mail, postage prepaid, or by certified mail, return receipt requested and postage prepaid, in each case to the appropriate address set forth below or at such other address as any party hereto may have furnished to the other parties hereto in writing:

| | |
|---|---|
| If to Escrow Agent: | SunTrust Bank |
| | Attn: Escrow Services |
| | 919 East Main Street, 7th Floor |
| | Richmond, Virginia 23219 |
| | Client Manager: _____ |
| | Phone: 804-782-_____ |
| | Facsimile:  804-225-7141 |
| | Email: _____@SunTrust.com |
| | |
| If to Buyer: | JC Buyer Company, Inc. |

6

410 Park Avenue, 11th Floor
New York, NY 10022
Attention: Tom Higbie
          Stephen Blauner
E-mail:   thigbie@soluslp.com
          sblauner@soluslp.com
Tax identification #:

With a copy (which shall not constitute notice) to:

Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
Attention: Marc Kieselstein, P.C.
          Alexandra Schwarzman
E-mail:   marc.kieselstein@kirkland.com
          Alexandra.schwarzman@kirkland.com

and

Kirkland & Ellis LLP
330 South Hope Street
Los Angeles, CA 90071
Attention: Tana M. Ryan, P.C.
Email:    tryan@kirkland.com

If to the Company or
any of its Affiliates:

Jack Cooper Investments, Inc.
c/o Compass Advisory Partners, LLC
306 Fourth Avenue, Suite 701
Pittsburgh, PA 15222
Attention: Nicholas W. Arrington
E-mail:   nick@compassadvisorypartners.com
Tax identification #:

With a copy (which shall not constitute notice) to:

> King & Spalding LLP
> 1180 Peachtree Street, N.E.
> Atlanta, GA 30309
> Attention: Rahul Patel
>          Sarah Borders
>          John Hyman
> E-mail:   rpatel@kslaw.com
>          sborders@kslaw.com
>          jhyman@kslaw.com
>
> and
>
> Paul, Weiss, Rifkind, Wharton & Garrison LLP
> 1285 Avenue of the Americas
> New York, NY 10019-6064
> Attention: Kelley A. Cornish
>          Brian S. Hermann
> Email:    kcornish@paulweiss.com
>          bhermann@paulweiss.com

Any party hereto may unilaterally designate a different address by giving notice of each change in the manner specified above to each other party hereto. Notwithstanding anything to the contrary herein provided, the Escrow Agent shall not be deemed to have received any notice, request, report or other communication hereunder prior to the Escrow Agent's actual receipt thereof.

4.6.    This Escrow Agreement is being made in and is intended to be construed according to the laws of the state of New York.  Except as permitted in Section 2.9, neither this Escrow Agreement nor any rights or obligations hereunder may be assigned by any party hereto without the express written consent of each of the other parties hereto. This Escrow Agreement shall inure to and be binding upon the Parties and the Escrow Agent and their respective successors, heirs and permitted assigns.

4.7.    The terms of this Escrow Agreement may be altered, amended, modified or revoked only by an instrument in writing signed by all the Parties and the Escrow Agent.

4.8.    This Escrow Agreement is for the sole benefit of the Indemnified Parties, the Parties and the Escrow Agent, and their respective successors and permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Escrow Agreement.

4.9.    No party to this Escrow Agreement shall be liable to any other party hereto for losses due to, or if it is unable to perform its obligations under the terms of this Escrow Agreement because of, acts of God, fire, war, terrorism, floods, strikes, electrical outages, equipment or transmission failure, or other causes reasonably beyond its control.

4.10   This Escrow Agreement shall terminate on the date on which all of the funds and property held by the Escrow Agent under this Escrow Agreement have been disbursed.  Upon the termination of this Escrow Agreement and the disbursement of all of the funds and property held hereunder, this Escrow Agreement shall be of no further effect except that the provisions of Sections 2.8, 3.1 and 4.4 shall survive such termination.

4.11. All titles and headings in this Escrow Agreement are intended solely for convenience of reference and shall in no way limit or otherwise affect the interpretation of any of the provisions hereof.

4.12. This Escrow Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

4.13. Contemporaneously with the execution and delivery of this Escrow Agreement and, if necessary, from time to time thereafter, each of the Parties shall execute and deliver to the Escrow Agent a Certificate of Incumbency substantially in the form of **Exhibit A-1** and **A-2** hereto, as applicable (a "Certificate of Incumbency"), for the purpose of establishing the identity and authority of persons entitled to issue notices, instructions or directions to the Escrow Agent on behalf of each such party.  Until such time as the Escrow Agent shall receive an amended Certificate of Incumbency replacing any Certificate of Incumbency theretofore delivered to the Escrow Agent, the Escrow Agent shall be fully protected in relying, without further inquiry, on the most recent Certificate of Incumbency furnished to the Escrow Agent.  Further, after the execution and delivery of this Escrow Agreement, the Parties shall provide to the Escrow Agent a Certificate of Incumbency (each, a "Professional Certificate of Incumbency", and collectively, "Professional Certificates of Incumbency") substantially in the form of Exhibit A-1 and A-2 hereto for each of the Professionals listed on Schedule A hereto, for the purpose of establishing the identity and authority of persons entitle to issue Joint Written Instructions on behalf of such Professionals in accordance with Section 1.4.  After delivery of such Professional Certificates of Incumbency to Escrow Agent in accordance with this Section 4.13, until such time as the Escrow Agent shall receive an amended Professional Certificate of Incumbency with respect to the applicable Professional, the Escrow Agent shall be fully protected in relying, without further inquiry, on the most recent Professional Certificate of Incumbency furnished to the Escrow Agent.

4.14. As between the Parties, this Escrow Agreement is made pursuant to the Purchase Agreement and is subject to the terms and conditions thereof.  If any conflicts exist between this Escrow Agreement and the Purchase Agreement, as between the Parties the Purchase Agreement shall control.

N WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date first above written.

**SunTrust Bank, as Escrow Agent**

By: _____

Name: ___Matt Ward_____

Title: _____Vice President_____

**JC Buyer Company, Inc.**

By: _____

Name: _____

Title: _____

**Jack Cooper Investments, Inc.**

By: _____

Name: _____

Title: _____

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date first above written.

**SunTrust Bank, as Escrow Agent**

By: _____

Name: _____

Title: _____


**JC Buyer Company, Inc.**

By: _____

Name: Tom Higbie_____

Title: _Vice-President_____


**Jack Cooper Investments, Inc.**

By: _____

Name: _____

Title: _____

[Signature Page to Escrow Agreement]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date first above written.

**SunTrust Bank, as Escrow Agent**

By: _____

Name: _____

Title: _____

**JC Buyer Company, Inc.**

By: _____

Name: _____

Title: _____

**Jack Cooper Investments, Inc.**

By: _____

Name: T. Michael Riggs

Title: Chief Executive Officer, President, Treasurer and Assistant Secretary

[Signature Page to Escrow Agreement]

**EXHIBIT A-1**

**Certificate of Incumbency**
**(List of Authorized Representatives)**

Client Name:    JC Buyer Company, Inc.

As an Authorized Officer of the above referenced entity, I hereby certify that each person listed below is an authorized signor for such entity, and that the title and signature appearing beside each name is true and correct.

| **Name** | **Title** | **Signature** | **Phone Number** |
|---|---|---|---|
| Tom Higbie | Vice-President | | (212) 284-4300 |
| Stephen Blauner | Secretary | | (212) 373-1562 |
| | | | |
| | | | |
| | | | |
| | | | |

IN WITNESS WHEREOF, this certificate has been executed by a duly authorized officer on:

_____.
        Date

JC BUYER COMPANY, INC.

By: _____

Name: Tom Higbie

Its:    Vice-President

**EXHIBIT B**

**SunTrust Bank, as Escrow Agent**

<u>**Schedule of Fees & Expenses**</u>

<u>**Acceptance/Legal Review Fee:**</u>       **$WAIVED** – one time only payable at the time of signing the
                                              Escrow Agreement

The Legal Review Fee includes review of all related documents and accepting the appointment of Escrow Agent on behalf of SunTrust Bank.  The fee also includes setting up the required account(s) and accounting records, document filing, and coordinating the receipt of funds/assets for deposit to the Escrow Accounts. This is a one-time fee payable upon execution of the Escrow Agreement.  <u>As soon as SunTrust Bank's attorney begins to review the Escrow Agreement, the legal review fee is subject to payment regardless if the Parties decide to appoint a different escrow agent or a decision is made that the Escrow Agreement is not needed.</u>

<u>**Administration Fee:**</u>             **$WAIVED** – payable at the time of signing the Escrow
                                          Agreement and on the anniversary date thereafter, if applicable

The Administration Fee includes providing routine and standard services of an Escrow Agent.  The fee includes administering the escrow account, performing investment transactions, processing cash transactions (including wires and check processing), disbursing funds in accordance with the Agreement (note any pricing considerations below), and providing trust account statements to the Parties for a twelve (12) month period.  If the account remains open beyond the twelve (12) month term, the Parties will be invoiced each year on the anniversary date of the execution of the Escrow Agreement.  Extraordinary expenses, including legal counsel fees, will be billed as out-of-pocket.  The Administration Fee is due upon execution of the Escrow Agreement.  The fees shall be deemed earned in full upon receipt by the Escrow Agent, and no portion shall be refundable for any reason, including without limitation, termination of the agreement.

<u>**Out-of-Pocket Expenses:**</u>                                        **At Cost**

Out-of-pocket expenses such as, but not limited to, postage, courier, overnight mail, wire transfer, travel, legal (out-of-pocket to counsel) or accounting, will be billed at cost.

**Note: This fee schedule is based on the assumption that the escrowed funds will be invested in one of the SunTrust Deposit Options.  If any other investment options are chosen, this fee schedule will become subject to change.**

**Deborah Spitale**
**SunTrust Escrow Solutions**
**Deb.Spitale@Suntrust.com**
**404-588-7191**

**Schedule A**

**Allocated Professional Payments**

| Professional | Allocated Professional Payment |
|---|---|
| Paul, Weiss, Rifkind, Wharton & Garrison LLP | |
| King & Spalding LLP | |
| AlixPartners LLP | |
| Houlihan Lokey Capital, Inc. | |
| Ogletree, Deakins, Nash, Smoak & Stewart, P.C. | |
| Sidley Austin LLP | |
| FTI Consulting, Inc. | |
| Scroggins & Williamson, PC | |
| Ernst & Young LLP | |
| Kekst and Company Incorporated | |
| Miller Thomson LP | |